
**Transportation Security Administration**

OFFICE OF THE ASSISTANT SECRETARY

**TSA MANAGEMENT DIRECTIVE No. 100.4
TRANSPORTATION SECURITY SEARCHES**

*To enhance mission performance, TSA is committed to promoting a culture founded on its values of Integrity, Innovation and Team Spirit.*

**REVISION:** This revised directive supersedes TSA MD 100.4, *Transportation Security Searches*, dated September 1, 2009.

**SUMMARY OF CHANGES:** Section 4, Definitions, clarifies and adds terms; and Section 6, Policy, addresses discovery of currency and illegal items, explains authority to verify identity, and discusses layered security.

1. **PURPOSE:** This directive establishes TSA policies to enhance the security of domestic and international commercial travel in the United States. These policies protect persons, facilities, and critical infrastructure as part of a layered security system in all modes of transportation by preventing, protecting against, and responding to acts of terrorism.

2. **SCOPE:** This directive applies to all TSA operational components and to all searches conducted under TSA authority, including, but not limited to, checkpoint screening to find explosives, improvised explosive device (IED) components, weapons, and other threat items. TSA personnel must use this directive in carrying out their functions. This directive does not and is not intended to limit the authority of TSA law enforcement officers. All search operations must be conducted without regard to race, color, religion, national origin, ethnicity, sexual orientation, or disability except as directed by the Federal Security Director (FSD) or Supervisory Air Marshal in Charge (SAC) and provided such direction is based on specific intelligence threat information.

3. **AUTHORITIES:**

    A.   6 U.S.C. § 1112

    B.   49 U.S.C. § 114

    C.   49 U.S.C. § 44901

    D.   49 U.S.C. § 44903

    E.   49 U.S.C. § 44917

    F.   49 CFR Chapter XII, Parts 1500-1699

    G.   Prohibited Items Interpretive Rule, 70 Federal Register 72930 (December 8, 2005)

4. **DEFINITIONS:** For purposes of this directive, the following definitions apply:

    A.   <u>Administrative Search</u>:  A search conducted without a warrant as part of a regulatory plan in furtherance of a specified non-law enforcement government purpose, such as to determine compliance with TSA regulations or to prevent the carriage of threat items or entry of an

unauthorized person into the sterile area, or to screen passengers entering any public conveyance.

B. <u>Accessible Property</u>: Property that is intended to be accessible to the individual in any secure area or while aboard any public conveyance.

C. <u>Behavior Detection Officers (BDOs)</u>: Specially-trained TSA personnel and TSA contract personnel who execute TSA's Screening of Passengers by Observation Technique (SPOT) program.

D. <u>Checkpoint Screening</u>: A search or appraisal of individuals and property for threats or threat items at a screening checkpoint.

E. <u>Consent Search</u>: A search by an authorized individual of a person, property, location, or vehicle based on permission by a person who has actual or apparent authority over the thing to be searched.

F. <u>Detection Technology</u>: Electronic and/or mechanical means used to assist in the discovery and identification of property or persons that may pose a threat.

G. <u>Federal Air Marshal (FAM)</u>: A TSA law enforcement officer who derives his or her authority from 49 U.S.C. § 114(p), 49 U.S.C. § 44903(d), 49 U.S.C. § 44917, and the Implementing Recommendations of the 9/11 Commission Act of 2007 (Public Law 110-53, 121 Stat. 266).

H. <u>Gate Screening</u>: The screening of passengers and other individuals and their accessible property at the boarding gate of an aircraft.

I. <u>Identification Media</u>: Documents that establish identity for the purposes of accessing the screening checkpoint, or any other secure area of a transportation facility or mode of conveyance. Identification media includes, but is not limited to, Government-issued or Government-sanctioned photo identification, such as passports and driver's licenses. (For a non-exhaustive list of acceptable identification media, go to www.tsa.gov.)

