# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SAI,

        *Plaintiff*,

    v.

TRANSPORTATION SECURITY
ADMINISTRATION,

        *Defendant*.

Civil Action No. 14-403 (RDM)

## AMENDED MEMORANDUM OPINION AND ORDER

This case is one of a series of cases that Plaintiff, who suffers from a neurological disorder, has brought arising out of alleged mistreatment by Transportation Security Administration ("TSA") employees at various airport security checkpoints. This Court previously resolved one of those cases, which Plaintiff brought against the TSA under the Rehabilitation Act seeking to compel the agency to respond to Plaintiff's complaints of mistreatment. *See Sai v. Dep't of Homeland Sec.*, 149 F. Supp. 3d 99 (D.D.C. 2015). Other cases, seeking damages and declaratory and injunctive relief relating to the alleged mistreatment and the TSA's policies more generally, remain pending before at least two other federal courts. *See Sai v. Covenant Aviation Sec.*, No. 16-1024 (N.D. Cal); *Sai v. Pekoske*, No. 15-2356 (1st Cir.).

In this action, Plaintiff alleges that the TSA has failed adequately to respond to six requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act ("PA"), 5 U.S.C. § 552a. The first of these requests sought surveillance video and reports relating to an incident that occurred at Boston's Logan International Airport ("BOS"), as well

any other complaints against the TSA employees involved in the incident and any similar complaints against the TSA, airport police, or airport agents. Plaintiff subsequently expanded this request also to seek records relating to incidents at New York LaGuardia Airport ("LGA") and Chicago O'Hare International Airport ("ORD"). The second request sought "any contract/agreement with other agencies regarding surveillance, or maintenance of surveillance footage, at Logan Airport." Dkt. 99-3 at 78 (McCoy Decl. Ex. I). The third request followed an incident at San Francisco International Airport ("SFO") and sought records like those Plaintiff sought relating to the BOS incident. The fourth—and by far the most expansive request—sought *all* policies and procedures that the TSA has *ever* issued that are not already available in the TSA's "electronic reading room." Finally, the fifth and sixth requests sought any additional records regarding the BOS and SFO incidents created after Plaintiff's original requests.

After Plaintiff filed suit, the TSA responded to each of the six pending FOIA requests and eventually released almost 4,000 pages of records (some with redactions) and three closed circuit television videos. The TSA has now moved for summary judgment, arguing that it reasonably construed (and, where necessary, narrowed) Plaintiff's requests; that it thoroughly searched for responsive records; and that it released all responsive, non-exempt records. Plaintiff opposes the TSA's motion and, with two minor exceptions, challenges virtually every aspect of the TSA's multiple searches and productions. Plaintiff contends that, as to each of the six requests, the TSA failed to conduct an adequate search; failed to produce segregable portions of records; withheld metadata and failed to release records in their "native," electronic format or in "fully digital, non-"rasterized" PDFs; improperly designated records as Sensitive Security Information ("SSI"); and improperly invoked FOIA Exemptions 3, 6, and 7. Plaintiff alleges, in addition, that the TSA withheld records that had been previously released; made false or misleading

statements in its *Vaughn* indices; violated the Privacy Act by maintaining records relating to Plaintiff's "protected First [A]mendment speech," Dkt. 111-2 at 33–34; destroyed records in violation of a "clear[] . . . evidence preservation demand," *id.* at 34; withheld records so as to commit "felony obstruction of justice," *id.* at 39; and, more generally, "maintained numerous unlawful policies, practices, and procedures . . . and willful violation[s] of the APA, FOIA, Rehabilitation Act, Privacy Act, and SSI statutes." Dkt. 111 at 3.

As explained below, many of these contentions are not properly before the Court; others are not developed with sufficient clarity to survive summary judgment; and yet others lack legal or factual merit. But there is some wheat among this abundance of chaff. The Court will, accordingly, **GRANT** in part and **DENY** in part the TSA's motion.

## I. BACKGROUND

The wide-ranging history of this matter is recounted in this Court's numerous prior opinions and orders. *See* Dkt. 34 (denying motion for preliminary injunction and motion for sanctions); Dkt. 42 (denying motion to expedite); Dkt. 43 (granting defendant's motion for protective order); Dkt. 47 (denying motion for reconsideration regarding sanctions); Dkt. 48 (denying motion to compel); Dkt. 49 (denying motion for leave to amend); Dkt. 74 (denying motions for reconsideration, for clarification, and to strike); Dkt. 93 (denying motion to compel service of Section 46105(b) orders and for declaratory relief regarding Section 46110(a) deadline, denying plaintiff's motion for attorney fees and costs, and denying leave to file supplemental pleading); *see also Sai v. TSA*, No. 16-5004 (D.C. Cir. June 6, 2016) (order dismissing interlocutory appeal seeking initial hearing en banc); *Sai v. TSA*, No. 16-1065 (U.S. Sup. Ct. June 5, 2017) (denying petition for writ of certiorari). For present purposes, the Court

need not repeat that history in its entirety, but simply recounts the allegations and procedural history relevant to the pending motion.

## A.     FOIA Requests

The subject of this suit are six FOIA and Privacy Act requests for records that Plaintiff, whose full name is Sai,[1] sent to the TSA in 2013.

Sai submitted the first of these requests on January 28, 2013,[2] requesting information relating to an incident at a security checkpoint at Boston Logan International Airport ("BOS Request"). This request initially sought "reports," "notes, correspondence, communications, . . . relating to the incident," "any and all records related to [Sai];" "copies of [Sai's] [travel] documents that were made at the scene;" "all history of complaints" against the TSA agents with whom Sai came into contact and "similar complaints" against the TSA; and "documents and communication related to responding to this request." Dkt. 99-3 at 50–51 (McCoy Decl. Ex. A). After the TSA requested additional information regarding the request on February 15, 2013, Sai expanded the request to include "all records related to" prior security incidents that occurred at New York LaGuardia Airport on June 27, 2012, and Chicago O'Hare International Airport on December 25, 2010. *Id.* at 55 (McCoy Decl. Ex. B). TSA failed to respond to the expanded BOS Request within the 20-day period specified by FOIA. *See id.* at 8 (McCoy Decl. ¶ 25); *id.* at 59 (McCoy Decl. Ex. D). On August 8, 2014, the agency provided an interim response releasing seven pages of records, with some redactions. *Id.* at 8 (McCoy Decl. ¶ 25). It

---

[1] Sai has indicated a preference not to be referenced using gendered pronouns, and, in this amended opinion, the Court has endeavored to respect that request.
[2] The declaration of Regina McCoy states that Sai's request was executed on January 21, 2013. The request, however, is dated January 28, 2013 and states that Sai sought records pertaining to an incident that occurred on January 21, 2013. Dkt. 99-3 at 52 (McCoy Decl. Ex. A). This minor error in the McCoy declaration is immaterial to the pending motion.

supplemented this response on October 3, 2014 with the release of an additional 229 pages of records and video of the BOS incident. *Id.* at 9 (McCoy Decl. ¶ 27).

On February 22, 2013, Sai submitted a second FOIA request ("CCTV Request") to TSA by email, requesting "any contract/agreement with other agencies regarding surveillance, or maintenance of surveillance footage, at Logan airport." *Id.* at 78 (McCoy Decl. Ex. I). The TSA did not respond to Sai's request until August 8, 2014, when it released 16 pages of responsive records in full. *Id.* at 18 (McCoy Decl. ¶ 56); *id.* at 80 (McCoy Decl. Ex. J).

Sai submitted the third request at issue, relating to an incident that took place at San Francisco International Airport ("SFO Request"), by email on March 15, 2013. *Id.* at 85–86 (McCoy Decl. Ex. L). Like the BOS Request, the SFO Request sought "reports," "notes," correspondence, [and] communications, . . . relating to the incident;" "any and all records related to [Sai];" "all history of complaints" against the TSA agents with whom Sai came into contact and "similar complaints" against the TSA; and "documents and communication related to responding to this request." *Id.* (McCoy Decl. Ex. L). The TSA initially responded to the request on August 8, 2014, "releasing 72 pages of responsive records in full as well as two CCTV videos." *Id.* at 22 (McCoy Decl. ¶ 71); *id.* at 93 (McCoy Decl. Ex. N). The agency supplemented that response on October 3, 2014 with an additional 427 pages of responsive records. *Id.* at 23 (McCoy Decl. ¶ 73).

The fourth request, which sought TSA policies and procedures ("Policies Request"), is by far the most expansive. Sai submitted that request on March 16, 2013. It sought (1) "*[a]ll* TSA policy and/or procedures documents which are not already included in the TSA's 'Electronic Reading Room,' including *all* Management Directives, Standard Operating Procedures, Operations Directives, Security Directives, Emergency Amendments, Information Circulars,

Memoranda, Handbooks, Letters, Bulletins, and Guidance ever issued, including both old [and] current versions;" (2) the "TSA's policies regarding screening procedures, both now and . . . at any point in the past;" (3) the "TSA's policies regarding the treatment of passengers with disabilities, both now and in the past;" (4) the "TSA's policies regarding the enforcement of its policies when TSA personnel . . . refuse to comply with TSA policy in a way that infringes on the rights of travelers;" (5) the "TSA's policies regarding cooperation with local airports and police;" (6) the "TSA's policies regarding when checkpoint video may be released;" (7) the "TSA's policies regarding 'no fly[,'] 'selectee[,'] and any similar lists;" (8) "legal justification for the TSA's public claims that passengers may not revoke consent to administrative search" including "formal agency legal memoranda, policy statements that include specific legal foundation arguments, court filings in which relevant arguments were advanced . . . , any court opinions, appeals, or the like in which a court responded negatively to those arguments;" and (9) "all Behavior Detection Officer training materials, and any studies investigating their efficacy." *Id.* at 125–28 (McCoy Decl. Ex. S).

On March 25, 2017, the TSA sent Sai a letter explaining that the request was "too broad in scope or did not specifically identify the records" sought, and it invited Sai to "resubmit [the] request containing a reasonable description of the records [he was] seeking." *Id.* at 30 (McCoy Decl. ¶ 91); *id.* at 132 (McCoy Decl. Ex. T). Because Sai did not respond, the TSA "administratively closed" the request on May 9, 2013. *Id.* at 30 (McCoy Decl. ¶ 92). About a year later, however, after Sai brought the present suit, the TSA "in its discretion, re-opened the request and initiated a search for responsive records to the extent the items sought in the request could be reasonably discerned based on the title provided or other information that was reasonably clear from the initial request." *Id.* at 31 (McCoy Decl. ¶ 93). The TSA directed that

fifteen different offices, including, for example, the Disability Branch of TSA's Office of Civil Rights and Liberties, Ombudsman & Traveler Engagement Division, "conduct a reasonable search for responsive records." *Id.* (McCoy Decl. ¶ 94). On July 30, 2015, the TSA made an initial release of 1,416 pages of responsive records, some of which were redacted in part. *Id.* at 35–36 (McCoy Decl. ¶ 109). Although releasing these records, the TSA reminded Sai that it had previously concluded that the "request was too broad" and that it had requested that Sai "resubmit [his] request with a reasonable description of the records" sought. *Id.* (McCoy Decl. ¶ 109); *id.* at 138 (McCoy Decl. Ex. U). Notwithstanding Sai's failure to respond, the agency explained, it had decided—in its discretion—to process the request "to the extent records [could] be reasonably identified." *Id.* at 138 (McCoy Decl. Ex. U). Subsequently, on August 20, 2015 and October 30, 2015, the TSA released an additional 1,294 pages and 329 pages of responsive records, respectively, some of which were again redacted in part. *Id.* at 36 (McCoy Decl. ¶ 110); *id.* at 145 (McCoy Decl. Ex. V). Finally, on February 29, 2016, the TSA notified Sai that it had located an additional collection of records, which the agency was withholding in full. *Id.* at 37 (McCoy Decl. ¶ 112); *id.* at 158 (McCoy Decl. Ex. X).

Sai's fifth and sixth requests cover the same ground covered by the BOS and SFO requests, but seek records created or obtained after those requests were filed ("BOS and SFO Re-Requests"). *See* Dkt. 28-3 at 11. Sai originally submitted the BOS and SFO Re-Requests on November 23, 2013. *See id.* That email was addressed to the TSA's FOIA division and read, in relevant part, "I hereby demand that you send me *all* documents, records, statements, surveillance video, external and internal correspondence, etc. that are currently or have ever been in the TSA's possession which relate to either of the two incidents I reported wherein the TSA violated my rights." *Id.* TSA initially viewed this email as duplicative of the SFO and BOS

requests and did not respond. Dkt. 99-3 at 43 (McCoy Decl. ¶ 123). In an earlier opinion in this case, however, the Court held that the November 23 email was in fact more expansive than Sai's earlier requests because it "also covered records created during the interval between the requests." Dkt. 74 at 15. Complying with that decision, the TSA acknowledged receipt of the BOS and SFO Re-Requests in September and October 2015, Dkt. 99-3 at 43–44 (McCoy Decl. ¶ 124–25, 127); *id.* at 178 (McCoy Decl. Ex. AA); *id.* at 180 (McCoy Decl. Ex. BB); *id.* at 185 (McCoy Decl. Ex. CC); "tasked those offices that it deemed most likely to have records related to the SFO and BOS incidents with searching for non-duplicative responsive records," *id.* at 46 (McCoy Decl. ¶ 133), and subsequently notified Sai that it found no non-duplicative records responsive to the requests, *id.* at 46–47 (McCoy Decl. ¶¶ 135, 138).

## B.    Procedural History

Because the TSA failed to respond within the 20-day period specified by FOIA, 5 U.S.C. § 552(a)(6)(A)(i), Sai was deemed, as a matter of law, to have exhausted administrative remedies, 5 U.S.C. § 552(a)(6)(C), and, having cleared that threshold requirement, Sai brought this suit, Dkt. 5. After filing suit, Sai moved both for a preliminary injunction and to expedite the action. Dkt. 8; Dkt. 18. The Court denied both motions. Minute Order (Apr. 17, 2014); Dkt. 34; Dkt. 42. Sai also moved to impose sanctions on the government, which the Court denied, Dkt. 30; Dkt. 32, and for reconsideration of the Court's denial, Dkt. 38, which the Court also denied, Dkt. 47. In addition, Sai unsuccessfully sought to amend the complaint, *see* Dkt. 49, and unsuccessfully sought reconsideration of that decision, Dkt. 50; Dkt. 74. The TSA, for its part, moved to dismiss in part and to strike portions of Sai's complaint, Dkt. 51, which the Court also denied, Dkt. 74. Sai then moved to "compel service of [Section] 46105(b) orders," Dkt. 77, for attorney fees and costs, Dkt. 85, and to file a supplemental pleading, Dkt. 86, all of which the Court denied, Dkt. 93.

