```
#03.post.txt                                                    #03.pre.txt
    1 Case 1:14-cv-00403-RDM Document 172 Filed 09/25/18 Page 1 of 70    1 Case 1:14-cv-00403-RDM Document 162 Filed 05/24/18 Page 1 of 70
    ...                                                                  ...
    9       AMENDED MEMORANDUM OPINION AND ORDER                         9       MEMORANDUM OPINION AND ORDER
   10 This case is one of a series of cases that Plaintiff, who suffers from a neurological diso  10 This case is one of a series of cases that Plaintiff, who suffers from a neurological diso
rder, has brought arising out of alleged mistreatment by Transportation Security Administ  rder, has brought arising out of his alleged mistreatment by Transportation Security Admin
ration ("TSA") employees at various airport security checkpoints. This Court previously res  istration ("TSA") employees at various airport security checkpoints. This Court previously
olved one of those cases, which Plaintiff brought against the TSA under the Rehabilitation   resolved one of those cases, which Plaintiff brought against the TSA under the Rehabilita
 Act seeking to compel the agency to respond to Plaintiff's complaints of mistreatment. Se  tion Act seeking to compel the agency to respond to his complaints of mistreatment. See Sa
e Sai v. Dep't of Homeland Sec., 149 F. Supp. 3d 99 (D.D.C. 2015). Other cases, seeking da  i v. Dep't of Homeland Sec., 149 F. Supp. 3d 99 (D.D.C. 2015). Other cases, seeking damage
mages and declaratory and injunctive relief relating to the alleged mistreatment and the T  s and declaratory and injunctive relief relating to the alleged mistreatment and the TSA's
SA's policies more generally, remain pending before at least two other federal courts. See   policies more generally, remain pending before at least two other federal courts. See Sai
 Sai v. Covenant Aviation Sec., No. 16-1024 (N.D. Cal); Sai v. Pekoske, No. 15-2356 (1st C   v. Covenant Aviation Sec., No. 16-1024 (N.D. Cal); Sai v. Pekoske, No. 15-2356 (1st Cir.)
ir.).                                                                                       .
    ---                                                                      ---
   12 After Plaintiff filed suit, the TSA responded to each of the six pending FOIA requests and   12 After Plaintiff filed suit, the TSA responded to each of the six pending FOIA requests and
 eventually released almost 4,000 pages of records (some with redactions) and three closed   eventually released almost 4,000 pages of records (some with redactions) and three closed
 circuit television videos. The TSA has now moved for summary judgment, arguing that it re   circuit television videos. The TSA has now moved for summary judgment, arguing that it re
asonably construed (and, where necessary, narrowed) Plaintiff's requests; that it thorough  asonably construed (and, where necessary, narrowed) Plaintiff's requests; that it thorough
ly searched for responsive records; and that it released all responsive, non-exempt record  ly searched for responsive records; and that it released all responsive, non-exempt record
s. Plaintiff opposes the TSA's motion and, with two minor exceptions, challenges virtually  s. Plaintiff opposes the TSA's motion and, with two minor exceptions, challenges virtually
 every aspect of the TSA's multiple searches and productions. Plaintiff contends that, as   every aspect of the TSA's multiple searches and productions. He contends that, as to each
to each of the six requests, the TSA failed to conduct an adequate search; failed to produ   of his requests, the TSA failed to conduct an adequate search; failed to produce segr
ce segregable portions of records; withheld metadata and failed to release records in thei  egable portions of records; withheld metadata and failed to release records in their "nati
r "native," electronic format or in "fully digital, non-"rasterized" PDFs; improperly desi  ve," electronic format or in "fully digital, non-"rasterized" PDFs; improperly designated
gnated records as Sensitive Security Information ("SSI"); and improperly invoked FOIA Exem   records as Sensitive Security Information ("SSI"); and improperly invoked FOIA Exemptions
ptions 3, 6, and 7. Plaintiff alleges, in addition, that the TSA withheld records that had   3, 6, and 7. He alleges, in addition, that the TSA withheld records that had been previou
 been previously released; made false or misleading statements in its Vaughn indices; viol  sly released; made false or misleading statements in its Vaughn indices; violated the Priv
ated the Privacy Act by maintaining records relating to Plaintiff's "protected First [A]me  acy Act by maintaining records relating to his "protected First [A]mendment speech," Dkt.
ndment speech," Dkt. 111-2 at 33-34; destroyed records in violation of a "clear[] . . . ev  111-2 at 33-34; destroyed records in violation of a "clear[] . . . evidence preservation d
idence preservation demand," id. at 34; withheld records so as to commit "felony obstructi  emand," id. at 34; withheld records so as to commit "felony obstruction of justice," id. a
on of justice," id. at 39; and, more generally, "maintained numerous unlawful policies, pr  t 39; and, more generally, "maintained numerous unlawful policies, practices, and procedur
actices, and procedures . . . and willful violation[s] of the APA, FOIA, Rehabilitation Ac  es . . . and willful violation[s of the APA, FOIA, Rehabilitation Act, Privacy Act, and SS
t, Privacy Act, and SSI statutes." Dkt. 111 at 3.                                           I statutes." Dkt. 111 at 3.
   17 The subject of this suit are six FOIA and Privacy Act requests for records that Plaintiff,    17 The subject of this suit are six FOIA and Privacy Act requests for records that Plaintiff,
 whose full name is Sai,1 sent to the TSA in 2013.                                           whose full name is Sai, sent to the TSA in 2013.
   18 Sai submitted the first of these requests on January 28, 2013,2 requesting information rel     18 Sai submitted the first of these requests on January 28, 2013,1 requesting information rel
ating to an incident at a security checkpoint at Boston Logan International Airport ("BOS  ating to an incident at a security checkpoint at Boston Logan International Airport ("BOS
 Request"). This request initially sought "reports," "notes, correspondence, communications   Request"). This request initially sought "reports," "notes, correspondence, communications
, . . . relating to the incident," "any and all records related to [Sai];" "copies of [Sa  , . . . relating to the incident," "any and all records related to [Sai];" "copies of [Sai
i's] [travel] documents that were made at the scene;" "all history of complaints" against  ]'s [travel] documents that were made at the scene;" "all history of complaints" against t
 the TSA agents with whom Sai came into contact and "similar complaints" against the TSA; an  he TSA agents with whom he came into contact and "similar complaints" against the TSA; and
d "documents and communication related to responding to this request." Dkt. 99-3 at 50-51    "documents and communication related to responding to this request." Dkt. 99-3 at 50-51 (
 (McCoy Decl. Ex. A). After the TSA requested additional information regarding the request  McCoy Decl. Ex. A). After the TSA requested additional information regarding the request o
 on February 15, 2013, Sai expanded the request to include "all records related to" prior s  n February 15, 2013, Sai expanded the request to include "all records related to" prior se
ecurity incidents that occurred at New York LaGuardia Airport on June 27, 2012, and Chicag  curity incidents that occurred at New York LaGuardia Airport on June 27, 2012, and Chicago
o O'Hare International Airport on December 25, 2010. Id. at 55 (McCoy Decl. Ex. B). TSA fa   O'Hare International Airport on December 25, 2010. Id. at 55 (McCoy Decl. Ex. B). TSA fai
iled to respond to the expanded BOS Request within the 20-day period specified by FOIA. See  led to respond to the expanded BOS Request within the 20-day period specified by FOIA. See
 id. at 8 (McCoy Decl. ¶ 25); id. at 59 (McCoy Decl. Ex. D). On August 8, 2014, the agency   id. at 8 (McCoy Decl. ¶ 25); id. at 59 (McCoy Decl. Ex. D). On August 8, 2014, the agency
 provided an interim response releasing seven pages of records, with some redactions. Id.   provided an interim response releasing seven pages of records, with some redactions. Id.
 at 8 (McCoy Decl. ¶ 25). It supplemented this response on October 3, 2014 with the releas  at 8 (McCoy Decl. ¶ 25). It supplemented this response on October 3, 2014 with the release
e of an additional 229 pages of records and video of the BOS incident. Id. at 9 (McCoy Dec   of an additional 229 pages of records and video of the BOS incident. Id. at 9 (McCoy Decl
l. ¶ 27).                                                                                  . ¶ 27).
   20 1 Sai has indicated a preference not to be referenced using gendered pronouns, and, in thi    20
s amended opinion, the Court has endeavored to respect that request.
   21 2 The declaration of Regina McCoy states that Sai's request was executed on January 21, 20     21 1 The declaration of Regina McCoy states that Sai's request was executed on January 21, 20
13. The request, however, is dated January 28, 2013 and states that Sai sought records per   13. The request, however, is dated January 28, 2013 and states that Sai sought records per
taining to an incident that occurred on January 21, 2013. Dkt. 99-3 at 52 (McCoy Decl. Ex.   taining to an incident that occurred on January 21, 2013. Dkt. 99-3 at 52 (McCoy Decl. Ex.
 A). This minor error in the McCoy declaration is immaterial to the pending motion.          A). This minor error in the McCoy declaration is immaterial to the pending motion.
   22 Sai submitted the third request at issue, relating to an incident that took place at San F     22 Sai submitted the third request at issue, relating to an incident that took place at San F
rancisco International Airport ("SFO Request"), by email on March 15, 2013. Id. at 85-86 (  rancisco International Airport ("SFO Request"), by email on March 15, 2013. Id. at 85-86 (
McCoy Decl. Ex. L). Like the BOS Request, the SFO Request sought "reports," "notes, corres  McCoy Decl. Ex. L). Like the BOS Request, the SFO Request sought "reports," "notes, corres
pondence, [and] communications, . . . relating to the incident;" "any and all records rela  pondence, [and] communications, . . . relating to the incident;" "any and all records rela
ted to [Sai];" "all history of complaints" against the TSA agents with whom Sai came into   ted to [Sai];" "all history of complaints" against the TSA agents with whom he came into c
contact and "similar complaints" against the TSA; and "documents and communication related   ontact and "similar complaints" against the TSA; and "documents and communication related
 to responding to this request." Id. (McCoy Decl. Ex. L). The TSA initially responded to t   to responding to this request." Id. (McCoy Decl. Ex. L). The TSA initially responded to th
he request on August 8, 2014, "releasing 72 pages of responsive records in full as well as  e request on August 8, 2014, "releasing 72 pages of responsive records in full as well as
 two CCTV videos." Id. at 22 (McCoy Decl. ¶ 71); id. at 93 (McCoy Decl. Ex. N). The agency    two CCTV videos." Id. at 22 (McCoy Decl. ¶ 71); id. at 93 (McCoy Decl. Ex. N). The agency
 supplemented that response on October 3, 2014 with an additional 427 pages of responsive   supplemented that response on October 3, 2014 with an additional 427 pages of responsive r
records. Id. at 23 (McCoy Decl. ¶ 73).                                                      ecords. Id. at 23 (McCoy Decl. ¶ 73).
    ---                                                                      ---
   24 On March 25, 2017, the TSA sent Sai a letter explaining that the request was "too broad in      24 On March 25, 2017, the TSA sent Sai a letter explaining that his request was "too broad in
 scope or did not specifically identify the records" sought, and it invited Sai to "resubm   scope or did not specifically identify the records" he was seeking, and it invited Sai to
it [the] request containing a reasonable description of the records [he was] seeking." Id.   "resubmit [the] request containing a reasonable description of the records [he was] seeki
 at 30 (McCoy Decl. ¶ 91); id. at 132 (McCoy Decl. Ex. T). Because Sai did not respond, th  ng." Id. at 30 (McCoy Decl. ¶ 91); id. at 132 (McCoy Decl. Ex. T). Because Sai did not res
e TSA "administratively closed" the request on May 9, 2013. Id. at 30 (McCoy Decl. ¶ 92).   pond, the TSA "administratively closed" the request on May 9, 2013. Id. at 30 (McCoy Decl.
                                                                                             ¶ 92).
   25 About a year later, however, after Sai brought the present suit, the TSA "in its discretio     25 About a year later, however, after Sai brought the present suit, the TSA "in its discretio
n, re-opened the request and initiated a search for responsive records to the extent the i  n, re- opened the request and initiated a search for responsive records to the extent the
tems sought in the request could be reasonably discerned based on the title provided or ot   items sought in the request could be reasonably discerned based on the title provided or o
her information that was reasonably clear from the initial request." Id. at 31 (McCoy Decl  ther information that was reasonably clear from the initial request." Id. at 31 (McCoy Dec
. ¶ 93). The TSA directed that fifteen different offices, including, for example, the Disa  l. ¶ 93). The TSA directed that fifteen different offices, including, for example, the Dis
bility Branch of TSA's Office of Civil Rights and Liberties, Ombudsman & Traveler Engageme  ability Branch of TSA's Office of Civil Rights and Liberties, Ombudsman & Traveler Engagem
nt Division, "conduct a reasonable search for responsive records." Id. (McCoy Decl. ¶ 94).  ent Division, "conduct a reasonable search for responsive records." Id. (McCoy Decl. ¶ 94)
 On July 30, 2015, the TSA made an initial release of 1,416 pages of responsive records, s  . On July 30, 2015, the TSA made an initial release of 1,416 pages of responsive records,
ome of which were redacted in part. Id. at 35-36 (McCoy Decl. ¶ 109). Although releasing t  some of which were redacted in part. Id. at 35-36 (McCoy Decl. ¶ 109). Although releasing
hese records, the TSA reminded Sai that it had previously concluded that the "request was  these records, the TSA reminded Sai that it had previously concluded that his "request was
 too broad" and that it had requested that Sai "resubmit [his] request with a reasonable d   too broad" and that it had requested that Sai "resubmit [his] request with a reasonable d
escription of the records" sought. Id. (McCoy Decl. ¶ 109); id. at 138 (McCoy Decl. Ex. U).  escription of the records" sought. Id. (McCoy Decl. ¶ 109); id. at 138 (McCoy Decl. Ex. U)
 Notwithstanding Sai's failure to respond, the agency explained, it had decided—in its di  . Notwithstanding Sai's failure to respond, the agency explained, it had decided—in its di
scretion—to process the request "to the extent records [could] be reasonably identified." I  scretion—to process the request "to the extent records [could] be reasonably identified."
d. at 138 (McCoy Decl. Ex. U). Subsequently, on August 20, 2015 and October 30, 2015, the   Id. at 138 (McCoy Decl. Ex. U). Subsequently, on August 20, 2015 and October 30, 2015, the
 TSA released an additional 1,294 pages and 329 pages of responsive records, respectively,   TSA released an additional 1,294 pages and 329 pages of responsive records, respectively,
 some of which were again redacted in part. Id. at 36 (McCoy Decl. ¶ 110); id. at 145 (McCo   some of which were again redacted in part. Id. at 36 (McCoy Decl. ¶ 110); id. at 145 (McC
y Decl. Ex. V). Finally, on February 29, 2016, the TSA notified Sai that it had located an  oy Decl. Ex. V). Finally, on February 29, 2016, the TSA notified Sai that it had located a
 additional collection of records, which the agency was withholding in full. Id. at 37 (Mc  n additional collection of records, which the agency was withholding in full. Id. at 37 (M
Coy Decl. ¶ 112); id. at 158 (McCoy Decl. Ex. X).                                          cCoy Decl. ¶ 112); id. at 158 (McCoy Decl. Ex. X).
   26 Sai's fifth and sixth requests cover the same ground covered by the BOS and SFO requests,       26 Sai's fifth and sixth requests cover the same ground covered by the BOS and SFO requests,
 but seek records created or obtained after those requests were filed ("BOS and SFO Re- Req   but seek records created or obtained after those requests were filed ("BOS and SFO Re- Req
uests"). See Dkt. 28-3 at 11. Sai originally submitted the BOS and SFO Re-Requests on Nove  uests"). See Dkt. 28-3 at 11. Sai originally submitted the BOS and SFO Re-Requests on Nove
mber 23, 2013. See id. That email was addressed to the TSA's FOIA division and read, in re  mber 23, 2013. See id. That email was addressed to the TSA's FOIA division and read, in re
levant part, "I hereby demand that you send me *all* documents, records, statements, surve  levant part, "I hereby demand that you send me *all* documents, records, statements, surve
illance video, external and internal correspondence, etc. that are currently or have ever   illance video, external and internal correspondence, etc. that are currently or have ever
been in the TSA's possession which relate to either of the two incidents I reported wherei  been in the TSA's possession which relate to either of the two incidents I reported wherei
n the TSA violated my rights." Id. The TSA initially viewed this email as duplicative of th  n the TSA violated my rights." Id. The TSA initially viewed this email as duplicative of t
e SFO and BOS requests and did not respond. Dkt. 99-3 at 43 (McCoy Decl. ¶ 123). In an earli  he SFO and BOS requests and did not respond. Dkt. 99-3 at 43 (McCoy Decl. ¶ 123). In an earli
er opinion in this case, however, the Court held that the November 23 email was in fact mor  er opinion in this case, however, the Court held that the November 23 email was in fact m
e expansive than Sai's earlier requests because it "also covered records created during th  ore expansive than Sai's earlier requests because it "also covered records created during th
e interval between the requests." Dkt. 74 at 15. Complying with that decision, the TSA ack  e interval between the requests." Dkt. 74 at 15. Complying with that decision, the TSA ack
nowledged receipt of the BOS and SFO Re-Requests in September and October 2015, Dkt. 99-3   nowledged receipt of the BOS and SFO Re-Requests in September and October 2015, Dkt. 99-3
 at 43-44 (McCoy Decl. ¶¶ 124-25, 127); id. at 178 (McCoy Decl. Ex. AA); id. at 180 (McCoy D   at 43-44 (McCoy Decl. ¶¶ 124-25, 127); id. at 178 (McCoy Decl. Ex. AA); id. at 180 (McCoy
ecl. Ex. BB); id. at 185 (McCoy Decl. Ex. CC); "tasked those offices that it deemed most l   Decl. Ex. BB); id. at 185 (McCoy Decl. Ex. CC); "tasked those offices that it deemed most
ikely to have records related to the SFO and BOS incidents with searching for non-duplicat   likely to have records related to the SFO and BOS incidents with searching for non-duplicat
ive responsive records," id. at 46 (McCoy Decl. ¶ 133), and subsequently notified Sai that  ive responsive records," id. at 46 (McCoy Decl. ¶ 133), and subsequently notified Sai that
 it found no non-duplicative records responsive to the requests, id. at 46-47 (McCoy Decl.   it found no non-duplicative records responsive to his requests, id. at 46-47 (McCoy Decl.
 ¶¶ 135, 138).                                                                               ¶¶ 135, 138).
    ---                                                                      ---
   28 Because the TSA failed to respond within the 20-day period specified by FOIA, 5 U.S.C. § 5      28 Because the TSA failed to respond within the 20-day period specified by FOIA, 5 U.S.C. § 5
52(a)(6)(A)(i), Sai was deemed, as a matter of law, to have exhausted administrative remed  52(a)(6)(A)(i), Sai was deemed, as a matter of law, to have exhausted his administrative r
ies, 5 U.S.C. § 552(a)(6)(C), and, having cleared that threshold requirement, Sai brought   emedies, 5 U.S.C. § 552(a)(6)(C), and, having cleared that threshold requirement, he broug
this suit, Dkt. 5. After filing suit, Sai moved both for a preliminary injunction and to e  ht this suit, Dkt. 5. After filing suit, Sai moved both for a preliminary injunction and t
xpedite the action. Dkt. 8; Dkt. 18. The Court denied both motions. Minute Order (Apr. 17,  o expedite the action. Dkt. 8; Dkt. 18. The Court denied both motions. Minute Order (Apr.
 2014); Dkt. 34; Dkt. 42. Sai also moved to impose sanctions on the government, which the   17, 2014); Dkt. 34; Dkt. 42. Sai also moved to impose sanctions on the government, which t
Court denied, Dkt. 30; Dkt. 32, and for reconsideration of the Court's denial, Dkt. 38, wh  he Court denied, Dkt. 30; Dkt. 32, and for reconsideration of the Court's denial, Dkt. 38,
ich the Court also denied, Dkt. 47. In addition, Sai unsuccessfully sought to amend the co   which the Court also denied, Dkt. 47. In addition, Sai unsuccessfully sought to amend his
mplaint, see Dkt. 49, and unsuccessfully sought reconsideration of that decision, Dkt. 50;   complaint, see Dkt. 49, and unsuccessfully sought reconsideration of that decision, Dkt. 5
 Dkt. 74. The TSA, for its part, moved to dismiss in part and to strike portions of Sai's   0; Dkt. 74. The TSA, for its part, moved to dismiss in part and to strike portions of Sai'
 complaint, Dkt. 51, which the Court also denied, Dkt. 74. Sai then moved to "compel servi  s complaint, Dkt. 51, which the Court also denied, Dkt. 74. Sai then moved to "compel serv
ce of [Section] 46105(b) orders," Dkt. 77, for attorney fees and costs, Dkt. 85, and to fi  ice of [Section] 46105(b) orders," Dkt. 77, for attorney fees and costs, Dkt. 85, and to f
le a supplemental pleading, Dkt. 86, all of which the Court denied, Dkt. 93.                ile a supplemental pleading, Dkt. 86, all of which the Court denied, Dkt. 93.
   29 The TSA has now moved for summary judgment, submitting that it has conducted a reasonable      29 The TSA has now moved for summary judgment, submitting that it has conducted a reasonable
 and adequate search and that its withholdings are appropriate under both FOIA and the Priv   and adequate search and that its withholdings are appropriate under both FOIA and the Priv
acy Act. Dkt. 99. The TSA supports its motion with the declarations of Regina McCoy, the a  acy Act. Dkt. 99. The TSA supports its motion with the declarations of Regina McCoy, the a
gency's FOIA officer, Dkt. 99-3 at 1 (McCoy Decl. ¶ 2), and Douglas Blair, Chief of the Se  gency's FOIA officer, Dkt. 99-3 at 1 (McCoy Decl. ¶ 2), and Douglas Blair, Chief of the Se
nsitive Security Information Program in the agency's Office of Law Enforcement & Federal A  nsitive Security Information Program in the agency's Office of Law Enforcement & Federal
ir Marshal Service, Dkt. 99-4 at 1 (Blair Decl. ¶ 1); Dkt. 105 at 17 (Supp. Blair Decl. ¶   Air Marshal Service, Dkt. 99-4 at 1 (Blair Decl. ¶ 1); Dkt. 105 at 17 (Supp. Blair Decl. ¶
1). Sai's opposition brief is only five pages long and merely lists—without analysis or su   1). Sai's opposition brief is only five pages long and merely lists—without analysis or su
pport— sixteen ways in which the TSA has allegedly violated the law; as Sai puts it, the "  pport— sixteen ways in which the TSA has allegedly violated the law; as Sai puts it, the "
TSA has violated nearly all the law[s] it could." Dkt. 111 at 2. Sai also requests that th  TSA has violated nearly all the law[s] it could." Dkt. 111 at 2. He also requests that the
e Court order that the TSA supplement its Vaughn index, order "full civil discovery," and    Court order that the TSA supplement its Vaughn index, order "full civil discovery," and o
order the TSA "to provide [the] Court with an in camera copy of [its] entire production[]   rder the TSA "to provide [the] Court with an in camera copy of [its] entire production[] .
 . . without redactions." Id. at 4-5. Standing alone, Sai's opposition brief provides lit   . . without redactions." Id. at 4-5. Standing alone, Sai's opposition brief provides litt
tle analysis or argument. Sai has also filed a forty-page affidavit, however, which contai  le analysis or argument. He has also filed a forty-page affidavit, however, which contains
ns more extensive legal and factual argument. Dkt. 111-2. Because the Court must liberally   more extensive legal and factual argument. Dkt. 111-2. Because the Court must liberally c
 construe pro se pleadings, see Erickson v. Pardus, 551 U.S. 89, 94 (2007), and because th  onstrue pro se pleadings, see Erickson v. Pardus, 551 U.S. 89, 94 (2007), and because the
e Court must, in any event, assess the legal sufficiency of a motion for summary judgment,   Court must, in any event, assess the legal sufficiency of a motion for summary judgment, s
 see Winston & Strawn, LLP v. McLean, 843 F.3d 503, 507-08 (D.C. Cir. 2016), and must cons  ee Winston & Strawn, LLP v. McLean, 843 F.3d 503, 507-08 (D.C. Cir. 2016), and must consid
```

