UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAI,

        *Plaintiff*,

        v.

TRANSPORTATION SECURITY
ADMINISTRATION,

        *Defendant*.

Civil Action No. 14-403-RDM

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

JESSIE K. LIU
*United States Attorney*

DANIEL F. VAN HORN
*Chief, Civil Division*

JOHNNY H. WALKER
*Assistant United States Attorney*
555 4th Street, N.W.
Washington, District of Columbia 20530
Telephone: 202 252 2575
Email: johnny.walker@usdoj.gov

Dated: September 28, 2018

# CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 1

ARGUMENT ........................................................................................................ 2

I. The TSA Has Not Released Records in an Improper Format ........................................ 3

A. The TSA Did Not Violate E-FOIA ........................................ 3

1. Sai's Requests Did Not Ask for Native File Types ........................................ 4

2. The TSA Is Not Obligated to Organize Its Releases into Distinct Files ...... 6

3. The TSA Cannot Readily Reproduce Native, Non-Rasterized, or Distinct Files to Requesters ........................................ 8

B. The TSA Has Re-Released Clearer Copies of the Illegible Records ..................... 11

II. The TSA Conducted a Proper Search ........................................................................................................

A. The TSA Searched All Locations Likely to Contain Responsive Records ........... 12

B. The Timeframe for the Search Has Been Clarified ........................................ 16

III. The TSA Properly Withheld Exempt Information ........................................ 17

A. The TSA Did Not Improperly Redact Information under Exemption 3 ................ 17

B. The TSA Did Not Improperly Redact Factual Information under Exemption 5 ... 17

C. The Text Redacted under Exemption 6 Involves a "Substantial Privacy Interest" ........................................ 18

CONCLUSION ........................................................................................................ 18

**INTRODUCTION**

On May 24, 2018, this Court issued a 70-page memorandum opinion and order largely granting the motion for summary judgment by the Transportation Security Administration ("TSA") on Plaintiff Sai's claims under the Freedom of Information Act ("FOIA"). The Court concluded, however, that certain issues were insufficiently developed or argued to support full summary judgment in the TSA's favor. The TSA now submits this renewed motion for summary judgment with a 42-page declaration by the TSA's FOIA Officer, Terri Miller. As shown, the deficiencies identified by the Court have been fully addressed, and the TSA is now entitled to summary judgment.

**BACKGROUND**

The background of this case and of Sai's FOIA requests is recounted in the Court's memorandum opinion dated May 24, 2018, and in the Court's many other opinions and orders in this case. Mem. Op. at 3 (citing other opinions and orders). To summarize, this case involves six FOIA requests submitted by Sai: (1) a request dated January 28, 2013, seeking records about an incident involving Sai at the security checkpoint at Boston Logan International Airport ("BOS Request"), ECF No. 99-3 at 50–51; (2) a request dated February 22, 2013, seeking "any contract/agreement with other agencies regarding surveillance, or maintenance of surveillance footage, as Logan airport ("CCTV Request"), id. at 78; (3) a request dated March 15, 2013, seeking records about an incident involving Sai at the security checkpoint at San Francisco International Airport ("SFO Request"), id. at 85–86; (4) a very broad request seeking all TSA policies and procedures not already posted in the TSA's electronic reading room ("Policies Request"), id. at 125–28; and (5) two requests that seek generally the same information as the BOS and SFO Requests, but covering the period of time after those requests were filed ("BOS and SFO Re-Requests").

After extensive proceedings, the TSA moved for summary judgment, which the Court granted in part and denied in part. *See* Mem. Op., ECF No. 162.

## ARGUMENT

Following an initial round of summary judgment briefing, the Court identified ten issues that require further development. They are summarized in the Court's conclusion and excerpted below:

