UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAI, | |
| *Plaintiff,* | |
| v. | Civil Action No. 14-403-RDM |
| TRANSPORTATION SECURITY ADMINISTRATION, | |
| *Defendant.* | |

## DEFENDANT'S STATEMENT OF
## MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Civil Rule 7(h), Defendant, the Transportation Security Administration ("TSA"), submits this statement of material facts as to which there is no genuine issue in support of its motion for summary judgment. This information is copied directly from the identified paragraphs in the declaration of Terri Miller.

### I.      Compliance with E-FOIA

#### A.      Discretization

1.      **Miller Decl. ¶ 10**. With respect to the discretization of records responsive to Plaintiff's Policies Request, TSA did, in fact, provide the responsive records in a manner that yielded far greater granularity than Plaintiff's representation that TSA provided only "concatenated PDFs with no discretization of separate records" and "no cogent ordering." Dkt. 111-2 at 2. The responsive PDF files were organized and separated by the item number and, in appropriate cases, the alpha-numeric sub-item of Plaintiff's Policies Request to which they were responsive. For example, the third interim response included three separate PDFs named: 1) "Records responsive to part 1-f Bates 003232 – 003538"; 2) "Records responsive to part 3-a Bates 003561 – 003573"; and 3) "Records responsive to part 5-b Bates 003223- 003231". *See* Dkt. 99-3 at 152 (McCoy Decl. Exh. W) (identifying the released records by the specific sub-items of the

request to which the records were responsive, identifying how many pages were being released, and identifying how many pages were being partially withheld or withheld in full). In total, TSA released to Plaintiff 20 distinct PDF files in response to the Policies Request, with each file identified by the item or sub-item of Plaintiff's request to which they were responsive.

    2.    **Miller Decl. ¶ 11**. Given that there were well over 100 documents collected and processed in response to Plaintiff's Policies Request, to produce the responsive records as "individual PDFs per distinct document, named clearly after the document's identifier and/or title," see Dkt. 99-3 at 129 (McCoy Decl. Exh. S), would have constituted an undue burden on the agency in excess of what the FOIA requires. Further, such records were not "readily reproducible" as individual files. TSA's reliance on FOIAXpress precludes it from furnishing individualized PDFs for each file. FOIAXpress collapses the files as part of the software's processing of the records for production; in order to undo this, an employee would have to attempt to recreate these file separations. There is no way to extract a list of where those breaks should occur in order to faithfully reproduce the records as individual files. Therefore, to require "discretization" of responsive records after processing through FOIAXpress would have entailed an ad hoc, manual follow-on effort requiring the FOIA Branch to separate each of the individual documents (some of which are only a page or two long) within FOIAXpress, create separate finalized PDF versions of each document, name each PDF file separately, and then burn each individual PDF to a disk for release to Plaintiff. A further avenue for potential inadvertent misrepresentation would occur when a file name must be created for each record, as there was no pre-existing list of responsive, redacted records that were processed that would provide that information. Overall, such a process would introduce the unacceptable prospect of a mistaken reproduction of each record's length and attachments, and require an effort that would be exceedingly difficult for the FOIA Branch to

exercise quality control over. As such, the records were not readily reproducible as individual files and an attempt at discretization would constitute an undue burden on the agency, accompanied by the risk of errors in the production.

**B.** **Original Format and Fully Digital Text PDFs**

3.      **Miller Decl. ¶ 13**. As explained previously, TSA's FOIA Branch used processing software called FOIAXpress to process Plaintiff's requests. See Dkt. 118-1 at 2-3 (¶¶ 8, 10). FOIAXpress  produced the responsive records for release in PDF format.[1] *See id* at ¶ 10. Some records responsive to Plaintiff's requests required review by TSA's Sensitive Security Information (SSI) Program Office to identify and protect SSI pursuant to 49 U.S.C. § 114(r), 49 C.F.R. Part 1520. *See id.* at ¶ 11. In accordance with TSA policy, the SSI Program Office required all records (excepting audio and video records) submitted for its review to be submitted in PDF format so that they could be properly – and irreversibly – redacted through the Adobe program that generates files in PDF format. The FOIA Branch then received back from the SSI Program Office records that had been rasterized in order to ensure that SSI redactions could not be reversed, as necessary, and those versions of the responsive records were then processed through FOIAXpress for final release. *See id.* at ¶¶ 9, 11.

4.      **Miller Decl. ¶ 14**. To have produced the records responsive to Plaintiff's requests in their original formats and/or as fully digital, non-rasterized text PDFs would have required processing outside of FOIAXpress and outside of the SSI Program Office's required standards. To do so would have created significant interference with and burden on the agency.

---

[1] Unless otherwise qualified, "PDF format" or "PDF" means rasterized PDFs for the purposes of this declaration.

### (1) Countermanding of Redactions

5.      **Miller Decl. ¶ 15**. The processing of responsive records outside of FOIAXpress and the SSI Program Office's required standards would interfere with the agency's obligation to protect SSI and information that is exempt from release under FOIA by creating the potential for its redactions to be countermanded, which would result in the unauthorized release of exempt information.

6.      **Miller Decl. ¶ 16**. TSA has an obligation to adhere to guidance and standards for information security, including those that have been set forth in the wake of unauthorized disclosures of government information.

7.      **Miller Decl. ¶ 17**. For example, following a disclosure of SSI that was discovered in December 2009, the DHS Office of Inspector General (OIG) conducted an inspection and issued a report regarding TSA's handling of SSI in January 2010. See Exh. 1 (DHS OIG Report – TSA's Breach of Sensitive Security Information (Redacted), January 2010). The Report found that TSA failed to properly redact a version of the Screening Management Standard Operating Procedures (SOP) before posting it on FedBizOps.gov in support of a solicitation, resulting in a breach of SSI. See id. at 5. The document was reviewed for SSI and redactions were applied; however, the redaction process did not result in "a locked down image of the document where text under the black redactions boxes [was] not visible or retrievable." See id. at 13. The Report recommended that the DHS Chief Privacy Officer "convene a working group of information technology experts from across the department to determine a department-wide standard for redaction software, and to develop methods for the proper public release of any sensitive information. Ensure that any selected software meets the department-wide standards as determined by the working group." Id. at 21. Following the working group, in May 2010, the DHS Chief Security Officer and Chief

Privacy Officer issued guidance that required the Department and its components to follow information protection procedures that result in the successful and verifiable permanent redaction of sensitive information.

8. **Miller Decl. ¶ 18**. One of the primary reasons that the DHS Privacy Office procured FOIAXpress as the FOIA processing software solution for the Department and its components is the system's ability to protect sensitive, exempt information in accordance with the OIG's recommendations and the DHS Chief Security and Privacy Officers' directive. FOIAXpress achieves this purpose by first ingesting the responsive record in its original format and converting that record to a Tagged Image Format (TIF) file, essentially taking a picture of the record. After conversion to a TIF File, FOIAXpress users apply all necessary redactions to the TIF file, and once those redactions are complete, FOIAXpress finalizes the records for production by creating a rasterized PDF, essentially a new picture of the record with the redactions applied. That rasterized PDF is the format used by the FOIA Branch for release to all requesters. These conversions of records from their original formats to TIF files and then to rasterized PDFs is essential to ensure the security of the redactions applied through the FOIAXpress process, and by extension, compliance with TSA's statutory obligation to ensure that SSI is not compromised by unauthorized release.

9. **Miller Decl. ¶ 19**. TSA is not aware of any countermanding of redactions applied to responsive records through the FOIAXpress process.

10. **Miller Decl. ¶ 20**. TSA knows of no FOIA processing software solution alternative to FOIAXpress that would simultaneously ensure locked-down redactions that could not be countermanded and allow for the processing of records in their original format or as fully digital (non-rasterized) text PDFs.

11.   **Miller Decl. ¶ 21**. Given this, TSA's only option to produce records responsive to Plaintiff's requests in their original format or as fully digital (non-rasterized) text PDFs would have been to apply appropriate redactions using redaction tools available in the records' native software programs like Excel, Outlook, or Word.[2] The subsequent significant administrative burden on the agency from having to devise and apply such alternative redaction mechanisms has already been explained, see Dkt. 118-1 at 4 (¶¶ 14-16), and for documents containing SSI, DHS has determined that these means are unacceptable because of the potential that applied redactions could be countermanded. Further, there is no opportunity to process records with SSI separately from those records without SSI because it cannot be determined which records contain SSI until after the SSI Program Office completes its review and furnishes the FOIA Branch with redacted versions of the records. Moreover, redacting government records in this way has been shown to be an ineffective and unreliable method of protecting information, resulting in the unauthorized release of sensitive information, which in turn would interfere with the agency and its mission.