J. <u>Law Enforcement Officer</u>: A sworn employee of a government entity (Federal, to include U.S. Military Police and U.S. Capitol Police, state, tribal, territorial and local, to include Rail police officers), with full power of arrest, who is trained and commissioned to enforce the criminal laws of the jurisdiction(s) in which he or she is commissioned

K. <u>Playbook</u>: Playbook is a risk mitigation program that provides a menu of security countermeasures ("Plays") that make use of various TSA and non-TSA security assets deployed in a random or unpredictable manner in order to complicate terrorist planning activities and deter, detect, and disrupt attacks within the airport environment. The Playbook approach is risk-based and supported through local decision-making between the airport operator and TSA.

L. <u>Playbook Screening</u>: Screening of individuals and their accessible property within the airport environment conducted consistent with and pursuant to the Playbook program.

M.  Office of Inspection Criminal Investigator: A TSA law enforcement officer that derives his or her authority from 49 U.S.C. § 114(p), 49 U.S.C. § 44903(d), and the Implementing Recommendations of the 9/11 Commission Act of 2007 (Public Law 110-53, 121 Stat. 266).

N.  Prohibited Items: Items that are not permitted to be carried by individuals through the screening checkpoint, in the sterile area, in the cabin of an aircraft, or in checked baggage, as described in the prohibited items interpretive rule (70 FR 72930 (Dec. 8, 2005)) or other TSA regulations, orders, and policies.

O.  Random Selection Protocol: A pre-determined protocol that uses a random number generator or other neutral system to select which persons, property, or vehicles will be screened during an administrative or special needs search. Use of a random selection protocol helps to ensure that selection authority is not arbitrarily or discriminatorily exercised.

P.  Regulatory Inspection: Inspection or test to determine compliance with TSA regulations, security programs, orders, policies, and applicable laws.

Q.  Reverse Screening: Post-arrival screening of passengers, accessible property, and checked baggage.

R.  Screening: A search or appraisal of a person, place, document or thing, with or without assisting technologies, to determine compliance with TSA standards, regulations, and applicable laws in order to detect a threat. Not all screening activities are searches under the Fourth Amendment (e.g., BDO observations).

S.  Screening Checkpoint: A screening location at the entry to a secure or other area of a transportation facility or public conveyance.

T.  Screening of Passengers by Observation Technique (SPOT) Program: SPOT is a behavior observation and analysis program that detects behaviors and activities that deviate from an established environmental baseline. Individuals whose behaviors meet or exceed predetermined thresholds are referred for additional screening or law enforcement intervention.

U.  Search: An examination or inspection conducted in accordance with the Fourth Amendment of a person's body, property, conveyance, or other area where the person would have a reasonable expectation of privacy.

V.  Secure Area: Any area of a transportation facility for which access is restricted and controlled in some manner, to include but not limited to: sterile, secured, and air operations areas of airports.

W.  Special Needs Search: A search conducted without a warrant and in furtherance of a special governmental need, beyond the ordinary needs of law enforcement. In the context of transportation security, special needs searches are designed to mitigate the risk to the public posed by the introduction of threats into the transportation system.

X.  Sterile Area: A portion of an airport, defined in the Airport Security Program (ASP), that provides individuals access to boarding aircraft and to which the access generally is

controlled by TSA or by an aircraft operator under 49 CFR part 1544 or a foreign air carrier under 49 CFR part 1546, through the screening of persons and property.

Y.  Threat: A natural or man-made situation, or an individual, entity, or action that has or indicates the potential to harm life, information, operations, the environment and/or property.

Z.  Threat Items: Any potentially hazardous items that pose a risk to transportation security, such as explosives, incendiaries, and items that could be used as weapons or otherwise transformed into a threat. Threat items may include items that are themselves benign, but that can be rapidly transformed into a security risk, including parts of weapons or explosives, and IED components, such as certain liquids and gels. Threat items may also be benign items that cannot be effectively and rapidly distinguished from dangerous items (e.g., water from certain liquid explosives; or an ordinary laptop from an electronic triggering device) or items that on their face appear to be threat items, such as imitation firearms or grenades. In addition, threat items may also include items that have been used or altered to conceal threats or prohibited items, such as thermos bottles and certain electronics.