The TSA has now moved for summary judgment, submitting that it has conducted a reasonable and adequate search and that its withholdings are appropriate under both FOIA and the Privacy Act. Dkt. 99. The TSA supports its motion with the declarations of Regina McCoy, the agency's FOIA officer, Dkt. 99-3 at 1 (McCoy Decl. ¶ 2), and Douglas Blair, Chief of the Sensitive Security Information Program in the agency's Office of Law Enforcement & Federal Air Marshal Service, Dkt. 99-4 at 1 (Blair Decl. ¶ 1); Dkt. 105 at 17 (Supp. Blair Decl. ¶ 1). Sai's opposition brief is only five pages long and merely lists—without analysis or support— sixteen ways in which the TSA has allegedly violated the law; as Sai puts it, the "TSA has violated nearly all the law[s] it could." Dkt. 111 at 2. Sai also requests that the Court order that the TSA supplement its *Vaughn* index, order "full civil discovery," and order the TSA "to provide [the] Court with an *in camera* copy of [its] entire production[] . . . without redactions." *Id.* at 4–5. Standing alone, Sai's opposition brief provides little analysis or argument. Sai has also filed a forty-page affidavit, however, which contains more extensive legal and factual argument. Dkt. 111-2. Because the Court must liberally construe *pro se* pleadings, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and because the Court must, in any event, assess the legal sufficiency of a motion for summary judgment, *see Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 507–08 (D.C. Cir. 2016), and must consider *sua sponte* whether any portions of the withheld records are reasonably segregable, *see Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007), the Court will treat Sai's affidavit as a brief in opposition and will also consider the adequacy of the TSA's legal contentions *sua sponte*. The Court will also consider the various supplemental briefs and filings that the parties have submitted.

## II.  LEGAL STANDARD

The Freedom of Information Act is premised on the notion that "an informed citizenry is "vital to the functioning of a democratic society . . . [and] needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).  The Act embodies a "general philosophy of full agency disclosure." *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 494 (1994) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 360 (1976)).  It thus mandates that an agency disclose records on request unless they fall within one of nine exemptions.  "These exemptions are 'explicitly made exclusive' and must be 'narrowly construed.'" *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (quoting *EPA v. Mink*, 410 U.S. 73, 79 (1973), and *FBI v. Abramson*, 456 U.S. 615, 630 (1982)).

FOIA cases are typically resolved on motions for summary judgment under Federal Rule of Civil Procedure 56.  *See Beltranena v. U.S. Dep't of State*, 821 F. Supp. 2d 167, 175 (D.D.C. 2011).  To prevail on a summary judgment motion, the moving party must demonstrate that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  In a FOIA action, the agency may meet its burden by submitting "relatively detailed and non-conclusory" affidavits or declarations, *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), and an index of the information withheld, *Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973); *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998).  An agency "is entitled to summary judgment if no material facts are in dispute and if it demonstrates 'that each document that falls within the class requested either has been produced . . . or is wholly exempt from the [FOIA's] inspection requirements.'" *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C.

Cir. 2001) (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)).  The Court reviews the agency's decision *de novo*, and the agency bears the burden of sustaining its action.  5 U.S.C. § 552(a)(4)(B).

## III.  ANALYSIS

Sai's arguments in opposition to the TSA's motion for summary judgment fall into three broad categories.  Specifically, Sai challenges (1) the format of the records the TSA produced pursuant to FOIA and the Privacy Act; (2) the adequacy of the TSA's search for records responsive to the FOIA requests; and (3) the TSA's withholding of portions of the records it released pursuant to FOIA and the Privacy Act.  In addition, Sai raises various allegations of misconduct by the TSA and requests the opportunity to conduct "full civil discovery."  The Court will consider each set of arguments in turn.

**A.      Format**

1.      *Rehabilitation Act*

Sai first argues that the TSA violated the Rehabilitation Act, 29 U.S.C. § 794d, and E-FOIA, 5 U.S.C. § 552(a)(3)(B), (C), by failing to release the requested records in a "native, electronic, or § 508 accessible format" and by failing to provide a copy of the agency's *Vaughn* index in a "spreadsheet format" that would permit "basic operations like copying the spreadsheets into Google Spreadsheets."  Dkt. 111-2 at 1–2 (emphasis omitted).  Sai argues that the format used by the TSA prevented access to "metadata" and "significantly impaired [Sai's] ability to use the documents, distribute the documents to [Sai's] audience in a format that would be accessible to them (which includes other people with disabilities)," and asserts that the "TSA uses DHS-wide FOIA processing software and methods that take documents that are originally [in a] native electronic [format] . . . and output paper or rasterized PDF[s]."  *Id.* at 2–4.  Finally, Sai maintains that records were not produced in discrete files (which Sai refers to as an absence

of "discretization") and were not produced in a "cogent" order. *Id.* at 2. As explained below, the Court is unpersuaded by these arguments.

To start, this is not a Rehabilitation Act case. The complaint does not invoke the Rehabilitation Act and, indeed, it expressly asserts that "[t]his suit is *solely* under FOIA and [the Privacy Act]." Dkt. 5 at 2 (Compl. ¶ 5). To be sure, Sai filed the complaint before the TSA released any records, and thus Sai did not know what format the agency would use. But Sai posits that the TSA, in general, uses software that does not result in the release of "native" format records, Dkt. 111-2 at 4, and, more importantly, despite filing multiple motions for leave to amend, *see* Dkt. 9; Dkt. 21, Sai has never sought to amend the complaint to assert a claim under the Rehabilitation Act. Although *pro se* litigants are entitled to some leeway, they must comply with the Federal Rules of Civil Procedure, *Jarrell v. Tisch*, 656 F. Supp. 237, 239 (D.D.C. 1987), and a plaintiff—even a *pro se* plaintiff—may not amend the complaint by raising an issue for the first time in a brief in opposition to a motion for summary judgment, *see Manna v. U.S. Dep't of Justice,* 106 F. Supp. 3d 16, 19 (D.D.C. 2015) ("[A plaintiff] cannot expand the scope of this litigation by merely referring to other requests in his opposition to Defendants' motion."); *Wright v. U.S. Dep't Justice*, 121 F. Supp. 3d 171, 183 n.7 (D.D.C. 2015) ("[I]t is inappropriate for a Court to consider new claims raised for the first time in a brief in opposition to a motion for summary judgment."); *Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("It is axiomatic that a complaint may not be amended by the briefs in opposition . . . ." (citation omitted)). Because Sai has not alleged a claim under the Rehabilitation Act, Sai's first argument fails as a matter of law.

But, even if the Court were to treat Sai's affidavit as a proposed amendment to the complaint—and, to be clear, the Court is not doing so—it would deny that motion as futile. *See*

*In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 215 (D.C. Cir. 2010) ("[A] district court has discretion to deny a motion to amend on grounds of futility where the proposed pleading would not survive a motion to dismiss.") (quoting *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 945 (D.C. Cir. 2004)).  To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This standard demands more than "labels and conclusions," *Twombly*, 550 U.S. at 55, and more than "legal conclusions" unsupported by "factual allegations," *Iqbal*, 556 U.S. at 678.  It follows, moreover, that a motion for leave to file an amended complaint is futile, and thus should be rejected, if the proposed pleading lacks factual allegations sufficient to clear the "plausibility" hurdle.  *See Clark-Williams v. WMATA*, No. 14-99, 2016 WL 4186810, at *3 (D.D.C. Feb. 16, 2016).  Even if construed as a proposed, amended complaint, Sai's affidavit does not clear that hurdle.

Subject to certain limitations, Section 508 of the Rehabilitation Act requires that federal agencies like the TSA ensure that "individuals with disabilities who are members of the public seeking information . . . have access to and use of information and data that is comparable to the access to and use of the information and data by such members of the public who are not individuals with disabilities."  29 U.S.C. § 794d(a)(1)(A)(ii).  Here, Sai complains that the TSA released records with "no discretization," without "metadata," and without "spreadsheet structure."  Dkt. 111-2 at 2.  "The format of [the] TSA's FOIA production," according to Sai, "has significantly impaired [his] ability to use the documents" and to "distribute [them] to [his] audience in a format that would be accessible to them (which includes other people with disabilities)."  *Id.* at 3.  It is not explained, however, how Sai's disability and the format in which

the records were released have prevented the access and use of the information and data in a manner that is comparable to those without disabilities. Sai at least hints at an explanation for why blind people may need "embedded metadata to assist navigation by screen readers," *id.* at 4, but the complaint does not allege that Sai is blind or that this same technology is necessary to accommodate Sai's disability. Nor does Sai have standing to assert the interests of members of Sai's "audience," including those who themselves have disabilities. *See Gettman v. DEA*, 290 F.3d 430, 435–36 (D.C. Cir. 2002) (concluding that magazine lacked standing to bring suit on behalf of readers). In short, Sai offers nothing more than "labels and conclusions," *Iqbal*, 556 U.S. at 678, in support of the contention that the format in which the TSA released the relevant records violated Sai's rights under Section 508. Accordingly, even if Sai's affidavit were treated as a proposed, amended complaint, the Court would deny leave to amend on grounds of futility.

      2.      *E-FOIA*

      Sai's contention that E-FOIA required the TSA to release the relevant records in their "native, electronic" format (with "embedded metadata") is more persuasive, although the argument produces mixed results when applied to the relevant facts. In 1996, Congress enacted the Electronic Freedom of Information Act Amendments to FOIA—or "E-FOIA" for short—to "improve public access to agency records and information" and to "maximize the usefulness of agency records and information collected, maintained, used, retained, and disseminated by the Federal Government." Pub. L. No. 104-231, § 2, 110 Stat. 3048 (1996). Under those amendments, when responding to a FOIA request, an agency must "provide the [requested] record[s] in any form or format requested by the [FOIA requester] if the record is readily reproducible by the agency in that form or format." 5 U.S.C. § 552(a)(3)(B). "Each agency," moreover, is required to "make reasonable efforts to maintain its records in forms or formats that are reproducible for purposes of" E-FOIA. *Id.* Courts, however, must "accord substantial

14

weight to an affidavit of an agency concerning the agency's determination as to . . . reproducibility under" E-FOIA.  5 U.S.C. § 552(a)(4)(B).

Much of Sai's argument is misdirected.  Sai asserts, for example, that "TSA's *Vaughn* declarations and exhibits are . . . partially rasterized PDFs," that the agency's "*Vaughn* indices are spreadsheets embedded in PDF format, severely hampering [his] ability to do basic operations like copying the spreadsheets into Google Spreadsheets," and that the TSA's refusal to provide "spreadsheet format versions of the *Vaughn* indices" has hampered Sai's ability to litigate this case.  Dkt. 111-2 at 2–3.  E-FOIA, however, applies only to records released pursuant to FOIA; it has no bearing on the form or format of declarations, indices, and exhibits filed with the Court, or served on the opposing party, in the course of litigating a FOIA suit. Three of Sai's FOIA requests, moreover, do not actually request that the TSA release the records in any format other than "electronic[]" or "digital."  Dkt. 99-3 at 50–51, (McCoy Decl. Ex. A) (BOS Request) (requesting a "digital copy of all related materials" and "demand[ing] that this request be serviced electronically to the maximum extent possible"); *id.* at 85–86 (McCoy Decl. Ex. L) (SFO Request) (requesting a "digital copy of all Related Material" and "demand[ing] that this request be serviced electronically to the maximum extent possible"); *id.* at 78 (McCoy Decl. Ex. I) (CCTV Request) (requesting "any contract/agreement with other agencies regarding surveillance, or maintenance . . . footage, at Logan airport" without specifying the format of production).  All of the requested records, however, were produced in an electronic format to Sai, Dkt. 118-1 at 2 (3d Supp. McCoy Decl. ¶ 7), and Sai agrees that responses provided in PDF format "fulfill the absolute minimum requirements of being electronically accessible," Dkt. 111-2 at 4.  Accordingly, as to Sai's BOS, SFO, and CCTV Requests, the format of TSA's responses met the requirements of E-FOIA.  *See* 5 U.S.C. § 552(a)(3)(B).

Turning to Sai's Policies Request, Sai once again did not request that the TSA provide the responsive records in a "native" format with embedded metadata. Rather, Sai asked that the TSA release the records "in an electronic, machine-processable, accessible, open, and well-structured format to the maximum extent possible." Dkt. 99-3 at 129 (McCoy Decl. Ex. S). Presumably recognizing the ambiguity of that request, Sai further explained that, "[t]his means," for example: "individual PDFs per distinct document," "fully digital text PDFs rather than scans or rasterizations," "digital redactions rather than black marker," "lists and structured data as machine-processable spreadsheets," and "scans rather than paper copies." *Id.* (McCoy Decl. Ex. S).

In opposing the TSA's motion for summary judgment, Sai raises three objections that are arguably relevant to this request: first, that each record was not released in a distinct, "discretiz[ed]" file; second, that spreadsheets were not released in a "useable, machine-processible format;" and, third, that the records were released as "rasterized PDF[s]." Dkt. 111-2 at 2, 4–5. The TSA, for its part, does not directly respond to the first of these objections. Although the agency stresses the limitations imposed by the software that it used to process FOIA requests at the relevant times, Dkt. 118 at 7–10; Dkt. 118-1 at 2–4 (3d Supp. McCoy Decl. ¶¶ 7–16), it fails to explain whether or why that software would have prevented the agency from generating separate PDF files for each discrete record, and it fails to argue that, as a matter of law, "discretization" does not constitute a "form or format" for purposes of 5 U.S.C. § 552(a)(3)(B). Based on this limited record, the Court cannot determine whether the TSA is entitled to summary judgment with respect to the "discretization" of the records released in response to Sai's Policies Request.

As to the second objection—that the TSA released spreadsheets in an unusable format—it is Sai that drops the ball. Although Sai asserts, generally, that the TSA FOIA response process is flawed because the agency does not release spreadsheets in a usable format, Dkt. 111-2 at 5, and although Sai contends, specifically, that the TSA's *Vaughn* index was produced in a format that did not permit "basic operations like copying the spreadsheet into Google Spreadsheets," *id.* at 2, Sai fails to assert that the TSA released any spreadsheets in response to the Policies Request. Absent some reason to conclude that Sai's general objection to the manner in which the TSA releases spreadsheets has any bearing on the Policies Request, the Court cannot opine on that question. Simply put, "[t]he judicial power does not extend to the determination of abstract questions." *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 324 (1936). Because this decision will require further litigation of a handful of specified issues, however, the Court will provide Sai with the opportunity to demonstrate that the TSA released spreadsheets in response to the Policies Request.

Although not crystal clear, Sai does adequately raise the final objection—that the records responsive to the Policies Request were released in a "rasterized" format, and not as "fully digital text PDFs"—and the TSA at least indirectly responds to that objection. Sai explains that "[b]y 'rasterized PDF,' [Sai] mean[s] the kind that is produced by scanning paper documents . . . or irreversibly rendering text into image format," Dkt. 111-2 at 4 n.10, and that understanding comports with the dictionary definition, *see* Rasterize, v., Oxford English Dictionary (2018) ("To convert (an image) into . . . points or pixels on a grid").[3] The question, then, is whether Sai was

---

[3] Available at http://www.oed.com/view/Entry/247452.

entitled to receive records responsive to the Policies Request in the "fully digital" (non-rasterized) text PDF format sought.  *See* 5 U.S.C. § 552(a)(3)(B).

The answer to that question overlaps with the sole question presented by Sai's final set of requests, the BOS and SFO Re-Requests.  In those requests, Sai asked that the TSA release the relevant records "in their original electronic format or as a scan of any documents that are originally paper."  Dkt. 28-3 at 11–12.  The second of these alternatives does not present an issue here; Sai requested scanned copies of original, paper records, and that is what Sai received.  The first alternative, however, might reasonably be construed to seek the requested non-paper files in their "native" format—for example, in "Word, Excel, or electronic PDF."  Dkt. 111-2 at 4.[4]  So, taken together, the final question posed by Sai's Policies Request and BOS and SFO Re-Requests is whether the records that Sai sought were "readily reproducible" by the TSA at the relevant time in the format that Sai requested: Word, Excel, electronic PDF, or the like.  5 U.S.C. § 552(a)(3)(B).