er sua sponte whether any portions of the withheld records are reasonably segregable, see Morley v. CIA, 508 F.3d 1108, 1123 (D.C. Cir. 2007), the Court will treat Sai's affidavit as his brief in opposition and will also consider the adequacy of the TSA's legal contentions sua sponte. The Court will also consider the various supplemental briefs and filings that the parties have submitted.

34 Sai's arguments in opposition to the TSA's motion for summary judgment fall into three broad categories. Specifically, Sai challenges (1) the format of the records the TSA produced pursuant to FOIA and the Privacy Act; (2) the adequacy of the TSA's search for records responsive to his FOIA requests; and (3) the TSA's withholding of portions of the records it released pursuant to FOIA and the Privacy Act. In addition, Sai raises various allegations of misconduct by the TSA and requests the opportunity to conduct "full civil discovery." The Court will consider each set of arguments in turn.

37 Sai first argues that the TSA violated the Rehabilitation Act, 29 U.S.C. § 794d, and E-FOIA, 5 U.S.C. § 552(a)(3)(B), (C), by failing to release the requested records in a "native, electronic, or § 508 accessible format" and by failing to provide him with a copy of the agency's Vaughn index in a "spreadsheet format" that would permit "basic operations like copying the spreadsheets into Google Spreadsheets." Dkt. 111-2 at 1–2 (emphasis omitted). He argues that the format used by the TSA prevented him from accessing "metadata" and "significantly impaired [his] ability to use the documents, distribute the documents to [his] audience in a format that would be accessible to them (which includes other people with disabilities)," and he asserts that the "TSA uses DHS-wide FOIA processing software and methods that take documents that are originally [in a] native electronic [format] . . . and output paper or rasterized PDF[s]." Id. at 2–4. Finally, Sai maintains that records were not produced in discrete files (which he refers to as an absence of "discretization") and were not produced in a "cogent" order. Id. at 2. As explained below, the Court is unpersuaded by these arguments.

38 To start, this is not a Rehabilitation Act case. The complaint does not invoke the Rehabilitation Act and, indeed, it expressly asserts that "[t]his suit is solely under FOIA and [the Privacy Act]." Dkt. 5 at 2 (Compl. ¶ 5). To be sure, Sai filed his complaint before the TSA released any records, and thus he did not know what format the agency would use. But he himself posits that the TSA, in general, uses software that does not result in the release of "native" format records, Dkt. 111-2 at 4, and, more importantly, despite filing multiple motions for leave to amend, see Dkt. 9; Dkt. 21, he has never sought to amend his complaint to assert a claim under the Rehabilitation Act. Although pro se litigants are entitled to some leeway, they must comply with the Federal Rules of Civil Procedure, Jarrell v. Tisch, 656 F. Supp. 237, 239 (D.D.C. 1987), and a plaintiff—even a pro se plaintiff—may not amend her complaint by raising an issue for the first time in a brief in opposition to a motion for summary judgment, see Manna v. U.S. Dep't of Justice, 106 F. Supp. 3d 16, 19 (D.D.C. 2015) ("[A plaintiff] cannot expand the scope of this litigation by merely referring to other requests in his opposition to Defendants' motion."); Wright v. U.S. Dep't Justice, 121 F. Supp. 3d 171, 183 n.7 (D.D.C. 2015) ("[I]t is inappropriate for a Court to consider new claims raised for the first time in a brief in opposition to a motion for summary judgment."); Arbitraje Casa de Cambio, S.A. de C.V. v. U.S. Postal Serv., 297 F. Supp. 2d 165, 170 (D.D.C. 2003) ("It is axiomatic that a complaint may not be amended by the briefs in opposition . . . ." (citation omitted)). Because Sai has not alleged a claim under the Rehabilitation Act, or, more precisely, a claim under the Administrative Procedure Act, see Sai, 149 F. Supp. 3d at 112–15 (concluding that § 504 claim for injunctive relief and, by implication, a § 508 claim, is properly brought under the APA), his first argument fails as a matter of law.