> (1) Did the TSA fail to comply with E-FOIA notwithstanding its failure to release the electronic records sought in Sai's BOS and SFO Re-Requests in their original format and its failure to release records responsive to [Sai's] Policies Request in "discretized," "fully digital," non-"rasterized" text PDFs; (2) Did the TSA release any spreadsheets in response to Sai's Policies Request; (3) Does the TSA possess legible copies of Dkt. 143-2 at 3, 6–7 (2013-TSPA-00368 Bates 003–004, 006–007); Dkt. 141-2 at 9–10 (2023-TSFO-01096 Bates 009–010); (4) Is the TSA required to search its FOIA Branch, Office of Legislative Affairs, Office of Chief Counsel, and Office of the Executive Secretariat for records responsive to Sai's BOS and SFO Requests and Re-Requests; (5) Did the TSA's searches for records responsive to the BOS and SFO Requests and Re-Requests cover the relevant timeframe, that is, from the date of the relevant incident to the date the relevant search commenced; (6) Did the TSA conduct a search reasonably calculated to locate responsive records with respect to the databases searched in response to the BOS and SFO Re-Requests and with respect to the search terms used to search the offices described in Part II.B.2 in response to the BOS and SFO Requests and Re-Requests; (7) Did the TSA redact information pursuant to Exemption 3 that was previously released to the ACLU prior to responding to Sai's Policies Request; (8) Did the TSA properly redact factual information responsive to Sai's SFO Request pursuant to Exemption 5; (9) Does the redacted contact information for TSA contract employees, a DHS Office of Chief Counsel employee, and a TSA Disability Branch employee implicate a "substantial privacy interest" under Exemption 6; and (10) Does the redacted contact information of TSA employees contained in policy documents implicate a "substantial privacy interest" under Exemption 6.

Mem. Op. at 69–70.[1] This renewed motion addresses the open issues directed at the TSA.

## I.    The TSA Has Not Released Records in an Impermissible Format.

### A.    *The TSA Did Not Violate E-FOIA.*

In its May 24, 2018, memorandum opinion, the Court ordered the parties to present additional argument and evidence on whether the TSA complied with the E-FOIA amendments in responding to Sai's requests. Mem. Op. at 14. Namely, the Court directed the parties to address whether the TSA violated E-FOIA by (1) not releasing records responsive to Sai's BOS and SFO Re-Requests in a native file type and (2) not releasing records responsive to Sai's Policies Request in "discretized," "fully digital," non-"rasterized" PDFs. *Id.* at 69.

As amended by E-FOIA, Pub. L. No. 104-231, 110 Stat. 3048 (1996), the FOIA statute requires agencies to "provide the [requested] record[s] in any form or format requested by the [requester]," but only "if the record is readily reproducible by the agency in that form or format." 5 U.S.C. § 552(a)(3)(B). Courts are required to "accord substantial weight to an affidavit of an agency concerning the agency's determination as to . . . reproducibility." *Id.* § 552(a)(4)(B). As the Court noted, Mem. Op. at 20, E-FOIA was enacted to overrule *Dismukes v. Department of Interior*, which upheld an agency's insistence that a requester access records only on microfiche rather than electronically, 603 F. Supp. 760 (D.D.C. 1984). Following the amendments, the D.C. Circuit has held that "[t]here is a clear statutory obligation to produce the records in electronic format when that format is requested." *Sample v. Bureau of Prisons*, 466 F.3d 1086, 1088 (D.C. Cir. 2006).

As explained below, Sai requested—and received—records in electronic format, and FOIA does not require the TSA to sort and label requested records into discrete, individually named files.

---

[1] The Court issued an amended memorandum opinion and order on September 25, 2018. ECF No. 172. Because much of this brief was drafted before the amended opinion was issued, it makes reference to the prior opinion.

And even had Sai asked for native file types and even if FOIA did generally require the TSA to organize records as directed, the TSA would be excused from doing so here because the records are not "readily reproducible" in native or discrete files given the possibility of countermanding redactions and the administrative burden associated with such an undertaking.

1.    Sai's Requests Did Not Ask for Native File Types.

The question of whether E-FOIA requires the TSA to release records in their native file type is a novel one without any direct precedent known to the TSA. It is not a question that the Court need engage in here, however, because Sai's BOS and SFO Re-Requests did not ask for records in their native file type. FOIA directs agencies to release records in a particular form or format only when such form or format is "requested by the [requester]." 5 U.S.C. § 552(a)(3)(B). Though the Court concluded that the BOS and SFO Re-Requests "might reasonably be construed to seek the requested non-paper files in their 'native' format—for example, in 'Word, Excel, or electronic PDF,'" Mem. Op. at 18 (quoting ECF No. 111-2 at 4), the TSA submits that the better reading of Sai's BOS and SFO Re-Requests is that they simply sought records in electronic format. That reading better comports with the text of the requests, the consistency of Sai's other requests, and the context of E-FOIA. The TSA addresses each of these points in turn.