12.   **Miller Decl. ¶ 22**. For example, in 2017, U.S. Immigration and Customs Enforcement (ICE) attempted to provide information fit for public release in its native format to an Arizona newspaper following the newspaper's FOIA request for "any and all criminal activity" reported to the agency's Victims of Immigration Crime Engagement Office (VOICE) hotline. Accordingly, ICE released to the newspaper an Excel spreadsheet of the hotline's call logs that it believed had all non-releasable information removed. A month after the release, ICE became aware that by releasing the spreadsheet it had inadvertently disclosed sensitive personally identifiable information of third parties, law enforcement sensitive information, and potentially deliberative

---

[2] TSA is not aware of any redaction tools in software programs like Excel, Outlook, and Word. Therefore, the FOIA Branch would likely need to manipulate the records by manually deleting exempt information, thereby creating a new record.

information. *See* Exh. 2 (Daniel Gonzalez, Trump Administration's Immigrant-Crime Hotline Releases Victims' Personal Information, azcentral.com (Jan. 21, 2018)).

13.     **Miller Decl. ¶ 23**. Processing records outside of the FOIAXpress environment would present an unacceptable risk of inadvertent disclosures like the example from ICE in 2017 or the prior TSA SSI spill in 2010. Each spill of exempt information – whether SSI or information protected by the Privacy Act or information otherwise exempt from release – requires that valuable, limited agency resources that would otherwise be dedicated to carrying out the agency's mission have to be redirected to take immediate action following such a disclosure, including taking steps to minimize vulnerabilities created by the disclosure. Often new government programs, such as rollouts of new security measures (as in the case of the TSA SSI spill) or offering identity-theft protection and credit monitoring (as in the case of the ICE disclosure), must be implemented to deal with the aftermath of unauthorized releases of exempt information. Such disruptions to ongoing agency activities interfere with the government business the agency is tasked with and impose a significant burden on the agency in terms of time, money, and resources.

14.     **Miller Decl. ¶ 24**. Absent an effective redaction option that would allow for release of records in their original format or as fully digital (non-rasterized) text PDFs, TSA's only remaining option for responding to Plaintiff's requests in the format of Plaintiff's choice would have been to withhold in full any record containing exempt information (rather than risk disclosing that exempt information as a result of the insufficient redaction techniques available). Doing so would have effectively precluded TSA from fulfilling its statutory duty to provide any reasonably segregable portion of a record. *See* 5 U.S.C. 552(b).

15.     **Miller Decl. ¶ 25**. Accordingly, records responsive to Plaintiff's requests were not readily reproducible in their original formats or as fully digital (non-rasterized) text PDFs because

producing them in those formats would have required using techniques for redaction that would not have ensured against countermanding, thereby creating significant interference and burden on the agency. The alternative – withholding in full records requiring any redactions – would have inhibited TSA's ability to segregate releasable material in accordance with the FOIA.

### (2)     Administrative Burden

16.     **Miller Decl. ¶ 26**. Further, the processing of records responsive to Plaintiff's requests outside of FOIAXpress would have also created a significant administrative burden on the agency. *See* Dkt. 118-1 at 3-4 (¶ 13).

17.     **Miller Decl. ¶ 27**. To expand on the previous explanation, TSA is not aware of any FOIA processing software solution alternative to FOIAXpress that allows the processing of records in original format or fully digital (non-rasterized) text PDFs while simultaneously allowing for the comprehensive tracking of the processing of a request. One of the most important features of FOIAXpress is its functionality as a tracking mechanism for all steps of the FOIA process, including intake, communications with requesters, tasking of program offices, responses from program offices, review of responsive documents, redactions, draft release letters, and final releases and release letters.

18.     **Miller Decl. ¶ 28**. FOIAXpress's tracking mechanism allows the FOIA Branch to efficiently manage the hundreds of requests it receives annually. At a DHS-wide level, the use of FOIAXpress allows DHS and all of its components to process tens of thousands of FOIA requests annually.[3] It also allows the FOIA Branch to produce an administrative record regarding any given request should it become necessary in an administrative appeal or federal court litigation.

---

[3] In 2017, DHS processed over 90,000 FOIA requests using FOIAXpress.

19.     **Miller Decl. ¶ 29**. If the FOIA Branch had to process Plaintiff's BOS and SFO Re-Requests and Policies Request outside of FOIAXpress, the administrative burden imposed on the office would have resulted in these requests monopolizing FOIA Branch's resources for significant periods of time. In essence, the FOIA Branch would have had to create parallel compendiums of records (original and as processed) provided by the program offices that were tasked (in this case, there were 18 different offices), manually track these parallel compendiums of records through the process of identifying responsive records, submitting them for SSI Program Office review, reintegrating the records following SSI Program Office review, applying and recording the redactions for FOIA exemptions, finalizing those records for release (by grabbing versions of the individual records from different compendiums, depending on whether each record was redacted and for what purpose the redaction was applied), and then releasing the records along with an explanation and accounting of the release as well as the withholding of information subject to exemptions. The significant burdens entailed by the demand that responsive records be produced in Plaintiff's preferred format demonstrate that the nearly 5,000 pages of records responsive to the BOS and SFO Re-Requests and Policies Request were not "readily reproducible" in their original format or as fully digital text PDFs.

20.     **Miller Decl. ¶ 30**. Further, manually tracking all of that activity would have created a significant burden on the FOIA Branch, requiring the re-allocation of resources typically applied to other FOIA tasks and resulting in a substantially slowed response time for Plaintiff and for other requesters with pending requests. It is likely that the FOIA Branch's backlog would have increased dramatically, which also could have triggered scrutiny from the Office of Government Information Services (OGIS), which has conducted a Compliance Assessment of TSA because of increased backlogs in the past. *See* Dkt. 118-2.

21. **Miller Decl. ¶ 31**. Manually tracking the processing of these three requests also could have prejudiced TSA in this litigation because it would not have had administrative records for the requests readily available in FOIAXpress. Rather, the agency would have had to piece together the administrative records based on the manual tracking of the FOIA process for each of the requests, yet another onerous and burdensome task.

22. **Miller Decl. ¶ 32**. As such, the records responsive to Plaintiff's BOS and SFO Re-Requests and Policies Request were not readily reproducible in their original formats or in fully digital (non-rasterized) text PDFs because doing so would have required processing and therefore tracking the requests outside of FOIAXpress, which in turn would have created a significant administrative burden on the agency.

## C.     Legibility

23. **Miller Decl. ¶ 33**. The Court found that certain pages released to Plaintiff were illegible. *See* Dkt. 162 at 23-24. These pages were Bates 003-004 and 006-007 from the BOS Request (2013-TSPA-00368) and Bates 009-010 from the CCTV Request (2013-TSFO-01096).[4]

24. **Miller Decl. ¶ 34**. The FOIA Branch has located more legible versions of these pages and has re-processed them. TSA is unaware of any more legible versions than those that have now been processed. These more legible versions have been produced to Plaintiff with

---

[4] In its Opinion and Order, the Court refers to these Bates pages as being part of TSA's response to Plaintiff's "BOS and SFO requests," but based on the alpha-numeric identifiers (2013-TSPA-00368 and 2013-TSFO-01096) and the descriptions of the records, *see* Dkt. 162 at 23, it appears that the Court is referring to Bates pages from the BOS and *CCTV* requests.

amended Bates pages 003_a, 004_a, 006_a, 007_a from the BOS Request (2013-TSPA-00368)[5]

and 009_a and 010_a from the CCTV Request (2013-TSFO-01096).[6]

25.     **Miller Decl. ¶ 35**. Bates pages 003_a, 004_a, and 007_a from the BOS Request

(2013-TSPA-00368) as well as Bates pages 009_a and 010_a from the CCTV Request (2013-

TSFO-01096) have been released in full to Plaintiff. Bates page 006_a has two Exemption 6

redactions protecting the name and last four digits of the phone number of a TSA employee. The

prior version of this page (Bates page 006) was released to Plaintiff without redactions because of

the lack of legibility. Now that the writing contained on this pages is legible, TSA has redacted

appropriate information that is exempt from release. The redactions applied to Bates page 006_a

are appropriate because, under Exemption 6, agencies are permitted to withhold "personnel and

medical files and similar files the disclosure of which would constitute a clearly unwarranted

invasion of personal privacy." 5 U.S.C. § 552(b)(6). As explained previously, *see* Dkt. 99-3 at 13

(¶ 40), "similar files" has been interpreted broadly to include any record that contains the type of

information that might be found in a personnel or medical file; therefore, all information that

applies to a particular individual meets the threshold requirement for Exemption 6 protection. The

employee whose information is redacted on Bates page 006_a is a Behavior Detection Officer

(BDO), whose job duties include observing and interacting with passengers and the public on a

daily basis at the airport in and around the checkpoint screening areas. Because of this employee's

position, the role that this employee plays at the airport, and the other information released in this

---

[5] Bates pages 003_a, 004_a, 006_a, 007_a from the BOS Request (2013-TSPA-00368) contain
personally identifiable information of Plaintiff's that TSA has not redacted as these pages are the
subject of a Privacy Act request, not a FOIA request.