AA. Transportation Security Inspector (TSI): A specially-trained TSA employee who conducts security assessments of transportation systems, works with transit officials to enhance the security of their systems, provides technical assistance for security, and conducts regulatory inspections.

BB. Transportation Security Officer (TSO): An individual who is trained, qualified, and authorized in accordance with applicable TSA standards and directives to screen individuals, accessible property, identification documents, and/or checked baggage for the presence of explosives, incendiaries, weapons, or other threats or threat items.

CC. Transportation Venue: A building, structure, or location that facilitates the movement of passengers or goods in the transportation system.

DD. Travel Document Checker: A specially-trained TSA employee who conducts checks of travel documents and verification of identification for individuals electing to access the screening checkpoint.

EE. TSA Law Enforcement Officer: A law enforcement officer who derives his or her authority from 49 U.S.C. § 114(p), 49 U.S.C. § 4490(d), and the Implementing Recommendations of the 9/11 Commission Act of 2007 (Public Law 110-53, 121 Stat. 266) and whose authority includes, but is not limited to, carrying a firearm; making arrests without a warrant for any offense against the United States committed in the officer's presence; or for any felony cognizable under the laws of the United States if there is probable cause to believe that the person to be arrested has committed or is committing the felony; and seeking and executing warrants for arrest or seizure of evidence issued under the authority of the United States upon probable cause that a violation has been committed.

FF. Visible Intermodal Prevention and Response (VIPR) Operations: TSA's deployment of specialized teams to augment the security of any mode of transportation. VIPR teams may comprise any asset of the U.S. Department of Homeland Security (DHS), including, FAMs, TSIs, canine detection teams, and detection technology.

5. **RESPONSIBILITIES:** All offices and individuals responsible for establishing and implementing programs and procedures involving searches must ensure that searches are conducted in accordance with this directive and other applicable law and policy.

   A. Office of Security Operations (OSO) is responsible for drafting procedures for operations that are consistent with this directive.

   B. Office of Law Enforcement/Federal Air Marshal Service (OLE/FAMS) is responsible for drafting procedures for OLE/FAMS operations that are consistent with this directive.

   C. Office of Training and Workforce Engagement (TWE) is responsible for:

   (1) General oversight and training of all TSA personnel, for example, Federal Air Marshals (FAMs), Federal Security Directors (FSDs), Transportation Security Specialists – Explosives (TSS-Es), TSIs, BDOs and TSOs.

   (2) Ensuring that all TSA personnel receive appropriate training to carry out this directive.

   D. FSDs are responsible for ensuring that all searches conducted by OSO personnel under his or her leadership are in accordance with this directive and all other applicable laws and policy including TSA Standard Operating Procedures and policies for regulatory inspections.

   E. OLE/FAMS SACs are responsible for ensuring that all searches conducted by FAMs and Assistant FSDs for Law Enforcement under his or her leadership are in accordance with OLE/FAMS authorities, policies and procedures, and this directive.

   F. Joint Coordination Center (JCC) is responsible for:

   (1) General oversight of the VIPR Program.

   (2) Coordination and development of guidelines for VIPR operations with other TSA components.

   (3) Monitoring active VIPR deployments.

   (4) Ensuring that VIPR operations plans are distributed to all appropriate TSA components for review.

   G. Office of Intelligence and Analysis (OIA) is responsible for providing information and guidance to assist in the identification of current threats and vulnerabilities that may form a predicate for searches.

   H. Office of Inspection (OOI) is responsible for providing procedures and conducting searches and all operations consistent with this directive.

   I. Office of Chief Counsel (OCC) is responsible for:

    (1) Reviewing Operations Plans, Standard Operating Procedures, Security Directives, TSA regulations, and other policies and plans to help ensure compliance with legal requirements.

    (2) Providing legal advice and guidance on issues related to searches.

**6. POLICY:** TSA personnel must use this directive in carrying out their functions. Nothing in this directive is intended to create any substantive or procedural rights, privileges, or benefits enforceable in any administrative, civil, or criminal matter.