The TSA contends that the answer to this question is "no," and in support of that contention it once again relies on a declaration from Regina McCoy.  According to McCoy, at all relevant times, the TSA used a FOIA processing software called FOIAXpress.  Dkt. 118-1 at 2 (3d Supp. McCoy Decl. ¶ 8).  That software, however, did not "have the capability to process records in their native formats," and, instead, records were "processed and prepared for release . . . in [a] PDF format."  *Id.* at 2–3 (3d Supp. McCoy Decl. ¶ 8).  Likewise, records that contained possible sensitive security information ("SSI") were provided to the SSI Program Office in a

---

[4]  It is far less clear that this request can plausibly be construed to reach "metadata" that is not necessary to read or use the record in that format, nor is it clear that Sai would be entitled to such "metadata."  *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Educ.*, 905 F. Supp. 2d 161, 172 (D.D.C. 2012) (rejecting the argument that "a government agency must produce electronic copies and/or metadata to comply with FOIA").

PDF format; were reviewed, sanitized, and returned to the FOIA Branch as PDFs; and were then entered into the FOIAXpress system and prepared for release as PDFs. *Id*. at 3 (3d Supp. McCoy Decl. ¶¶ 9–11). Against this backdrop, the TSA argues that the records responsive to Sai's requests were not "readily reproducible" in their native format because, without the availability of the FOIAXpress system, the agency would have been required

> to create a separate tracking system unique to Plaintiff's . . . requests for purposes of keeping accurate documentation of the request itself and correspondence with the requester, the tasking to various offices within the agency and follow-up correspondence with those offices, responsive records back from assigned offices, exemptions and redactions applied to the records and the various layers of review that each record underwent.

*Id*. at 3–4 (3d Supp. McCoy Decl. ¶ 13). On top of this, the TSA adds, "without FOIAXpress, the FOIA Branch would have had to identify and procure an alternative method for applying redactions," and, "[a]t all relevant times, [it] did not have the knowledge, training, or capability ready to apply such redactions to records in formats such as Excel (*e.g.*, .xls); Outlook (*e.g.*, .msg), or Word (*e.g.*, .doc)." *Id*. at 4 (3d Supp. McCoy Decl. ¶ 14).

At least on the present record, the Court is unconvinced that these justifications satisfy the requirements of 5 U.S.C. § 552(a)(3)(B). In order to prevail on this issue, the TSA must show that the records that Sai sought were not "readily reproducible" in their original electronic format. *Id.* "Relatively few cases discuss the application of the . . . 'readily reproducible' requirement," *Scudder v. CIA*, 25 F. Supp. 3d 19, 31 (D.D.C. 2014), however, and neither party has briefed the issue in any detail. The only D.C. Circuit precedent addressing the "readily reproducible" requirement, moreover, deals with the distinct question whether an agency may consider the "characteristics of the requester"—in that case, a prison inmate who was not permitted to possess electronic media—in applying the standard. *See Sample v. Bureau of Prisons*, 466 F.3d 1086, 1088 (D.C. Cir. 2006).

Congress enacted the "readily reproducible" requirement to overrule this Court's decision in *Dismukes v. Department of the Interior*, 603 F. Supp. 760 (D.D.C. 1984), holding that a FOIA requester was not entitled "to obtain a copy of a computer tape listing [the] name[s] and address[es] [of] participants in" bimonthly Bureau of Land Management oil and gas lease lotteries, *id.* at 760–61. *See* H.R. Rep. No. 104-795, at 21 (1996). The Bureau rejected the plaintiff's request, advising him that the lists were made available to the public on microfiche and that they would be provided to him in that format. *Dismukes*, 603 F. Supp. at 761. This decision was justified, according to the Bureau, by the fact that "microfiche [was] the format more likely to be readily readable by the largest number of requesters," even though the computer tape provided a less costly option for those "who need[ed] to obtain a . . . copy of the information for further study." *Id.* at 762–63. The Court agreed, holding that even if "computer tape [might] offer[] the least expensive, most convenient means of access to the" data for "this particular requester," agencies have "no obligation under FOIA to accommodate" every requester's preferences; agencies "need only provide responsive, nonexempt information in a reasonably accessible form." *Id.* at 763.

In rejecting this holding, Congress did not mandate that agencies comply with every request for release of records in every conceivable format. Instead, E-FOIA merely requires that an agency comply with a format request if the relevant record is "readily" reproducible in that format. That determination requires that the Court consider the "technical feasibility" of the request, and courts must "accord substantial weight to an affidavit of an agency concerning the agency's determination as to technical feasibility." 5 U.S.C. § 552(a)(4)(B). But "technically feasibile" is not "synonymous" with "readily reproducible," and the Court must also "consider the burden on the defendant" in producing records in a format that, although "technically

feasible," is not "readily" achieved. *Scudder*, 25 F. Supp. 3d at 38; *see also Long v. ICE*, 149 F. Supp. 3d 39, 55 (D.D.C. 2015). Assessing both the "technical feasibility" of a proposed format and the burden that would be imposed on the agency is necessarily a fact-dependent inquiry. *Scudder*, 25 F. Supp. 3d at 31.

The present context adds a slight twist on this inquiry. In one sense, Sai is not asking that the TSA *re*produce the relevant records in a new format; Sai is asking that it produce them in their original format. That context, of course, is not entirely alien to 5 U.S.C. § 552(a)(3)(B). As recounted above, Congress enacted the "readily reproducible" requirement in response to a judicial decision that involved a similar scenario. In *Dismukes*, the Bureau of Land Management kept data on computer tapes, yet it reproduced that information on microfiche for public disclosure. 603 F. Supp. at 760. Congress adopted the "readily reproducible" requirement in response, leaving little doubt that the "readily reproducible" requirement applies both to records that require conversion to a new format and to records, like those at issue here, that are sought in their original format, notwithstanding the fact that the agency can more easily release the records in a different format.

This Court's decision in *Scudder* provides helpful guidance. In that case, the CIA declined to release records in an electronic format, explaining that, due to security measures needed to protect classified materials, it could only produce the requested records as "paper printouts." 25 F. Supp. 3d. at 22. The district court rejected the contention that the CIA "is de facto exempt from the requirements of 5 U.S.C. § 552(a)(3)(B)," *id*. (emphasis omitted), and, instead, applied a fact-intensive approach, *id*. at 31. In doing so, the court adopted the test first articulated by the Court of Appeals for the Ninth Circuit in *TPS, Inc. v. United States Department of Defense*, 330 F.3d 1191 (9th Cir. 2003): "When an agency already creates or

converts documents in a certain format—be it for FOIA requestors, under a contract, or in the ordinary course of business—requiring that it provide documents in that format to others does not impose an unnecessarily harsh burden, absent specific, compelling evidence as to significant interference or burden." *Id.* at 1195; *see also Scudder*, 25 F. Supp. 3d at 32.

Applying that standard here, the Court concludes that the TSA has not—at least on the present record—carried its burden of demonstrating that it could not have "readily" produced the relevant electronic records in their original format as requested. There is no question that the TSA had the technical capacity to format the records in the manner requested; indeed, that is how the records were originally formatted and used by the agency. For obvious reasons, the TSA does not contest this point. Rather, the agency argues that releasing records under FOIA in their original format would be unduly burdensome because its FOIA processing software, and its SSI review process, require reformatting the records as PDF files, and because it lacked the technical sophistication to redact files in their original formats. *See* Dkt. 118 at 8–10; Dkt. 118-1 at 3–4 (3d Supp. McCoy Decl. ¶¶ 12–16).

The TSA may be able to show that Sai's request that the agency release the records in their original format posed a burden on the agency of sufficient magnitude to justify its rejection of that request. It may be able to show, for example, that it could not have, at the time, "readily" ensured that redactions were not countermanded. It has yet to do so, however, and the TSA's primary contention that the request was incompatible with the agency's then-existing FOIA processing software is in tension with the language and purpose of the E-FOIA amendments. The statute asks whether the record at issue "is readily reproducible by the agency in" the requested format, 5 U.S.C. § 552(a)(3)(B), and not whether reproducing the file in that format would complicate the agency's FOIA review process. Even more significantly, the next sentence

of the statute demands that agencies "make reasonable efforts to maintain . . . records in forms or formats that are reproducible for purposes of" E-FOIA. *Id.* And perhaps most significantly, Congress's goals of "improv[ing] public access to agency records," Pub. L. No. 104-231, § 2, 110 Stat. 3048 (1996), and "maximiz[ing] the usefulness of agency records," *id.*, would be easily frustrated if an agency could reject a request to release records in a particular format simply on the ground that releasing the records in that format would make the FOIA review process more difficult. Because the TSA has yet to show that Sai's format request posed a "significant interference or burden" beyond increased FOIA-processing costs, and because it has yet to show that administrative costs of that type constitute a legally sufficient basis for rejecting a format request, the TSA is not entitled to summary judgment with respect to the format of the records released in response to Sai's Policies Request and BOS and SFO Re-Requests. TSA has similarly failed to carry its burden of demonstrating that it could not have "readily" produced the records responsive to the Policies Request in "fully digital," non-"rasterized" "text PDFs" as requested.

3. *Legibility*

Finally, Sai argues that the TSA's response to the BOS and SFO Requests were deficient because six pages of records that the agency released were "completely illegible." Dkt. 111-2 at 2 (listing "2013-TSPA-00368 Bates 003-004, 006-007; 2013-TSFO-01096 Bates 009-010"). These records include a handwritten "Incident/Event Reporting Form" in response to Sai's SFO Request, Dkt. 143-2 at 6–7; scans of Sai's passport and boarding pass in response to the SFO Request, *id.* at 3; *see also* Dkt. 57-5 at 3, and a spreadsheet in response to Sai's BOS Request, Dkt. 141-2 at 9–10. Upon review of those documents, the Court agrees that the records are illegible. FOIA requesters are entitled to a legible copies of responsive agency records. *Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health & Human Servs.*, 844 F. Supp. 770, 779 (D.D.C.

1993) ("Without question, a FOIA respondent has a duty to release legible, complete records.").

Accordingly, the Court must also deny summary judgment as to these six pages: Dkt. 143-2 at 3,

6–7; Dkt. 141-2 at 9–10.

*   *   *

In sum: many of Sai's objections regarding the format of responsive records are

meritless.  With respect to the following objections, however, the Court concludes that the TSA

has yet to carry its burden on summary judgment:  First, as to the Policies Request, the TSA has

failed to explain why it could not "readily" have released the records as distinct PDFs or in "fully

digital," non-"rasterized" "text PDFs."  Second, as to the BOS and SFO Re-Requests, the TSA

has failed to explain why it could not have "readily" released the records in their original Word,

Excel, electronic PDF, or like format.  Third, with respect to six pages of records, the agency has

failed to explain why it could not have released legible copies.  Finally, with respect to the

Policies Request, the Court will provide Sai with the opportunity to identify any spreadsheets

that Sai received in a format that was not useful.  In all other respects, the TSA is entitled to

summary judgment on the format issues.

**B.      Adequacy of Searches**

Sai also argues that the searches that the TSA conducted in response to Sai's FOIA/PA

requests were inadequate.  Dkt. 111-2 at 5–19.  The adequacy of an agency's search for records

"is analyzed under the same standard" for purposes of both FOIA and the Privacy Act.

*Thompson v. U.S. Dep't of Justice*, 146 F. Supp. 3d 72, 82 (D.D.C. 2015).  Under both statutes,

the adequacy of the "search is generally determined not by the fruits of the search, but by the

appropriateness of the methods used to carry [it] out."  *Iturralde v. Comptroller of Currency*, 315

F.3d 311, 315 (D.C. Cir. 2003).  The agency "cannot limit its search to only one record system if

there are others that are likely to turn up the information requested," but, at the same time, it

need not "search every record system." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Similarly, the agency need not deploy every conceivable search term or permit the FOIA requester to dictate the search terms in the course of litigation, but it must use terms reasonably calculated to locate responsive records. *See Agility Public Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d 313, 339 (D.D.C. 2015) ("Where the search terms are reasonably calculated to lead to responsive documents, the Court should not 'micro manage' the agency's search."); *see also Physicians for Human Rights v. U.S. Dep't of Def.*, 675 F. Supp. 2d 149, 164 (D.D.C. 2009) ("[Agencies have] discretion in crafting lists of search terms that they believe[] to be reasonably tailored to uncover documents responsive to the FOIA request.").

The "agency fulfills its obligations under FOIA" and the Privacy Act "if it can demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)). To prevail on summary judgment, the agency must submit affidavits (or declarations) that "'denote which files were searched,' [and] by whom those files were searched, and [that] reflect a 'systematic approach to document location.'" *Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 144 (D.D.C. 2015) (quoting *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 371 (D.C. Cir. 1980)); *see also Baker & Hostetler LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006); *Oglesby*, 920 F.2d at 68. Those affidavits (or declarations) "are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs.*, 926 F.2d at 1200 (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)). But where "a review of the record raises substantial doubt, particularly in view of 'well defined requests and positive

indications of overlooked materials,' summary judgment is inappropriate." *Valencia-Lucena*, 180 F.3d at 326 (citation omitted).

        1.     *BOS and SFO Requests and Re-Requests*

Sai raises three challenges to the adequacy of the TSA's search for records responsive to the BOS and SFO Requests and Re-Requests. Sai contends that the TSA (a) failed to search all offices that might have responsive records; (b) failed "to adequately document the timing," and thus the cut-off dates, for the relevant searches; and (c) failed adequately to document the "keywords" used and the "database indices" searched. Dkt. 111 at 2. The Court will consider each of these contentions in turn.

        (a)     <u>Offices Searched</u>

Sai first asserts that the TSA did not search the following offices "for records, such as emails, in relation to [Sai's] complaints" of mistreatment at the TSA checkpoints: the Office of Security Operations ("OSO"), the Office of Strategic Communications and Public Affairs ("OPA"), the Office of Civil Rights and Liberties, the office of Ombudsman and Traveler Engagement ("OCR&L"), the SFO field office, Covenant Aviation Security, the TSA FOIA Branch, the BOS field office, the TSA Contact Center ("TCC"), the Office of Chief Counsel ("OCC"), the Office of the Executive Secretariat, the Office of Legislative Affairs ("OLA"), the Department of Homeland Security ("DHS"), and the DHS Office for Civil Rights and Liberties. Dkt. 111-2 at 5–6.

As explained in the McCoy declaration, the TSA has 39 program offices and operates at over 450 airports, and it "does not maintain a central index of records sorted by individuals to whom they relate." Dkt. 99-3 at 5 (McCoy Decl. ¶ 12). The TSA was not required to search every office or location for potentially responsive records, *Oglesby*, 920 F.2d at 68, but, rather, was merely required to engage in a search that was reasonably calculated to find the relevant

records, *Valencia-Lucena*, 180 F.3d at 325. In an effort to do so, the TSA searched numerous offices, including several of the offices that Sai claims went unsearched.

McCoy attests that, in response to the BOS Request, the TSA's FOIA Branch tasked the field offices for the Logan, LaGuardia, and O'Hare Airports with searching for responsive records. Dkt. 99-3 at 5 (McCoy Decl. ¶ 13). Those field offices are part of the OSO, one of the offices that Sai says the TSA neglected to search. *Id.* (McCoy Decl. ¶ 14). The TSA also tasked the TSOC, which is part of the OLE/FAMS, with conducting a search, *id.* at 6 (McCoy Decl. ¶ 18), and OLE/FAMS searched its Logan Airport "office for responsive records, including those maintained by the Special Agent in Charge[] and the TSOC," *id.* at 7 (McCoy Decl. ¶ 20). Finally, the TSA tasked the TCC with searching for responsive records. *Id.* at 7 (McCoy Decl. ¶¶ 21–23). Significantly, the "TCC is part of the Customer Service Branch of [the] TSA's Office of Civil Rights and Liberties, Ombudsman & Traveler Engagement Division" and "is responsible for fielding and providing timely responses to the traveling public via telephone and email to answer questions, provide guidance, and facilitate problem resolution." *Id.* (McCoy Decl. ¶ 22).