40 Subject to certain limitations, Section 508 of the Rehabilitation Act requires that federal agencies like the TSA ensure that "individuals with disabilities who are members of the public seeking information . . . have access to and use of information and data that is comparable to the access to and use of the information and data by such members of the public who are not individuals with disabilities." 29 U.S.C. § 794d(a)(1)(A)(ii). Here, Sai complains that the TSA released records to him with "no discretization," without "metadata," and without "spreadsheet structure." Dkt. 111-2 at 2. "The format of [the] TSA's FOIA production," according to Sai, "has significantly impaired [his] ability to use the documents" and to "distribute [them] to [his] audience in a format that would be accessible to them (which includes other people with disabilities)." Id. at 3. Sai fails to explain, however, how his disability and the format in which the records were released have prevented him from accessing and using the information and data in a manner that is comparable to those without disabilities. Sai at least hints at an explanation for why blind people may need "embedded metadata to assist navigation by screen readers," id. at 4, but he does not allege that he is blind or that this same technology is necessary to accommodate his disability. Nor does Sai have standing to assert the interests of members of his "audience," including those who themselves have disabilities. See Gettman v. DEA, 290 F.3d 430, 435–36 (D.C. Cir. 2002) (concluding that magazine lacked standing to bring suit on behalf of readers). In short, Sai offers nothing more than "labels and conclusions," Iqbal, 556 U.S. at 678, in support of his contention that the format in which the TSA released the relevant records violated his rights under Section 508. Accordingly, even if Sai's affidavit were treated as a proposed, amended complaint, the Court would deny leave to amend on grounds of futility.

43 Much of Sai's argument is misdirected. He asserts, for example, that "TSA's Vaughn declarations and exhibits are . . . partially rasterized PDFs," that the agency's "Vaughn indices are spreadsheets embedded in PDF format, severely hampering [his] ability to do basic operations like copying the spreadsheets into Google Spreadsheets," and that the TSA's refusal to provide him "with spreadsheet format" versions of the Vaughn indices" has hampered his ability to litigate this case. Dkt. 111-2 at 2–3. E-FOIA, however, applies only to records released pursuant to FOIA; it has no bearing on the form or format of declarations, indices, and exhibits filed with the Court, or served on the opposing party, in the course of litigating a FOIA suit. Three of Sai's FOIA requests, moreover, do not actually request that the TSA release the records in any format other than "electronic[]" or "digital." Dkt. 99-3 at 50-51, (McCoy Decl. Ex. A) (BOS Request) (requesting "a digital copy of all related materials" and "demand[ing] that this request be serviced electronically to the maximum extent possible"); id. at 85-86 (McCoy Decl. Ex. L) (SFO Request) (requesting "a digital copy of all Related Material" and "demand[ing] that this request be serviced electronically to the maximum extent possible"); id. at 78 (McCoy Decl. Ex. I) (CCTV Request) (requesting "any contract/agreement with other agencies regarding surveillance, or maintenance . . . footage, at Logan airport" without specifying the format of production). All of the requested records, however, were produced in an electronic format to Sai, Dkt. 118-1 at 2 (3d supp. McCoy Decl. ¶ 7), and Sai agrees that responses provided in PDF format "fulfill the absolute minimum requirements of being electronically accessible," Dkt. 111-2 at 4. Accordingly, as to Sai's BOS, SFO, and CCTV Requests, the format of TSA's responses met the requirements of E-FOIA. See 5 U.S.C. § 552(a)(3)(B).

44 Turning to Sai's Policies Request, Sai once again did not request that the TSA provide the responsive records in a "native" format with embedded metadata. Rather, he asked that the TSA release the records "in an electronic, machine-processable, accessible, open, and well-structured format to the maximum extent possible." Dkt. 99-3 at 129 (McCoy Decl. Ex. S). Presumably recognizing the ambiguity of that request, Sai further explained that, "[t]his means," for example: "individual PDFs per distinct document," "fully digital text PDFs rather than scans or rasterizations," "digital redactions rather than black marker," "lists and structured data as machine-processable spreadsheets," and "scans rather than paper copies." Id. (McCoy Decl. Ex. S).

46 As to the second objection–that the TSA released spreadsheets in an unusable format– it is Sai that drops the ball. Although he asserts, generally, that the TSA FOIA response process is flawed because the agency does not release spreadsheets in a usable format, Dkt. 111-2 at 5, and although he contends, specifically, that the TSA's Vaughn index was produced in a format that did not permit him to perform "basic operations like copying the spreadsheet into Google Spreadsheets," Dkt. 111-2 at 2, Sai fails to assert that the TSA release any spreadsheets in response to his Policies Request. Absent some reason to conclude that Sai's general objection to the manner in which the TSA releases spreadsheets has any bearing on the Policies Request, the Court cannot opine on that question. Simply put, "[t]he judicial power does not extend to the determination of abstract questions." Ashwander v. Tenn. Vall Auth., 297 U.S. 288, 324 (1936). Because this decision will require further litigation of a handful of specified issues, however, the Court will provide Sai with the opportunity to demonstrate that the TSA released spreadsheets in response to the Policies Request.

47 Although not crystal clear, Sai does adequately raise his final objection—that the records responsive to his Policies Request were released in a "rasterized" format, and not as "fully digital text PDFs"—and the TSA at least indirectly responds to that objection. Sai explains that "[b]y 'rasterized PDF,' [he] mean[s] the kind that is produced by scanning paper documents . . . or irreversibly rendering text into image format," Dkt. 111-2 at 4 n.10, and that understanding comports with the dictionary definition, see Rasterize, v., Oxford English Dictionary (2018) ("To convert (an image) into . . . points or pixels on a grid").[2] The question, then, is whether Sai was entitled to receive records responsive to his Policies Request in the "fully digital" (non-rasterized) text PDF format that he sought. See 5 U.S.C. § 552(a)(3)(B).

48 The answer to that question overlaps with the sole question presented by Sai's final set of requests, the BOS and SFO Re-Requests. In those requests, Sai asked that the TSA release the relevant records "in their original electronic format or as a scan of any documents that are originally paper." Dkt. 28-3 at 11–12. The second of these alternatives does not present an issue here; Sai requested scanned copies of original, paper records, and that is what he received. The first alternative, however, might reasonably be construed to seek the requested non-paper files in their "native" format—for example, in "Word, Excel, or electronic PDF." Dkt. 111-2 at 4.4 So, taken together, the final question posed by Sai's Policies Request and BOS and SFO Re-Requests is whether the records that he sought were "readily reproducible" by the TSA at the relevant time in the format that Sai requested: Word, Excel, electronic PDF, or the like. 5 U.S.C. § 552(a)(3)(B).

---

50 [2] Available at http://www.oed.com/view/Entry/247452.

51 [3] It is far less clear that this request can plausibly be construed to reach "metadata" that it is not necessary to read or use the record in the format, nor is it clear that Sai would be entitled to such "metadata". See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Educ., 905 F. Supp. 2d 161, 172 (D.D.C. 2012) (rejecting the argument that "a

government agency must produce electronic copies and/or metadata to comply with FOIA").

55 The present context adds a slight twist on this inquiry. In one sense, Sai is not asking that the TSA reproduce the relevant records in a new format; Sai is asking that it produce them in their original format. That context, of course, is not entirely alien to 5 U.S.C. § 552(a)(3)(B). As recounted above, Congress enacted the "readily reproducible" requirement in response to a judicial decision that involved a similar scenario. In Dismukes, the Bureau of Land Management kept data on computer tapes, yet it reproduced that information on microfiche for public disclosure. 603 F. Supp. at 760. Congress adopted the "readily reproducible" requirement in response, leaving little doubt that the "readily reproducible" requirement applies both to records that require conversion to a new format and to records, like those at issue here, that are sought in their original format, notwithstanding the fact that the agency can more easily release the records in a different format.

60 Finally, Sai argues that the TSA's response to the BOS and SFO Requests were deficient because six pages of records that the agency released were "completely illegible." Dkt. 111-2 at 2 (listing "2013-TSPA-00368 Bates 003-004, 006-007; 2013-TSFO-01096 Bates 009-010"). These records include a handwritten "Incident/Event Reporting Form" in response to Sai's SFO Request, Dkt. 143-2 at 4-7; scans of Sai's passport and boarding pass in response to the SFO Request, id. at 3; see also Dkt. 57-5 at 3, and a spreadsheet in response to Sai's BOS Request, Dkt. 141-2 at 9-10. Upon review of those documents, the Court agrees that the records are illegible. FOIA requesters are entitled to a legible copies of responsive agency records. Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health & Human Servs., 844 F. Supp. 770, 779 (D.D.C. 1993) ("Without question, a FOIA respondent has a duty to release legible, complete records."). Accordingly, the Court must also deny summary judgment as to these six pages: Dkt. 143-2 at 3, 6–7; Dkt. 141-2 at 9–10.

62 In sum: many of Sai's objections regarding the format of responsive records are meritless. With respect to the following objections, however, the Court concludes that the TSA has yet to carry its burden on summary judgment: First, as to the Policies Request, the TSA has failed to explain why it could not "readily" have released the records as distinct PDFs or in "fully digital," non-"rasterized" "text PDFs." Second, as to the BOS and SFO Re-Requests, the TSA has failed to explain why it could not have "readily" released the records in their original Word, Excel, electronic PDF, or like format. Third, with respect to six pages of records, the agency has failed to explain why it could not have released legible copies. Finally, with respect to the Policies Request, the Court will provide Sai with the opportunity to identify any spreadsheets that Sai received in a format that was not useful. In all other respects, the TSA is entitled to summary judgment on the format issues.

64 Sai also argues that the searches that the TSA conducted in response to Sai's FOIA/PA requests were inadequate. Dkt. 111-2 at 5-19. The adequacy of an agency's search for records "is analyzed under the same standard" for purposes of both FOIA and the Privacy Act. Thompson v. U.S. Dep't of Justice, 146 F. Supp. 3d 72, 82 (D.D.C. 2015). Under both statutes, the adequacy of the "search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry [it] out." Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C. Cir. 2003). The agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested," but, at the same time, it need not "search every record system." Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990). Similarly, the agency need not deploy every conceivable search term or permit the FOIA requester to dictate the search terms in the course of litigation, but it must use terms reasonably calculated to locate responsive records. See Agility Public Warehousing Co. K.S.C. v. NSA, 113 F. Supp. 3d 313, 339 (D.D.C. 2015) ("Where the search terms are reasonably calculated to lead to responsive documents, the Court should not 'micro manage' the agency's search."); see also Physicians for Human Rights v. U.S. Dep't of Def., 675 F. Supp. 2d 149, 164 (D.D.C. 2009) ("[Agencies have] discretion in crafting lists of search terms that they believe[] to be reasonably tailored to uncover documents responsive to the FOIA request.").

67 Sai raises three challenges to the adequacy of the TSA's search for records responsive to the BOS and SFO Requests and Re-Requests. Sai contends that the TSA (a) failed to search all offices that might have responsive records; (b) failed "to adequately document the timing," and thus the cut-off dates, for the relevant searches; and (c) failed adequately to document the "keywords" used and the "database indices" searched. Dkt. 111 at 2. The Court will consider each of these contentions in turn.

69 Sai first asserts that the TSA did not search the following offices "for records, such as emails, in relation to [Sai's] complaints" of mistreatment at the TSA checkpoints: the Office of Security Operations ("OSO"), the Office of Strategic Communications and Public Affairs ("OPA"), the Office of Civil Rights and Liberties, the office of Ombudsman and Traveler Engagement ("OCR&L"), the SFO field office, Covenant Aviation Security, the TSA FOIA Branch, the BOS field office, the TSA Contact Center ("TCC"), the Office of Chief Counsel ("OCC"), the Office of the Executive Secretariat, the Office of Legislative Affairs ("OLA"), the Department of Homeland Security ("DHS"), and the DHS Office for Civil Rights and Liberties. Dkt. 111-2 at 5–6.

73 Finally, in response to the BOS and SFO Re-Requests, the TSA tasked the Logan and San Francisco Airport field offices, the TCC, and OLE/FAMS with searching for records that post-dated those found in the earlier search. Id. at 44 (McCoy Decl. ¶ 127). TSA found no responsive records to these requests that were not already included in the productions for the BOS and SFO Requests. Id. at 47 (McCoy Decl. ¶¶ 136, 139).

75 A number of the other offices that Sai claims the TSA should have searched lie beyond the TSA's purview or beyond the scope of Sai's request and this litigation. As Sai recognizes, Covenant Aviation Security is a private contractor, Dkt. 111-2 at 6 n.13, and thus is not subject to FOIA, Roman v. Dep't of the Air Force, 952 F. Supp. 2d 166, 175 (D.D.C. 2013) (citing U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 144–45 (1989)). Similarly, Sai contends that the TSA failed to search the Department of Homeland Security or the DHS Office of Civil Rights and Liberties for responsive records, but Sai submitted the FOIA/PA requests only to the TSA, and the DHS FOIA regulations require that a requester "write directly to the Department component that maintains [the] records" sought. 6 C.F.R. § 5.3(a) (2003) (superseded 2016); see also 6 C.F.R. § 5.1(b) (defining "component" to mean "each separate bureau, office, division, commission, service, center, or administration"). "As a result, only the component to which the FOIA request is directed has an obligation to conduct a search." Ewell v. U.S. Dep't Justice, 153 F. Supp. 3d 294, 302 (D.D.C. 2016) (interpreting analogous Department of Justice regulation).

84 The problem here is that the TSA has not submitted evidence sufficient for the Court to determine when it commenced each of the relevant searches. Sai asserts, without contradiction from the TSA, that the most recent e-mail released in response to Sai's FOIA/PA requests was dated July 7, 2014, and that Sai did not receive responses to some of the requests until 2016. Dkt. 111-2 at 7; see also Dkt. 99-3 at 187 (McCoy Decl. Ex. DD). From this and the fact that the TSA continued to review Sai's administrative Rehabilitation Act complaint in the interval between July 7, 2014, and January 6, 2016, when Sai received the final response to the BOS and SFO Re-Requests, Sai infers that the TSA's search could not have encompassed the entire, relevant timeframe. Dkt. 111-2 at 7; see also Dkt. 99-3 at 187 (McCoy Decl. Ex. DD) (final response to BOS and SFO Re-Requests).