*First*, the text of Sai's BOS and SFO Re-Requests indicates only that Sai wanted electronic records, not that Sai wanted those records in their native file type. Sai's request sought records "in their original electronic format or as a scan of any documents that are originally paper." ECF No. 28-3 at 11–12. That language plainly directs the TSA to release documents in electronic format if they were originally in electronic format, and electronic scans of documents if they were originally in paper format. This reading sensibly ascribes the word "original" the same meaning in its modification of the word "electronic" as it clearly carries in its modification of the word "paper." The term does not refer to the specific original file type of the electronic documents, only that the

document originated as electronic, just as Sai obviously means to refer to documents that originated as paper. Notably, Sai's FOIA requests and briefs in this case reveal Sai to be well-versed in the technical terminology and with a penchant for being specific as to how the TSA should deliver responsive records. Had Sai intended that these requests require that electronic records be released in their native file types when preparing them, Sai has unmistakably demonstrated the facility to provide a clear directive.

*Second*, the TSA's reading of Sai's request is bolstered by reference to Sai's other four requests at issue in this litigation. As the Court correctly noted, none of those requests contained any language that could be construed as seeking native file types; instead, Sai specified only that records be released in electronic format (with some additional directives as to readability and organization). Mem. Op. at 15–16 (discussing the format specifications in the BOS SFO, CCTV and Policies requests). In those instances where Sai did specify a filetype, he demanded PDFs—which is the filetype that the TSA used for all its releases to Sai (other than audio and video). SOF ¶ 18. Of particular note, for the BOS and SFO Requests, which sought information substantially similar to that sought by the BOS and SFO Re-Requests, Sai demanded only that the TSA produce a "digital copy" of records and that the requests be "serviced electronically to the maximum extent possible." ECF Nos. 99-3 at 50–51 (BOS Request); *id.* at 85–86 (SFO Request). Given that the BOS and SFO Re-Requests sought substantially the same information as the BOS and SFO Requests (but over a different timeline), the former can best be read to seek the same production format as the latter, which is also consistent with all the other requests at issue in this case.

*Finally*, the TSA's reading is supported by the use of the word "format" in the context of FOIA. While Sai seems to have taken the litigation position that the word "format" in BOS and SFO Re-Requests referred to native file types (though they did not specifically say so), the word

is commonly used in the FOIA context to refer more broadly to electronic—as opposed to paper—format. *See* 5 U.S.C. § 552(f)(2)(A) (defining "record" to include information "maintained by an agency in any format, including an electronic format");  H.R. Rep. No. 104-795, at 18 (1996) ("Records which are subject to the FOIA shall be made available under the FOIA when the records are maintained in electronic format."); *Sample*, 466 F.3d at 1088 ("There is a clear statutory obligation to produce the records in electronic format when that format is requested."). Accordingly, the better reading of Sai's request is that it invoked FOIA's requirement that records be produced in electronic format, not in their original file types.

Because Sai did not request records in their original file type, Sai may not now compel the agency and its many subcomponents to reprocess and release records in response the BOS and SFO Re-Requests in their original file types. *See* 5 U.S.C. § 552(a)(3)(B). The TSA should be granted summary judgment on this issue.

2.      The TSA Is Not Obligated to Organize Its Releases into Distinct Files.

In the Policies Request, Sai requested that the TSA release records as "individual PDFs per distinct document, named clearly after the document's identifier and/or title, rather than a single digital file containing multiple concatenated documents." ECF No. 99-3 at 129. The Court opined that the TSA "fail[ed] to argue that, as a matter of law, 'discretization' does not constitute a 'form or format' for purposes of 5 U.S.C. § 552(a)(3)(B)" and concluded that it could not determine whether the TSA was entitled to summary judgment on this issue on the present record. Mem. Op. at 16–17.

The TSA was under no legal obligation to arrange Sai's releases as Sai requested. As courts in this district have repeatedly held, FOIA does not require agencies to "organize documents to facilitate FOIA responses." *Shapiro v. U.S. Dep't of Justice*, 37 F. Supp. 3d 7, 20 (D.D.C. 2014) (quoting *Goulding v. IRS*, No. 97-5628, 1998 WL 325202, at *5 (N.D. Ill. June 8, 1998)); *see also*

*Prison Legal News v. Lappin*, 780 F. Supp. 2d 29, 45–46 (D.D.C. 2011) (same). Yet that is precisely what Sai's demand for discrete files would have the TSA do. Separating the releases into individual files and assigning them names associated with the document's title would be akin to organizing, individually binding, and including separate cover sheets for records produced in paper format. FOIA does not impose such a requirement.