[6] Bates 009_a and 010_a from CCTV Request (2013-TSFO-01096) are most legible when viewed
on a screen using software with zoom capability (*e.g.*, viewing on a computer using Adobe
software, zoomed to ~200%).

record which would tend to reveal the employee's airport duty location, the disclosure of the employee's name and entire phone number would lead the employee to be easily identified and contacted, which in turn could expose the employee to unnecessary unofficial questioning, harassment, and stigmatization. Such risks are real, as TSA employees working at and around checkpoints are often subject to verbal and physical harassment as well as assault.[7] Further, the risk of such privacy violations is particularly acute here, where Plaintiff has demonstrated that information released to Plaintiff through the FOIA and Privacy Act process will be disseminated on the internet, *see* https://s.ai/foia/, allowing for wide accessibility of the employee's personal information.

26. **Miller Decl. ¶ 36**. Balanced against this individual employee's privacy interest in avoiding harassment is the potential public benefit of disclosing the employee's personal information. Given that the employee is a BDO (a frontline screening employee at TSA) and not a senior official with any managerial responsibility or policy decision-making authority, disclosing the employee's name and last four digits of the employee's phone number would not contribute to Plaintiff's or the public's understanding of TSA's operations, therefore any potential benefit would be negligible at best.

27. **Miller Decl. ¶ 37**. Accordingly, weighing the employee's privacy interests against the public interest in the employee's personal information, a determination was made that the employee's name and last four digits of the employee's phone number should be withheld since their release would not further the public's understanding of TSA's operations.

---

[7] *See* Exh. 3 (Compendium of relevant news stories).

II.     **Offices Searched for BOS and SFO Requests and Re-Requests**

A.     **FOIA Branch**

28.     **Miller Decl. ¶ 39**. The Court found that the BOS and SFO Requests "can only reasonably be construed to encompass FOIA processing records" because they sought "all documents and communication[s] related to or responding to" the requests "whether internal or external," and that "TSA offers no meaningful explanation for why it did not search its FOIA Branch for records." Dkt. 162 at 30.

29.     **Miller Decl. ¶ 40**. As an initial matter with respect to both the BOS Request and the SFO Request, the cut-off date for responsive records is the date that the search commences. The FOIA Branch did not believe that any responsive records to the BOS and SFO Requests (apart from direct communications with Plaintiff, which Plaintiff already possessed) would have been generated within the FOIA Branch prior to the commencement of the search. Therefore, the FOIA Branch made the reasonable determination not to task itself with searching for responsive records.

30.     **Miller Decl. ¶ 41**. Further, with response to the BOS Request, the original request was a three-page single-spaced document that proclaimed itself to be not only a FOIA request, but also an "evidence preservation demand" with no obvious delineation between the two. *See* Dkt. 99-3 at Exh. A. The FOIA Branch originally determined that the request was not reasonably described and was unreasonably burdensome. *See* Dkt. 99-3 at 4 (¶ 9). On February 5, 2013, TSA informed Plaintiff via letter that the request was not reasonably described and requested that Plaintiff provide as much information as possible to enable the FOIA Branch to locate the records being sought. *See id.* at ¶ 9, n.7.

31.     **Miller Decl. ¶ 42**. When Plaintiff responded via email, Plaintiff stated that Plaintiff had never applied for employment with TSA, borne a government credential, or received a citation

or fine from TSA, and, rather than narrowing the request, Plaintiff expanded it to include all records related to two prior screening experiences at New York's LaGuardia Airport (LGA) and Chicago's O'Hare International Airport (ORD). *See* Dkt. 99-3 at 4 (¶ 10), 55 (McCoy Decl. Exh. B). The clarifying email did not mention anything about seeking records "related to responding to the requests." *See id.* at 55 (McCoy Decl. Exh. B). Instead, it focused on "harassment by TSA agents" that Plaintiff had allegedly experienced at airport checkpoints and sought "all records related to [those] event[s]" including "any incident reports, police reports, or the like" as well as "a clear statement about what corrective measures the TSA takes when TSA agents simply refuse to obey clearly established policy." *Id.* Based on this response, TSA re-opened the BOS Request, understanding Plaintiff to be seeking records – "including incident reports, police reports, and the like" – related to screening experiences at BOS, LGA, and ORD. *See* Dkt. 99-3 at 4 (¶ 11).

32.     **Miller Decl. ¶ 43**. Because the email Plaintiff sent in response to the NRD (i.e., "not reasonably defined") letter did not make any mention of seeking records about responding to the BOS Request itself and the overall substance of the email focused on seeking records related to screening experiences, the FOIA Branch did not interpret that email as clarification that the request was one seeking records about responding to the BOS Request and therefore did not task itself with a search. Instead, the FOIA Branch reasonably interpreted the request to be one seeking records related to the screening experiences Plaintiff had specified and therefore tasked all offices determined likely to have responsive records including: BOS, ORD, LGA, the Transportation Security Operations Center (TSOC), the Office of Law Enforcement/Federal Air Marshal Service (OLE/FAMS), and the TSA Contact Center (TCC). *See* Dkt. 99-3 at 5-8 (¶¶ 13-23).

33.     **Miller Decl. ¶ 44**. With respect to the SFO Request, the original request was a three-page single-spaced document identifying itself as "simultaneously" a "FOIA request," a

"CPRA request," "a request under the Privacy Act," and "an evidence preservation demand." *See* Dkt. 99-3 at 85 (McCoy Decl. Exh. L). The FOIA Branch originally determined that a portion of that request, including the portion seeking "any and all documents and communications related to responding to this request, whether internal or external," was too broad in scope or did not specifically identify the records Plaintiff was seeking. *See* Dkt. 99-3 at 19 (¶ 60), 89-90 (McCoy Decl. Exh. M).[8] TSA requested that Plaintiff provide a reasonable description of the records Plaintiff was seeking. *See id.* TSA never received a response from Plaintiff. *See* Dkt. 99-3 at 19 (¶ 60).

34.   **Miller Decl. ¶ 45**. In the absence of any response from Plaintiff to clarify the portion of the request that was determined to be overly broad and not reasonably described (including the portion seeking records "related to responding to this request"), the FOIA Branch undertook a search reasonably calculated to locate records responsive to those portions of the SFO Request that were described with sufficient specificity, including a search for records related to Plaintiff's March 1, 2013 screening at San Francisco International Airport (SFO); records related to complaints against six TSA and Covenant Aviation Security (CAS) employees; and records related to similar complaints against any TSA, CAS or SFO employee. The FOIA Branch tasked the offices determined likely to have such responsive records, which would have been created in connection with the underlying incident itself, rather than records created in the collateral effort to gather those records about the underlying incident. The only offices that were reasonably likely to

---

[8] While the TSA letter appears to have had a numbering error when referring to the various sub-items in the SFO Request (breaking out five bulleted items, but later referring to "Items 4 through 6"), there is no doubt that the item seeking records "related to responding to this request," which was listed last, was one of the items for which the FOIA Branch requested Plaintiff resubmit a reasonable description. See Dkt. 99-3 at 89-90 (McCoy Decl. Exh. M).

have records about the underlying incidents themselves included SFO, TCC, and the Disability Branch (DB). *See* Dkt. 99-3 at 20-21 (¶¶ 62-69).