    A.    General: Intelligence reports indicate that Al-Qaeda and Al-Qaeda affiliates and other terrorist groups continue to develop plans for multiple attacks against transportation systems. Successful, coordinated bombing attacks aimed at incurring mass casualties in various transportation systems have occurred. Terrorist groups continue to pursue a range of targets, tactics, and capabilities to accomplish their objectives.

        (1) TSA conducts all administrative and special needs searches in a manner designed to be minimally intrusive, in light of current technology, to detect the presence of threat items. TSA recognizes individuals being searched have an expectation of privacy in their persons and property, and demands that all TSA personnel conduct searches in such a way as to respect those privacy interests, while advancing TSA's transportation security mission.

        (2) Searches may be conducted by TSA personnel or at the direction of TSA, as determined by TSA Headquarters or local TSA officials. TSA will consult and coordinate with Federal, state, and local law enforcement officials, as well as affected transportation entities, as appropriate, when conducting these operations. Risk analysis and operational and strategic intelligence may provide guidance in executing appropriate screening and security measures.

        (3) TSA's layered security strategy includes an overlapping system of screening and searches. No single security measure or method is sufficiently reliable to be depended upon in isolation. For this reason, search techniques, to include detection technology (e.g., Advanced Imaging Technology), may be utilized in any appropriate circumstance, and are not limited to circumstances indicating a potential threat. Additionally, an individual and his or her property may be selected for more than one search activity prior to boarding an aircraft, bus, train, or other public conveyance.

        (4) Searches may include examination of individuals and all contents of accessible property, including, but not limited to, containers, compartments, and envelopes, or anywhere threat items may reasonably be expected to be concealed. Searches may be conducted for the purpose of resolving items that appear to be a threat or for identification media, as appropriate. Interactions with TSA personnel as part of checkpoint screening may not rise to the level of a search (e.g., a brief verbal exchange with BDOs), but those interactions may result in a need to conduct a search of an individual or accessible property.

        (5) During a search, it may be necessary to read textual materials, for example, any written material or other media that may provide information about potential threats.

Searches may properly include the reading of textual materials if necessary to rule out the presence of a threat.

B.  Administrative/Special Needs Searches:

   (1) All administrative or special needs searches are to be tailored to the transportation security purpose for which they are conducted. These searches are designed to be minimally intrusive, in that they should be no more intensive or extensive than reasonably necessary to detect threat items, to prevent persons who may pose a threat to transportation security from entering the transportation system, or to determine compliance with TSA standards, regulations, and applicable laws.

   (2) Examples of administrative or special needs searches include:

      (a) Open and look searches of a carry-on bag conducted during Gate Screening;

      (b) Screening activities conducted as part of checkpoint screening, including patdowns, walk-through metal detector (WTMD), and Advanced Imaging Technology (AIT);

      (c) Explosives Detection System (EDS) screening; and

      (d) Other screening activities, such as, Explosives Trace Detection (ETD) of hands, and/or vehicle screening either by physical search (e.g., open trunk) or by backscatter x-ray technology.

   (3) All administrative or special needs searches should be conducted according to established procedures to ensure that the searches will be confined in good faith to their intended purpose. When designing or conducting an administrative or special needs search, the following objectives must be addressed, if applicable:

      (a) How the search is intended to enhance the security of persons and critical infrastructure, to augment the security of any mode of transportation, or to ensure compliance with TSA regulations;

      (b) The threat item(s) that are the target of the search, or the regulation or order in the case of regulatory inspection;

      (c) The manner in which persons are given notice of the search;

      (d) The procedures used to detect or deter the introduction of the designated threat item(s), to conduct regulatory inspections, or to determine whether an individual is using multiple names or dates of birth which may need to be checked against Government watch lists;

      (e) How the search procedures are tailored to protect personal privacy;

      (f) The applicable pre-determined random selection protocol, unless all persons and/or vehicles that pass through the location will be searched; and

(g) Maintaining appropriate records of the activity.

(4) Before conducting an administrative or special needs search, standard operating procedures and applicable deployment operations plans should be developed in consultation with OCC.

(5) To incorporate unpredictability and enhance deterrence, search locations may be switched or the number, staffing, and scheduling of locations may vary so that deployment patterns are shifting and difficult to predict.