In responding to the SFO Request, the TSA tasked the TSA's field office at the San Francisco Airport and TCC with searching for responsive records. *Id.* at 20 (McCoy Decl. ¶ 62, 64). The TSA also searched the Disability Branch of the Office of Civil Rights and Liberties, Ombudsman and Traveler Engagement, which is the "primary point of contact within TSA for supporting the DHS disability policy agenda." *Id.* at 21 (McCoy Decl. ¶¶ 67–68). The Disability Branch searched for all records relating to Sai (not just records relating to the SFO incident), which located emails, deliberative drafts, and Sai's administrative complaints. *Id.* (McCoy Decl. ¶ 69).

Finally, in response to the BOS and SFO Re-Requests, the TSA tasked the Logan and San Francisco Airport field offices, the TCC, and OLE/FAMS with searching for records that post-dated those found in the earlier search. *Id.* at 44 (McCoy Decl. ¶ 127). TSA found no responsive records to these requests that were not already included in the productions for the BOS and SFO Requests. *Id.* at 47 (McCoy Decl. ¶¶ 136, 139).

The McCoy declaration must be accorded a presumption of good faith, *see SafeCard Servs.*, 926 F.2d at 1200, and it demonstrates that much of Sai's concern about the scope of the TSA's search is incorrect or overstated. Despite Sai's assertions to the contrary, the uncontroverted record demonstrates that relevant portions of the Logan, LaGuardia, O'Hare, and San Francisco Airport field offices were searched, along with relevant portions of the Office of Security Operations, Office of Civil Rights and Liberties, and the TSA Contact Center. The lone response that Sai offers to McCoy's declaration is that the only email released was from the Disability Branch, Dkt. 111-2 at 6−7, but failure to uncover records does not mean that the search was inadequate, *see Iturralde*, 315 F.3d at 315 ("[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search."); *Boyd*, 475 F.3d at 391 ("[T]he fact that a particular document was not found does not demonstrate the inadequacy of a search."). Moreover, the fact that the Disability Branch may have been copied on responsive emails does not indicate that those emails were not obtained from the offices from which they originated.

A number of the other offices that Sai claims the TSA should have searched lie beyond the TSA's purview or beyond the scope of Sai's request and this litigation. As Sai recognizes, Covenant Aviation Security is a private contractor, Dkt. 111-2 at 6 n.13, and thus is not subject to FOIA, *Roman v. Dep't of the Air Force*, 952 F. Supp. 2d 166, 175 (D.D.C. 2013) (citing *U.S.*

*Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 144–45 (1989)).  Similarly, Sai contends that the

TSA failed to search the Department of Homeland Security or the DHS Office of Civil Rights

and Liberties for responsive records, but Sai submitted the FOIA/PA requests only to the TSA,

and the DHS FOIA regulations require that a requester "write directly to the Department

component that maintains [the] records" sought.  6 C.F.R. § 5.3(a) (2003) (superseded 2016); *see

also* 6 C.F.R § 5.1(b) (defining "component" to mean "each separate bureau, office, division,

commission, service, center, or administration").  "As a result, only the component to which the

FOIA request is directed has an obligation to conduct a search."  *Ewell v. U.S. Dep't Justice*, 153

F. Supp. 3d 294, 302 (D.D.C. 2016) (interpreting analogous Department of Justice regulation).

The Court is not convinced on the current record, however, that the TSA has carried its

burden with respect to four offices that Sai contends were not, but should have been, searched.

First, Sai faults the TSA for failing to conduct a search of the agency's FOIA Branch for

responsive records.  Dkt. 111-2 at 6.  The TSA, for its part, offers no relevant response.  It

merely asserts that Sai's request for all records "related to [him] held by any relevant parties"

was overly broad, Dkt. 99-3 at 5 (McCoy Decl. ¶ 12), requiring the agency to focus its search on

specific offices "based on the particular subject matters described in correspondence with [Sai]

related to [his] request[s]," *Id.* (McCoy Decl. ¶ 13), or "[b]ased on the particular information

reasonably described in the request," *id.* at 20 (McCoy Decl. ¶ 62).  The TSA is correct that it

was not required to conduct "an unreasonably burdensome search," *Goland*, 607 F.2d at 353, and

was not required to search every TSA office and every TSA file system for records "related to"

Sai.  But the agency seems to concede, as it must, that it was required to conduct a search

reasonably calculated to find records "reasonably described in the request."  That much seems

settled.  What the TSA fails to acknowledge, however, is that both the BOS and SFO Requests

expressly sought "all documents and communication[s] related to or responding to" the requests, "whether internal or external." Dkt. 99-3 at 51 (McCoy Decl. Ex. A) (BOS Request); *id*. at 59 (McCoy Decl. Ex. D) (interim response confirming request for same); *id*. at 67 (final release confirming request for same); *id*. at 86 (McCoy Decl. Ex. L) (SFO Request); *id*. at 89 (McCoy Decl. Ex. M) (confirmation of receipt of request for same); *id*. at 92 (McCoy Decl. Ex. N) (interim response confirming request for same); *id*. at 99 (McCoy Decl. Ex. P) (final release confirming request for same). Those requests can only reasonably be construed to encompass FOIA processing records, and, as this Court has previously recognized, FOIA is applicable to the FOIA process itself. *See Shapiro v. U.S. Dep't of Justice*, 153 F. Supp. 3d 253, 276 (D.D.C. 2016). Because the TSA offers no meaningful explanation for why it did not search its FOIA Branch for records "related to responding to" Sai's FOIA requests, the TSA is not entitled to summary judgment with respect to this portion of Sai's claims.

Although less clear, the Court is also unconvinced based on the current record that the TSA correctly declined to search for responsive records held by its Office of Legislative Affairs. To be sure, Sai did not specifically request records from the Office of Legislative Affairs, and that office does not leap to mind when asked where records relating to incidents that occurred at various airport security checkpoints might be found. But correspondence from and to Speaker Pelosi's office relating to the incident evidently came to the TSA's attention in the course of responding to Sai's FOIA requests, *see, e.g.*, Dkt. 145-2 at 123, and that correspondence should have caused the agency to inquire whether the Office of Legislative Affairs possessed other, potentially responsive records. *See Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998) ("An agency . . . must revise its assessment of what is [a] "reasonable" [search] in a particular case to account for leads that emerge during its inquiry.").

Finally, the Court is not convinced that TSA correctly declined to search for responsive records held by its Office of Chief Counsel and Office of the Executive Secretariat. Email correspondence released to Sai indicates that individuals in those offices had some involvement, even if only minimal, in addressing Sai's complaints, *see* Dkt. 145-2 at 61, 123, 143; Dkt. 144-3 at 58–62, 73, and the TSA has acknowledged that it did not search those offices for records responsive to Sai's SFO request, *see* Dkt. 99-3 at 20–21 (McCoy ¶¶ 63, 66–68). This correspondence indicates that these offices may have possessed records responsive to the SFO Request, and, on the current record, the Court is unable to conclude that TSA conducted a search "reasonably calculated to uncover all relevant documents" with respect to those offices. *See Valencia-Lucena*, 180 F.3d at 325.

In sum: the Court agrees, with the four exceptions described above, that the TSA searched those offices that were likely to have records responsive to Sai's BOS and SFO Requests and Re-Requests. The exceptions are the TSA's FOIA Branch, its Office of Legislative Affairs, its Office of Chief Counsel, and its Office of the Executive Secretariat. For present purposes, the Court holds only that the TSA has yet to carry its burden with respect to those four offices.

(b)  Time Frame for the Search

Sai also argues that the TSA has failed to demonstrate that it searched for records covering the relevant time frame. The Court agrees.

The governing DHS FOIA regulations at the time of Sai's request provided that, "[i]n determining which records are responsive to a [FOIA/PA] request, a component," like the TSA, should "ordinarily . . . include only records in its possession as of the date that it begins its search." 6 C.F.R. § 5.4(a) (2003) (superseded 2016) (FOIA); 6 C.F.R. § 5.22(a) (Privacy Act).

If a different date is used, the component is required to "inform the requester of that date."  6 C.F.R. § 5.4(a) (2003); 6 C.F.R. § 5.22(a).  The DHS regulations comport, moreover, with the D.C. Circuit's admonition that, absent a specific justification, agencies should respond to requests seeking records created or obtained up to the date of search.  *See Pub. Citizen v. Dep't of State*, 276 F.3d 634, 644 (D.C. Cir. 2002); *see also Defs. of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 12 n.10 (D.D.C. 2004).

The problem here is that the TSA has not submitted evidence sufficient for the Court to determine when it commenced each of the relevant searches.  Sai asserts, without contradiction from the TSA, that the most recent e-mail released in response to Sai's FOIA/PA requests was dated July 7, 2014, and that Sai did not receive responses to some of the requests until 2016.  Dkt. 111-2 at 7; *see also* Dkt. 99-3 at 187 (McCoy Decl. Ex. DD).  From this and the fact that the TSA continued to review Sai's administrative Rehabilitation Act complaints in the interval between July 7, 2014, and January 6, 2016, when Sai received the final response to the BOS and SFO Re-Requests, Sai infers that the TSA's search could not have encompassed the entire, relevant timeframe.  Dkt. 111-2 at 7; *see also* Dkt. 99-3 at 187 (McCoy Decl. Ex. DD) (final response to BOS and SFO Re-Requests).

In response, the TSA notes that the July 7, 2014 email was dated "just weeks" after it issued its "interim and final releases in the BOS and SFO Requests" and that "[i]t is not unreasonable for an agency to take time after the completion of a FOIA search to review and process the responsive records."  Dkt. 118 at 12.  That response, however, ignores the BOS and SFO Re-Requests, which were not processed until much later.  Indeed, the TSA acknowledges that it did not initially treat the Re-Requests as distinct FOIA/PA requests and that was not until September 21, 2015 that the agency sent Sai "an acknowledgement letter" for those requests.

Dkt. 99-3 at 43 (McCoy Decl. ¶¶ 123–24).  Although the TSA correctly observes that Sai's

objection is premised on the "speculat[ion] as to the dates that [the relevant] searches ended,"

Dkt. 118 at 13, that speculation is a product of the fact that the TSA, which has sole access to the

relevant information, has not revealed *when* the search occurred and *what* cut-off date that the

agency applied.[5]

Finally, the TSA argues that because the BOS and SFO Re-Requests "sought records

related to two incidents that occurred in 2013, and because the agency had already conducted

adequate, reasonable searches for responsive records," it is "unsurprising" that "no new records

were uncovered" in response to those requests.  Dkt. 118 at 14.  That may be so, but there is

reason to believe that new records were created after the date of the original requests in the

course of the TSA's consideration of Sai's Rehabilitation Act complaints, and, without evidence

regarding the temporal scope of the TSA's search, it is impossible to know whether the search

was adequate.  Under these circumstances, the Court, accordingly, cannot conclude that the TSA

has carried its burden on this issue for purposes of summary judgment.

One last, related issue bears note, however.  The TSA is correct that the BOS and SFO

Re-Requests required the agency to search only for records relating to the original BOS and SFO

incidents, which occurred in early 2013.  That is what Sai sought when Sai made the re-requests

in November 2013, Dkt. 28-3 at 11–12, and, as the TSA correctly observes, a FOIA requester

cannot, years later and after a dispute is in litigation, expand the scope of a request by merely

asserting, as Sai did, that "due to the [the agency's] delay," the request "now also encompasses

records relating to" events that occurred long after the original request.  Dkt. 99-3 at 182 (McCoy

---

[5]  Although the TSA asserts that Sai has speculated about when the "searches *ended*," it is
actually the date the searches *started* that matters under the governing regulations.  *See* 6 C.F.R.
§ 5.4(a) (2003) (superseded 2016); 6 C.F.R. § 5.22(a).

Decl. Ex. BB); *see Houser v. Church*, 271 F. Supp. 3d 197, 204 (D.D.C. 2017); *Donoghue v. Office of Info. Policy, U.S. Dep't of Justice*, 157 F. Supp. 3d 21, 23 n.2 (D.D.C. 2016); *Coss v. U.S. Dep't of Justice*, 98 F. Supp. 3d 28, 34 (D.D.C. 2015). Even if later-created records might fall within the scope of an open-ended request, the BOS and SFO Re-Requests were not open-ended: they sought only records relating to "the two incidents" that occurred at the Logan and San Francisco Airports in early 2013. Dkt. 28-3 at 11. To the extent Sai seeks records relating to other incidents, Sai must submit a new FOIA request. *See Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996).

(c)    Adequacy of the Searches

Sai further contends that the TSA "failed to provide adequate record evidence . . . document[ing]" the "keywords" and "database indices" searched. Dkt. 111 at 2. The Court agrees that the TSA has failed to meet its burden with respect to some of the offices searched.

"To establish that it has conducted an adequate FOIA search, [an agency] must provide a 'reasonably detailed' affidavit containing 'search terms and the type of search performed, and averring that all files likely to contain responsive materials . . . were searched . . . to allow the district court to determine if the search was adequate in order to grant summary judgment.'" *Anderson v. U.S. Dep't of State*, 661 F. Supp. 2d 6, 10 (D.D.C. 2009) (quoting *Oglesby*, 920 F.2d at 68). "Affidavits that include search methods, locations of specific files searched, descriptions of searches of all files likely to contain responsive documents, and names of agency personnel conducting the search are considered sufficient." *Ferranti v. Bureau of Alcohol, Tobacco & Firearms*, 177 F. Supp. 2d 41, 47 (D.D.C. 2001) (citing *Weisberg*, 705 F.2d at 1348). In contrast, in the absence of other indicia of a thorough search, a declaration that "fail[s] to document the search terms used" in an electronic search will not provide the Court with

34

sufficient basis to grant summary judgment in favor of the agency. *Anderson*, 661 F. Supp. 2d at

11 (quoting *Aguirre v. SEC*, 551 F. Supp. 2d 33, 60 (D.D.C. 2008)); *see also Friends of*

*Blackwater*, 391 F. Supp. 2d at 120 (explaining that the agency's failure to "enumerate any

specific search terms used in examining the agency's electronic files" raised doubts as to the

adequacy of the search); *see also Judicial Watch, Inc. v. U.S. Dep't of Justice*, 185 F. Supp. 2d

54, 64 (D.D.C. 2002) ("The . . . declaration fails to explain whether key words were used and if

so which key words were used to search for responsive documents.  Without knowing these

details regarding defendant's search, the Court cannot determine whether defendant's efforts

were 'reasonably calculated' to recover the responsive records.").

   With respect to the databases searched, the McCoy declaration describes in sufficient

detail the locations and databases within each office searched in response to the BOS and SFO

Requests, *see* Dkt. 99-3 at 6–8 (McCoy Decl. ¶¶ 15–17, 20, 23) (BOS Request); *id.* at 20–21

(McCoy Decl. ¶¶ 63, 65–66, 69) (SFO Request).  In response to the BOS and SFO Re-Requests,

however, the TSA merely states that the FOIA Branch tasked the SFO, BOS, TCC, and

Disability Branch offices to search for responsive records, but does not explain which databases

or locations were searched within those offices.  *Id.* at 46, 47 (McCoy Decl. ¶¶ 134, 137).