85 In response, the TSA notes that the July 7, 2014 email was dated "just weeks" after it issued its "interim and final releases in the BOS and SFO Requests" and that "[i]t is not unreasonable for an agency to take time after the completion of a FOIA search to review and process the responsive records." Dkt. 118 at 12. That response, however, ignores the BOS and SFO Re-Requests, which were not processed until much later. Indeed, the TSA acknowledges that it did not initially treat the Re-Requests as distinct FOIA/PA requests and that was not until September 21, 2015 that the agency sent Sai "an acknowledgement letter" for those requests. Dkt. 99-3 at 43 (McCoy Decl. ¶¶ 123-24). Although the TSA correctly observes that Sai's objection is premised on the "speculat[ion] as to the dates that [the relevant] searches ended," Dkt. 118 at 13, that speculation is a product of the fact that the TSA, which has sole access to the relevant information, has not revealed when the search occurred and what cut-off date the agency applied.5

87 One last, related issue bears note, however. The TSA is correct that the BOS and SFO Re-Requests required the agency to search only for records relating to the original BOS and SFO incidents, which occurred in early 2013. That is what Sai sought when Sai made the re-requests in November 2013, Dkt. 28-3 at 11–12, and, as the TSA correctly observes, a FOIA requester cannot, years later and after a dispute is in litigation, expand the scope of a request by merely asserting, as Sai did, that "due to the [the agency's] delay," the request "now also encompasses records relating to" events that occurred long after the original request. Dkt. 99-3 at 182 (McCoy Decl. Ex. BB); see Houser v. Church, 271 F. Supp. 3d 197, 204 (D.D.C. 2017); Donoghue v. Office of Info. Policy, U.S. Dep't of Justice, 157 F. Supp. 3d 21, 23 n.2 (D.D.C. 2016); Coss v. U.S. Dep't of Justice, 98 F. Supp. 3d 28, 34 (D.D.C. 2015). Even if later-created records might fall within the scope of an open-ended request, the BOS and SFO Re-Requests were not open- ended: they sought only records relating to "the two incidents" that occurred at the Logan and San Francisco Airports in early 2013. Dkt. 28-3 at 11. To the extent Sai seeks records relating to other incidents, Sai must submit a new FOIA request. See Kowalczyk v. Dep't of Justice, 73 F.3d 386, 389 (D.C. Cir. 1996).

88 5 Although the TSA asserts that Sai has speculated about when the "searches ended," it is actually the date the searches started that matters under the governing regulations. See 6 C.F.R. § 5.4(a) (2003) (superseded 2016); 6 C.F.R. § 5.22(a).

92 With respect to the databases searched, the McCoy declaration describes in sufficient detail the locations and databases within each office searched in response to the BOS and SFO Requests, see Dkt. 99-3 at 6-8 (McCoy Decl. ¶¶ 15-17, 20, 23) (BOS Request); id. at 20–21 (McCoy Decl. ¶¶ 63, 65-66, 69) (SFO Request). In response to the BOS and SFO Re-Requests, however, the TSA merely states that the FOIA branch tasked the SFO, BOS, TCC, and Disability Branch offices to search for responsive records, but does not explain which databases or locations were searched within those offices. Id. at 46, 47 (McCoy Decl. ¶¶ 134, 137). Although the Court assumes that the TSA searched the same databases and locations as it did in response to the BOS and SFO Requests, the agency must describe its searches in greater detail to meet its burden on summary judgment.

government agency must produce electronic copies and/or metadata to comply with FOIA").

55 The present context adds a slight twist on this inquiry. In one sense, Sai is not asking that the TSA reproduce the relevant records in a new format; he is asking that it produce them in their original format. That context, of course, is not entirely alien to 5 U.S.C. § 552(a)(3)(B). As recounted above, Congress enacted the "readily reproducible" requirement in response to a judicial decision that involved a similar scenario. In Dismukes, the Bureau of Land Management kept data on computer tapes, yet it reproduced that information on microfiche for public disclosure. 603 F. Supp. at 760. Congress adopted the "readily reproducible" requirement in response, leaving little doubt that the "readily reproducible" requirement applies both to records that require conversion to a new format and to records, like those at issue here, that are sought in their original format, notwithstanding the fact that the agency can more easily release the records in a different format.

60 Finally, Sai argues that the TSA's response to his BOS and SFO Requests were deficient because six pages of records that the agency released were "completely illegible." Dkt. 111-2 at 2 (listing "2013-TSPA-00368 Bates 003-004, 006-007; 2013-TSFO-01096 Bates 009-010"). These records include a handwritten "Incident/Event Reporting Form" in response to Sai's SFO Request, Dkt. 143-2 at 4-7; scans of Sai's passport and boarding pass in response to the SFO Request, id. at 3; see also Dkt. 57-5 at 3, and a spreadsheet in response to Sai's BOS Request, Dkt. 141-2 at 9-10. Upon review of those documents, the Court agrees that the records are illegible. FOIA requesters are entitled to a legible copies of responsive agency records. Cleary, Gottlieb, Steen & Hamilton v. Dep't of Health & Human Servs., 844 F. Supp. 770, 779 (D.D.C. 1993) ("Without question, a FOIA respondent has a duty to release legible, complete records."). Accordingly, the Court must also deny summary judgment as to these six pages: Dkt. 143-2 at 3, 6–7; Dkt. 141-2 at 9–10.

62 In sum: many of Sai's objections regarding the format of responsive records are meritless. With respect to the following objections, however, the Court concludes that the TSA has yet to carry its burden on summary judgment: First, as to Sai's Policies Request, the TSA has failed to explain why it could not "readily" have released the records as distinct PDFs or in "fully digital," non-"rasterized" "text PDFs." Second, as to the BOS and SFO Re-Requests, the TSA has failed to explain why it could not have "readily" released the records in their original Word, Excel, electronic PDF, or like format. Third, with respect to six pages of records, the agency has failed to explain why it could not have released legible copies. Finally, with respect to Sai's Policies Request, the Court will provide Sai with the opportunity to identify any spreadsheets that he received in a format that was not useful. In all other respects, the TSA is entitled to summary judgment on the format issues.

64 Sai also argues that the searches that the TSA conducted in response to his FOIA/PA requests were inadequate. Dkt. 111-2 at 5-19. The adequacy of an agency's search for records "is analyzed under the same standard" for purposes of both FOIA and the Privacy Act. Thompson v. U.S. Dep't of Justice, 146 F. Supp. 3d 72, 82 (D.D.C. 2015). Under both statutes, the adequacy of the "search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry [it] out." Iturralde v. Comptroller of Currency, 315 F.3d 311, 315 (D.C. Cir. 2003). The agency "cannot limit its search to only one record system if there are others that are likely to turn up the information requested," but, at the same time, it need not "search every record system." Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990). Similarly, the agency need not deploy every conceivable search term or permit the FOIA requester to dictate the search terms in the course of litigation, but it must use terms reasonably calculated to locate responsive records. See Agility Public Warehousing Co. K.S.C. v. NSA, 113 F. Supp. 3d 313, 339 (D.D.C. 2015) ("Where the search terms are reasonably calculated to lead to responsive documents, the Court should not 'micro manage' the agency's search."); see also Physicians for Human Rights v. U.S. Dep't of Def., 675 F. Supp. 2d 149, 164 (D.D.C. 2009) ("[Agencies have] discretion in crafting lists of search terms that they believe[] to be reasonably tailored to uncover documents responsive to the FOIA request.").

67 Sai raises three challenges to the adequacy of the TSA's search for records responsive to his BOS and SFO Requests and Re-Requests. He contends that the TSA (a) failed to search all offices that might have responsive records; (b) failed "to adequately document the timing," and thus the cut-off dates, for the relevant searches; and (c) failed adequately to document the "keywords" used and the "database indices" searched. Dkt. 111 at 2. The Court will consider each of these contentions in turn.

69 Sai first asserts that the TSA did not search the following offices "for records, such as emails, in relation to [his] complaints" of mistreatment at the TSA checkpoints: the Office of Security Operations ("OSO"), the Office of Strategic Communications and Public Affairs ("OPA"), the Office of Civil Rights and Liberties, the office of Ombudsman and Traveler Engagement ("OCR&L"), the SFO field office, Covenant Aviation Security, the TSA FOIA Branch, the BOS field office, the TSA Contact Center ("TCC"), the Office of Chief Counsel ("OCC"), the Office of the Executive Secretariat, the Office of Legislative Affairs ("OLA"), the Department of Homeland Security ("DHS"), and the DHS Office for Civil Rights and Liberties. Dkt. 111-2 at 5–6.

73 Finally, in response to Sai's BOS and SFO Re-Requests, the TSA tasked the Logan and San Francisco Airport field offices, the TCC, and OLE/FAMS with searching for records that post-dated those found in the earlier search. Id. at 44 (McCoy Decl. ¶ 127). TSA found no responsive records to these requests that were not already included in the productions for the BOS and SFO Requests. Id. at 47 (McCoy Decl. ¶¶ 136, 139).

75 A number of the other offices that Sai claims the TSA should have searched lie beyond the TSA's purview or beyond the scope of Sai's request and this litigation. As Sai recognizes, Covenant Aviation Security is a private contractor, Dkt. 111-2 at 6 n.13, and thus is not subject to FOIA, Roman v. Dep't of the Air Force, 952 F. Supp. 2d 166, 175 (D.D.C. 2013) (citing U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 144–45 (1989)). Similarly, Sai contends that the TSA failed to search the Department of Homeland Security or the DHS Office of Civil Rights and Liberties for responsive records, but he submitted his FOIA/PA requests only to the TSA, and the DHS FOIA regulations require that a requester "write directly to the Department component that maintains [the] records" sought. 6 C.F.R. § 5.3(a) (2003) (superseded 2016); see also 6 C.F.R. § 5.1(b) (defining "component" to mean "each separate bureau, office, division, commission, service, center, or administration"). "As a result, only the component to which the FOIA request is directed has an obligation to conduct a search." Ewell v. U.S. Dep't Justice, 153 F. Supp. 3d 294, 302 (D.D.C. 2016) (interpreting analogous Department of Justice regulation).

84 The problem here is that the TSA has not submitted evidence sufficient for the Court to determine when it commenced each of the relevant searches. Sai asserts, without contradiction from the TSA, that the most recent e-mail released in response to his FOIA/PA requests was dated July 7, 2014, and that he did not receive responses to some of his FOIA/PA requests until 2016. Dkt. 111-2 at 7; see also Dkt. 99-3 at 187 (McCoy Decl. Ex. DD). From this and the fact that the TSA continued to review his administrative Rehabilitation Act complaint in the interval between July 7, 2014, and January 6, 2016, when he received his final response to his BOS and SFO Re-Requests, he infers that the TSA's search could not have encompassed the entire, relevant timeframe. Dkt. 111-2 at 7; see also Dkt. 99-3 at 187 (McCoy Decl. Ex. DD) (final response to BOS and SFO Re-Requests).

85 In response, the TSA notes that the July 7, 2014 email was dated "just weeks" after it issued its "interim and final releases in the BOS and SFO Requests" and that "[i]t is not unreasonable for an agency to take time after the completion of a FOIA search to review and process the responsive records." Dkt. 118 at 12. That response, however, ignores Sai's BOS and SFO Re-Requests, which were not processed until much later. Indeed, the TSA acknowledges that it did not initially treat the Re-Requests as distinct FOIA/PA requests and that was not until September 21, 2015 that the agency sent Sai "an acknowledgement letter" for those requests. Dkt. 99-3 at 43 (McCoy Decl. ¶¶ 123-24). Although the TSA correctly observes that Sai's objection is premised on his "speculation] as to the dates that [the relevant] searches ended," Dkt. 118 at 13, that speculation is a product of the fact that the TSA, which has sole access to the relevant information, has not revealed when the search occurred and what cut-off date the agency applied.4

87 One last, related issue bears note, however. The TSA is correct that Sai's BOS and SFO Re-Requests required the agency to search only for records relating to the original BOS and SFO incidents, which occurred in early 2013. That is what Sai sought when he made the re-requests in November 2013, Dkt. 28-3 at 11–12, and, as the TSA correctly observes, a FOIA requester cannot, years later and after a dispute is in litigation, expand the scope of a request by merely asserting, as Sai did, that "due to the [the agency's] delay," the request "now also encompasses records relating to" events that occurred long after the original request. Dkt. 99-3 at 182 (McCoy Decl. Ex. BB); see Houser v. Church, 271 F. Supp. 3d 197, 204 (D.D.C. 2017); Donoghue v. Office of Info. Policy, U.S. Dep't of Justice, 157 F. Supp. 3d 21, 23 n.2 (D.D.C. 2016); Coss v. U.S. Dep't of Justice, 98 F. Supp. 3d 28, 34 (D.D.C. 2015). Even if later-created records might fall within the scope of an open-ended request, Sai's BOS and SFO Re-Requests were not open- ended: they sought only records relating to "the two incidents" that occurred at the Logan and San Francisco Airports in early 2013. Dkt. 28-3 at 11. To the extent Sai seeks records relating to other incidents, he must submit a new FOIA request. See Kowalczyk v. Dep't of Justice, 73 F.3d 386, 389 (D.C. Cir. 1996).

88 4 Although the TSA asserts that Sai has speculated about when the "searches ended," it is actually the date the searches started that matters under the governing regulations. See 6 C.F.R. § 5.4(a) (2003) (superseded 2016); 6 C.F.R. § 5.22(a).

92 With respect to the databases searched, the McCoy declaration describes in sufficient detail the locations and databases within each office searched in response to Sai's BOS and SFO Requests, see Dkt. 99-3 at 6-8 (McCoy Decl. ¶¶ 15-17, 20, 23) (BOS Request); id. at 20–21 (McCoy Decl. ¶¶ 63, 65-66, 69) (SFO Request). In response to Sai's BOS and SFO Re-Requests, however, the TSA merely states that the FOIA branch tasked the SFO, BOS, TCC, and Disability Branch offices to search for responsive records, but does not explain which databases or locations were searched within those offices. Id. at 46, 47 (McCoy Decl. ¶¶ 134, 137). Although the Court assumes that the TSA searched the same databases and locations as it did in response to Sai's BOS and SFO Requests, the agency must describe its searches in greater detail to meet its burden on summary judgment.