Nor is such a requirement imposed by the "form or format" provision of E-FOIA. As the context, legislative history, and application of that provision make clear, it does not compel agencies to sort or arrange a FOIA requester's records according to that requester's specifications. As noted, FOIA requires agencies to "provide the record in any form or format requested by the person if the record is readily reproducible by the agency in that form or format." 5 U.S.C. § 552(a)(3)(B). Though "form or format" is not defined in the statute, its context helps define its meaning. For example, in the very next subparagraph of paragraph (3), the statute states, "In responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic form or format, except when such efforts would significantly interfere with the operation of the agency's automated information system." *Id.* § 552(a)(3)(C). The statute also repeatedly uses the word format to refer to electronic documents, as opposed to paper. *See, e.g.,* 5 U.S.C. § 552(f)(2) (defining "record" to include information "maintained by an agency in any format, including an electronic format"); *id.* at 552(a)(2) (requiring agencies to make certain records "available for public inspection in an electronic format"); *see also* Pub. L. 104-231, 110 Stat. 3048, 3048 (1996) (describing E-FOIA as an act to "amend section 552 of title 5, United States Code, popularly known as the Freedom of Information Act, to provide for public access to information in an electronic format, and for other purposes"). And the legislative history of the statute indicates Congress's intent to allow access to records in an electronic format as opposed to

7

a physical format like paper or microfiche. *See* H.R. Rep. 104-795, at 8 (1996) ("The response to a request may involve paper or, increasingly, information in an electronic format."); *id.* at 14 (noting that the "form or format" requirement "applies to choices between conventional record forms (e.g., paper, microfiche, or electronic) as well as to choices between existing electronic formats").

These sources make clear that the phrase "form or format" in E-FOIA refers to the method in which records are stored, not in how they are arranged, sorted, and identified for the requester. Sai's Policies Request sought records in an electronic format as PDF documents, and that is what Sai received. FOIA does not require the TSA to arrange, separate, and label those electronic PDFs according to Sai's specifications.[2]

3. The TSA Cannot Readily Reproduce Native, Non-Rasterized, or Distinct Files to Requesters.

In any event, even if Sai had requested native file types and even if FOIA's "form or format" provision did require the TSA to separate, arrange, and label documents according to Sai's specifications, the TSA would be excused from doing so here because the records are not "readily reproducible" as such. The same is true of Sai's demand for non-"rasterized" records.

As the Court recognized, E-FOIA did not impose an absolute obligation on agencies to "comply with every request for release of records in every conceivable format." Mem. Op. at 20. An agency need only release records in a form or format that is "readily reproducible," 5 U.S.C. § 552(a)(3)(B), and "technically feasible," *id.* § 552(a)(4)(B). Similarly, an agency is obligated only to make "reasonable efforts" to search for a record in electronic form or format and need not

[2] Nevertheless, the TSA went above and beyond its obligations under FOIA and organized the releases for Sai's Policies Request into 20 distinct PDF files separated by item number and, in appropriate cases, the alpha-numeric sub-item of the request to which the records were responsive. SOF ¶ 1.

do so at all "when such efforts would significantly interfere with the operation of the agency's automated information system." *Id.* § 552(a)(3)(C). As explained in detail in the Miller declaration, to have produced records as individual, discrete files or in their original file type or in a non-rasterized PDF would have required the TSA to process records outside of its FOIAXpress software, which would have imposed a substantial administrative burden on the agency and allowed for the unacceptable possibility of errors in production and countermanding of the TSA's redactions of exempt material and Sensitive Security Information ("SSI"). As noted, the Court must "accord substantial weight to an affidavit of an agency concerning the agency's determination as to . . . reproducibility." *Id.* § 552(a)(4)(B).  The TSA addresses each of these risks in more detail below.