35.     **Miller Decl. ¶ 46**. In the correspondence from Plaintiff following the interim release of records responsive to the SFO Request (in which Plaintiff raised many issues and reiterated many aspects of Plaintiff's original request), Plaintiff made no mention of seeking records "related to responding this request." *See* Dkt. 99-3 at 95-97 (McCoy Decl. Exh. O).

36.     **Miller Decl. ¶ 47**. Because Plaintiff failed to respond to the FOIA Branch's initial determination that a portion of the SFO Request, including the portion seeking records "related to responding to this request," was not reasonably described, and because Plaintiff made no further mention of that portion of the request in subsequent correspondence, the FOIA Branch did not interpret the request as one seeking records related to "responding to this request." Rather, the FOIA Branch interpreted the request to be one seeking those records that were reasonably described – pertaining to Plaintiff's screening at SFO and complaints about TSA, CAS, and SFO employees – and processed the request accordingly.

37.     **Miller Decl. ¶ 48**. With respect to the BOS and SFO Re-Requests, these requests did not include any language seeking records "related to responding to [the requests], whether external or internal" at all. *See* Dkt. 28-3 at 11-12. Since such language did not appear in the BOS and SFO Re-Requests, the FOIA Branch did not interpret those requests to be seeking records related to responding to the requests, and therefore did not task itself with a search. Rather, after attempts to clarify what records Plaintiff was seeking, the FOIA Branch interpreted these requests as seeking records related to the BOS screening incident on January 21, 2013, and the SFO screening incident on March 1, 2013, from a timeframe that post-dated the prior searches conducted with respect to those two incidents. *See* Dkt. 99-3 at 43-45 (¶¶ 123-131).

**B.**     **Office of Legislative Affairs, Office of the Executive Secretariat, and Office of Chief Counsel**

38.     **Miller Decl. ¶ 49**. The Court held that it was not convinced that TSA had adequately justified its failure to task its Office of Legislative Affairs (OLA), Office of the Executive Secretariat (Exec Sec), and Office of Chief Counsel (OCC) to search for records responsive to the BOS and SFO Requests and Re-Requests in light of certain released records suggesting that those offices could have possessed responsive records. *See* Dkt. 162 at 30-31. The released records referenced by the Court were the following:

a. OLA: Dkt. 145-2 at 123;[9]

b. Exec Sec: Dkt. 145-2 at 61, 123, 143; and

c. OCC: Dkt. 144-3 at 58-62, 73.

*See* Dkt. 162 at 30, 31. All of the released pages referenced by the Court were released in response to the SFO Request. *See* Dkt. 99-3 at 102-120 (McCoy Decl. Exh. Q).

39.     **Miller Decl. ¶ 50**. As previously explained, a portion of the SFO Request was determined to be overly broad and not reasonably described. Despite requesting a reasonable description from Plaintiff, TSA never received a reasonable description of that portion of the request, notwithstanding Plaintiff's engagement about other aspects of the request. Accordingly, the FOIA Branch set out in good faith to respond to those aspects of the request that were reasonably described, namely: records related to Plaintiff's screening at SFO on March 1, 2013, including "all surveillance video, reports, notes, correspondence, communications, and other documents relating to the incident;" "any and all reports related to the event, such as TSA Incident

---

[9] The Court cited to this page with a "see, e.g." citation. Dkt. 162 at 30. The relevant pages appear to span Dkt. 145-2 at 115-123.

Reports or the like;" as well as any and all records of Plaintiff's x-ray baggage screening. *See* Dkt. 99-3 at 85 (McCoy Decl. Exh. L).

40.     **Miller Decl. ¶ 51**. In the course of searching for records responsive to the SFO Request, the FOIA Branch tasked the Disability Branch (DB). The DB located records responsive to the SFO Request as well as many records that were related to Plaintiff generally, but were not responsive to the SFO Request. Despite their non-responsiveness to the reasonably described items in the SFO Request, the FOIA Branch processed and released these records along with those that were responsive. Among these non-responsive released records were the pages referenced by the Court.

41.     **Miller Decl. ¶ 52**. With respect to the referenced pages regarding OLA, those pages pertain to correspondence from Speaker Pelosi's office regarding the administrative processing of Plaintiff's SFO and BOS administrative complaints pursuant to the Rehabilitation Act ("Section 504 complaints"). *See* Dkt. 145-2 at 115-123. Since the administrative processing of Plaintiff's Section 504 complaints were outside the scope of the SFO Request, there was no reason to believe that the existence of these pages suggested that other *responsive* documents would be held in the possession of OLA. Accordingly, the FOIA Branch properly did not task OLA separately.

42.     **Miller Decl. ¶ 53**. Similarly, with respect to the referenced pages regarding Exec Sec, those pages pertain to emails between DB and Exec Sec concerning correspondence with Speaker Pelosi's office regarding the administrative processing of Plaintiff's Section 504 complaints, *see* Dkt. 145-2 at 61, 143, and emails between OLA and Exec Sec concerning correspondence with Speaker Pelosi's office regarding the administrative processing of Plaintiff's Section 504 complaints, *see id.* at 123. Again, since the administrative processing of Plaintiff's Section 504 complaints was outside the scope of the SFO Request, there was no reason to believe

that the existence of these pages suggested that other *responsive* documents would be held in the possession of Exec Sec. Therefore, the FOIA Branch properly did not task Exec Sec separately.

43.     **Miller Decl. ¶ 54**. Likewise, with respect to the referenced pages regarding OCC, some of those pages pertain to discussions between DB and OCC regarding a meeting to discuss the administrative processing of Plaintiff's Section 504 complaints. *See* Dkt. 144-3 at 58-62. As explained above, the administrative processing of Plaintiff's Section 504 complaints was outside the scope of the SFO Request, therefore there is no reason to believe that the existence of these pages suggested that other *responsive* documents regarding those reasonably described portions of the SFO request would be held in the possession of OCC. Accordingly, the FOIA Branch properly did not task OCC separately on the basis of those pages.

44.     **Miller Decl. ¶ 55**. None of these above-referenced pages regarding OLA, Exec Sec or OCC (which were released in connection with the SFO Request despite being non-responsive to the reasonably described portions of that request) were responsive to the BOS Request, BOS Re-Request, or SFO Re-Request because none of those requests sought records related to the administrative processing of Plaintiff's Section 504 complaints either. *See* Dkt. 99-3 at 50-52 (McCoy Decl. Exh. A), 85-87 (Exh. L); Dkt. 28-3 at 11-12.

45.     **Miller Decl. ¶ 56**. With respect to the one remaining referenced page regarding OCC, *see* Dkt. 144-3 at 73, that page shows an email from an OCC paralegal seeking information from DB regarding the BOS incident. Since records related to the BOS incident were outside the scope of the SFO Request and therefore non-responsive, and since this record was located during the course of the search for records responsive to the SFO Request, the FOIA Branch had no reason to believe that OCC would have other records responsive to the SFO Request based on a single email inquiry pertaining to the BOS incident. Therefore, the FOIA Branch did not task OCC with

a search for records responsive to the SFO Request and, for the same reason, did not task OCC with a search for the SFO Re-Request.

46.     **Miller Decl. ¶ 57**. Further, even if this page, Dkt. 144-3 at 73, had been located in the course of the search for records responsive to the BOS Request, the FOIA Branch would not have had reason to believe that OCC would possess other responsive documents. The page shows that the OCC paralegal was seeking the "complete files" that had been sent from a TSA employee at BOS. *See id.* at 73-74. Since the FOIA Branch had already tasked and re-tasked BOS, *see* Dkt. 99-3 at 6 (¶ 15), 7 (¶ 21), there was no reason for the FOIA Branch to believe that OCC would possess separate, responsive records regarding the BOS incident that had not already been searched for and located by the BOS program office pursuant to its tasking. Moreover, FOIA Branch records show that the same TSA employee at BOS responsible for sending the "complete files" had also been the point of contact for the FOIA Branch's tasking and re-tasking of the BOS program office. Therefore, even if this page had been located in the search for the BOS Request, the FOIA Branch would not have tasked OCC for the BOS Request or Re-request on the basis of this page because the FOIA Branch reasonably believed that all files likely to contain responsive, non-duplicative material had already been searched.