(6) Notice must be provided to persons who will be subject to search.

  (a) The notice should be provided in such a manner as to allow persons the opportunity to avoid the search by choosing not to enter the location. In addition, the notice should provide warning that once the screening process has begun, screening must be completed. For additional information regarding the legal requirements for notification, see *TSA Airport Signage Guidelines* (August 2010).

  (b) TSA should seek the cooperation of airport, aircraft, mass transit, or other transportation operators to inform the public that searches may occur at that transportation venue, in addition to notice provided prior to entry into the physical location of the search.

(7) With appropriate training and authorization, any TSA personnel may conduct an administrative or special needs search.

(8) TSA personnel also engage in other security activities that are not searches. Examples of security activities which are NOT searches include:

  (a) Canine sniff;

  (b) Visible presence operations as part of VIPR operations;

  (c) Any BDO observations; and

  (d) Brief verbal exchanges between TSA personnel and non-TSA personnel.

C. Possible Criminal Activity:

(1) Administrative and special needs searches may not be conducted to detect evidence of crimes unrelated to transportation security. However, if such evidence is discovered, TSA personnel shall refer it to a supervisor or a law enforcement official for appropriate action. This report satisfies a TSA employee's obligation to report known or suspected violations of Federal law. (TSA MD 1100.73-5, *Employee Responsibilities and Conduct*, Section 5A(9)). Although an individual may be requested to wait until law enforcement arrives, he or she is free to leave the screening checkpoint once applicable screening requirements have been completed successfully. TSA officers must complete an Incident Report whenever law enforcement is notified. Examples of criminal wrongdoing include possession of illegal drugs, possession of child pornography, and money laundering (i.e.,

        transferring illegally gained money through legitimate channels so that its illegal source is untraceable).

    (2) Traveling with large amounts of currency is not illegal. Sometimes currency discovered at the screening checkpoint will need to be screened to clear it to enter sterile areas (or other secure areas). For example, cash in very large quantities may shield explosive materials and other threat items. As a general matter, there should be no reason to ask questions of the passenger about currency, although there may be times when questions are warranted by security needs. When currency appears to be indicative of criminal activity, TSA will report the matter to the appropriate authorities. For all flights, factors indicating that cash is related to criminal activity include the quantity, packaging, circumstances of discovery, or method by which the cash is carried, including concealment. For international flights, currency that exceeds $10,000 may not be transported into or out of the United States unless it has been reported to U.S. Customs and Border Protection (CBP). TSA should notify CBP and/or law enforcement authorities pursuant to its local standard operating procedures that the individual possesses a sum of currency that appears to exceed $10,000. TSA may also note any factors related to criminal activity for purposes of notifying CBP and/or law enforcement. Although an individual may be requested to wait until law enforcement arrives, he or she is free to leave the screening checkpoint once applicable screening requirements have been completed successfully.

D. Verifying Identification: The purpose of screening for identification media is to verify an individual's identity and to ensure they have undergone watch list matching or other possible information-based pre-screening before entering a sterile area and/or before boarding an aircraft.

    (1) Prior to entering the sterile area, individuals seeking access must have their identity verified by the Travel Document Checker (TDC).

    (2) Identification media may be screened at locations other than the TDC. The purpose of such screening is to re-verify the individual's identity when there has been an indication that re-verification is appropriate (for example, when an individual possesses multiple forms of identification reflecting different names or dates of birth that have not been checked against the watch lists), thus adding an additional layer of security.

    (3) TSA may screen an individual's accessible property for identification media when TSA would otherwise have a right to access the individual's property and in order to verify the individual's identity, for example, according to the standard operating procedures for the SPOT program; when TSA is already screening the accessible property; during gate screening; or for another appropriate reason (e.g., as a result of a random selection protocol).