Although the Court assumes that the TSA searched the same databases and locations as it did in

response to the BOS and SFO Requests, the agency must describe its searches in greater detail to

meet its burden on summary judgment.

   With respect to the search terms used, the McCoy declaration provides an accounting of

the terms used for the majority of the offices searched.  In response to the BOS Request, for

example, the McCoy declaration reports that the BOS field office searched electronic records

"using Plaintiff's name as a search term," Dkt. 99-3 at 6 (McCoy Decl. ¶ 15); the LGA field

office searched "using Plaintiff's name" as well as "the date of the LGA incident," *id.* (McCoy Decl. ¶ 16); and the TCC office "electronically searched its centralized database for records containing Plaintiff's name, phone number, and email address" as well as "the date and flight number of Plaintiff's scheduled travel on the day of the BOS incident, for complaints related to the TSA employees involved in the BOS incident, and for complaints referencing the BOS airport agents or police," *id.* at 7–8 (McCoy Decl. ¶ 23). Similarly, in response to the SFO Request, the McCoy declaration explains that the TSA searched the TCC office "for records containing Plaintiff's name, the names and badge numbers of the TSA and CAS employees . . . , for complaints using the search terms 'carry-on liquids' and 'San Francisco Airport (SFO).'" *Id.* at 21 (McCoy Decl. ¶ 65). As to the McCoy declaration's description of its search of these offices, the Court finds that it has provided "necessary details . . . about the scope or methods of the searches conducted," *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 91–92 (D.D.C. 2009), and meet its burden of showing that the search was adequate.

The TSA has failed, however, adequately to describe the searches it conducted for records in the following offices: the ORD field office and OLE/FAMS office in response to the BOS Request; the SFO field office and Disability Branch office in response to the SFO Request; and the BOS, SFO, TCC, and Disability Branch offices in response to the Re-Requests. For those offices, the TSA does not identify the search terms it used, instead merely stating that it searched "for responsive records," Dkt. 99-3 at 6–7, 20–21, 46–47 (McCoy Decl. ¶¶ 17, 20, 63, 66, 69, 134, 137), or "records related to Plaintiff," *id.* at 21 (McCoy Decl. ¶ 69). Without knowing the search terms the TSA used, the Court cannot determine whether its efforts were "reasonably calculated" to locate responsive records in those offices.

In sum: the Court concludes that the TSA has failed to carry its burden of showing that its searches for the records Sai requested in the BOS and SFO Requests and Re-Requests covered the relevant timeframe—from the date of the relevant incident to the date the search commenced. The Court also concludes that the TSA has failed to carry its burden of showing that it conducted a search "reasonably calculated" to recover responsive records with respect to the databases searched in response to the BOS and SFO Re-Requests and with respect to the search terms used to search the ORD and OLE/FAMS offices in response to the BOS Request; the SFO and Disability Branch offices in response to the SFO Request; and the BOS, SFO, TCC, and Disability Branch offices in response to the Re-Requests.

2.    *Policies Request*

The scope of the TSA's search for records responsive to Sai's Policies Request raises a distinct set of issues. The parties agree about two things: First, Sai requested "*[a]ll* TSA policy and/or procedures documents" that were "not already" available through the agency's electronic reading room, "including both old [and] current versions" of those documents. Dkt. 99-3 at 125 (McCoy Decl. Ex. S); Dkt. 118 at 15. Second, the TSA did not search for—and, thus, did not release—"all" such records. Dkt. 111-2 at 8; Dkt. 118 at 15. At that point, however, the parties' agreement ends. Sai lists dozens of policies that Sai contends the TSA released in response to third-party FOIA requests, that the TSA identified in other litigation, or that "confidential source(s)" brought to Sai's attention. Dkt. 111-2 at 8–10, 17; Dkt. 116-1 at 1–3. Those policies, which the TSA failed to release in response to Sai's request, run the gamut from the TSA's "Checked Baggage," "Advanced Imaging Technology," "Colorimetric," "Expedited Screening," "Travel Document Checkpoint," and "K9" Standard Operating Procedures ("SOPs"), Dkt. 111-2 at 8–10, to various reports relating to the TSA's "Screening Passengers Through Observations Techniques" ("SPOT") program, Dkt. 116 at 1; Dkt. 116-1 at 1–3. The TSA, for its part, does

not engage on whether these records exist, but rather argues that Sai's request for "all" TSA policies and procedures—past and present—not already available through the agency's electronic reading room was vastly overbroad and that all that the agency could do was make a reasonable effort to respond to what it perceived to be the core of Sai's request. Dkt. 118 at 16–17.

The Court agrees with the TSA. An agency is required to respond to a FOIA request only if the request "reasonably describes" the records sought. 5 U.S.C. § 552(a)(3)(A). More importantly for present purposes, "[a]n agency need not honor a [FOIA or Privacy Act] request that requires 'an unreasonably burdensome search.'" *Am. Fed'n of Gov't Emps., Local 2782 v. U.S. Dep't of Commerce*, 907 F.2d 203, 208–09 (D.C. Cir. 1990) (quoting *Goland*, 607 F.2d at 353). As a result, "it is the requester's responsibility to frame [his or her request[] with sufficient particularity to ensure that searches are not unreasonably burdensome, and to enable the searching agency to determine precisely what records are being requested." *Assassination Archives & Research Ctr. Inc. v. CIA*, 720 F. Supp. 217, 219 (D.D.C. 1989); *see also Bloeser v. U.S. Dep't of Justice*, 811 F. Supp. 2d 316, 321 (D.D.C. 2011). A description is sufficient if it would enable "a professional employee of the agency who [is] familiar with the subject area of the request to locate the record with a reasonable amount of effort." *Dale v. IRS*, 238 F. Supp. 2d 99, 104 (D.D.C. 2002) (quoting *Marks v. United States*, 578 F.2d 261, 263 (9th Cir. 1978)). In contrast, "[b]road sweeping requests lacking specificity are not sufficient." *Id*.; *see also Pinson v. U.S. Dep't of Justice,* 245 F. Supp. 3d 225, 244 (D.D.C. 2017) (same); *Tereshchuk v. Bureau of Prisons*, 67 F. Supp. 3d 441, 454 (D.D.C. 2014) (same); *Sack v. CIA*, 53 F. Supp. 3d 154, 164 (D.D.C. 2014) (same); *Am. Fed'n of Gov't Emps. v. Dep't of Commerce*, 632 F. Supp. 1272, 1277–78 (D.D.C. 1986) (same).

Measured against this standard, there is little doubt that the Policies Request did not "reasonably describe" a class of documents subject to disclosure. *Am. Fed'n of Gov't Emps.*, 907 F.2d at 209. Indeed, it is difficult to imagine how the TSA could have complied with Sai's request for all "policy and/or procedures documents," past and present, including all "Management Directives, Standard Operating Procedures, Operations Directives, Security Directives, Emergency Amendments, Information Circulars, Memoranda, Handbooks, Letters, Bulletins, and Guidance," Dkt. 99-3 at 125 (McCoy Decl. Ex. S), short of searching virtually every file at the agency and then guessing what Sai actually hoped to receive. Nor did Sai's nine more specific requests, and twenty-seven non-exclusive subparts, add the required specificity. They sought all TSO polices, past and present, dealing with "screening procedures," "the treatment of passengers with disabilities," violations by TSA personnel of policies "in a way that infringes on the rights of travelers," "cooperation with local airports and police," "when checkpoint video may be released," the TSA's "no fly" list and "any similar lists," "legal justification for" declining to allow passengers to "revoke consent to administrative search once they have entered a screening area," and "Behavior Detection Officer training materials" and "any studies investigating their efficacy." Dkt. 99-3 at 125–27 (McCoy Decl. Ex. S).

The TSA, moreover, provided Sai with ample opportunity to refine the request. Shortly after Sai submitted the request, the TSA wrote to Sai, explaining: "After careful review of your FOIA request, we [have] determined that the request is too broad in scope or [does] not specifically identify the records [that] you are seeking." Dkt. 99-3 at 132 (McCoy Decl. Ex. T). The TSA, accordingly, invited Sai to "resubmit [the] request containing a reasonable description of the records [sought]" and cautioned that the "request [would] not be entered into [the agency's] processing queue until [it] receive[d] clarification." *Id.* (McCoy Decl. Ex. S). Sai did

not respond to this invitation, and the agency therefore "administratively closed" the request on May 9, 2013. *Id.* at 30 (McCoy Decl. ¶ 92).

Although the TSA did, in an exercise of "discretion," subsequently process Sai's request "to the extent" it was able "reasonably" to identify responsive records, *id.* at 31 (McCoy Decl. ¶ 93), it never agreed to search for "*[a]ll* TSA policy and/or procedures documents," past and present, Dkt. 118-1 at 5 (3d Supp. McCoy Decl. ¶ 17); Dkt. 118 at 16–17, nor—for the reasons explained above—was it required to do so. It is thus both unsurprising and unavailing that Sai has been able to identify "policy and procedures documents" that Sai says the TSA failed to release. The TSA represents that complying in full with Sai's request "would have created an extreme burden on and undue hardship for the entire agency and, in particular, the FOIA Branch." Dkt. 118-1 at 6 (3d Supp. McCoy Decl. ¶ 19). That assertion is entitled to a presumption of good faith, *SafeCard Servs.*, 926 F.2d at 1200, and it is convincing given the breadth of Sai's request.

Even though the TSA was not required to respond to Sai's unrefined Policies Request, it nonetheless made a good faith effort to provide at least a partial response. The FOIA Branch tasked—and, on occasion, re-tasked—fifteen offices with searching for the records that the agency reasonably believed lay at the heart of Sai's request. Dkt. 99-3 at 31, 31–35 (McCoy Decl. ¶¶ 94–107). The McCoy declaration provides a detailed account of the efforts of each of these offices to locate potentially responsive records, while necessarily construing and limiting Sai's request to avoid the "unreasonable burden" that a full response would have entailed. *Am. Fed'n of Gov't Emps.*, 907 F.2d at 209. All told, the TSA released over 3,000 pages of records responsive to Sai's Policies Request, and it reviewed approximately 900 additional pages of records that were withheld for reasons discussed below. Dkt. 99-3 at 35–37 (McCoy Decl.

¶¶ 109–12).

Sai's opposition ignores the fact that the TSA reasonably, and lawfully, concluded that the request was overbroad and that the agency would have acted well within its rights had it simply declined to conduct any search until Sai accepted its invitation to clarify and narrow the request. *See* Dkt. 111-2 at 8–19. Apparently, in Sai's view, having provided *some* response, the TSA was obligated to provide a *full* response. That contention, however, is at odds with FOIA's "dominant objective" of disclosure. *Rose*, 425 U.S. at 361. If that nothing-or-all approach were to prevail, agencies would have a strong incentive to reject wildly overbroad FOIA requests, like Sai's Policies Request, and to refuse to make any effort to provide what they reasonably can. Nothing in FOIA or the governing law requires that agencies or the courts adopt such a counterproductive approach. Sai had the opportunity to refine the Policies Request, and Sai remains free to submit further requests that "reasonably describe[]" the records sought, 5 U.S.C. § 552(a)(3)(A), and that do not require that the agency engage in "an unreasonably burdensome search," *Am. Fed'n of Gov't Emps.*, 907 F.2d at 209 (quoting *Goland*, 607 F.2d at 353). Having failed to frame the request with sufficient specificity, Sai cannot now fault the TSA for conducting an onerous, but not exhaustive, search based on its best assessment of what records were most important to Sai.

C.      **Withholdings**

Sai also challenges the TSA's reliance of FOIA Exemptions 3, 5, 6, and 7(C) to withhold or to redact certain records. The Court will address each exemption in turn.

1.      *Exemption 3*

FOIA Exemption 3 shields from disclosure materials that are "specifically exempted from disclosure by statute" so long as that statute "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A)(ii). 49 U.S.C.

§ 114(r) creates such a specific, statutory exemption to disclosure. It provides, in relevant part, that notwithstanding FOIA, the TSA "shall prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security under authority of the Aviation and Transportation Security Act, Pub. L. No. 107-71, or under chapter 449 of [title 49 of the U.S. Code] if the [TSA] decides that disclosing the information would (A) be an unwarranted invasion of personal privacy; (B) reveal a trade secret or privileged or confidential commercial or financial information; or (C) be detrimental to the security of transportation."[6] 49 U.S.C. § 114(r)(1). The SSI implementing regulations, in turn, specify a number of categories of information and records constituting SSI, including records relating to "[s]ecurity programs and contingency plans," "airport operator" security or security contingency plans, "security incident response plan[s]," various "[s]ecurity [d]irectives," notices issued by DHS or the Department of Transportation "regarding a threat to aviation . . . transportation," "performance specification[s] and any description of a test object or test procedure," "vulnerability assessment[s]," "[d]etails of any security inspection or investigation of an alleged violation of aviation . . . transportation security," threat information, "[s]ecurity measures . . . recommended by the Federal government," and "information regarding security screening under aviation . . . transportation security requirements of Federal law." 49 C.F.R. § 1520.5. Those permitted access to SSI are prohibited from disclosing "or otherwise provid[ing] access to[] SSI" to anyone other than authorized recipients with a "need to know." 49 C.F.R. § 1520.9(a)(2). Moreover, and of

---

[6] Although the text of 49 U.S.C. § 114(r) refers to the "Under Secretary of Transportation for Security," who served as the head of the TSA at the time the agency was created, *see* Aviation and Transportation Security Act, Pub. L. No. 107-71, § 101 (2001), Congress transferred the TSA from the Department of Transportation to the Department of Homeland Security as part of the Homeland Security Act of 2002, Pub. L. No. 107-296, § 403. "In conjunction with the transfer of TSA to DHS, the Under Secretary . . . adopted the new title of Administrator." 69 Fed. Reg. 28,066, 28,068 (May 18, 2004).

particular relevance here, the governing regulations specify that, "notwithstanding the Freedom of Information Act, (5 U.S.C. § 552), the Privacy Act, (5 U.S.C. § 552a), and other laws, records containing SSI are not available for public inspection or copying, nor does [the] TSA . . . release such records to persons without a need to know."  49 C.F.R. § 1520.15(a).

Sai does not dispute that properly designated SSI is exempt from disclosure under both FOIA and the Privacy Act and, instead, argues that the TSA acted "without authority" in designating certain records as SSI.  Dkt. 111-2 at 25.  As Sai correctly observes, 49 U.S.C. § 114(r)(4) precludes the TSA from designating information as SSI for certain purposes; in particular, the TSA lacks authority to designate information as SSI "(A) to conceal a violation of law, inefficiency, or administrative error; (B) to prevent embarrassment to a person, organization, or agency; (C) to restrain competition; or (D) to prevent or delay the release of information that does not require protection in the interest of transportation security, including basic scientific research information not clearly related to transportation security."  Sai further contends that Congress, the DHS Inspector General, and others have criticized the TSA for, at times, improperly designating such information as SSI, Dkt. 111-2 at 26–28, and that the TSA has engaged in such improper designation here, *id.* at 21, 28.  Before reaching the merits of that contention, however, the Court must determine whether it has jurisdiction to do so.  It is at this threshold point that Sai's challenge founders.