93 With respect to the search terms used, the McCoy declaration provides an accounting of the terms used for the majority of the offices searched. In response to the BOS Request, for example, the McCoy declaration reports that the BOS field office searched electronic records "using Plaintiff's name as a search term," Dkt. 99-3 at 6 (McCoy Decl. ¶ 15); the LGA field office searched "using Plaintiff's name" as well as "the date of the LGA incident," id. (McCoy Decl. ¶ 16); and the TCC office "electronically searched its centralized database for records containing Plaintiff's name, phone number, and email address" as well as "the date and flight number of Plaintiff's scheduled travel on the day of the BOS incident, for complaints related to the TSA employees involved in the BOS incident, and for complaints referencing the BOS airport agents or police," id. at 7-8 (McCoy Decl. ¶ 23). Similarly, in response to the SFO Request, the McCoy declaration explains that the TSA searched the TCC office "for records containing Plaintiff's name, the names and badge numbers of the TSA and CAS employees . . . , for complaints using the search terms 'carry-on liquids' and 'San Francisco Airport (SFO).'" Id. at 21 (McCoy Decl. ¶ 65). As to the McCoy declaration's description of its search of these offices, the Court finds that it has provided "necessary details . . . about the scope or methods of the searches conducted," Defs. of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 91-92 (D.D.C. 2009), and meet its burden of showing that the search was adequate.

95 In sum: the Court concludes that the TSA has failed to carry its burden of showing that its searches for the records Sai requested in the BOS and SFO Requests and Re-Requests covered the relevant timeframe—from the date of the relevant incident to the date the search commenced. The Court also concludes that the TSA has failed to carry its burden of showing that it conducted a search "reasonably calculated" to recover responsive records with respect to the databases searched in response to the BOS and SFO-Requests and with respect to the search terms used to search the ORD and OLE/FAMS offices in response to the BOS Request; the SFO and Disability Branch offices in response to the SFO Request; and the BOS, SFO, TCC, and Disability Branch offices in response to the Re-Requests.

---

97 The scope of the TSA's search for records responsive to Sai's Policies Request raises a distinct set of issues. The parties agree about two things: First, Sai requested "[a]ll TSA policy and/or procedures documents" that were "not already" available through the agency's electronic reading room, "including both old [and] current versions" of those documents. Dkt. 99-3 at 125 (McCoy Decl. Ex. S); Dkt. 118 at 15. Second, the TSA did not search for—and, thus, did not release—"all" such records. Dkt. 111-2 at 8; Dkt. 118 at 15. At that point, however, the parties' agreement ends. Sai lists dozens of policies that Sai contends the TSA released in response to third-party FOIA requests, that the TSA identified in other litigation, or that "confidential source(s)" brought to Sai's attention. Dkt. 111-2 at 8-10, 17; Dkt. 116-1 at 1-3. Those policies, which the TSA failed to release in response to Sai's request, run the gamut from the TSA's "Checked Baggage," "Advanced Imaging Technology," "Colorimetric," "Expedited Screening," "Travel Document Checkpoint," and "K9" Standard Operating Procedures ("SOPs"), Dkt. 111-2 at 8-10, to various reports relating to the TSA's "Screening Passengers Through Observations Techniques" ("SPOT") program, Dkt. 116 at 1; Dkt. 116-1 at 1-3. The TSA, for its part, does not engage on whether these records exist, but rather argues that Sai's request for "all" TSA policies and procedures—past and present—not already available through the agency's electronic reading room was vastly overbroad and that all that the agency could do was make a reasonable effort to respond to what it perceived to be the core of Sai's request. Dkt. 118 at 16-17.

98 The Court agrees with the TSA. An agency is required to respond to a FOIA request only if the request "reasonably describes" the records sought. 5 U.S.C. § 552(a)(3)(A). More importantly for present purposes, "[a]n agency need not honor a [FOIA or Privacy Act] request that requires 'an unreasonably burdensome search.'" Am. Fed'n of Gov't Emps., Local 2782 v. U.S. Dep't of Commerce, 907 F.2d 203, 208-09 (D.C. Cir. 1990) (quoting Goland, 607 F.2d at 353). As a result, "it is the requester's responsibility to frame [his or her request[] with sufficient particularity to ensure that searches are not unreasonably burdensome, and to enable the searching agency to determine precisely what records are being requested." Assassination Archives & Research Ctr. Inc. v. CIA, 720 F. Supp. 217, 219 (D.D.C. 1989); see also Bloeser v. U.S. Dep't of Justice, 811 F. Supp. 2d 316, 321 (D.D.C. 2011). A description is sufficient if it would enable "a professional employee of the agency who [is] familiar with the subject area of the request to locate the record with a reasonable amount of effort." Dale v. IRS, 238 F. Supp. 2d 99, 104 (D.D.C. 2002) (quoting Marks v. United States, 578 F.2d 261, 263 (9th Cir. 1978)). In contrast, "[b]road sweeping requests lacking specificity are not sufficient." Id.; see also Pinson v. U.S. Dep't of Justice, 245 F. Supp. 3d 225, 244 (D.D.C. 2017) (same); Tereshchuk v. Bureau of Prisons, 67 F. Supp. 3d 441, 454 (D.D.C. 2014) (same); Sack v. CIA, 53 F. Supp. 3d 154, 164 (D.D.C. 2014) (same); Am. Fed'n of Gov't Emps. v. Dep't of Commerce, 632 F. Supp. 1272, 1277-78 (D.D.C. 1986) (same).

99 Measured against this standard, there is little doubt that the Policies Request did not "reasonably describe" a class of documents subject to disclosure. Am. Fed'n of Gov't Emps., 907 F.2d at 209. Indeed, it is difficult to imagine how the TSA could have complied with Sai's request for all "policy and/or procedures documents," past and present, including all "Management Directives, Standard Operating Procedures, Operations Directives, Security Directives, Emergency Amendments, Information Circulars, Memoranda, Handbooks, Letters, Bulletins, and Guidance," Dkt. 99-3 at 125 (McCoy Decl. Ex. S), short of searching virtually every file at the agency and then guessing what Sai actually hoped to receive. Nor did Sai's nine more specific requests, and twenty-seven non-exclusive subparts, add the required specificity. They sought all TSO polices, past and present, dealing with "screening procedures," "the treatment of passengers with disabilities," violations by TSA personnel of policies "in a way that infringes on the rights of travelers," "cooperation with local airports and police," "when checkpoint video may be released," the TSA's "no fly" list and "any similar lists," "legal justification for" declining to allow passengers to "revoke consent to administrative search once they have entered a screening area," and "Behavior Detection Officer training materials" and "any studies investigating their efficacy." Dkt. 99-3 at 125-27 (McCoy Decl. Ex. S).

100 The TSA, moreover, provided Sai with ample opportunity to refine the request. Shortly after Sai submitted the request, the TSA wrote to Sai, explaining: "After careful review of your FOIA request, we [have] determined that the request is too broad in scope or [does] not specifically identify the records [that] you are seeking." Dkt. 99-3 at 132 (McCoy Decl. Ex. T). The TSA, accordingly, invited Sai to "resubmit [the] request containing a reasonable description of the records sought[" and cautioned that the "request [would] not be entered into [the agency's] processing queue until [it] receive[d] clarification." Id. (McCoy Decl. Ex. S). Sai did not respond to this invitation, and the agency therefore "administratively closed" the request on May 9, 2013. Id. at 30 (McCoy Decl. ¶ 92).

101 Although the TSA did, in an exercise of "discretion," subsequently process Sai's request "to the extent" it was able "reasonably" to identify responsive records, id. at 31 (McCoy Decl. ¶ 93), it never agreed to search for "[a]ll TSA policy and/or procedures documents," past and present, Dkt. 118-1 at 5 (3d Supp. McCoy Decl. ¶ 17); Dkt. 118 at 16-17, nor—for the reasons explained above—was it required to do so. It is thus both unsurprising and unavailing that Sai has been able to identify "policy and procedures documents" that Sai says the TSA failed to release. The TSA represents that complying in full with Sai's request "would have created an extreme burden on and undue hardship for the entire agency and, in particular, the FOIA Branch." Dkt. 118-1 at 6 (3d Supp. McCoy Decl. ¶ 19). That assertion is entitled to a presumption of good faith, SafeCard Servs., 926 F.2d at 1200, and it is convincing given the breadth of Sai's request.

102 Even though the TSA was not required to respond to Sai's unrefined Policies Request, it nonetheless made a good faith effort to provide at least a partial response. The FOIA Branch tasked—and, on occasion, re-tasked—fifteen offices with searching for the records that the agency reasonably believed lay at the heart of Sai's request. Dkt. 99-3 at 31, 31-35 (McCoy Decl. ¶¶ 94-107). The McCoy declaration provides a detailed account of the efforts of each of these offices to locate potentially responsive records, while necessarily construing and limiting Sai's request to avoid the "unreasonable burden" that a full response would have entailed. Am. Fed'n of Gov't Emps., 907 F.2d at 209. All told, the TSA released over 3,000 pages of records responsive to Sai's Policies Request, and it reviewed approximately 900 additional pages of records that were withheld for reasons discussed below. Dkt. 99-3 at 35-37 (McCoy Decl. ¶¶ 109-12).

103 Sai's opposition ignores the fact that the TSA reasonably, and lawfully, concluded that the request was overbroad and that the agency would have acted well within its rights had it simply declined to conduct any search until Sai accepted its invitation to clarify and narrow the request. See Dkt. 111-2 at 8-19. Apparently, in Sai's view, having provided some response, the TSA was obligated to provide a full response. That contention, however, is at odds with FOIA's "dominant objective" of disclosure. Rose, 425 U.S. at 361. If that nothing-or-all approach were to prevail, agencies would have a strong incentive to reject wildly overbroad FOIA requests, like Sai's Policies Request, and to refuse to make any effort to provide what they reasonably can. Nothing in FOIA or the governing law requires that agencies or the courts adopt such a counterproductive approach. Sai had the opportunity to refine the Policies Request, and Sai remains free to submit further requests that "reasonably describe[]" the records sought, 5 U.S.C. § 552(a)(3)(A), and that do not require that the agency engage in "an unreasonable burdensome search," Am. Fed'n of Gov't Emps., 907 F.2d at 209 (quoting Goland, 607 F.2d at 353). Having failed to frame the request with sufficient specificity, Sai cannot now fault the TSA for conducting an onerous, but not exhaustive, search based on its best assessment of what records were most important to Sai.

---

107 FOIA Exemption 3 shields from disclosure materials that are "specifically exempted from disclosure by statute" so long as that statute "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A)(ii). 49 U.S.C. § 114(r) creates such a specific, statutory exemption to disclosure. It provides, in relevant part, that notwithstanding FOIA, the TSA "shall prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security under authority of the Aviation and Transportation Security Act, Pub. L. No. 107-71, or under chapter 449 of [title 49 of the U.S. Code] if the [TSA] decides that disclosing the information would (A) be an unwarranted invasion of personal privacy; (B) reveal a trade secret or privileged or confidential commercial or financial information; or (C) be detrimental to the security of transportation." 49 U.S.C. § 114(r)(1). The SSI implementing regulations, in turn, specify a number of categories of information and records constituting SSI, including records relating to "[s]ecurity programs and contingency plans," "airport operator security or security contingency plans," "security incident response plan[s]," various "[s]ecurity [d]irectives," notices issued by DHS or the Department of Transportation "regarding a threat to aviation . . . transportation," "performance specification[s] and any description of a test object or test procedure," "vulnerability assessment[s]," "[d]etails of any security inspection or investigation of an alleged violation of aviation . . . transport

93 With respect to the search terms used, the McCoy declaration provides an accounting of the terms used for the majority of the offices searched. In response to Sai's BOS Request, for example, the McCoy declaration reports that the BOS field office searched electronic records "using Plaintiff's name as a search term," Dkt. 99-3 at 6 (McCoy Decl. ¶ 15); the LGA field office searched "using Plaintiff's name" as well as "the date of the LGA incident," id. (McCoy Decl. ¶ 16); and the TCC office "electronically searched its centralized database for records containing Plaintiff's name, phone number, and email address" as well as "the date and flight number of Plaintiff's scheduled travel on the day of the BOS incident, for complaints related to the TSA employees involved in the BOS incident, and for complaints referencing the BOS airport agents or police," id. at 7-8 (McCoy Decl. ¶ 23). Similarly, in response to Sai's SFO Request, the McCoy declaration explains that the TSA searched the TCC office "for records containing Plaintiff's name, the names and badge numbers of the TSA and CAS employees . . . , for complaints using the search terms 'carry-on liquids' and 'San Francisco Airport (SFO).'" Id. at 21 (McCoy Decl. ¶ 65). As to the McCoy declaration's description of its search of these offices, the Court finds that it has provided "necessary details . . . about the scope or methods of the searches conducted," Defs. of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 91-92 (D.D.C. 2009), and meet its burden of showing that the search was adequate.

95 In sum: the Court concludes that the TSA has failed to carry its burden of showing that its searches for the records Sai requested in his BOS and SFO Requests and Re-Requests covered the relevant timeframe—from the date of the relevant incident to the date the search commenced. The Court also concludes that the TSA has failed to carry its burden of showing that it conducted a search "reasonably calculated" to recover responsive records with respect to the databases searched in response to the BOS and SFO-Requests and with respect to the search terms used to search the ORD and OLE/FAMS offices in response to the BOS Request; the SFO and Disability Branch offices in response to the SFO Request; and the BOS, SFO, TCC, and Disability Branch offices in response to the Re-Requests.

97 The scope of the TSA's search for records responsive to Sai's Policies Request raises a distinct set of issues. The parties agree about two things: First, Sai requested "[a]ll TSA policy and/or procedures documents" that were "not already" available through the agency's electronic reading room, "including both old [and] current versions" of those documents. Dkt. 99-3 at 125 (McCoy Decl. Ex. S); Dkt. 118 at 15. Second, the TSA did not search for—and, thus, did not release—"all" such records. Dkt. 111-2 at 8; Dkt. 118 at 15. At that point, however, the parties' agreement ends. Sai, for his part, lists dozens of policies that he contends the TSA released in response to third-party FOIA requests, that the TSA identified in other litigation, or that "confidential source(s)" brought to his attention. Dkt. 111-2 at 8-10, 17; Dkt. 116-1 at 1-3. Those policies, which the TSA failed to release in response to Sai's request, run the gamut from the TSA's "Checked Baggage," "Advanced Imaging Technology," "Colorimetric," "Expedited Screening," "Travel Document Checkpoint," and "K9" Standard Operating Procedures ("SOPs"), Dkt. 111-2 at 8-10, to various reports relating to the TSA's "Screening Passengers Through Observations Techniques" ("SPOT") program, Dkt. 116 at 1; Dkt. 116-1 at 1-3. The TSA, for its part, does not engage on whether these records exist, but rather argues that Sai's request for "all" TSA policies and procedures—past and present—not already available through the agency's electronic reading room was vastly overbroad and that all that the agency could do was make a reasonable effort to respond to what it perceived to be the core of Sai's request. Dkt. 118 at 16-17.