*First*, releasing records in their native file types and as non-rasterized PDFs would impose an undue administrative burden on the TSA. In passing E-FOIA, Congress recognized that, "[a]s a general rule, the decision whether to disclose requested records or information in a new requested form, whether electronic or other form, is a matter of administrative discretion. In exercising that discretion, agencies should consider administrative efficiency and the existence of identified public demands for the information." H.R. Rep. 104-795, at 14–15. As explained in more detail in the Miller declaration, the Department of Homeland Security, of which the TSA is a component, uses FOIAXpress to process tens of thousands of FOIA requests each year and to maintain an administrative record of that processing in the event of an administrative appeal or litigation. SOF ¶¶ 3, 18. FOIAXpress, like every other processing tool known to TSA, does not permit agencies to process records in their native file type or as non-rasterized PDFs. SOF ¶¶ 16–17. The Miller declaration explains in detail the utterly unmanageable burden that it would impose upon the TSA to process Sai's BOS and SFO Re-Requests and Policies Request without the use of

FOIAXpress. SOF ¶ 19–22. Given this burden, it is plain that the records are not "readily reproducible" as native file types or as non-rasterized PDFs.

Similarly, it would have imposed an undue administrative burden to have arranged responsive records in individual PDF files as Sai requested. As the Miller declaration explains, FOIAXpress collapses files as part of its processing of records. SOF ¶ 11. To produce them as distinct files, the TSA would have had to manually separate the records within FOIAXpress, create separate PDF files for each, name each, and then burn each of them to a storage medium for release to Sai. SOF ¶ 11. Further, FOIAXpress does not maintain a record of where each document begins and ends, meaning that a FOIA officer would have to spend time investigating and discerning how each record is delineated, and then determine how to label that record in the file name. SOF ¶ 1. This would not only be unduly burdensome, it would create the untenable prospect of a mistaken representation that would be exceedingly difficult to quality control. SOF ¶ 11.

*Second*, processing records outside of FOIAXpress would have prevented the TSA from meeting its statutory obligation to protect SSI, pursuant to 49 U.S.C. § 114(r) and 49 C.F.R. Part 1520, and information that is exempt from release under FOIA. In enacting E-FOIA, Congress noted that the statute's "'reasonable efforts' qualification could relieve agencies of the obligation of releasing the original form of partially exempt records in circumstances where agencies need to handle the records in a certain form for purposes of redaction and, therefore, cannot readily disclose them, as redacted, in a previously existing form." S. Rep. 104-272, at 15 (1996). In its prior opinion, the Court noted that the TSA may be able to show that Sai's request for records in their native file type would have "imposed a burden on the agency of sufficient magnitude to justify its rejection of that request," including, for example, that the TSA "could not have, at the time, 'readily' ensured that redactions were not countermanded." Mem. Op. at 22. TSA makes precisely

that showing in the Miller declaration. SOF ¶¶ 5–15. In summary, the declaration shows that one

of the very reasons that the Department of Homeland Security adopted FOIAXpress was because

of its ability to ensure the security of redactions by locking them down through rasterization. SOF

¶¶ 7–8. Before FOIAXpress, the agency had experienced problems with the countermanding of

redactions and the improper release of SSI. SOF ¶ 7. The TSA is aware of no FOIA processing

software solution that would lock down redactions in native files. SOF ¶ 10.[3] Accordingly, the TSA

could not have "readily" ensured that redactions were not countermanded without processing

records using the FOIAXpress software. As such, the TSA was not required to comply with Sai's

request for discretized records, native files, or non-rasterized PDFs.

> B.      *The TSA Has Re-Released Clearer Copies of the Illegible Records.*

The Court concluded that six pages of records released to Sai were illegible. Mem. Op. at

23–24. Following the Court's opinion, the TSA located more legible copies of those pages and

released them to Sai. SOF ¶ 24. Having released to Sai the most legible copies available after

processing through FOIAXpress, the TSA is entitled to summary judgment on this issue.

The newly legible copy of one of the pages revealed certain information that the TSA has

redacted and withheld under Exemption 6 because they would "constitute a clearly unwarranted

invasion of personal privacy." 5 U.S.C. § 552(b)(6). To determine whether information is properly

withheld under Exemption 6, the Court must determine whether "disclosure would compromise a

substantial, as opposed to a *de minimus*, privacy interest." *Nat'l Assn' of Retired Fed. Emps. v.*

---

[3] Also, the TSA is unaware of any redaction tools in software applications like Excel, Outlook,
and Word. Therefore, the only way to remove SSI and exempt information from such documents
would be to edit and manipulate them into a new record without the exempt information. SOF ¶ 11
n.2. FOIA does not require the TSA to engage in this process of generating new records to avoid
exempt information. *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 152
(1980) ("[FOIA] does not obligate agencies to create or retain documents; it only obligates them
to provide access to those which it in fact has created and retained.").

*Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989). If so, the Court must then "balance the privacy interest in non-disclosure against the public interest" in disclosure. *Consumers' Checkbook Ctr. for Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 554 F.3d 1046, 1050 (D.C. Cir. 2009). As the Miller declaration explains, that analysis supports the TSA's redactions here. SOF ¶¶ 25–27.

## II.   The TSA Conducted a Proper Search.

### A.   *The TSA Searched All Locations Likely to Contain Responsive Records.*

*FOIA Branch*. The Court concluded that the TSA's initial motion for summary judgment did not convincingly show that the TSA was not obligated to search its FOIA Branch for records about its response to Sai's request. Mem. Op. 29–30. As this Court noted, however, the cutoff date for responsive records is the date on which an agency begins its search. *Id.* at 33 n.4 (citing 6 C.F.R. § 5.4(a)(2003)). The FOIA Branch determined that it was not likely to have generated any "documents [or] communication[s] related to" Sai's request, ECF No. 99-3 at 51, prior to the commencement date of the search (other than communications directly with Sai, which Sai would already have). SOF ¶ 29. Accordingly, the FOIA Branch reasonably determined that it was not a location likely to have responsive records.

In addition, as explained in the Miller declaration, the TSA informed Sai that the BOS Request was overly broad, and Sai responded by clarifying its scope in a way that did not include FOIA processing records. SOF ¶¶ 30–32. Accordingly, the TSA was not required to release them. *See Hainery v. U.S. Dep't of Interior*, 925 F. Supp. 2d 34, 44, (D.D.C. 2013) (holding that, once a plaintiff agrees to limit the scope of a FOIA request, he cannot argue that he failed to receive records outside the scope of the narrowed request); *Wilson v. U.S. Dep't of Transp.*, 730 F. Supp. 2d 140, 152 (D.D.C. 2010) (same); *Kenney v. U.S. Dep't of* Justice, 603 F. sup. 2d 184, 189 (D.D.C. 2009) (same).

Similarly, for the SFO Request, the TSA informed Sai that it was too broad, but received no response or clarification. SOF ¶ 33–. Thus, the TSA reasonably construed Sai's BOS and SFO Requests as not requiring a search of the FOIA Branch and instead searched for responsive records that it perceived were adequately described so as to allow the agency to conduct a reasonable search. SOF ¶ 34. At no time in subsequent communications between Sai and the FOIA Branch regarding the SFO Request did Sai object that the TSA had not released FOIA processing records. SOF ¶¶ 35–36. Accordingly, just as with the Policies Request, the TSA gave Sai "ample opportunity to refine" Sai's BOS and SFO Requests, but Sai chose not to do so in a way that clarified that Sai was seeking FOIA processing records. Mem. Op. at 39;[4] *see also Judicial Watch, Inc. v. Exp.–Imp. Bank*, 108 F.Supp.2d 19, 27–28 (D.D.C. 2000) (concluding that agency need not search for records where the FOIA request did not "reasonably describe the records sought," was "unreasonably broad and impose[d] an unreasonable burden" on the agency, and where the requester "fail[ed] to state its request with sufficient particularity [and] declined the [agency's] repeated attempts clarify the request").

*Office of Legislative Affairs, Office of the Executive Secretariat, and Office of Chief Counsel*. The Court was not convinced that the TSA had justified its failure to search the Office of Legislative Affairs, Office of Executive Secretariat, and Office of Chief Counsel in response to Sai's BOS and SFO Requests and Re-Requests, in light of certain documents released from other offices. Mem. Op. at 30–31.