## III.     Timeframe of Searches for BOS and SFO Requests and Re-Requests

47.     **Miller Decl. ¶ 59**. For each of the four requests at issue, below are the dates that the relevant program offices were tasked and the dates that their signed responses were submitted to the FOIA Branch.[10]

48.     **Miller Decl. ¶ 60**. BOS Request

---

[10] While the FOIA Branch does not have a date certain for when each search commenced, the searches commenced within the date range between taskings and submission of signed responses.

a. LGA – tasked 2/21/13; signed response 2/28/13

b. ORD – tasked 2/21/13; signed response 2/28/13

c. BOS – tasked 2/21/13; signed response 3/8/13

d. OLE (BOS) – tasked 12/24/13; signed response 12/30/13

e. OLE (TSOC) – tasked 12/24/13; signed response 12/30/13

f. TCC – tasked 06/19/14; signed response 06/25/14

g. BOS (second tasking) – re-tasked 6/19/14; signed response 07/31/14

49.  **Miller Decl. ¶ 61**. SFO Request

a. SFO – tasked 12/19/13; signed response 12/24/13, 12/31/13

b. SFO (second tasking) – re-tasked 6/26/14; signed response 07/02/14, 07/03/14

c. TCC – tasked 6/26/14; signed response 07/08/14

d. DB – tasked 07/17/14; signed response 08/05/14

e. DB (second tasking) – re-tasked 08/05/14; signed response 08/05/14

50.  **Miller Decl. ¶ 62**. BOS Re-Request

a. BOS – tasked 10/26/15; signed response 12/09/15 [tasking states specifically to search for records from 2/22/14 to present]

b. TCC – tasked 11/18/15; signed response 11/23/15 [tasking states specifically to search for records from 6/26/14 to present]

c. OLE – tasked 12/17/15; signed response 12/23/16 [tasking states specifically to search for records from 1/1/14 to present]

51.  **Miller Decl. ¶ 63**. SFO Re-Request

a. SFO – tasked 10/26/15; signed response 10/27/15, 10/30/15, 11/2/15 [tasking states specifically to search for records from 7/4/14 to present]

21

b. TCC – tasked 11/18/15; signed response 11/23/15 [tasking states specifically to search for records from 6/26/14 to present]

c. DMD (DMD is an alternative acronym for the office known as the Disability Branch or DB) – tasked 11/25/15; signed response 11/25/15 [tasking states specifically to search for records from 7/4/14 to present]

52. **Miller Decl. ¶ 64**. For the BOS and SFO Re-Requests, the FOIA Branch tasked the program offices to search for records in a specific timeframe that should have started when that program office had completed its prior search (for the BOS and SFO Requests, respectively), and ended with the present date (*i.e.*, the date of the commencement of the Re-Request search). For some of the program office taskings, however, there was a discrepancy between the actual completed prior search dates for the BOS and SFO Requests and the start dates as written in the corresponding Re-Request tasking assignments. Any discrepancy, however, resulted in an over-inclusive timeframe.[11]

## IV.    Databases and Search Terms Used for BOS and SFO Re-Requests

53. **Miller Decl. ¶ 65**. The Court found that TSA did not adequately describe the databases searched for the BOS and SFO Re-Requests. Dkt. 162 at 35. The Court further found that TSA did not adequately describe the search terms used by the BOS, SFO, TCC, and DB in response to the BOS and SFO Re-Requests. *Id.* at 36.[12]

---

[11] For example, the BOS Re-Request tasking of the BOS program office should have provided the timeframe for the search to start 8/1/14 (the date *after* the last BOS response, *see supra* at ¶ 60g), but instead the tasking provided that the timeframe for the search start 2/22/14, *see supra* at ¶ a.62. Accordingly, the BOS program office's search for the BOS Re-Request encompassed an extra five months already covered by the initial BOS Request.

[12] While the Court does not list OLE/FAMS as one of the offices for which database and search term information is lacking for the BOS Re-Request, *see* Dkt. 162 at 35, 36, the FOIA Branch tasked OLE/FAMS with a search for the BOS Re-Request, *see* Dkt. 99-3 at 46 (¶ 134). Therefore, information regarding the search conducted by OLE/FAMS is included in this declaration.

54.    **Miller Decl. ¶ 66**. With respect to the BOS Re-Request, BOS searched for responsive records, including electronic records, using Plaintiff's name as a search term in emails contained in Outlook, and for records held by the Customer Service Manager. BOS also searched using Plaintiff's name as a search term for records within an enterprise application database that is used to track and manage operational activities at airports. Using Plaintiff's name as a search term, TCC searched its centralized database for records that were related to the BOS incident on January 21, 2013. OLE/FAMS electronically searched its incident management system database using Plaintiff's name as a search term.

55.    **Miller Decl. ¶ 67**. With respect to the SFO Re-Request, using Plaintiff's name as a search term, SFO searched for responsive records, including electronic records, in its FOIA records; TSA computer hard drives; its internal, shared websites; emails in Outlook; and in a performance and results information tracking system as well as a security incident report tracking system. Additionally, SFO searched its hard copy records. Using Plaintiff's name as a search term, TCC searched its centralized database for records that were related to the SFO incident on March 1, 2013. DB searched for responsive records including electronic records using Plaintiff's name as well as Plaintiff's name and SFO as search terms in emails contained in Outlook, in the DB manager's computer, and in DB's centralized complaint tracking database. DB also searched for responsive records in the office's centralized hard copy file system.

## V.    Search Terms Used for BOS and SFO Requests

56.    **Miller Decl. ¶ 69**. With respect to the search terms used for the BOS Request, as previously explained, ORD searched for responsive records including CCTV and electronic records held by its Coordination Center as well as its Screening and Inspections department, Dkt.

23

99-3 at 6 (¶ 17). ORD conducted its searches using the date of the ORD incident (December 25, 2010) as the search term.

57.    **Miller Decl. ¶ 70**. As for the search terms OLE/FAMS used for the BOS Request, the office lacked a record of the search terms it used in 2013 when responding to the BOS Request. Accordingly, in an effort to provide the Court with adequate information regarding search terms pursuant to the Court's Memorandum Opinion and Order, Dkt. 162 at 36, OLE/FAMS conducted a new search on June 14, 2018, in accordance with their general business practice for responding to FOIA requests (the same business practice that OLE/FAMS believes it utilized for the original search in 2013). For that search, OLE/FAMS searched for responsive records, including electronic records, in their incident monitoring database and the archive for that database, along with electronic log databases in which incidents may be recorded. The search parameters used, including search terms, were Plaintiff's name, Boston, BDO referral, American Airlines, and the date range of December 1, 2012 to January 31, 2013. The search yielded the same incident reports that were released to Plaintiff in response to the original BOS Request; no new, previously unreleased records were located.

58.    **Miller Decl. ¶ 71**. With respect to the search terms used for the SFO Request, SFO searched responsive records using Plaintiff's name as well as the date of the incident (March 1, 2013) in combination with Delta Airline passengers.

59.    **Miller Decl. ¶ 72**. DB performed its search using as search terms Plaintiff's name, SFO, and San Francisco International Airport.

## VI.    Timing of Exemption 3 Redactions as Released to Plaintiff and the ACLU

60.    **Miller Decl. ¶ 74**. The relevant Bates pages at issue are 1404-1405, 1408, 1414, 1462-1464, 2557-2559, 2802-2803, and 2829-2830 from Plaintiff's Policies Request (2015-TSLI-

0004); and 4356-4357, 4360, 4366, 4414-4416, 4893-4895, 5126-5127, 5153-5154 from the ACLU's Request (TSA 15-00014). Dkt. 116-1 at 1 (¶ 4).

61.     **Miller Decl. ¶ 75**. The FOIA Branch released the relevant pages to Plaintiff on July 20, 2015 (Bates pages 1404-1405, 1408, 1414, 1462-1464) and August 20, 2015 (Bates pages 2557-2559, 2802-2803, 2829-2830). Dkt. 99-3 at 35-36 (¶ 109-110), 134-147 (McCoy Decl. Exhs. U and V). After one more interim release on October 30, 2015, the FOIA Branch issued its final response to Plaintiff on February 29, 2016, Dkt. 99-3 at 37 (¶ 111-112), at 148-159 (McCoy Decl. Exhs. W and X).

62.     **Miller Decl. ¶ 76**. The FOIA Branch released the relevant pages with revised Exemption 3 SSI redactions (which released some more information than had previously been released to Plaintiff) to the ACLU on April 22, 2016 (Bates pages 4356-4357, 4360, 4366, 4893-4895, 5126-5127, 5153-5154) and April 26, 2016 (Bates pages 4414-4416), between two and nine months after releasing the relevant pages to Plaintiff.