E. Initiation and Completion of Security Screening Searches: A screening activity may be initiated once an individual has elected to attempt entry into a sterile or secure area of any transportation venue, or elected to attempt to board an aircraft, bus, train, or other public conveyance. Once a screening activity has been initiated, it must be completed, and an individual may not withdraw from or refuse to complete the screening activity without authorization by the FSD or Deputy Federal Security Director (DFSD) or their delegees. If an individual were to be allowed to withdraw from or refuse to complete screening, it would

afford terrorists multiple opportunities to attempt to penetrate security by "electing not to fly" on the cusp of detection until a vulnerable portal is found. It would also allow terrorists a low-cost method of detecting systematic vulnerabilities in security, knowledge that could be extremely helpful in planning future attacks. Ordinarily, an individual demonstrates an election to attempt entry into a sterile or the secured area or board an aircraft or conveyance as described below:

(1) Checkpoint Queue. Ordinarily, screening of an individual or accessible property in the checkpoint queue begins when an individual both (1) passes a sign posted at the entrance to the queue advising that individuals and property are subject to screening and (2) is selected by TSA personnel to undergo the screening procedure being conducted in the queue. Once the screening procedure is complete, the individual may proceed to the TDC podium, the checkpoint, or return to the public area of the airport or transportation venue.

(2) TDC Podium. Ordinarily, screening of an individual at the TDC podium begins when the individual hands his or her travel document and identification to the TDC. Once verification of the travel document and the identity of the individual are complete, the individual may depart the TDC podium and either proceed to the checkpoint or return to the public area of the airport or transportation venue.

(3) Checkpoint Screening of Accessible Property. Ordinarily, screening of accessible property at the screening checkpoint begins when an individual places accessible property on the x-ray conveyor belt or hands accessible property to TSA personnel. Once screening of the accessible property and the individual are complete, the individual may depart the checkpoint and either proceed into the sterile area/board the conveyance, or return to the public area of the airport or transportation venue.

(4) Checkpoint Screening of an Individual. Screening of an individual at the checkpoint is ordinarily conducted through the use of various procedures and detection technology, such as the WTMD, AIT, and/or patdown. In order to initiate any of these procedures, generally individuals must divest property, including the removal of shoes and outer garments, and/or empty their pockets. Ordinarily, screening of an individual at the checkpoint begins when the individual divests and places such property on the x-ray conveyor belt or hands such property to TSA personnel. Once screening is complete, the individual may depart the checkpoint and proceed into the sterile area/board the conveyance, or return to the public area of the airport or transportation venue.

F.  Consent Searches: Unlike an administrative or special needs search, the scope of a consent search will depend on the scope of the permission given by the individual who has actual or apparent authority over the thing to be searched.

(1) A search of a person, property, vehicle, or location based on consent may be conducted in any transportation venue.

(2) Persons may decline to be searched or withdraw consent at any time.

(3) With appropriate training, any TSA personnel, including TSOs and TSIs, may conduct a consent search.

    G.   Law Enforcement Searches:

        (1) TSA law enforcement officers may engage in law enforcement activities consistent with established authorities and protocols. This directive does not and is not intended to limit the authority of TSA law enforcement officers.

        (2) Law enforcement activities may include investigations, detentions, and searches, as appropriate, and are not limited to administrative or special needs searches. This directive does not and is not intended to explain or define the variety of law enforcement searches that may be conducted.

        (3) The only TSA personnel who should engage in law enforcement activities are TSA law enforcement officers (e.g., Office of Inspection Criminal Investigator or FAMs acting in accordance with their authorities under 49 U.S.C. § 114(p)).

7. **PROCEDURES:** All screening, searches and regulatory inspection must be conducted in accordance this directive and other applicable laws and policy.

8. **APPROVAL AND EFFECTIVE DATE:** This policy is approved and effective the date of signature, unless otherwise specified.

**APPROVAL**

*Signed*                                                      January 25, 2012
_____        _____
John Pistole                                             Date
Administrator

**EFFECTIVE**


_____
Date

Distribution:      Administrator; Offices of Chief Counsel, Inspection, Intelligence and Analysis, Law Enforcement/Federal Air Marshal Service, and Security Operations; and Federal Security Directors; Special Agents in Charge; and Supervisory Air Marshals in Charge
Point-of-Contact:  Office of Chief Counsel, (571) 227-3645

000073