This is not the first time that this Court has addressed whether it has jurisdiction to consider the contention that the TSA exceeded its authority in designating records that Sai sought as SSI.  Shortly after Sai filed this action, the TSA moved to strike the complaint to the extent it sought to challenge the TSA's designation of information as SSI.  Dkt. 51 at 9.  Such a challenge, the TSA argued, must be brought—if at all—in the Court of Appeals.  *Id.*  For the

most part, the Court agreed.  As the TSA correctly observed, 49 U.S.C. § 46110(a) provides that

"a person disclosing a substantial interest in an order issued . . . in whole or in part under [49

U.S.C. § 114(r)] may apply for review of the order by filing a petition for review in the United

States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the

United States for the circuit in which the person resides or has its principal place of business."[7]

That grant of jurisdiction in the courts of appeals, moreover, is exclusive, leaving the federal

district courts with no authority to review SSI orders issued pursuant to 49 U.S.C. § 114(r).  *See*

*Lacson v. U.S. Dep't of Homeland Sec.*, 726 F.3d 170, 173–77 (D.C. Cir. 2013) (discussing grant

of exclusive jurisdiction to the courts of appeals to review orders issued by the TSA under

§ 114(r)); *Nat'l Fed'n of the Blind v. U.S. Dep't of Transp.*, 827 F.3d 51, 57 (D.C. Cir. 2016)

("[S]ection 46110(a)'s direct-review provision removes the Rule from the purview of the district

court and places it within our exclusive jurisdiction."); *Standing Rock Sioux Tribe v. U.S. Army*

*Corps of Eng'rs*, 249 F. Supp. 3d 516, 519 (D.D.C. 2017) ("[F]ederal circuit courts have

exclusive jurisdiction to review TSA's SSI determinations."); *see also Telecomms. Research &*

*Action Ctr. v. FCC*, 750 F.2d 70, 77 (D.C. Cir. 1984) ("[E]ven where Congress has not expressly

stated that statutory jurisdiction is 'exclusive,' . . . a statute which vests jurisdiction in a

particular court cuts off original jurisdiction in other courts in all cases covered by that statute.").

Although the Court, accordingly, agreed with the TSA that it lacks jurisdiction to review SSI

orders, it concluded that it was "premature to dismiss Plaintiff's claims that documents were

improperly withheld on this ground" because the TSA had "yet to [produce] a *Vaughn* index or a

---

[7]  Although the statute refers to § 114(s), that section was redesignated as § 114(r) in 2008.  *See*
Consolidated Appropriations Act of 2008, Pub. L. No. 110-161, § 568(a).

fully developed record with respect to what materials were withheld on what grounds." Dkt. 74 at 13.

In returning to this issue, Sai now argues that the TSA improperly designated certain information as SSI in violation of 49 U.S.C. § 114(r)(4) and that "[a]ny designation of SSI in contradiction to [§]114(r)(4) is *ultra vires*, and cannot constitute an 'order' under 49 U.S.C. [§] 46110(a)." Dkt. 111-2 at 26. In other words, the exclusive jurisdiction of the courts of appeals to review "orders" issued under 49 U.S.C. § 114(r) does not, in Sai's view, extend to challenges to SSI designations premised on the anti-abuse provisions of § 114(r)(4). As Sai candidly concedes, no court has ever embraced—or even considered—parsing the jurisdictional rule set forth in § 46110(a) in this manner. Hrg. Tr. Mar. 13, 2018 (Rough at 11:48); Hrg Tr. Apr. 5, 2018 (Rough at 12:00). Nor can the Court perceive any textual or other reason to accept Sai's invitation to do so.

To start, the language of § 46110(a) draws no distinction between review of SSI determinations based on § 114(r)(1)—which defines the circumstances under which an SSI designation is proper—and those based on § 114(r)(4)—which defines the circumstances under which such a designation is improper. *Compare* 49 U.S.C. § 114(r)(1), *with* 49 U.S.C. § 114(r)(4). To the contrary, the statutory language is categorical: a person seeking to challenge an SSI order issued by the TSA under "subsection . . . (s) [now, subsection (r)] of section 114" must file a petition in the appropriate court of appeals. 49 U.S.C. § 46110(a).

The statute does not distinguish between the subparagraphs of § 114(r); rather, the courts of appeals have exclusive jurisdiction over *all* challenges to orders premised on § 114(r). Sai argues that the distinction Sai proposes can be found in Congress's use of the word "order." *See* Dkt. 111-2 at 26. Although some SSI designations constitute "orders," those that are *ultra vires*

are not "orders" and thus not subject to § 46110(a). *Id.* That contention, however, suffers from two flaws. First, Sai does not—and cannot—explain why the same logic does not apply to a challenge premised on § 114(r)(1). An action taken without authority—that is, under circumstances not covered by the grant of authority in § 114(r)(1)—is every bit as much *ultra vires* as an action taken in contravention of a limitation on the agency's authority—that is, under circumstances precluded by § 114(r)(4). Second, Sai ignores D.C. Circuit precedent holding that the term "order" in § 46110(a) "should be read expansively" and includes final agency determinations of "rights or obligations" or final agency action giving "rise to legal consequences." *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 598 (D.C. Cir. 2007); *see also Nat'l Fed'n of the Blind*, 827 F.3d at 55 (holding the term "order" in § 46110(a) is "not . . . limited by the APA definition of 'order'"). As the D.C. Circuit has explained, the "broad[] constru[ction]" that it has accorded "the word 'order' as used in section 46110(a)" is intended to *facilitate* "judicial review" of agency action. *Avia Dynamics, Inc. v. FAA*, 641 F.3d 515, 520 (D.C. Cir. 2011). That purpose, of course, is particularly weighty in cases in which the aggrieved party contends that the agency's action was *ultra vires*.

Finally, Sai suggests that, in responding to a separate FOIA request submitted by the ACLU, the TSA publicly disclosed portions of the information that it claimed in Sai's case were exempt from disclosure as SSI. Dkt. 116-1 at 1 (records released to Sai contained "more SSI redaction[s] than made" to records released to the ACLU). To the extent Sai intends to invoke the "official acknowledgement" doctrine, a three-part showing is required: "First, the information [Sai] requested must be as specific as the information previously released. Second, the information requested must match the information previously disclosed . . . . Third, . . . the information requested must already have been made public through an official and documented

disclosure." *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990); *see also Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007); *Shapiro*, 153 F. Supp. 3d at 285.

The TSA does not dispute that the ACLU may have received information that was withheld from Sai as SSI, but urges the Court to reject Sai's "official acknowledgement" argument for three reasons. First, it argues that because Sai has evidently already obtained the withheld material from the ACLU website, Sai's claim is now "moot." Dkt. 118 at 29–30. In support of this contention the TSA cites to the D.C. Circuit's decision in *Crooker v. U.S. State Department*, 628 F.2d 9 (D.C. Cir. 1980) (per curiam), in which the court held, "[w]here the records have already been furnished, it is abusive and a dissipation of agency and court resources to make and process a second claim," *id.* at 10. That case differs from the present case, however, in one critical respect: in *Crooker*, the plaintiff sought the release of records that he had already obtained from another agency, *id.*, while in the present case, Sai contends that the government did not provide the relevant material. *See* Dkt. 116-1 at 1 n.1. The fact that the government has released records to a third party, which has then made those records public, does not obviate the government's obligation to respond fully to an otherwise proper FOIA request. *See Tax Analysts*, 492 U.S. at 152 ("It is one thing to say that an agency need not disclose materials that it has previously released; it is quite another to say that an agency need not disclose materials that some other person or group may have previously released.").

The TSA also returns to the theme that Sai's Policies Request was vastly overbroad and that, as a result, it cannot be faulted for failing to find and release every responsive record. The ACLU's request, the TSA contends, was "comparatively tailored" in seeking records relating to the "TSA's behavior detection programs" and thus, unsurprisingly, resulted in a more complete production of those records. Dkt. 118 at 31. That argument is, as noted above, persuasive as far

as it goes.  It fails to explain, however, why the TSA redacted SSI from records released to Sai,

but, according to Sai, did not in every instance redact the same purported SSI from the records

released to the ACLU.  Dkt. 116-1 at 1–2.  The TSA's excessive burden argument has no

application in this context.

This, then, leaves the TSA's final argument, which is more promising but remains

incomplete.  As the TSA explains, after it released records to Sai in response to the Policies

Request in 2015, *see* Dkt. 99-3 at 35–37 (McCoy Decl. ¶¶ 109–11), the ACLU—in pressing its

own FOIA request—convinced the TSA to "withdr[a]w some of the identified redactions" the

agency had previously made, and the TSA "re-released" the relevant records.  Dkt. 118-1 at 6–7

(3d Supp. McCoy Decl. ¶ 23).  To the extent the TSA revisited its SSI determinations *after* it

released the responsive records to Sai, the TSA is correct that it did not have an obligation to

"update or supplement [its] prior response."  *See James v. U.S. Secret Serv.*, 811 F. Supp. 2d 351,

358 (D.D.C. 2011) ("The FOIA does not require an agency to update or supplement a prior

response to a request for records."), *aff'd*, No. 11-5299, 2012 WL 1935828 (D.C. Cir. May 11,

2012).  The "official disclosure" doctrine applies to information that was, at the relevant time,

"already" public.  *Fitzgibbon*, 911 F.2d at 765.  It does not—and could not reasonably—apply to

information that was confidential at the time the agency responded to the plaintiff's FOIA

request and was only subsequently officially released; applying the doctrine retroactively would

be administratively unmanageable and would violate the cardinal rule of administrative law that

courts evaluate agency action based on the record as it existed at the time the agency acted.  *See*

*Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1152 (D.C. Cir. 1991) ("To require an agency to

adjust or modify its FOIA responses based on post-response occurrences could create an endless

cycle of judicially mandated reprocessing."); *Nat'l Sec. Counselors v. CIA*, 206 F. Supp. 3d 241,

256 (D.D.C. 2016) ("[J]udicial review of agency responses to FOIA requests 'properly focuses on the time the determination to withhold [was] made.'" (quoting *Bonner*, 928 F.2d at 1152)).

On the present record, however, the Court cannot determine with any certainty whether the TSA released information to the ACLU prior to responding to Sai's FOIA request, while withholding that same information from Sai. For present purposes, the TSA merely asserts that it "made a diligent, good-faith effort to ensure consistency with respect to the information withheld." Dkt. 118-1 at 6 (3d Supp. McCoy Decl. ¶ 22). Ultimately, Sai will bear the burden of demonstrating that the TSA officially released information to the ACLU and, then, *later* withheld that same information from Sai based on Exemption 3. *See Cottone v. Reno*, 193 F.3d 550, 554 (D.C. Cir. 1999) (explaining that "the party advocating disclosure bears the initial burden of production" when invoking the official acknowledgement doctrine). To prevail on summary judgment, however, the TSA must demonstrate that it is entitled to prevail as a matter of law. *Celotex Corp.*, 477 U.S. at 322–23. Because the current record is incomplete on this issue, the Court must defer resolving it.

2.      *Exemption 5*

Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This exemption shields "those documents . . . normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). Courts have, accordingly, incorporated the three traditional civil discovery privileges under Exemption 5: "(1) the attorney work-product privilege; (2) the deliberative process privilege; and (3) the attorney-client privilege." *Wright*, 121 F. Supp. 3d at 184. Sai's opposition appears to challenge only the TSA's invocation of the deliberative process privilege. *See* Dkt. 111-2 at 24–25.

The deliberative process privilege protects "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Sears, Roebuck & Co.*, 421 U.S. at 150 (quoting *Carl Zeiss Stiftung v. V.E.B. Carl Zeiss, Jena*, 40 F.R.D. 318, 324 (D.D.C. 1966)). The "privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance 'the quality of agency decisions,' . . . by protecting open and frank discussion among those who make them within the Government." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8–9 (2001) (citations omitted). "Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions." *Sears, Roebuck & Co.*, 421 U.S. at 151.

"To qualify for withholding under Exemption 5's executive privilege, information must be both 'predecisional' and 'deliberative.'" *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992); *see also Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014); *Pub. Citizen, Inc. v. OMB*, 598 F.3d 865, 874 (D.C. Cir. 2010); *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006). A record "is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision, rather than to support a decision already made," and it is "deliberative if it 'reflects the give-and-take of the consultative process.'" *Petroleum Info. Corp.*, 976 F.2d at 1434 (citations omitted). The agency asserting the privilege bears the burden of establishing that the information is exempt. *Fed. Open Mkt. Comm. of the Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979); *EPA v. Mink*, 410 U.S. 73, 93 (1973); *Public Citizen, Inc.*, 598 F.3d at 360; *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014). "Summary judgment is warranted when the agency's affidavits

'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Elec. Frontier Found.*, 739 F.3d at 7 (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)); *see also Senate of the Commonwealth of P.R. v. U.S. Dep't of Justice*, 823 F.2d 574, 585 (D.C. Cir. 1987). To meet this burden, an "agency must establish 'what deliberative process is involved, and the role played by the documents in issue in the course of that process.'" *Senate of the Commonwealth of P.R.*, 823 F.2d at 585–86 (citation omitted).

The McCoy declaration offers explanations for each of the TSA's invocations of the deliberative process privilege. She attests that, in responding to the BOS Request, the agency withheld information on two pages that was both predecisional—the records "were generated before the agency had reached a decision regarding" how to respond to "complaints alleging a disability-related civil rights violation"—and deliberative—the records "reflect the open consultative process between program offices" considering "how to respond" to the complaints. Dkt. 99-3 at 13 (McCoy Decl. ¶ 39). Similarly, in responding to the SFO Request, the TSA once again invoked Exemption 5 to withhold information that was both predecisional—the information pertained to "prospective agency action"—and deliberative—it reflected deliberations involving agency counsel regarding how the agency should respond to "administrative complaints against [the] TSA." *Id.* at 26 (McCoy Decl. ¶ 83(c)). It reached the same conclusion with respect to other predecisional deliberations regarding (1) the Disability Branch's assessment of how to handle Sai's "administrative complaint[s]," (2) the investigation, collection, and analysis of information relating to Sai's "administrative complaints," (3) "hypothetical checkpoint screening scenarios involving medically exempt liquids," and (4) "a

draft . . . letter . . . to Congresswoman Nancy Pelosi's office regarding [Sai's] administrative complaint." *Id.* at 26–28 (McCoy Decl. ¶¶ 84–85). Finally, in responding to the Policies Request, the TSA withheld "a memorandum and a PowerPoint presentation . . . prepared in anticipation of a briefing to the Secretary of DHS regarding airport security measures," which "reflect proposals and recommendations regarding agency action." *Id.* at 40 (McCoy Decl. ¶ 118(b)).

Sai challenges the TSA's reliance on the deliberative process privilege on five grounds: First, Sai contends that information that the TSA shared with Corbin Stewart in an email falls beyond the privilege because "a simple Google search" and the email format (*i.e.* the capitalization of Stewart's name) demonstrate that Stewart was not a TSA or DHS employee.[8] Dkt. 111-2 at 24. Even if Stewart was not a TSA or DHS employee, the deliberative process privilege might still apply. *See*, *e.g.*, *Competitive Enter. Inst. v. EPA*, 232 F. Supp. 3d 172, 184–85 (D.D.C. 2017) (describing "consultant exemption"). The Court need not determine whether Stewart's employment status matters here, however, because McCoy has attested under the penalty of perjury that Stewart "is—and was at the time of the [relevant] email record"—"a TSA employee within the Civil Rights and Liberties-Office of Traveler Engagement." Dkt. 118-1 at 6 (3d Supp. McCoy Decl. ¶ 20). That declaration is entitled to a presumption of good faith, *SafeCard Servs.*, 926 F.2d at 1200, and Sai has failed to offer any evidence that would permit a reasonable factfinder to question its veracity, Dkt. 111-2 at 24. *See Bloeser*, 811 F. Supp. 2d at 322 ("[S]peculative and conclusory assertions do not amount to 'contradictory evidence in the record . . . of agency bad faith.'" (quoting *Judicial Watch, Inc. v. Bd. of Governors of Fed.*

---

[8] Sai spells the name "Stewart," Dkt. 111-2 at 24, while the TSA spells it "Stuart," Dkt. 118 at 21. Nothing, of course, turns on this.