98 The Court agrees with the TSA. An agency is required to respond to a FOIA request only if the request "reasonably describes" the records sought. 5 U.S.C. § 552(a)(3)(A). More importantly for present purposes, "[a]n agency need not honor a [FOIA or Privacy Act] request that requires 'an unreasonably burdensome search.'" Am. Fed'n of Gov't Emps., Local 2782 v. U.S. Dep't of Commerce, 907 F.2d 203, 209 (D.C. Cir. 1990) (quoting Goland, 607 F.2d at 353). As a result, "it is the requester's responsibility to frame [his or her request[] with sufficient particularity to ensure that searches are not unreasonably burdensome, and to enable the searching agency to determine precisely what records are being requested." Assassination Archives & Research Ctr. Inc. v. CIA, 720 F. Supp. 217, 219 (D.D.C. 1989); see also Bloeser v. U.S. Dep't of Justice, 811 F. Supp. 2d 316, 321 (D.D.C. 2011). A description is sufficient if it would enable "a professional employee of the agency who [is] familiar with the subject area of the request to locate the record with a reasonable amount of effort." Dale v. IRS, 238 F. Supp. 2d 99, 104 (D.D.C. 2002) (quoting Marks v. United States, 578 F.2d 261, 263 (9th Cir. 1978)). In contrast, "[b]road sweeping requests lacking specificity are not sufficient." Id.; see also Pinson v. U.S. Dep't of Justice, 245 F. Supp. 3d 225, 244 (D.D.C. 2017) (same); Tereshchuk v. Bureau of Prisons, 67 F. Supp. 3d 441, 454 (D.D.C. 2014) (same); Sack v. CIA, 53 F. Supp. 3d 154, 164 (D.D.C. 2014) (same); Am. Fed'n of Gov't Emps. v. Dep't of Commerce, 632 F. Supp. 1272, 1277-78 (D.D.C. 1986) (same).

99 Measured against this standard, there is little doubt that Sai's Policies Request was vastly overbroad and thus did not demand a response commensurate with the request. Indeed, short of demanding a response to all agency records, it is difficult to image a request broader in scope and more burdensome than a request for all "policy and/or procedures documents," past and present, including all "Management Directives, Standard Operating Procedures, Operations Directives, Security Directives, Emergency Amendments, Information Circulars, Memoranda, Handbooks, Letters, Bulletins, and Guidance." Dkt. 99-3 at 125 (McCoy Decl. Ex. S). Nor did Sai's nine more specific requests, and twenty-seven non-exclusive subparts, add the required specificity. Those more specific requests were still extraordinarily capacious. They sought all TSO polices, past and present, dealing with "screening procedures," "the treatment of passengers with disabilities," violations by TSA personnel of policies "in a way that infringes on the rights of travelers," "cooperation with local airports and police," "when checkpoint video may be released," the TSA's "no fly" list and "any similar lists," "legal justification for" declining to allow passengers to "revoke consent to administrative search once they have entered a screening area," and "Behavior Detection Officer training materials" and "any studies investigating their efficacy." Dkt. 99-3 at 125-27 (McCoy Decl. Ex. S).

100 The TSA, moreover, provided Sai with ample opportunity to refine his request. Shortly after Sai submitted his request, the TSA wrote to him, explaining: "After careful review of your FOIA request, we [have] determined that the request is too broad in scope or [does] not specifically identify the records [that] you are seeking." Dkt. 99-3 at 132 (McCoy Decl. Ex. T). The TSA, accordingly, invited Sai to "resubmit [his] request containing a reasonable description of the records sought[" and cautioned that his "request [would] not be entered into [the agency's] processing queue until [it] receive[d] clarification." Id. (McCoy Decl. Ex. S). Sai did not respond to this invitation, and the agency therefore "administratively closed" the request on May 9, 2013. Id. at 30 (McCoy Decl. ¶ 92).

101 Although the TSA did, in an exercise of "discretion," subsequently process Sai's request "to the extent" it was able "reasonably" to identify responsive records, id. at 31 (McCoy Decl. ¶ 93), it never agreed to search for "[a]ll TSA policy and/or procedures documents," past and present, Dkt. 118-1 at 5 (3d Supp. McCoy Decl. ¶ 17); Dkt. 118 at 16-17, nor—for the reasons explained above—was it required to do so. It is thus both unsurprising and unavailing that Sai has been able to identify "policy and procedures documents" that he says the TSA failed to release. The TSA represents that complying in full with Sai's request "would have created an extreme burden on and undue hardship for the entire agency and, in particular, the FOIA Branch." Id. at 6 (3d Supp. McCoy Decl. ¶ 19). That assertion is entitled to a presumption of good faith, SafeCard Servs., 926 F.2d at 1200, and it is convincing given the breadth of Sai's request.

102 Even though the TSA was not required to respond to Sai's unrefined Policies Request, it nonetheless made a good faith effort to provide him with at least a partial response. The FOIA Branch tasked—and, on occasion, re-tasked—fifteen offices with searching for the records that the agency reasonably believed lay at the heart of Sai's request. Dkt. 99-3 at 31, 31-35 (McCoy Decl. ¶¶ 94-107). The McCoy declaration provides a detailed account of the efforts of each of these offices to locate potentially responsive records, while necessarily construing and limiting Sai's request to avoid the "unreasonable burden" that a full response would have entailed. Am. Fed'n of Gov't Emps., 907 F.2d at 209. All told, the TSA released over 3,000 pages of records responsive to Sai's Policies Request, and it reviewed approximately 900 additional pages of records that were withheld for reasons discussed below. Dkt. 99-3 at 35-37 (McCoy Decl. ¶¶ 109-12).

103 Sai's opposition ignores the fact that the TSA reasonably, and lawfully, concluded that his request was overbroad and that the agency would have acted well within its rights had it simply declined to conduct any search until Sai accepted its invitation to clarify and narrow his request. See Dkt. 111-2 at 8-19. Apparently, in Sai's view, having provided some response, the TSA was obligated to provide a full response. That contention, however, is at odds with FOIA's "dominant objective" of disclosure. Rose, 425 U.S. at 361. If that nothing-or-all approach were to prevail, agencies would have a strong incentive to reject wildly overbroad FOIA requests, like Sai's Policies Request, and to refuse to make any effort to provide what they reasonably can. Nothing in FOIA or the governing law requires that agencies or the courts adopt such a counterproductive approach. Sai had the opportunity to refine his Policies Request, and he remains free to submit further requests that "reasonably describe[]" the records sought, 5 U.S.C. § 552(a)(3)(A), and that do not require that the agency engage in "an unreasonable burdensome search," Am. Fed'n of Gov't Emps., 907 F.2d at 209 (quoting Goland, 607 F.2d at 353). Having failed to frame his request with sufficient specificity, he cannot now fault the TSA for conducting an onerous, but not exhaustive, search based on its best assessment of what records were most important to Sai.

107 FOIA Exemption 3 shields from disclosure materials that are "specifically exempted from disclosure by statute" so long as that statute "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A)(ii). 49 U.S.C. § 114(r) creates such a specific, statutory exemption to disclosure. It provides, in relevant part, that notwithstanding FOIA, the TSA "shall prescribe regulations prohibiting the disclosure of information obtained or developed in carrying out security under authority of the Aviation and Transportation Security Act, Pub. L. No. 107-71, or under chapter 449 of [title 49 of the U.S. Code] if the [TSA] decides that disclosing the information would (A) be an unwarranted invasion of personal privacy; (B) reveal a trade secret or privileged or confidential commercial or financial information; or (C) be detrimental to the security of transportation." 49 U.S.C. § 114(r)(1). The SSI implementing regulations, in turn, specify a number of categories of information and records constituting SSI, including records relating to "[s]ecurity programs and contingency plans," "airport operator security or security contingency plans," "security incident response plan[s]," various "[s]ecurity [d]irectives," notices issued by DHS or the Department of Transportation "regarding a threat to aviation . . . transportation," "performance specification[s] and any description of a test object or test procedure," "vulnerability assessment[s]," "[d]etails of any security inspection or investigation of an alleged violation of aviation . . . transport

ation security," threat information, "[s]ecurity measures . . . recommended by the Federal government," and "information regarding security screening under aviation . . . transport ation security requirements of Federal law." 49 C.F.R. § 1520.5. Those permitted access to SSI are prohibited from disclosing "or otherwise provid[ing] access to[] SSI" to anyone o ther than authorized recipients with a "need to know." 49 C.F.R. § 1520.9(a)(2). Moreover, and of particular relevance here, the governing regulations specify that, "notwithstandin g the Freedom of Information Act, (5 U.S.C. § 552), the Privacy Act, (5 U.S.C. § 552a), an d other laws, records containing SSI are not available for public inspection or copying, n or does [the] TSA . . . release such records to persons without a need to know." 49 C.F.R. § 1520.15(a).

108 **6** Although the text of 49 U.S.C. § 114(r) refers to the "Under Secretary of Transportation for Security," who served as the head of the TSA at the time the agency was created, see Aviation and Transportation Security Act, Pub. L. No. 107-71, § 101 (2001), Congress trans ferred the TSA from the Department of Transportation to the Department of Homeland Securit y as part of the Homeland Security Act of 2002, Pub. L. No. 107-296, § 403. "In conjunctio n with the transfer of TSA to DHS, the Under Secretary . . . adopted the new title of Admi nistrator." 69 Fed. Reg. 28,066, 28,068 (May 18, 2004).

109 Sai does not dispute that properly designated SSI is exempt from disclosure under both FOI A and the Privacy Act and, instead, argues that the TSA acted "without authority" in desig nating certain records as SSI. Dkt. 111-2 at 25. As Sai correctly observes, 49 U.S.C. § 11 4(r)(4) precludes the TSA from designating information as SSI for certain purposes; in par ticular, the TSA lacks authority to designate information as SSI "(A) to conceal a violati on of law, inefficiency, or administrative error; (B) to prevent embarrassment to a person , organization, or agency; (C) to restrain competition; or (D) to prevent or delay the rel ease of information that does not require protection in the interest of transportation sec urity, including basic scientific research information not clearly related to transportati on security." **Sai further contends that** Congress, the DHS Inspector General, and others ha ve criticized the TSA for, at times, improperly designating such information as SSI, Dkt. 111-2 at 26–28, and that the TSA has engaged in such improper designation here, id. at 21, 28. Before reaching the merits of that contention, however, the Court must determine whet her it has jurisdiction to do so. It is at this threshold point that Sai's challenge found ers.

110 This is not the first time that this Court has addressed whether it has jurisdiction to co nsider **the contention that the** TSA exceeded its authority in designating records that **Sai sought as** SSI. Shortly after Sai filed this action, the TSA moved to strike **his** complaint to the extent it sought to challenge the TSA's designation of information as SSI. Dkt. 51 at 9. Such a challenge, the TSA argued, must be brought—if at all—in the Court of Appeals. Id. For the most part, the Court agreed. As the TSA correctly observed, 49 U.S.C. § 4611 0(a) provides that "a person disclosing a substantial interest in an order issued . . . in whole or in part under [49 U.S.C. § 114(r)] may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Ci rcuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business." That grant of jurisdiction in the courts of appeals, moreover, is exclusive, leaving the federal district courts with no authority to review SSI orders issued pursuant to 49 U.S.C. § 114(r). See Lacson v. U.S. Dep't of H omeland Sec., 726 F.3d 170, 173–77 (D.C. Cir. 2013) (discussing grant of exclusive jurisdi ction to the courts of appeals to review orders issued by the TSA under § 114(r)); Nat'l F ed'n of the Blind v. U.S. Dep't of Transp., 827 F.3d 51, 57 (D.C. Cir. 2016) ("[S]ection 4 6110(a)'s direct-review provision removes the Rule from the purview of the district court a nd places it within our exclusive jurisdiction."); Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs, 249 F. Supp. 3d 516, 519 (D.D.C. 2017) ("[F]ederal circuit courts have ex clusive jurisdiction to review TSA's SSI determinations."); see also Telecomms. Research & Action Ctr. v. FCC, 750 F.2d 70, 77 (D.C. Cir. 1984) ("[E]ven where Congress has not expr essly stated that statutory jurisdiction is 'exclusive,' . . . a statute which vests juri sdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute."). Although the Court, accordingly, agreed with the TSA that it lacks jurisdiction to review SSI orders, it concluded that it was "premature to dismiss Pl aintiff's claims that documents were improperly withheld on this ground" because the TSA ha d "yet to [produce] a Vaughn index or a fully developed record with respect to what mater ials were withheld on what grounds." Dkt. 74 at 13.

111 **6** Although the statute refers to § 114(s), that section was redesignated as § 114(r) in 200 8. See Consolidated Appropriations Act of 2008, Pub. L. No. 110-161, § 568(a).

114 The statute does not distinguish between the subparagraphs of § 114(r); rather, the courts of appeals have exclusive jurisdiction over all challenges to orders premised on § 114(r) . Sai argues that the distinction **he proposes can be found in Congress's use of the word "order." See** Dkt. 111-2 at 26. Although some SSI designations constitute "orders," those th at are ultra vires are not "orders" and thus not subject to § 46110(a). Id. That contentio n, however, suffers from two flaws. First, Sai does not—and cannot—explain why the same lo gic does not apply to a challenge premised on § 114(r)(1). An action taken without author ity—that is, under circumstances not covered by the grant of authority in § 114(r)(1)—is e very bit as much ultra vires as an action taken in contravention of a limitation on the ag ency's authority—that is, under circumstances precluded by § 114(r)(4). Second, Sai ignores D.C. Circuit precedent holding that the term "order" in § 46110(a) "should be read expan sively" and includes final agency determinations of "rights or obligations" or final agenc y action giving "rise to legal consequences." Safe Extensions, Inc. v. FAA, 509 F.3d 593, 598 (D.C. Cir. 2007); see also Nat'l Fed'n of the Blind, 827 F.3d at 55 (holding the term " order" in § 46110(a) is "not . . . limited by the APA definition of 'order'"). As the D.C . Circuit has explained, the "broad[] constru[ction]" that it has accorded "the word 'orde r' as used in section 46110(a)" is intended to facilitate "judicial review" of agency acti on. Avia Dynamics, Inc. v. FAA, 641 F.3d 515, 520 (D.C. Cir. 2011). That purpose, of cours e, is particularly weighty in cases in which the aggrieved party contends that the agency' s action was ultra vires.