In reaching this conclusion, the Court cited *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20 (D.C. Cir. 1998). As the McCoy and Miller declarations show, *Campbell* is distinguishable from

---

[4] In discussing the Policies Request, the Court noted that where the TSA "provided Sai with ample opportunity to refine [the] request," and where "Sai did not respond to this invitation," "the TSA was not required to respond to Sai's unrefined" request.  Mem. Op. 39-40.

the instant case for two reasons. *First*, in Campbell, the agency searched only one of its records systems and did not "revise its assessment of what [was] 'reasonable'" based on what leads "emerge[d] during its inquiry." *Id.* at 28. Here, the TSA conducted searches across multiple records systems and program offices in response to Sai's requests and made several re-assessments throughout the search process resulting in many program offices being re-tasked or having a new program office be tasked, based off of information as it emerged during the course of the searches. See ECF No. 99-3 at 5–8 (describing search for BOS Request); *id.* at 20–22 (describing search for SFO Request); *id.* at 44–47 (describing search for BOS and SFO Re-Requests); *see also* SOF ¶¶ 53–59 (providing additional descriptions of certain searches for the BOS and SFO Requests and Re-Requests). *Second*, in *Campbell*, the agency defended its failure to supplement its original search by arguing that it was not required to do so unless "specifically asked to do so within the FOIA request." 164 F.3d at 28. Here, the TSA conducted searches of multiple records systems and program offices (and in some cases conducted additional searches) for which the requests did not specifically ask. *See* ECF No. 99-3 at 5–8, 20–22, 44–47; SOF ¶¶ 53–59. As such, the searches in response to Sai's SFO and BOS Requests and Re-Requests cannot be analogized to the deficient search in *Campbell*.

Further, the relevant case law does not require an agency chase down every lead, but rather only "the type of 'clear lead' that would suggest that [the] offices likely would possess responsive materials." *Coleman v. Drug Enforcement Admin.*, 134 F. Supp. 3d 294, 303 (D.D.C. 2015). If an agency has "reason to believe that the office would not possess any documents or only duplicate documents," there is no obligation to follow a lead. *Id.* at 302.

Even when there appears to be grounds to apply the "clear leads" requirement based on records arguably pointing to un-tasked offices, however, that theory need not undermine the

14

adequacy of the search if the agency has "a specific reason not to search there." *Id.* (noting that "[t]he DEA presented no such reason on this record"). Here, the TSA did not believe, based on the additional records in question, that the Office of Legislative Affairs, Office of Executive Secretariat, and Office of Chief Counsel would have additional, non-duplicative documents, and the TSA has provided a detailed explanation of its reasoning on the record. SOF ¶¶ 38–46.  As fully set forth in the Miller declaration, the TSA reasonably determined that any additional records indicated by the documents referencing those three offices would either have been duplicate documents already uncovered by searches of other offices[5] or would not have been responsive to Sai's requests,[6] largely because they related not to the incidents at BOS and SFO, but to the administrative processing of a complaint filed by Sai under Section 504 of the Rehabilitation Act. SOF ¶¶ 40–46. Accordingly, the found documents do not present "clear and certain" leads to additional responsive documents. *Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996) (holding that an "agency need pursue only a lead it cannot in good faith ignore, i.e., a lead that is both clear and certain"). And the TSA has provided ample evidence demonstrating that it made a "good faith effort to conduct a search for the requested records, using methods which can

---

[5] The fact that references to the Office of Legislative Affairs and the Office of Executive Secretariat appear on the same page suggests on its face the duplicative nature of any additional tasking. *See* ECF No. 145-2 at 123.

[6] In particular, with respect to ECF No. 144-3 at 73, that page was located in response to the SFO Request, yet nothing on that page is responsive to the SFO Request; rather, it refers to a claim arising from Sai's screening at BOS on January 21, 2013, with no mention of SFO whatsoever. *See* SOF ¶ 45. An agency cannot be expected to cross-reference all requests that it receives. Such an expectation would produce the absurd result of obligating an agency to have awareness across all requests so that if a record in response to Request A might suggest a lead that could be responsive to an entirely separate and distinct Request B, then the agency, in the midst of searching and responding to Request A, would have to recognize that there was a potential lead with respect to Request B, and follow that lead by adjusting Request B based on a record uncovered in Request A. While the FOIA requires a great deal of agencies, omniscience on the part of each employee involved in processing FOIA requests is not one of them.

reasonably be expected to produce the information requested." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