## VII.    Exemption 5 Redactions for SFO Request

63.     **Miller Decl. ¶ 78**. According to Plaintiff's filing, Dkt. 111-2 at 24-25, the relevant pages of the SFO Request are Bates pages 107-112, 127-129, 137, 145, 214-217, 220-223, 258-261, 293-300, 480, and 530-535. *See* Dkt. 111-2 at 24-25 (¶¶ 135-138).

64.     **Miller Decl. ¶ 79**. Bates pages 107, 127, 137, 145, 214, 215, 220, 261, 480, and 530 do not contain Exemption 5 redactions, Dkt. 99-3 at 102-120 (McCoy Decl. Exh. Q), despite being included in the page range with which Plaintiff takes issue, Dkt. 111-2 at 24-25 (¶¶ 135-138). Since there are no Exemption 5 redactions to explain on those pages, this declaration will not address them.

65.     **Miller Decl. ¶ 80**. As explained previously, Bates pages 108-112, 128-129, 216-217, and 221-223 all contain correspondence between the DB and TSA field personnel regarding Plaintiff's Section 504 administrative complaint related to the BOS incident. Dkt. 99-3 at 103-109 (McCoy Decl. Exh. Q). These pages were properly redacted pursuant to the deliberative process privilege under Exemption 5 because they reflect internal predecisional discussions regarding prospective agency action on a pending administrative complaint. Specifically, these pages contain employees' summarized interpretations of particular segments of the CCTV video of the BOS incident and accompanying follow-up questions from DB employees directed to the TSA field personnel who were involved in or witnessed the incident. The questions seek explanations and motivations for decisions that the TSA field personnel made or actions they took during the incident. Releasing this correspondence from the DB would necessarily reveal the DB employees' predecisional impressions and interpretations of what is conveyed by the CCTV video, the aspects of the incident that they viewed as critical to the analysis of the Section 504 administrative complaint, and the process through which they sought information they viewed as necessary for adjudicating that complaint. These pages also include TSA field personnel's responses to DB's questions, which are essential to the deliberative process leading up to the agency's decision with regard to the Section 504 administrative complaint. These responses include beliefs, opinions, interpretations, and explanations from the individual respondent's personal perspective. Releasing this information would reveal not facts, but candid intra-agency dialogue between program office employees in the midst of the Section 504 administrative complaint process.

66.     **Miller Decl. ¶ 81**. As previously explained, Bates pages 258-260 of the SFO Request contains an email from the DB Manager to the Assistant Administrator for Civil Rights & Liberties – Ombudsman & Traveler Engagement (CRL-OTE), who oversees the DB among

other offices. *See* Exh. 99-3 at 109 (Exh. Q). These pages were properly redacted pursuant to the deliberative process privilege under Exemption 5 because they reflect internal predecisional discussions regarding possible alternative processes within the program office designed to reduce the existing backlog of administrative complaints as well as internal predecisional discussions regarding prospective agency action on a pending administrative complaint. Specifically, the email contains a discussion of options available to the agency to address the backlog of Section 504 complaints, and the DB Manager's recommendations to the Assistant Administrator for her consideration prior to making a decision. The DB Manager references discussions she has had with other TSA employees on the subject of resolving the backlog and lays out for the Assistant Administrator the possibilities as she sees them. In particular, for the Assistant Administrator's consideration prior to making a decision for the program office, the DB Manager explains when, in her opinion, the processing of some Section 504 complaints could be expedited by decreasing the layers of review leading up to the Assistant Administrator's own review and signature and when those extra layers of review are necessary. Discussion of Plaintiff's administrative complaint is included in this much broader discussion of how best to utilize the agency's limited resources to reduce the backlog of Section 504 administrative complaints. The information redacted on these pages pursuant to Exemption 5 is not factual information, but rather an employee's recommendations and rationale as presented to her superior in order for a decision to be made.

67.     **Miller Decl. ¶ 82**. As previously explained, Bates pages 293-300 consist of emails between DB employees pertaining to the handling of Plaintiff's Section 504 administrative complaint related to the BOS incident. These pages were properly redacted pursuant to the deliberative process privilege under Exemption 5 because they reflect internal predecisional discussions regarding prospective agency action on a pending administrative complaint.

Specifically, these pages contain an email exchange between a DB employee and the DB Manager in which the DB employee provides draft questions that he has composed as follow up questions for TSA field personnel who were in involved in or witnessed the BOS incident; the DB employee seeks feedback and input from the DB Manager (his supervisor) on these draft questions. The DB Manager responds to the DB employee and includes edits, critiques, and questions regarding the drafts. In turn, the DB employee responds with an explanation of his thought process regarding the drafting of the questions and clarification regarding the information that he believes is most important to illicit from the TSA field personnel. Releasing this information would not reveal facts, but rather internal, predecisional, deliberative written conversations within the DB at the investigative stage of the processing of a Section 504 complaint.

68.     **Miller Decl. ¶ 83**. As previously explained, Bates pages 531-535 of the SFO Request contain a draft determination letter from CRL-OTE to Plaintiff regarding Plaintiff's Section 504 administrative complaint related to the BOS incident. *See* Dkt. 99-3 at 118 (Exh. Q). These pages were properly redacted pursuant to the deliberative process privilege under Exemption 5 because they contain predecisional proposed agency action on a pending administrative complaint. Specifically, these pages contain the start of an incomplete draft determination letter related to Plaintiff's Section 504 complaint regarding the BOS incident. As shown by the unredacted email on Bates page 530, a DB employee is sharing this partially completed draft with the DB Manager, his supervisor, for his review. The draft letter includes sections titled "Summary of the Complaint" and "Findings of Fact," however, by virtue of its incompletion, it is clear that this draft letter does not represent final, postdecisional agency language and determinations regarding any facts. Rather, the draft letter captures the initial drafting stages of the agency's internal predecisional process prior to arriving at a final decision, which

would be conveyed in a complete, finalized, signed determination letter. Any "findings of fact" contained in the draft letter were subject to change pending review by the DB Manager and others before the completion of the internal agency's deliberative process with respect to this particular administrative complaint.

## VIII.   Exemption 6 Redactions for the Policies and SFO Requests

69.   **Miller Decl. ¶ 85**. The relevant pages from the Policies Request are Bates pages 2267-68, 2271, 2273, 2331, 2355, and 2392. Dkt. 162 at 64. The relevant pages from the SFO Request are Bates pages 113, 181, 211, 254, 279, 284, and 481. *Id.*

### A.   Exemption 6 Redactions for Policies Request

70.   **Miller Decl. ¶ 86**. With respect to the Exemption 6 redactions in the Policies Request, as previously explained, the redactions on Bates pages 2267-68, 2271, and 2273 protect names, photographs, and email addresses of TSA employees. Dkt. 99-3 at 170 (McCoy Decl. Exh. Y). All of these pages are contained within a monthly internal newsletter for a TSA program office, the Office of Security Operations (OSO). Specifically, on Bates pages 2267-68, the redactions protect the names and photographs of Transportation Security Officers (TSOs), including Lead TSOs (LTSOs) and Supervisory TSOs (STSOs), as well as one photograph of a Transportation Security Manager (TSM) and one photograph of a non-senior level TSA HQ employee occupying a program analyst position. Those Bates pages are part of a section in the newsletter dedicated to thanking TSA employees who are also veterans. In addition to the employees' photographs, names, positions, and work duty locations, the pages include information about the employees' military service. On Bates page 2271, the redactions protect the names and a photograph of two LTSOs who are featured for helping to apprehend an individual who stole someone's purse at an airport,

as well as the name of a local law enforcement officer involved in the incident.[13] On Bates page 2273, the redactions protect the names and photographs of three TSOs, the photograph of one TSO, and the name of one BDO. This page in the newsletter highlights TSA employees whose work in the Ticket Document Checker (TDC) position at different, named airports helped security effectiveness.