*Reserve Sys.*, 773 F. Supp. 2d 57, 60 (D.D.C. 2011))).  Nor is the Court convinced that Sai is

entitled to take discovery on whether Stewart was a TSA employee.  Even if some discovery

were permitted, Sai could not reasonably expect more than the testimony of a TSA official under

the penalty of perjury.  Sai has that, and far more than Sai has offered would be necessary to cast

aside the presumption of good faith and to open the door to more extensive discovery.  *See*

*Justice v. I.R.S.*, 798 F. Supp. 2d 43, 47 (D.D.C. 2011) ("Courts permit discovery in FOIA cases

where a 'plaintiff has made a sufficient showing that the agency acted in bad faith.'" (quoting

*Voinche v. FBI*, 412 F. Supp. 2d 60, 72 (D.D.C. 2006))); *Schrecker v. U.S. Dep't of Justice*, 217

F. Supp. 2d 29, 35 (D.D.C. 2002) ("Discovery in FOIA is rare and should be denied where an

agency's declarations are reasonably detailed [and] submitted in good faith and [where] the court

is satisfied that no factual dispute remains.").

      Second, Sai argues that portions of the withheld information responsive to the SFO

Request reflect facts, not deliberations.  Dkt. 111-2 at 24−25.  The TSA counters that this

contention is "without any substantive or logical support."  Dkt. 118 at 22.  It is the TSA,

however, that bears the burden of establishing that the deliberative privilege was properly

invoked, *Senate of the Commonwealth of P.R.*, 823 F.2d at 585, and its explanation of the bases

for withholding certain information in response to the SFO Request admits of some ambiguity,

*see* Dkt. 99-3 at 26−27 (McCoy Decl. ¶ 84).  McCoy attests, for example, that the TSA withheld

emails "discussing the . . . collection . . . of information related to administrative complaints."

*Id.* at 27 (McCoy Decl. ¶ 84).  Sai, to be sure, overstates the law when categorically asserting

that "[f]acts are not exempt under" Exemption 5.  Dkt. 111-2 at 25.  But, by the same token, Sai

is correct that facts "generally must be disclosed."  *Nat'l Ass'n of Home Builders v. Norton*, 309

F.3d 26, 39 (D.C. Cir. 2002) (citation omitted).  The relevant question is whether "'the disclosure

of even purely factual material may so expose the deliberative process within an agency' that the material is appropriately held privileged." *Petroleum Info. Corp.*, 976 F.2d at 1434; *see also Quarles v. Dep't of Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990) (even when requested material is factual, it is still exempt when disclosure "would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions" (quoting *Dudman Commc'ns Corp. v. Dep't of the Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987))). The Court must, accordingly, ask whether disclosure of the withheld information would "reveal an agency's or official's mode of formulating or exercising policy-implicating judgment." *Nat'l Ass'n of Home Builders*, 309 F.3d at 39 (citation omitted); *see also In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (asking whether the factual information is "inextricably intertwined with the deliberative" information); *Playboy Enters., Inc. v. U.S. Dep't of Justice*, 677 F.2d 931, 936 (D.C. Cir. 1982) (asking whether the factual information was prepared to "assist[] the [agency official] [in] mak[ing] a complex decision," or whether the information "was prepared only to inform the [agency official] of facts which he in turn would make available"). On the present record, the Court cannot determine whether or how the TSA applied this test to the information that it gathered in responding to the SFO Request. As a result, the TSA has yet to carry its burden with respect to the assertion of the deliberative privilege regarding this limited set of records.

Third, Sai maintains that one document uses the phrase "we decided," demonstrating in Sai's view that the document is post-decisional; that a second document contains a "post-decisional response and re-training;" and, more generally, that "policies, memoranda of law, and similar documents" are "post-decisional" and thus not protected by the privilege. Dkt. 111-2 at 25. Sai's first contention—that the use of past-tense "we decided" indicates that the document is

post-decisional—has little force.  The mere fact that a document uses the past tense does not

resolve whether it falls within Exemption 5.  The unredacted portions of the document do not

indicate that the redacted portions are anything other than what TSA says: "internal predecisional

discussions regarding prospective agency action."  Dkt. 99-3 at 116 (McCoy Decl. Ex. Q).  The

document in question reads: "We decided to hold-off on sending Sai and [redacted, citing

Exemption 6] to DHS. With Sai, we are [redacted, citing Exemption 5]."  *See* Dkt. 145-2 at 77.

Significantly, the TSA disclosed what had been decided—not to "send[] Sai"—and only redacted

*other* information that the TSA attests was predecisional.  The same is true with respect to the

document Sai characterizes as containing "post-decisional response and re-training."  Dkt. 111-2

at 25.  Although the redacted record is part of an email chain that discusses training on how to

screen medical liquids, Dkt. 144-3 at 197, it is not evident that the redacted information relates to

the Disability Branch's review of Sai's Rehabilitation Act complaints, *id.* at 197, and there is no

reason to question the TSA's representation that its review was ongoing, Dkt. 99-3 at 111

(McCoy Decl. Ex. Q).  Finally, with respect to Sai's contention that "policies, memoranda of

law, and similar documents" are "post-decisional" and thus not protected by the deliberative

process privilege, this attack is far too amorphous to defeat TSA's motion for summary

judgment.  Sai does not identify what documents were improperly redacted or withheld, and fails

to develop the contention with sufficient detail (or, indeed, any detail) to permit the Court to

consider it on the merits.

Fourth, Sai contends that the "TSA made inconsistent redactions of identical information,

demonstrating the arbitrary and capricious nature of its" invocation of Exemption 5.  Dkt. 111-2

at 22 (citing "2013-TSPA-00339 Bates 266 (unredacted) vs[.] 428, 431 (redacted); 106

(unredacted) vs[.] 294, 295, 300 (redacted); 214 (unredacted) vs[.] 287 (redacted)").  Sai is

correct that the TSA redacted slightly more information on three pages of materials than it did on duplicate copies of those same materials. The Court has reviewed those minor inconsistencies and concludes that they do not demonstrate a lack of good faith or a failure of the TSA to release reasonably segregable materials; rather, they reflect nothing more than modest differences regarding the precise line between deliberative and background material. Sai has already received the less-substantially redacted versions, moreover, and thus has no basis to complain about the more substantial redactions made to duplicate copies. *See Crooker*, 628 F.2d at 10 ("Once the records are produced the substance of the controversy disappears and becomes moot since the disclosure which the suit seeks has already been made."); *see also Williams & Connolly v. SEC*, 662 F.3d 1240, 1243–44 (D.C. Cir. 2011) ("Once the documents are released to the requesting party, there no longer is any case or controversy.").

Finally, Sai argues that "*all* of TSA's privilege claims"—including the deliberative, work product, and attorney-client privilege—"are void" because the "TSA deliberately obstructed the processing of" Sai's FOIA request and administrative complaints. Dkt. 111-2 at 37, 39–40. For support, Sai cites to email correspondence suggesting that TSA officials decided to "hold-off" on processing Sai's Rehabilitation Act complaints. *Id.* at 37–41. "Taken together," Sai argues, the email correspondence demonstrates that the TSA was engaged in a "deliberate cover-up[]" of "felony obstruction of justice in refusing to process, delaying the processing, and refusing to release the results of two former federal civil rights investigations." *Id.* at 39. From this, Sai then posits that the crime-fraud exception—or some similar doctrine—precludes the TSA from relying on any common-law privilege. *Id.*

This imaginative contention merits only cursory discussion. As the D.C. Circuit has explained:

> To establish the [crime-fraud] exception to the attorney-client privilege, the court must consider whether the client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and establish that the client actually "carried out the crime or fraud." *In re Sealed Case*, 107 F.3d 46, 49 (D.C. Cir. 1997). To establish the exception to the work-product privilege, courts ask a slightly different question, focusing on the client's general purpose in consulting the lawyer rather than on his intent regarding the particular communication: "Did the client consult the lawyer or use the material for the purpose of committing a crime or fraud?" *Id.* at 51.

*In re Sealed Case*, 223 F.3d 775, 778 (D.C. Cir. 2000). The D.C. Circuit has, likewise, observed that the deliberative process privilege is a qualified privilege, which "disappears altogether when there is any reason to believe government misconduct occurred." *In re Sealed Case*, 121 F.3d at 746. The problem with this argument is that Sai has not come close to carrying the burden of "mak[ing] a prima facie showing of a violation sufficiently serious to defeat" any of these privileges. *In re Sealed Case*, 754 F.2d 395, 399 (D.C. Cir. 1985). Sai merely argues that the TSA delayed processing the administrative complaints under the Rehabilitation Act, Dkt. 111-2 at 37−38. That conclusion is a far cry from "felony obstruction of justice," *id.* at 39, and it is a far cry from the type of serious misconduct necessary to abrogate any of the privileges at issue.

3.  *Exemptions 6 & 7(C)*

FOIA Exemptions 6 and 7(C) protect personal privacy. The two exemptions protect similar interests, but they differ in scope. Exemption 6 shields "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "[T]he mere fact that an agency file or record contains personal, identifying information," however, "is not enough to invoke Exemption 6;" in addition, the information must be "of such a nature that its disclosure would constitute a clearly unwarranted privacy invasion." *Judicial Watch, Inc. v. U.S. Dep't of State*, 282 F. Supp. 3d 36, 49–50 (D.D.C. 2017) (quoting *Nat'l Ass'n of Home Builders*, 309 F.3d at 32). This, in turn, requires a two-part analysis. *See Edelman v. SEC*, 302 F. Supp. 3d 421, 425 (D.D.C. 2018). The Court

must first determine whether "disclosure would compromise a substantial, as opposed to a *de minimis*, privacy interest." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989). If the agency clears that first hurdle, the Court must then "balance the privacy interest in non-disclosure against the public interest" in disclosure. *Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 554 F.3d 1046, 1050 (D.C. Cir. 2009); *see also Judicial Watch, Inc.*, 282 F. Supp. 3d at 49−50.

Exemption 7(C) applies to a narrower category of records than Exemption 6, but it offers more robust protection of those records. *See Tracy v. U.S. Dep't of Justice*, 191 F. Supp. 3d 83, 95 (D.D.C. 2016). Thus, while Exemption 6 applies broadly to all "'[g]overnment records on an individual which can be identified as applying to that individual,'" *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 601–02 (1982) (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess. at 11, *reprinted in* 1966 U.S.C.C.A.N. 2428), Exemption 7 applies only to "records . . . compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7)(C). But, with respect to that narrower category of records, "'Exemption 7(C) is more protective of privacy than Exemption 6' and thus establishes a lower bar for withholding material." *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 6 (D.C. Cir. 2011) (quoting *U.S. Dep't of Defense v. FLRA*, 510 U.S. 487, 496 n.6 (1994)). Like Exemption 6, Exemption 7(C) requires courts to balance the asserted privacy interest against the public interest in releasing the record. For two reasons, however, it is easier for an agency to tip the scale in its favor under Exemption 7. First, while Exemption 6 requires the agency to demonstrate that disclosure would constitute a "clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6), Exemption 7(C) "omits the adverb 'clearly,'" *100Reporters LLC v. U.S. Dep't of Justice*, 248 F. Supp. 3d 115, 159 (D.D.C. 2017). Second, while Exemption 6 asks whether the disclosure "would" constitute such an invasion of privacy, 5 U.S.C. §

552(b)(6), Exemption 7(C) merely asks whether the disclosure "could reasonably be expected" to do so, 5 U.S.C. § 552(b)(7)(C).

Here, the TSA invoked Exemption 6 in support of each of the redactions that it made on privacy grounds. It also relied on Exemption 7(C) with respect to one narrow subset of redactions—those designed to protect the identities of local law enforcement officers. Because Exemption 7(C) is more protective than Exemption 6, the Court will apply the Exemption 7(C) standard to this one subset of redactions, but will otherwise apply the Exemption 6 standard. Before applying these standards, however, the Court first addresses Sai's threshold contentions that the TSA's privacy redactions were improper because (1) disclosure was required under 5 C.F.R. § 293.311; (2) the redacted names and contact information were already known to Sai; and (3) "[i]n other cases," similar information was not redacted. Dkt. 111-2 at 22–23.

Sai's first argument is a nonstarter. Sai is correct that 5 C.F.R. § 293.311(a) provides that information disclosing a federal employee's name and present and past positions is generally "available to the public." That provision, however, applies only to information contained in "official personnel folder[s]," "performance file system folders," "their automated equivalent records," and other "personnel record files . . . which are under the control of the Office" of Personnel Management ("OPM"). *Id.* Here, however, by Sai's own account, "[t]he files . . . from which these names have been redacted are not 'personnel'" or "similar files." Dkt. 111-2 at 23. Nor are any of the files "under the control of" OPM. *See* 5 C.F.R. § 293.311(a). But, even putting those difficulties aside, Sai disregards the very next subsection of the regulation. That subsection provides that "an agency will generally not disclose" employee information that "[w]ould otherwise be protected from mandatory disclosure under an exemption of the FOIA." 5

C.F.R. § 293.311(b)(2). The relevant regulation accordingly, by its own terms, does not disarm an otherwise available FOIA exemption.

Sai's second contention—the redacted private information is already known to Sai—is equally unavailing. Agencies releasing records pursuant to FOIA requests must be mindful that "[d]ocuments released in a FOIA action must be made available to the public as a whole." *Stonehill v. IRS*, 558 F.3d 534, 539 (D.C. Cir. 2009); *see also Clay v. U.S. Dep't Justice*, 680 F. Supp. 2d 239, 248 (D.D.C. 2010) ("The FOIA's . . . exemptions are designed to protect those 'legitimate governmental and private interests' that might be 'harmed by release of certain types of information' to the public at large." (quoting *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003))). In releasing private information, an agency must operate on the assumption—confirmed in this case, *see* Dkt. 99-3 at 14, 28, 41 (McCoy Decl. ¶¶ 42, 86, 119)—that the recipient will further distribute the information, or that others will seek the same information and reasonably expect similar treatment by the FOIA office. Accordingly, Sai's purported knowledge of the redacted information does not call into question the TSA's withholding of the information pursuant to Exemption 6.

Third, Sai's contention that similar information was not redacted "in other cases" is also unpersuasive. It is unclear what Sai means by this. To the extent Sai means that the TSA disclosed the names or contact information of agency employees to other FOIA requesters involved in other litigation, that contention does not undercut the TSA's reliance on Exemptions 6 and 7(C) here. The "standards for invoking the [official-acknowledgement] doctrine are high." *Shapiro*, 153 F. Supp. 3d at 285. "Prior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Wolf*, 473 F.3d at 378. Nor does a prior disclosure of "similar" information

suffice to show that the asserted privacy interest is not real. As the D.C. Circuit has recognized, the appropriate balance between "the privacy interest in non-disclosure [and] the public interest in the release of the records" necessarily varies from case to case. *See Lepelletier v. FDIC*, 164 F.3d 37, 47 (D.C. Cir. 1999) (internal quotation marks omitted). And, to the extent Sai contends that the TSA released precisely the same record to Sai with fewer redactions in response to one of the FOIA requests, Sai has already received the less-substantially redacted record and thus the challenge is moot. *See Crooker*, 628 F.2d at 10.