115 Finally, Sai suggests that, in responding to a separate FOIA request submitted by the ACLU , the TSA publicly disclosed portions of the information that it claimed in **Sai's case** wer e exempt from disclosure as SSI. Dkt. 116-1 at 1 (records released to Sai contained "more SS I redaction[s] than made" to records released to the ACLU). To the extent Sai intends to invoke the "official acknowledgement" doctrine, **a three-part showing is required**: "First, the information [Sai] requested must be as specific as the information previously release d. Second, the information requested must match the information previously disclosed . . . . Third, . . . the information requested must already have been made public through an o fficial and documented disclosure." Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir. 1990); see also Wolf v. CIA, 473 F.3d 370, 378 (D.C. Cir. 2007); Shapiro, 153 F. Supp. 3d at 285.

116 The TSA does not dispute that the ACLU may have received information that was withheld fro m Sai as SSI, but urges the Court to reject Sai's "official acknowledgement" argument for three reasons. First, it argues that because Sai was evidently already obtained the withhe ld material from the ACLU website, **Sai's claim is** now "moot." Dkt. 118 at 29–30. In suppor t of this contention the TSA cites to the D.C. Circuit's decision in Crooker v. U.S. State Department, 628 F.2d 9 (D.C. Cir. 1980) (per curiam), in which the court held, "[w]here t he records have already been furnished, it is abusive and a dissipation of agency and cour t resources to make and process a second claim," id. at 10. That case differs from the pre sent case, however, in one critical respect: in Crooker, the plaintiff sought the release of records that he had already obtained from another agency, id., while in the present cas e, Sai contends that **the** government **did not provide the relevant material.** See Dkt. 116-1 at 1 n.1. The fact that the government has released records to a third party, which has th en made those records public, does not obviate the government's obligation to respond full y to an otherwise proper FOIA request. See Tax Analysts, 492 U.S. at 152 ("It is one thing to say that an agency need not disclose materials that it has previously released; it is quite another to say that an agency need not disclose materials that some other person or group may have previously released.").

118 This, then, leaves the TSA's final argument, which is more promising but remains incomplet e. As the TSA explains, after it released records to Sai in response to the Policies Reque st in 2015, see Dkt. 99-3 at 35–37 (McCoy Decl. ¶¶ 109–11), the ACLU—in pressing its own F OIA request—convinced the TSA to "withdr[a]w some of the identified redactions" the agency had previously made, and the TSA "re-released" the relevant records. Dkt. 118-1 at 6–7 (3 d Supp. McCoy Decl. ¶ 23). To the extent the TSA revisited its SSI determinations after it released the responsive records to Sai, the TSA is correct that it did not have an obliga tion to "update or supplement [its] prior response." See James v. U.S. Secret Serv., 811 F . Supp. 2d 351, 358 (D.D.C. 2011) ("The FOIA does not require an agency to update or suppl ement a prior response to a request for records."), aff'd, No. 11-5299, 2012 WL 1935828 (D .C. Cir. May 11, 2012). The "official disclosure" doctrine applies to information that was , at the relevant time, "already" public. Fitzgibbon, 911 F.2d at 765. It does not—and cou ld not reasonably—apply to information that was confidential at the time the agency respon ded to the plaintiff's FOIA request and was only subsequently officially released; applyin g the doctrine retroactively would be administratively unmanageable and would violate the cardinal rule of administrative law that courts evaluate agency action based on the record as it existed at the time the agency acted. See Bonner v. U.S. Dep't of State, 928 F.2d 1 148, 1152 (D.C. Cir. 1991) ("To require an agency to adjust or modify its FOIA responses b ased on post-response occurrences could create an endless cycle of judicially mandated rep rocessing."); Nat'l Sec. Counselors v. CIA, 206 F. Supp. 3d 241, 256 (D.D.C. 2016) ("[J]ud icial review of agency responses to FOIA requests 'properly focuses on the time the determ ination to withhold [was] made.'" (quoting Bonner, 928 F.2d at 1152)).

124 The McCoy declaration offers explanations for each of the TSA's invocations of the deliber ative process privilege. She attests that, in responding to **the** BOS Request, the agency wi thheld information on two pages that was both predecisional—the records "were generated be fore the agency had reached a decision regarding" how to respond to "complaints alleging a disability-related civil rights violation"—and deliberative—the records "reflect the open consultative process between program offices" considering "how to respond" to the compla ints. Dkt. 99-3 at 13 (McCoy Decl. ¶ 39). Similarly, in responding to **the** SFO Request, the TSA once again invoked Exemption 5 to withhold information that was both predecisional—the information pertained to "prospective agency action"—and deliberative—it reflected delibe rations involving agency counsel regarding how the agency should respond to "administrativ e complaints against [the] TSA." Id. at 26 (McCoy Decl. ¶ 83(c)). It reached the same conc lusion with respect to other predecisional deliberations regarding (1) the Disability Bran ch's assessment of how to handle Sai's "administrative complaint[s]," (2) the investigatio n, collection, and analysis of information relating to Sai's "administrative complaints," (3) "hypothetical checkpoint screening scenarios involving medically exempt liquids," and

(4) "a draft . . . letter . . . to Congresswoman Nancy Pelosi's office regarding [Sai's] administrative complaint." Id. at 26–28 (McCoy Decl. ¶¶ 84–85). Finally, in responding to the Policies Request, the TSA withheld "a memorandum and a PowerPoint presentation . . . prepared in anticipation of a briefing to the Secretary of DHS regarding airport security measures," which "reflect proposals and recommendations regarding agency action." Id. at 40 (McCoy Decl. ¶ 118(b)).

126    First, Sai contends that information that the TSA shared with Corbin Stewart in an email falls beyond the privilege because "a simple Google search" and the email format (i.e. the capitalization of Stewart's name) demonstrate that Stewart was not a TSA or DHS employee.[8] Dkt. 111-2 at 24. Even if Stewart was not a TSA or DHS employee, the deliberative process privilege might still apply. See, e.g., Competitive Enter. Inst. v. EPA, 232 F. Supp. 3d 172, 184– 85 (D.D.C. 2017) (describing "consultant exemption"). The Court need not determine whether Stewart's employment status matters here, however, because McCoy has attested under the penalty of perjury that Stewart "is–and was at the time of the [relevant] email record"–"a TSA employee within the Civil Rights and Liberties-Office of Traveler Engagement." Dkt. 118-1 at 6 (3d Supp. McCoy Decl. ¶ 20). That declaration is entitled to a presumption of good faith, SafeCard Servs., 926 F.2d at 1200, and Sai has failed to offer any evidence that would permit a reasonable factfinder to question its veracity, Dkt. 111-2 at 24. See Bloeser, 811 F. Supp. 2d at 322 ("[S]peculative and conclusory assertions do not amount to 'contradictory evidence in the record . . . of agency bad faith.'" (quoting Judicial Watch, Inc. v. Bd. of Governors of Fed. Reserve Sys., 773 F. Supp. 2d 57, 60 (D.D.C. 2011))). Nor is the Court convinced that Sai is entitled to take discovery on whether Stewart was a TSA employee. Even if some discovery were permitted, Sai could not reasonably expect more than the testimony of a TSA official under the penalty of perjury. Sai has that, and far more than Sai has offered would be necessary to cast aside the presumption of good faith and to open the door to more extensive discovery. See Justice v. I.R.S., 798 F. Supp. 2d 43, 47 (D.D.C. 2011) ("Courts permit discovery in FOIA cases where a 'plaintiff has made a sufficient showing that the agency acted in bad faith.'" (quoting Voinche v. FBI, 412 F. Supp. 2d 60, 72 (D.D.C. 2006))); Schrecker v. U.S. Dep't of Justice, 217 F. Supp. 2d 29, 35 (D.D.C. 2002) ("Discovery in FOIA is rare and should be denied where an agency's declarations are reasonably detailed [and] submitted in good faith and [where] the court is satisfied that no factual dispute remains.").

127    [8] Sai spells the name "Stewart," Dkt. 111-2 at 24, while the TSA spells it "Stuart," Dkt. 118 at 21. Nothing, of course, turns on this.

128    Second, Sai argues that portions of the withheld information responsive to the SFO Request reflect facts, not deliberations. Dkt. 111-2 at 24–25. The TSA counters that this content ion is "without any substantive or logical support." Dkt. 118 at 22. It is the TSA, however, that bears the burden of establishing that the deliberative privilege was properly invoked, Senate of the Commonwealth of P.R., 823 F.2d at 585, and its explanation of the bases for withholding certain information in response to the SFO Request admits of some ambiguity, see Dkt. 99-3 at 26–27 (McCoy Decl. ¶ 84). McCoy attests, for example, that the TSA withheld emails "discussing the . . . collection . . . of information related to administrative complaints." Id. at 27 (McCoy Decl. ¶ 84). Sai, to be sure, overstates the law when can tegorically asserting that "[f]acts are never exempt under" Exemption 5. Dkt. 111-2 at 25. But, by the same token, Sai is correct that facts "generally must be disclosed." Nat'l Ass'n of Home Builders v. Norton, 309 F.3d 26, 39 (D.C. Cir. 2002) (citation omitted). The relevant question is whether "'the disclosure of even purely factual material may expose the deliberative process within an agency' that the material is appropriately held privileged." Petroleum Info. Corp., 976 F.2d at 1434; see also Quarles v. Dep't of Navy, 893 F.2d 390, 392 (D.C. Cir. 1990) (even when requested material is factual, it is still exempt when disclosure "would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions" (quoting Dudman Commc'ns Corp. v. Dep't of the Air Force, 815 F.2d 1565, 1568 (D.C. Cir. 1987))). The Court must, accordingly, ask whether disclosure of the withheld information would "reveal an agency's or official's mode of formulating or exercising policy-implicating judgment." Nat'l Ass'n of Home Builders, 309 F.3d at 39 (citation omitted); see also In re Sealed Case, 121 F.3d 729, 737 (D.C. Cir. 1997) (asking whether the factual information is "inextricably intertwined with the deliberative" information); Playboy Enters., Inc. v. U.S. Dep't of Justice, 677 F.2d 931, 936 (D.C. Cir. 1982) (asking whether the factual information was prepared to "assist[] the [agency official] [in] mak[ing] a complex decision," or whether the information "was prepared only to inform the [agency official] of facts which he in turn would make available"). On the present record, the Court cannot determine whether or how the TSA applied this test to the information that it gathered in responding to the SFO Request. As a result, the TSA has yet to carry its burden with respect to the assertion of the deliberative privilege regarding this limited set of records.

129    Third, Sai maintains that one document uses the phrase "we decided," demonstrating in Sai's view that the document is post-decisional; that a second document contains a "post- decisional response and re-training;" and, more generally, that "policies, memoranda of law, and similar documents" are "post-decisional" and thus not protected by the privilege. Dkt. 111-2 at 25. Sai's first contention–that the use of past-tense "we decided" indicates that the document is post-decisional–has little force. The mere fact that a document uses the past tense does not resolve whether it falls within Exemption 5. The unredacted portions of the document do not indicate that the redacted portions are anything other than what TSA says: "internal predecisional discussions regarding prospective agency action." Dkt. 99-3 at 116 (McCoy Decl. Ex. Q). The document in question reads: "We decided to hold-off on sending Sai and [redacted, citing Exemption 6] to DHS. With Sai, we are [redacted, citing Exemption 5]." See Dkt. 145-2 at 77. Significantly, the TSA disclosed what had been decided–not to "send[] Sai"–and only redacted other information that the TSA attests was predecisional. The same is true with respect to the document Sai characterizes as containing "post-decisional response and re-training." Dkt. 111-2 at 25. Although the redacted record is part of an email chain that discusses training on how to screen medical liquids, Dkt. 144-3 at 197, it is not evident that the redacted information relates to the Disability Branch's review of Sai's Rehabilitation Act complaints, id. at 197, and there is no reason to question the TSA's representation that its review was ongoing, Dkt. 99-3 at 111 (McCoy Decl. Ex. Q). Finally, with respect to Sai's contention that "policies, memoranda of law, and similar documents" are "post-decisional" and thus not protected by the deliberative process privilege, this attack is far too amorphous to defeat TSA's motion for summary judgment. Sai does not identify what documents were improperly redacted or withheld, and fails to develop the contention with sufficient detail (or, indeed, any detail) to permit the Court to consider it on the merits.

131    Finally, Sai argues that "all of TSA's privilege claims"–including the deliberative, work product, and attorney-client privilege–"are void" because the "TSA deliberately obstructed the processing of" Sai's FOIA request and administrative complaints. Dkt. 111-2 at 37, 39-40. For support, Sai cites to email correspondence suggesting that TSA officials decided to "hold-off" on processing Sai's Rehabilitation Act complaints. Id. at 37–41. "Taken together," Sai argues, the email correspondence demonstrates that the TSA was engaged in a "deliberate cover-up[]" of "felony obstruction of justice in refusing to process, delaying the processing, and refusing to release the results of two former federal civil rights investigations." Id. at 39. From this, Sai then posits that the crime-fraud exception–or some similar doctrine–precludes the TSA from relying on any common-law privilege. Id.

134    In re Sealed Case, 223 F.3d 775, 778 (D.C. Cir. 2000). The D.C. Circuit has, likewise, observed that the deliberative process privilege is a qualified privilege, which "disappears altogether when there is any reason to believe government misconduct occurred." In re Sealed Case, 121 F.3d at 746. The problem with this argument is that Sai has not come close to carrying the burden of "mak[ing] a prima facie showing of a violation sufficiently serious to defeat" any of these privileges. In re Sealed Case, 754 F.2d 395, 399 (D.C. Cir. 1985). Sai merely argues that the TSA delayed processing the administrative complaints under the Rehabilitation Act, Dkt. 111-2 at 37-38. That conclusion is a far cry from "felony obstruction of justice," id. at 39, and it is a far cry from the type of serious misconduct necessary to abrogate any of the privileges at issue.