      B.    *The Timeframe for the Search Has Been Clarified.*

      The Court also concluded that the TSA failed to document when it commenced its searches. Mem. Op. 31–34. As a result, there was no way to know the cutoff dates for the records deemed responsive to Sai's various requests (which date would be the same as the search-commencement date, *see* 6 C.F.R. § 5.4(a) (2003)), and it therefore was impossible to fully assess the adequacy of the TSA's search. *Id.* To remedy this, the TSA has now specified when each component office was tasked to search for responsive records, and when those offices submitted their signed response. SOF ¶¶ 48–51. The searches would have commenced within that timeframe. SOF ¶ 47 n.10. For the BOS and SFO Re-Requests, the tasking memorandums specifically stated the date range of responsive records for each office, indicating that it should begin with the date on which that office completed its searches for records responsive to the original BOS and SFO Requests and ending with the commencement of the new search. SOF ¶ 52. In some cases, the tasking memoranda misstated the timeframe for the prior search, but all errors resulted in an overinclusive search. SOF ¶ 52. In light of this information regarding the timing of the commencement of the respective searches, it can now be determined that TSA carried its burden with respect to the temporal scope of its searches.

      C.    *The Search Was Reasonably Calculated to Locate Responsive Records.*

      Next, the Court held that the TSA had not met its burden of adequately describing (1) the databases and locations searched in response to the BOS and SFO Re-Requests, (2) the search terms used by ORD field office and the OLE/FAMS office in response to the BOS Request; (3) the search terms used by the SFO field office and the Disability Branch office in response to the SFO Request; and (4) the search terms use by the BOS and SFO field offices, TCC, and the

16

Disability Branch office in response to the BOS and SFO Re-Requests. Mem. Op. at 34–37. As explained in detail the Miller declaration, the TSA has now remedied these deficiencies. SOF ¶¶ 53–59.

## III.   The TSA Properly Withheld Exempt Information.

Finally, the Court concluded that it needed additional information to justify the TSA's application of exemptions. The TSA has now furnished that information, as summarized below.

### A.   *The TSA Did Not Improperly Redact Information under Exemption 3.*

Sai previously argued that the TSA improperly withheld information as exempt SSI under Exemption 3 because it had previously released that information to the American Civil Liberties Union ("ACLU"). ECF No. 116-1 at 1. The Court held that the TSA had correctly argued that it need not supplement its releases to Sai simply because it later released additional information to the ACLU, but concluded that the summary-judgment record did not establish that the releases to Sai predated the releases to the ACLU. Mem. Op. 47–49. The Miller declaration cures this deficiency and establishes that the releases to Sai did indeed predate the releases to the ACLU. SOF ¶¶ 60–62. Accordingly, the TSA is entitled to summary judgment.

### B.   *The TSA Did Not Improperly Redact Factual Information under Exemption 5.*

Next, Sai had asserted that the TSA improperly withheld facts under the deliberative process privilege. ECF No. 111-2 at 24–25. Though the TSA noted that Sai's assertion was without support, the Court opined that it is TSA's burden to show that it is entitled to summary judgment, and that facts may be withheld under the deliberative process privilege if the disclosure would nevertheless expose a deliberative process. Mem. Op. at 53–54. As the Miller declaration clarifies, the TSA did not withhold mere facts under the deliberative-process privilege; instead, it withheld information that would reveal deliberative processes by the agency. SOF ¶¶ 63–68. Accordingly, that information was properly withheld.

17

C.     *The Text Redacted under Exemption 6 Involves a "Substantial Privacy Interest."*

As for the TSA's invocation of Exemption 6, the Court concluded that the TSA must provide more information on the substantial privacy interests implicated by the redacted information. Mem. Op. at 64. The Miller declaration does exactly that. It describes in detail why the redacted names and contact information of TSA employees implicates a substantial privacy interest, how the release of the redacted information would constitute a clearly unwarranted invasion of privacy, and why the release of certain identifying information would subject the identified individuals to the risk of annoyance or harassment. SOF ¶¶ 69–86. With these additional facts, the TSA is entitled to summary judgment on its application of Exemption 6.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in favor of the TSA.

Dated: September 28, 2018

Respectfully Submitted,

JESSIE K. LIU, D.C. Bar #472845
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:   /s/ Johnny Walker
JOHNNY H. WALKER, D.C. Bar # 991325
Assistant United States Attorney
555 4th Street, N.W.
Washington, District of Columbia 20530
Telephone: 202 252 2575
Email: johnny.walker@usdoj.gov

*Counsel for Defendant*