71.     **Miller Decl. ¶ 87.** As discussed previously, Dkt. 99-3 at 13 (¶ 40), and *supra*, ¶ 35, Exemption 6 permits agencies to withhold "personnel medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of privacy." 5 U.S.C. § 552(b)(6). "Similar files" has been interpreted broadly to include any record that contains the type of information found in a personnel or medical file; thus, all information that applies to a particular individual satisfies the threshold requirement for Exemption 6. It is TSA policy to protect the names and personal information (including photographs) of employees, like TSOs and BDOs, who – by virtue of their screening positions – interact with passengers and the public on a daily basis at airports and security checkpoints. Revealing the names and photographs of these TSO and BDO employees whose information appears on Bates pages 2267-68, 2271, and 2273, along with the other unredacted information on these pages (including work duty locations) would make it extremely easy to identify and contact those employees, thereby opening those employees to unnecessary harassment and abuse in connection with the events and circumstances described in the record. As noted above, *see supra* n.8, these risks are very real for TSA's screening personnel, as evidenced by the many instances of verbal and physical assaults perpetrated against them in the line of duty. Here, that risk is amplified by the fact that Plaintiff has a demonstrated practice of

---

[13] As noted previously, TSA originally asserted Exemption 7(C) over the law enforcement officer's name, but revised that determination and provided a corrected version of the page with only Exemption 6 protecting that name. *See* Dkt. 99-3 at 42 n.19, 176 (McCoy Decl. Exh. Z).

publishing information from FOIA and Privacy Act requests on the internet, *see* https://s.ai/foia/, enabling wide dissemination of the employees' personal information, and thereby increasing the likelihood that someone who gains access to that information will decide to act upon it. Thus, the TSO and BDO employees have a substantial privacy interest in protecting their names and photographs from disclosure.

72.     **Miller Decl. ¶ 88**. Likewise, the local law enforcement officer whose name appears on Bates page 2271 has a substantial privacy interest in the protection of his name. Like the TSA screening employees, the law enforcement officer interacts with the public on a daily basis and the unredacted information on the page reveals the airport at which the officer works. Thus, revealing the officer's name in conjunction with this other information would render him easily identifiable and locatable, which could make him vulnerable to annoyance or harassment in his official duties at that airport, particularly given the established likelihood that Plaintiff would publish the officer's name on the internet, along with other information released to Plaintiff through the FOIA and Privacy Act process. *See* https://s.ai/foia/.

73.     **Miller Decl. ¶ 89**. Balanced against these frontline employees' substantial privacy interests is the public's interest in uncovering their names and photographs. Any such public interest is extremely small. These are low-level employees who are not responsible for shaping policy, and the revelation of their names would reveal nothing about the agency's operations or activities as an institution. Nor would the release of their information illuminate any details regarding Plaintiff's specific FOIA request, as these pages address events that are entirely unrelated to Plaintiff's experience; they simply appear in a newsletter that also contains some information responsive to Plaintiff's request. Accordingly, after balancing the substantial privacy

interests at stake against the extraordinarily minimal public interest at stake, a determination was made to protect the names and photographs of these individuals pursuant to Exemption 6.

74.     **Miller Decl. ¶ 90**. As for the withholding of the photographs of the TSM on Bates page 2267 and the HQ Program Analyst on Bates page 2268, it is TSA policy to release names of employees who are not front-line screening personnel – as neither TSMs nor program analysts are – because they interact with the public less and therefore are less likely to be vulnerable to in-person harassment or annoyance from the revelation of their names alone or even their names along with their work duty locations (which was information released in this instance). Nevertheless, TSA does protect other personal information of its non-frontline employees if those employees are relatively low-level, non-senior officials who do not play a part in significant policy decisions. The TSM and program analyst on Bates pages 2267 and 2268 are such employees. These employees have a substantial privacy interest in not having their personal information, including email addresses, phone numbers, and – as relevant here – photographs revealed publicly because doing so could make them identifiable and therefore vulnerable to harassment and abuse. In contrast, the public's interest in obtaining the photographs of such employees is negligible. There is no insight or knowledge of government operations to be gained by the release of these two photographs of low-level TSA employees who do not have policy-making authority within the agency. The public does not stand to benefit from such disclosure, but the employees stand to be harmed by it in the form of potential future abuse and harassment. Accordingly, a determination was made to redact the photographs of these two employees pursuant to Exemption 6.

75.     **Miller Decl. ¶ 91**. With respect to the redactions taken pursuant to Exemption 6 on Bates page 2331 of the Policies Request, as previously explained, these redactions protect the work email address of a TSA employee. *See* Dkt. 99-3 at 170 (McCoy Decl. Exh. Y). Specifically, this

redaction protects the name of a DB program specialist who, among other duties, is responsible for receiving internal requests from within TSA for training and questions regarding passenger screening. This individual is a low-level employee within the DB whose job is not to field inquiries directly from the public, but rather to work within TSA on disability training and education. This employee has a substantial privacy interest in not having her work email address released because doing so would make her vulnerable to abusive or harassing emails particularly from individuals who are dissatisfied with TSA's disability policies. The risk of such harassment is real when considering Plaintiff's propensity to publish online any information Plaintiff receives through the FOIA process. *See* https://s.ai/foia/. This publication means that the employee's email address would be widely available on the internet, accessible to anyone who might seek to use it for any purpose, including harassment. *See id.* (noting that "Anyone is welcome to use the documents disclosed on this page in whatever way they like, on the sole condition of giving credit to [Plaintiff]").

76.     **Miller Decl. ¶ 92**. Balanced against the DB program specialist's substantial interest in preventing a clear invasion of her privacy is the public's very small interest in the disclosure of her email address. The public does not stand to benefit from the release of the email address. Such a disclosure would not reveal anything about the government's activities, nor would it provide any information about the agency's operations or policy decisions. The employee is a low-level, non-senior employee without policy-making authority. Accordingly, the public has no cognizable interest in obtaining her email address, while she has a significant privacy interest in protecting it. As such, a determination was made to redact the DB program specialist's email address pursuant to Exemption 6.

77.     **Miller Decl. ¶ 93**. Finally, with respect to the redaction on Bates pages 2355 and 2392, as explained previously, these redactions protect TSA employees' work email addresses and last four digits of their office phone numbers. *See* Dkt. 99-3 at 170, 171 (McCoy Decl. Exh. Y). Specifically, these Bates pages are from two template agreements regarding airport security surveillance programs (*e.g.*, CCTV security cameras within airports). One provides a template for agreements between TSA and transportation authorities, the other provides a template for agreements between TSA and transportation facilities. In both cases the redactions protect the email addresses and phone numbers of TSA employees within the Office of Security Capabilities who may fill the role of the Contracting Officer's Representative and Alternate Contracting Officer's Representative in such agreements. These employees have a substantial privacy interest in protecting their email work addresses and phone numbers from disclosure. While their contact information may be disclosed to entities that enter into agreements with TSA, such as a transportation authority or facility, they are not senior-level, public-facing officials whose work information is available publicly. Rather, they work internally within TSA and with stakeholders (like a transportation authority) to ensure compliance with TSA policies, standards, and agreements. Disclosure of their work email and phone numbers could lead to harassing, annoying, and abusive contact. This contact could come from individuals from the aviation or transportation industries who do not understand the employees' roles and create annoyance with misguided inquiries and communications regarding potential agreements. Such contact could also come in the form of harassment or abuse from members of the public who take issue with surveillance in the transportation sector and decide to express their grievances not through proper channels but directly to these employees because their contact information is readily available. The real potential for widespread availability of this contact information is amplified in this case due to

Plaintiff's practice of publishing information released in the FOIA process online. *See* https://s.ai/foia/. This publication allows for broad dissemination and access, increasing the chances of harassment.

78. **Miller Decl. ¶ 94**. Weighed against the significant privacy interests of these TSA employees is the minimal public interest in uncovering their email addresses and phone numbers. As stated above, these are not senior officials, nor do they have policy-making authority. Release of their email addresses and the last four digits of their phone number would reveal nothing about the agency's operations or activities and would not further the public's knowledge of the government's conduct, paritcualrly because in this case, the information appears on template pages, as opposed to actually entered-into agreements between TSA and another entity. In sum, the TSA employees' interest in protecting themselves against privacy violations is significant, while the public's interest in their personal information is extremely small. As such, a determination was made to redact the employees' work email addresses and last four digits of their office phone numbers to protect their substantial privacy interests pursuant to Exemption 6.