Finally, Sai contends that "[t]he official contact information of federal officials has no relation to their 'personal privacy'" and that "[t]he disclosure of the identities of officials involved in [Sai's] Rehabilitation Act complaints is not 'clearly unwarranted.'" Dkt. 111-2 at 23 (emphasis removed). As the TSA's *Vaughn* index and the redacted documents show, the TSA redacted the following information, which Sai now seeks: (1) the names and contact information for non-TSA employees, including local law enforcement officers, *see* Dkt. 99-3 at 74–75 (McCoy Decl. Ex. H); Dkt. 143-2 at 1–2, Dkt. 146-2 at 4–7, 10, 13–14, 16; contract employees, *see* Dkt. 99-3 at 103 (McCoy Decl. Ex. Q); Dkt. 144-3 at 41, 139, 182; Dkt. 145-1 at 7, 12; and a congressional staffer, *see* Dkt. 99-3 at 117 (McCoy Decl. Ex. Q); Dkt. 145-2 at 84; (2) TSA employees' non-work-related personal information, *compare* Dkt. 99-3 at 105, 108 (McCoy Decl. Ex. Q), *with* Dkt. 144-3 at 63, 142; (3) email addresses and telephone numbers for a DHS employee working in the Office of Chief Counsel and a TSA employee working in the agency's Disability Branch, Dkt. 144-3 at 109, Dkt. 145-2 at 84; and (4) names and contact information for TSA employees found in policy documents prepared for internal use, *see* Dkt. 99-3 at 170–71, 174 (McCoy Decl. Ex. Y); Dkt. 133-2 at 29–30, 33, 35, 93; Dkt. 134-1 at 6, 43.

The TSA explains that release of the "personal identifying information" in the redacted records "could expose [the government officers] to unnecessary unofficial questioning, harassment, and stigmatization." Dkt. 99-3 at 14 (McCoy Decl. ¶ 42). This concern is a reasonable one, TSA asserts, because "the personal identifying information in these records would necessarily identify the individual" as "having played a particular role in an incident, or complaining about a particular incident" and would reveal the locations where the individuals work and how to contact them. *Id.* (McCoy Decl. ¶ 42). In addition, the TSA explains, this risk of harassment is "real and substantial" in this case because Sai "has publicized responses to his FOIA requests on his website." *Id.* (McCoy Decl. ¶ 42).

Starting with the privacy interest of the local law enforcement officers in preventing disclosure of their identity, the Court has no basis to question the TSA's good-faith representation that these records were compiled for law enforcement purposes, nor does Sai argue to the contrary. The Court must, accordingly, apply the Exemption 7(C) standard to assess whether the TSA has met its burden of showing that the redactions were proper. The D.C. Circuit has "adopted a categorical rule permitting an agency to withhold information identifying private citizens mentioned in law enforcement records, unless disclosure is 'necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity.'" *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003) (citation omitted). To be sure, "[i]n their capacity as public officials," law enforcement officers "may not have as great a claim to privacy as that afforded to ordinary private citizens." *Lesar v. U.S. Dep't of Justice*, 636 F.2d 472, 487 (D.C. Cir. 1980). But, several courts have nonetheless recognized that law enforcement officers "have a legitimate interest in preserving the secrecy of matters that conceivably could subject them to annoyance or harassment in either their official or private lives." *Id.* Here, the

Court cannot discern any significant public interest would be advanced by exposing local law enforcement officers to that potential for "annoyance or harassment." *See id.* The Court, accordingly, concludes that the TSA properly redacted the identifying information for the local law enforcement officials.

Although assessed under the Exemption 6 standard, the Court reaches a similar conclusion with respect to the "personal information" regarding two TSA employees that the agency redacted from the responsive records. In both cases, moreover, there is no discernible public interest in the redacted information. All that the public would learn in one case is who Zachary Bromer, a TSA employee, hoped "enjoyed herself today," Dkt. 144-3 at 63 ("I hope [redacted] enjoyed herself today"), and why, in another case, another TSA employee was unavailable "to provide a statement," *id.* at 142. Such information "reveals little or nothing about an agency's own conduct" and therefore "does not further the statutory purpose" and "the public has no cognizable interest in [its] release." *Beck v. U.S. Dep't of Justice*, 997 F.2d 1498, 1493 (D.C. Cir. 1993) (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989)); *see also Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 117 (D.D.C. 2005) ("[T]he public interest in learning the names of these lower-echelon employees is small."). Because on balance "something . . . outweighs nothing every time," *Horner*, 879 F.2d at 879, the TSA properly withheld the personal information of its employees, *see* Dkt. 144-3 at 63, 142.

The TSA has not, however, met its burden of showing a "substantial privacy interest" with respect to other identifying and contact information withheld pursuant to Exemption 6. The disclosure of names and contact information "is not inherently and always a significant threat to

. . . privacy," *Horner*, 879 F.2d at 877, yet the TSA has offered little more than conclusory assertions applicable to each redaction, without regard to the position held by the relevant employee, the role played by that employee, the substance of the underlying agency action, or the nature of the agency record at issue. The TSA has failed to explain, for example, how the release of contact information for the TSA and contract employees that handled Sai's complaint would constitute a "clearly unwarranted" invasion of their privacy. It has not explained—nor is it obvious from the face of the documents—that TSA contract employees, the DHS Office of Chief Counsel employee, or the TSA Disability Branch employee played "a particular role in an incident" or "complain[ed] about a particular incident" such that the release of their information would subject them to a real risk of annoyance or harassment. *See* Dkt. 99-3 at 14 (McCoy Decl. ¶ 42). And, it has not explained why TSA employee names and professional contact information contained in the policy documents implicate a substantial privacy interest. A substantial privacy interest may well be at stake but, on the current record, the TSA has not met its burden with respect to the following redactions: Dkt. 133-2 at 29–30, 33, 35, 93 (2015-TSLI-00004 Bates 2267–68, 2271, 2273, 2331); Dkt. 134-1 at 6, 43 (2015-TSLI-00004 Bates 2355, 2392); Dkt. 144-3 at 109 (2013-TSPA-00339 Bates 181); Dkt. 144-3 at 41, 139, 182 (2013-TSPA-00339 Bates 113, 211, 254); Dkt. 145-1 at 7, 12 (2013-TSPA-00339 Bates 279, 284); and Dkt. 145-2 at 84 (2013-TSPA-00339 Bates 481).

**D.    Segregability**

Sai also challenges TSA's assertion that it released all reasonably segregable records in response to the Policies Request. *See* Dkt. 111-2 at 20. FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions [that] are exempt." 5 U.S.C. § 552(b). "While the segregability requirement applies to all documents and all exemptions in the FOIA," the courts have

recognized that "segregation is not required where the 'exempt and nonexempt information are inextricably intertwined, such that the excision of exempt information would impose significant costs on the agency and produce an edited document with little informational value.'" *Covington v. McLeod*, 646 F. Supp. 2d 66, 72 (D.D.C. 2009) (quoting *Mays v. Drug Enf't Admin.*, 234 F.3d 1324, 1327 (D.C. Cir. 2000)) (first citation omitted). The government bears "the burden of justifying nondisclosure," *Mead Data Cent., Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977), and must "show with reasonable specificity why the documents cannot be further segregated," *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996) (internal quotation marks omitted). To carry this burden, the government must provide a "'detailed justification' for [withheld records'] non-segregability." *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead*, 566 F.2d at 261).

Sai presses two arguments related to segregability, both of which turn on arguments considered, and rejected, above. Sai first argues that the TSA improperly failed to release various Standard Operating Procedures ("SOPs")—or alternative versions of SOPs—that Sai sought in the Policies Request. But, as discussed above, the request was defectively overbroad, and the fact that the TSA made an effort to answer the request in part did not obligate the agency to release every policy or procedure document that it had ever created, and was not already available in the TSA's electronic reading room. *See supra* Part III.B.2. Sai's assertions learned from "confidential source(s)," mistakenly released records, and documents posted by third parties that purport to represent "authentic" copies of TSA documents, Dkt. 111-2 at 19–21, does not change that conclusion. Second, Sai contends that inconsistencies in the TSA's redactions under the deliberative process privilege show that the agency has not released certain segregable material. *Id.* at 22. But, as also discussed above, those minor inconsistencies do not establish a

lack of good faith, and, in any event, Sai has already received copies of the less thoroughly redacted records. *See supra* Part III.C.2.

More generally, Sai fails to identify any evidence that the TSA withheld records in whole based on a valid FOIA exemption, where a portion of those records were reasonably segregable and could have been released without disclosing the exempt information. The Court, moreover, has reviewed the various *Vaughn* indices that the TSA has submitted in support of its motion, *see* Dkt. 99-3 at 73–76 (McCoy Decl. Ex. H); *id.* at 102–20 (McCoy Decl. Ex. Q); *id.* at 160–74 (McCoy Decl. Ex. Y), and those indices demonstrate that the agency redacted the exempt portions of otherwise responsive records where possible. The Court, accordingly, concludes that with respect to records that the TSA released, it has met its obligation to release reasonably segregable portions.

## E.      Allegations of Bad Faith and Misconduct

The remainder of Sai's opposition contains a variety of other accusations that the TSA has engaged in misconduct. Construed liberally, these allegations may present an argument—albeit a flawed one—that the TSA acted in bad faith in responding to the requests and that, in light of this bad faith, Sai should be allowed to conduct discovery regarding the TSA's actions. Among these claims, Sai argues that TSA despoiled CCTV video of the Logan Airport incident. Dkt. 111-2 at 34–36. In support of this contention, Sai posits that (1) TSA policy requires 15 "[c]amera views" of each passenger during screening and requires that the surveillance video be maintained for 30 days; (2) Sai submitted a FOIA request seeking the Logan Airport surveillance video within that 30-day window; (3) the TSA released only one video showing Sai's screening at Logan Airport and informed Sai that no other video exists; and (4) "the only possible conclusion is that TSA and BOS committed spoliation." *Id.* at 35–36.

That theory, however, cannot be squared with McCoy's declaration, submitted under the penalty of perjury, which recounts that "BOS searched for responsive records including closed circuit television (CCTV)" and located "one CCTV video of the incident." Dkt. 99-3 at 6 (McCoy Decl. ¶ 15). As this Court has explained, agency declarations, like McCoy's, "are accorded a presumption of good faith," and that presumption "cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs.*, 926 F.2d at 1200. To be sure, TSA policy may have required additional "views," and it may have required that video records be maintained for thirty days. Dkt. 111-2 at 35–36. But that does not mean that the videos Sai sought, in fact, existed at the time Sai filed the FOIA request, and it certainly does not mean that the TSA destroyed some (but not all) of the videos Sai sought in order to avoid its obligation of production. Far more than Sai has offered is necessary to give rise to a disputed issue of fact regarding an agency's good faith; indeed, if a FOIA requester's reasonable belief that other records should have been found were sufficient, discovery would likely be the norm, rather than exception, in FOIA cases. *See Cole v. Rochford*, 285 F. Supp. 3d 73, 76 (D.D.C. 2018) ("[I]n the FOIA context, courts have permitted discovery only in exceptional circumstances where a plaintiff raises a sufficient question as to the agency's good faith in searching for or processing documents."); *see also Baker & Hostetler LLP*, 473 F.3d at 318 (concluding that the district court properly denied discovery request where the plaintiff "offered no evidence of bad faith to justify additional discovery").

Sai also argues that TSA violated Sai's rights under the Privacy Act by documenting "protected First Amendment speech" at checkpoints, including documentation of the "parody DHS" t-shirt Sai was wearing while going through the Logan Airport screening and Sai's act of partially disrobing at the O'Hare Airport screening. Dkt. 111-2 at 33–34. For support, Sai cites

to 5 U.S.C. § 552a(e)(7), which provides that "[e]ach agency that maintains a system of records shall . . . maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." This argument, however, is not properly before the Court because Sai brought this suit to "challeng[e] the failure of [the TSA] to respond to plaintiff Sai's multiple requests for records," Dkt. 5 at 1 (Compl. ¶ 1), not to challenge the content of those records.[9]

Finally, Sai argues that the TSA deliberately delayed processing the Logan and San Francisco Airport Rehabilitation Act complaints. Dkt. 111-2 at 37–40. Those contentions, however, also have nothing to do with the present action. Indeed, this Court has previously resolved Sai's separate lawsuit raising just that issue. *See Sai*, 149 F. Supp. 3d at 99. Sai offers no basis to conclude that the TSA's delay in processing the Rehabilitation Act complaints shows that it improperly withheld records responsive to Sai's FOIA requests. *Cf. House v. U.S. Dep't Justice*, 197 F. Supp. 3d 192, 203–04 (D.D.C. 2016) (explaining that allegations of misconduct unrelated to the processing of the plaintiff's FOIA/PA requests or the suit "failed to rebut the presumption of good faith").

The Court, accordingly, concludes that Sai has failed to rebut the presumption of good faith applicable to the TSA's explication of its search efforts and has failed to show that discovery is warranted in this FOIA/Privacy Act action.

## CONCLUSION

---

[9] Similarly, to the extent that Sai is asserting First Amendment claims against TSA, those claims are foreclosed because they are not raised in the complaint. *See Wright*, 121 F. Supp. 3d at 183 n.7.

For these reasons, the Court will **GRANT** in part and will **DENY** in part the TSA's motion for summary judgment. In particular, the motion is granted, except as to the following issues, which will require further development: (1) Did the TSA fail to comply with E-FOIA notwithstanding its failure to release the electronic records sought in Sai's BOS and SFO Re-Requests in their original format and its failure to release records responsive to the Policies Request in "discretized," "fully digital," non-"rasterized" text PDFs; (2) Did the TSA release any spreadsheets in response to the Policies Request; (3) Does the TSA possess legible copies of Dkt. 143-2 at 3, 6–7 (2013-TSPA-00368 Bates 003–004, 006–007); Dkt. 141-2 at 9–10 (2013-TSFO-01096 Bates 009–010); (4) Is the TSA required to search its FOIA Branch, Office of Legislative Affairs, Office of Chief Counsel, and Office of the Executive Secretariat for records responsive to Sai's BOS and SFO Requests and Re-Requests; (5) Did the TSA's searches for records responsive to the BOS and SFO Requests and Re-Requests cover the relevant timeframe, that is, from the date of the relevant incident to the date the relevant search commenced; (6) Did the TSA conduct a search reasonably calculated to locate responsive records with respect to the databases searched in response to the BOS and SFO Re-Requests and with respect to the search terms used to search the offices described in Part II.B.2 in response to the BOS and SFO Requests and Re-Requests; (7) Did the TSA redact information pursuant to Exemption 3 that was previously released to the ACLU *prior to* responding to Sai's Policies Request; (8) Did the TSA properly redact factual information responsive to Sai's SFO Request pursuant to Exemption 5; (9) Does the redacted contact information for TSA contract employees, a DHS Office of Chief Counsel employee, and a TSA Disability Branch employee implicate a "substantial privacy interest" under Exemption 6; and (10) Does the redacted contact information of TSA employees contained in policy documents implicate a "substantial privacy interest" under Exemption 6.

Finally, the Court further concludes that Sai has failed to demonstrate that discovery is warranted in this FOIA/PA action.

The Court will set a briefing schedule in a separate order for the parties to address these (and only these) remaining issues.

**SO ORDERED**.


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: September 25, 2018