136    FOIA Exemptions 6 and 7(C) protect personal privacy. The two exemptions protect similar interests, but they differ in scope. Exemption 6 shields "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "[T]he mere fact that an agency file or record contains personal, identifying information," however, "is not enough to invoke Exemption 6;" in addition, the information must be "of such a nature that its disclosure would constitute a clearly unwarranted privacy invasion." Judicial Watch, Inc. v. U.S. Dep't of State, 282 F. Supp. 3d 36, 49–50 (D.D.C. 2017) (quoting Nat'l Ass'n of Home Builders, 309 F.3d at 32). This, in turn, requires a two-part analysis. See Edelman v. SEC, 302 F. Supp. 3d 421, 425 (D.D.C. 2018). The Court must first determine whether "disclosure would compromise a substantial, as opposed to a de minimis, privacy interest." Nat'l Ass'n of Retired Fed. Emps. v. Horner, 879 F.2d 873, 874 (D.C. Cir. 1989). If the agency clears that first hurdle, the Court must then "balance the privacy interest in non-disclosure against the public interest" in disclosure. Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs., 554 F.3d 1046, 1050 (D.C. Cir. 2009); see also Judicial Watch, Inc., 282 F. Supp. 3d at 49–50.

138    Here, the TSA invoked Exemption 6 in support of each of the redactions that it made on privacy grounds. It also relied on Exemption 7(C) with respect to one narrow subset of redactions–those designed to protect the identities of local law enforcement officers. Because Exemption 7(C) is more protective than Exemption 6, the Court will apply the Exemption 7(C) standard to this one subset of redactions, but will otherwise apply the Exemption 6 standard. Before applying these standards, however, the Court first addresses Sai's threshold contentions that the TSA's privacy redactions were improper because (1) disclosure was required under 5 C.F.R. § 293.311; (2) the redacted names and contact information were already known to Sai; and (3) "[i]n other cases," similar information was not redacted. Dkt. 111-2 at 22–23.

140    Sai's second contention–the argument that the redacted private information is already known to Sai–is equally unavailing. Agencies releasing records pursuant to FOIA requests must be mindful that "[d]ocuments released in a FOIA action must be made available to the public as a whole." Stonehill v. IRS, 558 F.3d 534, 539 (D.C. Cir. 2009); see also Clay v. U.S. Dep't of Justice, 680 F. Supp. 2d 239, 248 (D.D.C. 2010) ("The FOIA's . . . exemptions are designed to protect those 'legitimate governmental and private interests' that might be 'harmed by release of c

certain types of information' to the public at large." (quoting August v. FBI, 328 F.3d 697, 699 (D.C. Cir. 2003))). In releasing private information, an agency must operate on the assumption—confirmed in this case, see Dkt. 99-3 at 14, 28, 41 (McCoy Decl. ¶¶ 42, 86, 119)—that the recipient will further distribute the information, or that others will seek the same information and reasonably expect similar treatment by the FOIA office. Accordingly, Sai's purported knowledge of the redacted information does not call into question the TSA's withholding of the information pursuant to Exemption 6.

141  Third, Sai's contention that similar information was not redacted "in other cases" is also unpersuasive. It is unclear what Sai means by this. To the extent Sai means that the TSA disclosed the names or contact information of agency employees to other FOIA requesters involved in other litigation, that contention does not undercut the TSA's reliance on Exemptions 6 and 7(C) here. The "standards for invoking the [official-acknowledgment] doctrine are high." Shapiro, 153 F. Supp. 3d at 285. "Prior disclosure of similar information does not suffice; instead, the specific information sought by the plaintiff must already be in the public domain by official disclosure." Wolf, 473 F.3d at 378. Nor does a prior disclosure of "similar" information suffice to show that the asserted privacy interest is not real. As the D.C. Circuit has recognized, the appropriate balance between "the privacy interest in non-disclosure [and] the public interest in the release of the records" necessarily varies from case to case. See Lepelletier v. FDIC, 164 F.3d 37, 47 (D.C. Cir. 1999) (internal quotation marks omitted). And, to the extent Sai contends that the TSA released precisely the same record to him with fewer redactions in response to one of his FOIA requests, he has already received the less-substantially redacted record and thus his challenge is moot. See Crooker, 628 F.2d at 10.

142  Finally, Sai contends that "[t]he official contact information of federal officials has no relation to their 'personal privacy'" and that "[t]he disclosure of the identities of officials involved in [his] Rehabilitation Act complaints is not 'clearly unwarranted.'" Dkt. 111-2 at 23 (emphasis removed). As the TSA's Vaughn index and the redacted documents show, the TSA redacted the following information, which Sai now seeks: (1) the names and contact information for non-TSA employees, including local law enforcement officers, see Dkt. 99-3 at 74-75 (McCoy Decl. Ex. H); Dkt. 143-2 at 1-2, 146-2 at 4-7, 10, 13-14, 16; contract employees, see Dkt. 99-3 at 103 (McCoy Decl. Ex. Q); Dkt. 144-3 at 41, 139, 182; Dkt. 145-1 at 7, 12; and a congressional staffer, see Dkt. 99-3 at 117 (McCoy Decl. Ex. D); Dkt. 145-2 at 84; (2) TSA employees' non-work-related personal information, compare Dkt. 99-3 at 105, 108 (McCoy Decl. Ex. Q), with Dkt. 144-3 at 63, 142; (3) email addresses and telephone numbers for a DHS employee working in the Office of Chief Counsel and a TSA employee working in the agency's Disability Branch, Dkt. 144-3 at 109, Dkt. 145-2 at 84; and (4) names and contact information for TSA employees found in policy documents prepared for internal use, see Dkt. 99-3 at 170-71, 174 (McCoy Decl. Ex. Y); Dkt. 133-2 at 29-30, 33, 35, 93; Dkt. 134-1 at 6, 43.

148  Sai also challenges TSA's assertion that it released all reasonably segregable records in response to his Policies Request. See Dkt. 111-2 at 20. FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions [that] are exempt." 5 U.S.C. § 552(b). "While the segregability requirement applies to all documents and all exemptions in the FOIA," the courts have recognized that "segregation is not required where the 'exempt and nonexempt information are inextricably intertwined, such that the excision of exempt information would impose significant costs on the agency and produce an edited document with little informational value.'" Covington v. McLeod, 646 F. Supp. 2d 66, 72 (D.D.C. 2009) (quoting Mays v. Drug Enf't Admin., 234 F.3d 1324, 1327 (D.C. Cir. 2000)) (first citation omitted). The government bears "the burden of justifying nondisclosure," Mead Data Cent., Inc. v. U.S. Dep't of the Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977), and must "show with reasonable specificity why the documents cannot be further segregated," Armstrong v. Exec. Office of the President, 97 F.3d 575, 578 (D.C. Cir. 1996) (internal quotation marks omitted). To carry this burden, the government must provide a "detailed justification" for [withheld records]' non-segregability." Johnson v. Exec. Office for U.S. Attorneys, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting Mead, 566 F.2d at 261).

149  Sai presses two arguments related to segregability, both of which turn on arguments considered and rejected, above. He first argues that the TSA improperly failed to release various Standard Operating Procedures ("SOPs")—or alternative versions of SOPs—that he sought in his Policies Request. But, as discussed above, the request was defectively overbroad, and the fact that the TSA made an effort to answer the request in part did not obligate the agency to release every policy or procedure document that it had ever created, and was not already available in the TSA's electronic reading room. See supra Part III.B.2. Sai's assertions he learned from "confidential source(s)," mistakenly released records, and documents posted by third parties that purport to represent "authentic" copies of TSA documents, Dkt. 111-2 at 19-21, does not change that conclusion. Second, Sai contends that inconsistencies in the TSA's redactions under the deliberative process privilege show that the agency has not released certain segregable material. Id. at 22. But, as also discussed above, those minor inconsistencies do not establish a lack of good faith, and, in any event, Sai has already received copies of the less thoroughly redacted records. See supra Part III.C.2.

150  More generally, Sai fails to identify any evidence that the TSA withheld records in whole based on a valid FOIA exemption, where a portion of those records were reasonably segregable and could have been released without disclosing the exempt information. The Court, moreover, has reviewed the various Vaughn indices that the TSA has submitted in support of its motion, see Dkt. 99-3 at 73-76 (McCoy Decl. Ex. H); id. at 102-20 (McCoy Decl. Ex. Q); id. at 160-74 (McCoy Decl. Ex. Y), and those indices demonstrate that the agency redacted the exempt portions of otherwise responsive records where possible. The Court, accordingly, concludes that with respect to records that the TSA released, it has met its obligation to release reasonably segregable portions.

152  The remainder of Sai's opposition contains a variety of other accusations that the TSA has engaged in misconduct. Construed liberally, these allegations may present an argument—albeit a flawed one—that the TSA acted in bad faith in responding to his request and that, in light of this bad faith, Sai should be allowed to conduct discovery regarding the TSA's actions. Among these claims, Sai argues that TSA despoiled CCTV video of the Logan Airport incident. Dkt. 111-2 at 34-36. In support of this contention, Sai posits that (1) TSA policy requires 15 "[c]amera views" of each passenger during screening and requires that the surveillance video be maintained for 30 days; (2) he submitted a FOIA request seeking the Logan Airport surveillance video within that 30-day window; (3) the TSA released only one video showing his screening at Logan Airport and informed him that no other video exists; and (4) "the only possible conclusion is that TSA and BOS committed spoliation." Id. at 35-36.

153  That theory, however, cannot be squared with McCoy's declaration, submitted under the penalty of perjury, which recounts that "BOS searched for responsive records including closed circuit television (CCTV)" and located "one CCTV video of the incident." Dkt. 99-3 at 6 (McCoy Decl. ¶ 15). As this Court has explained, agency declarations, like McCoy's, "are accorded a presumption of good faith," and that presumption "cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" SafeCard Servs., 926 F.2d at 1200. To be sure, TSA policy may have required additional "views," and it may have required that video records be maintained for thirty days. Dkt. 111-2 at 35-36. But that does not mean that the videos Sai sought, in fact, existed at the time he filed his FOIA request, and it certainly does not mean that the TSA destroyed some (but not all) of the videos Sai sought in order to avoid its obligation of production. Far more than Sai has offered is necessary to give rise to a disputed issue of fact regarding an agency's good faith; indeed, if a FOIA requester's reasonable belief that other records should have been found were sufficient, discovery would likely be the norm, rather than exception, in FOIA cases. See Cole v. Rochford, 285 F. Supp. 3d 73, 76 (D.D.C. 2018) ("[I]n the FOIA context, courts have permitted discovery only in exceptional circumstances where a plaintiff raises a sufficient question as to the agency's good faith in searching for or processing documents."); see also Baker & Hostetler LLP, 473 F.3d at 318 (concluding that the district court properly denied discovery request where the plaintiff "offered no evidence of bad faith to justify additional discovery").

154  Sai also argues that TSA violated his rights under the Privacy Act by documenting his "protected First Amendment speech" at checkpoints, including documentation of the "parody DHS" t-shirt he was wearing while going through the Logan Airport screening and his act of partially disrobing at the O'Hare Airport screening. Dkt. 111-2 at 33-34. For support, Sai cites to 5 U.S.C. § 552a(e)(7), which provides that "[e]ach agency that maintains a system of records shall . . . maintain no record describing how any individual exercises rights guaranteed by the First Amendment unless expressly authorized by statute or by the individual about whom the record is maintained or unless pertinent to and within the scope of an authorized law enforcement activity." This argument, however, is not properly before the Court because Sai brought this suit to "challeng[e] the failure of [the TSA] to respond to plaintiff Sai's multiple requests for records," Dkt. 5 at 1 (Compl. ¶ 1), not to challenge the content of those records.[8]

155  Finally, Sai argues that the TSA deliberately delayed processing his Logan and San Francisco Airport Rehabilitation Act complaints. Dkt. 111-2 at 37-40. Those contentions, however, also have nothing to do with the present action. Indeed, this Court has previously resolved Sai's separate lawsuit raising just that issue. See Sai, 149 F. Supp. 3d at 99. Sai offers no basis to conclude that the TSA's delay in processing his Rehabilitation Act complaints shows that it improperly withheld records responsive to Sai's FOIA requests. Cf. Thomas v. U.S. Dep't Justice, 197 F. Supp. 3d 192, 203-04 (D.D.C. 2016) (explaining that allegations of misconduct unrelated to the processing of the plaintiff's FOIA/PA requests or the suit "failed to rebut the presumption of good faith").

---

[8] Similarly, to the extent that Sai is asserting First Amendment claims against TSA, those claims are foreclosed because they are not raised in his complaint. See Wright, 121 F. Supp. 3d at 183 n.7.

159  For these reasons, the Court will GRANT in part and will DENY in part the TSA's motion for summary judgment. In particular, the motion is granted, except as to the following issues, which will require further development: (1) Did the TSA fail to comply with E-FOIA notwithstanding its failure to release the electronic records sought in Sai's BOS and SFO Re- Requests in their original format and its failure to release records responsive to his Policies Request in "discretized," "fully digital," non-"rasterized" text PDFs; (2) Did the TSA release any spreadsheets in response to the Policies Request; (3) Does the TSA possess legible copies of Dkt. 143-2 at 3, 6-7 (2013-TSPA-00368 Bates 003-004, 006-007); Dkt. 141-2 at 9-10 (2023-TSFO-01096 Bates 009-010); (4) Is the TSA required to search its FOIA Br

ch, Office of Legislative Affairs, Office of Chief Counsel, and Office of the Executive Secretariat for records responsive to Sai's BOS and SFO Requests and Re-Requests; (5) Did the TSA's searches for records responsive to the BOS and SFO Requests and Re-Requests cover the relevant timeframe, that is, from the date of the relevant incident to the date the relevant search commenced; (6) Did the TSA conduct a search reasonably calculated to locate responsive records with respect to the databases searched in response to the BOS and SFO Re-Requests and with respect to the search terms used to search the offices described in Part II.B.2 in response to the BOS and SFO Requests and Re-Requests; (7) Did the TSA redact information pursuant to Exemption 3 that was previously released to the ACLU prior to responding to Sai's Policies Request; (8) Did the TSA properly redact factual information responsive to Sai's SFO Request pursuant to Exemption 5; (9) Does the redacted contact information for TSA contract employees, a DHS Office of Chief Counsel employee, and a TSA Disability Branch employee implicate a "substantial privacy interest" under Exemption 6; and (10) Does the redacted contact information of TSA employees contained in policy documents implicate a "substantial privacy interest" under Exemption 6.

160  Finally, the Court further concludes that Sai has failed to demonstrate that discovery is warranted in this FOIA/PA action.

163  Date: September 25, 2018