B. **Exemption 6 Redactions for SFO Request**

79. **Miller Decl. ¶ 95**. With respect to the redactions taken pursuant to Exemption 6 on Bates pages 113, 254, and 279 of the SFO Request, as previously explained, these redactions protect the email addresses of TSA contract employees. Dkt. 99-3 at 103, 109, 111 (McCoy Decl. Exh. Q). These contract employees have a substantial privacy interest in the protection of their work email addresses because their disclosure could expose the contract employees to harassment or abuse. Specifically, these are the email addresses of lower-level contract employees. The relevant email on Bates pages 113 and 279 seeks guidance regarding how to handle the inquiry from Plaintiff. Similarly, on Bates page 254, the relevant email involves a contract employee

forwarding a message from Plaintiff to a TSA employee at the TSA Contact Center. These contract employees were copied on these emails because they are responsible for monitoring and responding to inquiries and complaints – including those from Plaintiff – that come to the TSA Contact Center's general inbox. The contract employees use a generic TSA Contact Center email address when responding to such inquiries and complaints, and therefore the public cannot directly, individually address the responding employee. Because of the nature of their jobs, including having to interact with disgruntled passengers on a regular basis, their individual work email addresses are not publicly disclosed to avoid the risk of harassment and abuse from passengers or others who, when provided with personally-identifiable contact information (such as an individual's work email address), may target an individual contract employee with emails including profanity, insults, and threats because they are dissatisfied with TSA generally or, more specifically, with their treatment by TSA either at an airport or in the complaint process. In this case, the risk of such harassment is real since Plaintiff has demonstrated that Plaintiff publicizes responses to Plaintiff's FOIA requests on Plaintiff's website, *see* https://s.ai/foia/. Thus, the single disclosure to Plaintiff would likely mean wide distribution of the contract employees' personally identifiable information, amplifying the risk of harassment from multiple sources.

80.     **Miller Decl. ¶ 96**. While the contract employees at the TSA Contact Center have privacy interests in their work email addresses that are substantial, there is virtually no public interest in the release of such information. The individuals in question are low-level employees within a contract firm that does not have any policy-making authority within TSA. There is nothing to be gleaned about TSA's operations by the release of such information, and any public benefit is infinitesimal. Accordingly, taking into account this balancing of the contract employees'

substantial privacy interests and the public's negligible interest in the information, a determination was made that these email addresses should be withheld pursuant to Exemption 6.

81.    **Miller Decl. ¶ 97**. With respect to the redactions taken pursuant to Exemption 6 on Bates pages 211 and 284, as previously explained, these redactions protect the email addresses of TSA contract employees. *See* Dkt. 99-3 at 108, 111 (McCoy Decl. Exh. Q). These two contract employees have a substantial privacy interest in the protection of their work email addresses because their disclosure could expose the contract employees to harassment or abuse. Specifically, these are email addresses of contract employees who are acting only as intermediaries, one forwarding a complaint from Plaintiff about Plaintiff's SFO screening to a TSA employee at SFO and one who is copied on the email. These are not senior level or public-facing government employees. Rather, they are contract employees who, in this case, are responsible for ushering Plaintiff's complaint to TSA. They have a privacy interest in not being subjected to harassment, annoyance or abuse because of their work as contractors with TSA at SFO. Should their individual work email addresses be released to Plaintiff, there is a real risk that those email addresses would be distributed widely on the internet, as Plaintiff has done with information released previously via FOIA. *See* https://s.ai/foia/. Accordingly, the contract employees could be subject to harassment from multiple sources by virtue of the single release to Plaintiff.

82.    **Miller Decl. ¶ 98**. Balanced against these individuals' privacy interests in protecting their work email addresses is the negligible public benefit of such a disclosure. These individuals are contract employees who forwarded a complaint (which Plaintiff had sent to a generic claims inbox) to a TSA SFO employee. They are not high-ranking government officials who have authority within TSA, nor do their email addresses reveal anything about TSA's operations at SFO or any other government activity. Disclosure of their email addresses provides

no real value to the public and would only open the individuals up to potential harassment, annoyance, and abuse. Given this balancing of the public and private interests at stake, a determination was made that the contract employees' email addresses should be redacted pursuant to Exemption 6.

83.     **Miller Decl. ¶ 99**. With respect to the redactions taken pursuant to Exemption 6 on Bates page 181, as explained previously, these redactions protect a TSA employee's work email address and the last four digits of the employee's work phone number. *See* Dkt. 99-3 at 107 (McCoy Decl. Exh. Q). Specifically, this TSA employee is a line-attorney within OCC's Employment & Civil Rights group whose primary responsibility is to advise client offices within TSA on employment and civil rights matters. As the released records indicate, she was involved in communicating with DB employees regarding Plaintiff's administrative Section 504 complaints and TSA's responses thereto, including providing legal review and advice. This employee has a substantial privacy interest in the protection of her work email address and full office phone number. Disclosure of this information represents a real risk of exposing her to harassment, annoyance, and abuse. As mentioned above, Plaintiff has a documented practice of publishing information released in response to Plaintiff's FOIA and Privacy Act requests. Plaintiff has also published much information on Plaintiff's website about Plaintiff's Section 504 administrative complaints, Plaintiff's dissatisfaction with the processing of those complaints, and Plaintiff's litigation regarding the processing of those complaints and the incidents underlying those complaints. Because of Plaintiff's history of publishing information released in response to Plaintiff's FOIA requests and because of this employee's involvement in Plaintiff's Section 504 complaint, release of this employee's email address and full phone number to Plaintiff would likely mean that this information would be widely distributed and openly accessible on the internet,

which in turn would open the employee up to harassing emails and phone calls to her direct lines of communications at work. The employee has a substantial interest in avoiding such a clearly unwarranted invasion of privacy.

84.     **Miller Decl. ¶ 100**. Against this substantial privacy interest is the public's interest in the disclosure of this employee's email address and phone number. Here, the public's interest in this information is essentially non-existent. As stated above, this employee is a line-attorney; while she provides legal advice to clients, she is not in a position of making important policy decisions for the agency. The revelation of this employee's work email address and last four digits of her office phone number would provide no insight into the agency's specific conduct in the context of the processing of Plaintiff's administrative claims nor would it serve to further the public's understanding of the agency's operations in general; in contrast, her information could expose her to harassment based on disagreements or objections to the advice provided. Having balanced the public's negligible interest in the information against the employee's substantial privacy interest in non-disclosure, a determination was made that release of the information would constitute a clearly unwarranted invasion of privacy and therefore the FOIA Branch protected the employee's email address and last four digits of her phone number pursuant to Exemption 6.

85.     **Miller Decl. ¶ 101**. Finally, with respect to the redaction taken on Bates page 481, as explained previously, this redaction protects a TSA employee's email address that sheds no light on agency operations. *See* Dkt. 99-3 at 116 (McCoy Decl. Exh. Q). Specifically, this redaction protects the TSA employee's personal email address (*i.e.*, not a .gov address). This information is extremely personal in nature as one's private, non-work email address is one of the primary methods of personal contact in this day and age. If this employee's personal email address were to be disclosed to Plaintiff through FOIA, it would likely end up being published on the internet, *see*

*supra* and https://s.ai/foia/, which would allow for widespread dissemination. Such public dissemination would make the employee vulnerable to harassment and abuse. His personal email inbox would be at risk for becoming deluged with emails from strangers who found the information on the internet, and he could become a target for endeavoring hackers or nefarious individuals looking to convert a government insider. Given these real risks, the employee has a significant privacy interest in protecting his personal email address.

86.     **Miller Decl. ¶ 102**. On the other hand, the public has virtually no interest in obtaining this employee's personal, non-.gov, email address. The employee occupied an analyst position within the DB; he was tasked with analyzing complaints made to the DB, but ultimately decisions about those complaints were made many levels above him in the chain of command. He was not directing government policy. Disclosure of his personal email address would shed no light on government operations nor would it reveal any additional information about the agency's conduct. In short, there is no public interest in the release of this employee's personal email address. Balancing this lack of a public interest against the substantial privacy interest that this employee has in protecting his email address, a determination was made to protect the email address pursuant to Exemption 6.

*     *     *

Dated: September 28, 2018

Respectfully Submitted,

JESSIE K. LIU, D.C. Bar #472845
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:    /s/ Johnny Walker
JOHNNY H. WALKER, D.C. Bar # 991325
Assistant United States Attorney
555 4th Street, N.W.
Washington, District of Columbia 20530
Telephone: 202 252 2575
Email: johnny.walker@usdoj.gov

*Counsel for Defendant*