UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAI,

        *Plaintiff*,

        v.

TRANSPORTATION SECURITY
ADMINISTRATION,

        *Defendant*.

Civil Action No. 14-0403 (RDM)

**REPLY IN SUPPORT OF DEFENDANT'S RENEWED MOTION
FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S
CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**

JESSIE K. LIU
*United States Attorney*

DANIEL F. VAN HORN
*Chief, Civil Division*

JOHNNY H. WALKER
*Assistant United States Attorney*
555 4th Street, N.W.
Washington, District of Columbia 20530
Telephone: 202 252 2575
Email: johnny.walker@usdoj.gov

Dated: December 13, 2019

## CONTENTS

INTRODUCTION ....................................................................................................1

ARGUMENT ....................................................................................................1

I. TSA Is in Compliance with E-FOIA ....................................................................................................1

A. Sai's BOS and SFO Re-Requests Did Not Specify that They Sought Native File Types ....................................................................................................1

B. TSA Is Not Obligated to Organize Its Releases into Distinct Files ....................................................................................................7

C. TSA Cannot Readily Reproduce Native, Non-Rasterized, or Distinct Files in Response to Sai's Request ....................................................................................................9

D. TSA Is Re-Releasing a Clearer Copy of the Difficult-to-Read Record ....................................................................................................14

II. TSA's Declarations Show that It Conducted a Proper Search ....................................................................................................14

A. The Miller Declaration Need Not Be Based on Personal Knowledge ....................................................................................................14

B. TSA Has Explained Its Searches and Their Results ....................................................................................................15

C. TSA Has Shown the Timeframe of Its Searches ....................................................................................................16

D. Sai Provides No Basis for TSA to Conduct Additional Searches ....................................................................................................19

CONCLUSION ....................................................................................................20

# AUTHORITIES

Page(s)

**Cases**

*Barnard v. Dep't of Homeland Sec.*,
 531 F. Supp. 2d 131 (D.D.C. 2008) ........................................................................... 15

*Barnard v. DHS*,
 598 F. Supp. 2d 1 (D.D.C. 2009) ......................................................................... 16, 17

*Bonner v. U.S. Dep't of State*,
 928 F.2d 1148 (D.C. Cir. 1991) ........................................................................... 18, 19

*Burke v. Gould*,
 286 F.3d 513 (D.C. Cir. 2002) ................................................................................. 11

*Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*,
 241 F. Supp. 3d 14 (D.D.C. 2017) .............................................................................. 9

*Covad Commc'ns Co. v. Revonet, Inc.*,
 267 F.R.D. 14 (D.D.C. 2010) ................................................................................. 9, 14

*Davis v. District of Columbia*,
 No. 10-1233, 2013 WL 12358526 (D.D.C. June 20, 2013) ...................................... 11

*DiBacco v. U.S. Army*,
 795 F.3d 178 (D.C. Cir. 2015) ................................................................................. 20

*Forsham v. Harris*,
 445 U.S. 169 (1980) ............................................................................................... 9, 10

*Hainey v. U.S. Dep't of the Interior*,
 925 F. Supp. 2d 34 (D.D.C. 2013) ........................................................................... 16

*Hall v. Dep't of Justice*,
 63 F. Supp. 2d 14 (D.D.C. 1999) ............................................................................. 15

*Inst. for Policy Studies v. CIA*,
 885 F. Supp. 2d 120 (D.D.C. 2012) ......................................................................... 15

*Johnson v. United States*,
 239 F. Supp. 3d 38 (D.D.C. 2017) ........................................................................... 15

*McClanahan v. U.S. Dep't of Justice*,
 204 F. Supp. 3d 30 (D.D.C. 2016) ........................................................................... 18

i

*McGehee v. CIA*,
   697 F.2d 1095 (D.C. Cir. 1983) ................................................................................ 18

*Oglesby v. U.S. Dep't of Army*,
   920 F.2d 57 (D.C. Cir. 1990) .................................................................................... 13

*Prison Legal News v. Lappin*,
   780 F. Supp. 2d 29 (D.D.C. 2011) ............................................................................ 10

*Pub. Citizen v. Dep't of State*,
   276 F.3d 634 (D.C. Cir. 2002) .................................................................................. 18

*Robertson v. Am. Airlines, Inc.*,
   239 F. Supp. 2d 5 (D.D.C. 2002) .............................................................................. 11

*SafeCard Servs., Inc. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) ................................................................................ 13

*Sai v. TSA.*,
   315 F. Supp. 3d 218 (D.D.C. 2018) .............................................................. 12, 16, 18

*Thompson v. EOUSA*,
   587 F. Supp. 2d 202 (D.D.C. 2008) .......................................................................... 16

**Statutes**

5 U.S.C. § 552(b) ............................................................................................................ 14

5 U.S.C. § 552(f)(2)(A) ..................................................................................................... 9

# INTRODUCTION

In its opening brief and in the extensive declaration of Terri Miller, the Transportation Security Administration ("TSA") addressed point-by-point the remaining issues that the Court identified for briefing in a renewed motion for summary judgment. The Miller declaration (the relevant parts of which Sai does not dispute) convincingly shows why it would be extremely burdensome for TSA to release native file types in response to Sai's BOS and SFO Re-Requests, which Sai did not even ask for in the first place, and to provide nonrasterized, "discretized" records in response to Sai's Policies Request. The Miller declaration also responds in detail to the Court's questions about the adequacy of TSA's search. Sai's opposition concerns itself more with ignoring or seeking to have the Court disregard these aspects of the Miller declaration rather than address them head on. Sai also attempts to raise all-new arguments that are readily foreclosed by the declaration of Regina McCoy already on file, which Sai ignores. Also, Sai has raised no further argument that TSA improperly withheld information as exempt and has thereby conceded that TSA is entitled to summary judgment on that issue. For these reasons, TSA is entitled to summary judgment, and Sai's cross-motion for summary judgment should be denied.

# ARGUMENT

## I.      TSA Is in Compliance with E-FOIA.

### A.      *Sai's BOS and SFO Re-Requests Did Not Specify that They Sought Native File Types.*

On their face, the BOS and SFO Re-Requests do not indicate that Sai wanted the native file type for every responsive record and instead indicate only that Sai wanted records originally created in electronic format to be released in electronic format and electronic scans of all documents originally created in paper format. That reading is evident from the immediate context

of the request, it is consistent with Sai's many other requests, and it gives "format" the meaning typically ascribed to it in the context of FOIA.

Sai makes a number of attempts to show why the language of the BOS and SFO Re-Requests should be read to demand native file types. *See* Pl.'s Opp. at 3–6; Pl.'s Summ. J. Br. at 4–5. None is convincing. *First*, Sai contends that TSA's interpretation would read the word "original" out of the request. Pl.'s Opp. at 4. To the contrary, TSA's interpretation incorporates and gives that word its most appropriate construction. Indeed, the whole exercise of TSA's argument is to give specific meaning to the word "original" that is informed by its context within the request, the context of Sai's other requests, and the typical use of the word "format" in the context of FOIA. As TSA explained in part, read in context (i.e., juxtaposed with records "originally in paper"), the phrase "original electronic format" refers to documents that were originally electronic records, just as "originally in paper" refers to documents that were originally paper records. Def.'s Br. at 4–5. Indeed, Sai eventually acknowledges that "TSA attempts to maintain some aspect of the accepted meaning of 'original,'" Pl.'s Opp. at 4, thereby apparently disclaiming the preceding argument that TSA's interpretation omits it. (Sai does not say what "aspect" of the meaning TSA failed to maintain.) Accordingly, Sai's shifting and self-contradicted argument that the TSA has read out the word "original" should be rejected. Ultimately, Sai claims only that there was "good reason" to request electronic records in their native file type. Pl.'s Opp. at 4–5. But the question is not whether Sai had good reason to make that request native file types (and Sai apparently had no such reason generally, as Sai admittedly did not do for any other requests), it is whether Sai actually did so based on a plain reading of the request. As TSA has explained, Sai did not.

*Second*, Sai contends that it is a "distraction" to read the BOS and SFO Re-Requests in the context of Sai's other requests. Pl.'s Opp. at 5. To the contrary, it is eminently reasonable for the TSA to assume that Sai's preferred file type would not change dramatically between Sai's many different FOIA requests to TSA made in roughly the same time frame.[1] Sai provides no reason why the BOS and SFO Re-Requests would present a unique situation in which native file types would suddenly become the assumed norm. Indeed, Sai acknowledges that the *original* BOS and SFO Requests—which sought precisely the same information but within a more tailored timeframe—did *not* seek native file types. *See id.* Given that Sai's reference to "original electronic format" was ambiguous at best (it does not use the word "native" at all), it was entirely appropriate to read that phrase as asking that TSA release records that originated electronically in electronic format, just as Sai requested in the substantially similar BOS and SFO Requests.

This linkage is perhaps made most clear by the fact that, in clarifying the BOS and SFO Re-Requests, Sai stated that TSA need not re-release records that it had already released (not in native format) in response to the BOS and SFO Requests. *See* ECF No. 99-3 at 180. This demonstrates that Sai viewed those already-released non-native-format records to be duplicative of the records sought in the BOS and SFO Re-Requests and further supports reading the formatting

---

[1] All of the requests related to this litigation were received by TSA's FOIA Branch within ten months of each other in 2013. *See* ECF No. 99-3 ¶ 6.

request in the BOS and SFO Re-Request in tandem with Sai's other requests, particularly the original BOS and SFO Requests.[2]

Further, the Court need not look only to the context of Sai's *other* requests (which Sai acknowledges did not seek records in any specific electronic file type). The context of the BOS and SFO Re-Request itself shows why TSA properly read it as asking only that records be released in electronic format and not as paper. The BOS and SFO Re-Requests arose in the course of an email discussion between Sai and TSA personnel about the original BOS and SFO Requests. Sai does not (and cannot) contend that those original requests contained any language indicating that Sai sought electronic records in their native file types. Both the BOS Request and the SFO Request demand only that they be "serviced electronically to the maximum extent possible—e.g., scans of documents rather than paper copies . . . ." ECF No. 99-3 at 51 (BOS Request), 86 (SFO Request). It was in the context of discussing those requests (and Sai's impatience at how long it was taking TSA to respond to them) that Sai made the demand for the immediate release of records that later became known as the separately designated BOS and SFO Re-Requests. *See* ECF No. 28-3 at 11–12. Because TSA reasonably viewed Sai's demand as duplicative of the original BOS and SFO Request, *see* ECF No. 99-3 at 43 (McCoy Decl. ¶ 123), it had no reason to believe that Sai's reference to "original electronic format" was anything other than a reiteration of the original demand that the requests be "serviced electronically" with electronic documents released in

---

[2] Sai contends that the TSA itself "notes the uniqueness of the format sought in the BOS and SFO Re-Requests" in its renewed motion for summary judgment. Pl.'s Opp. at 5 n.1. But TSA was clearly not acknowledging that it should have interpreted the phrase "original electronic format" to request native file types. TSA was drawing a distinction in the language of the Policies and BOS and SFO Re-Requests after the Court appeared to agglomerate them. *See* ECF No. 174-3 at 2 n.1 (Miller Decl.). Indeed, in the brief filed with the declaration cited by Sai, TSA specifically argued that the BOS and SFO Re-Requests did not seek native file types by their terms. *See* Def.'s Br. at 4–6.

electronic format and papers scanned into electronic format. Indeed, Sai later confirmed that reading: only days after Sai made the demand that became the BOS and SFO Re-Requests, Sai reiterated that responsive records be electronic in a way that unambiguously did not make reference to receiving records in any specific file type: "I remind you that my request demands a response by e-mail, not physical mail, with digital documents." ECF No. 28-3.[3]

*Finally*, Sai argues that TSA attacks a straw man by contending that its reading of Sai's request comports with the meaning of the word "format" as used in FOIA. Pl.'s Opp. at 5–6. Sai contends that the word "format" in the request does not refer to native file types, but the phrase "original electronic format" does. But "format" is the only noun in Sai's phrase; so clearly Sai is attempting to use the word "format" to refer to a "file type." The word "original" in Sai's reading of the phrase means only not the file type after TSA processes the document but the file type before TSA processes the document. As TSA has shown, however, in the context of FOIA, "format" is more appropriately used to distinguish between paper format and electronic format, not specific file types. *See* Def.'s Br. at 5–6. Further, the statutory language and associated legislative history that Sai relies upon further undermines Sai's position. The House Report that Sai quotes uses "format" to refer to the electronic *media* on which a record is stored—e.g., tapes, disks, CD-ROMS, and "other digital or electronic *media*"—not to the file types that electronic records are

---

[3] Indeed, it appears that it was not until years later, in September 2015 that Sai insisted that "as always, I have requested native format, electronic documents, § 508 compliant, etc." ECF No. 99-3. Despite Sai's insistence that the requests "always" sought native file types, Sai acknowledges in briefing that none of Sai's other FOIA requests can in fact be read to seek native file types. *See* Pl.'s Opp. at 3 (contending that only the BOS and SFO Re-Requests sought native file types). Further, Sai's later insistence that TSA release "native" file types shows that Sai is technologically conversant enough to employ such language at the time Sai submitted the request. Yet, Sai failed to do so as to these Re-requests.

kept in. Sai presents no statutory text or legislative history indicating that Congress intended the word "format" in E-FOIA to refer to file types.

B.      *TSA Is Not Obligated to Organize Its Releases into Distinct Files.*

Relying on relevant case law and statutory language, TSA showed that it is not legally obligated to sort records responsive to Sai's Policies Request into individual files. Def.'s Br. at 6–8. Sai's convoluted argument to the contrary relies entirely upon an incorrect characterization of Sai's own request and the authorities upon which the TSA relies. Pl.'s Opp. at 6–9; Pl.'s Summ. J. Br. at 5. *First*, Sai contends that it is an "inherent feature" of electronic formats that they are discrete from one another, and so Sai's request is intended to ask "that [TSA] preserve[] the documents as distinct files with their individual file names," which " is properly understood as a request to protect these aspects of the original electronic format when the agency chooses the format for release." Pl.'s Opp. at 7. As an initial matter, Sai's premise is flawed. The notion that different records are discrete from one another is no more unique to electronic records than it is to paper records. Paper records can be bound and kept individually, just at electronic records can be stored as individual files. Nor is discrete storage particularly "inherent" in either paper or electronic records. One may amalgamate and stack various paper records, and electronic records may be bundled into a PDF. Given the lack of any meaningful distinction between paper records and electronic records, Sai's argument, if accepted, would appear to also require agencies to bind or otherwise individually segregate paper records for release if demanded to do so. No provision of FOIA can be read to require agencies to perform such burdensome administrative services for requesters.

Further, FOIA does not permit Sai to demand records that "preserve" the nonsubstantive individual characteristics of electronic records—be that the storage of records as individual files or their file names. This is evident in how courts in this District treat metadata—another form of

nonsubstantive information associated with electronic records. As a rule, requesters are not permitted to demand native file formats for the purpose of obtaining metadata. *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 241 F. Supp. 3d 14, 23 n.4 (D.D.C. 2017) ("[T]he metadata in the . . . emails [found in the custodian's nongovernment email account] does not in itself make each email unique [under the FOIA] as compared to the forwarded reproduction of the email in [his government email] account.") (citing *Covad Commc'ns Co. v. Revonet, Inc.*, 267 F.R.D. 14, 20 (D.D.C. 2010) ("In the absence of some reason to believe that the metadata will yield an answer that the hard copy will not, production of the information in native format [ ] is not necessary.")); *see also Forsham v. Harris*, 445 U.S. 169, 185 (1980) ("The Freedom of Information Act deals with 'agency records,' not information in the abstract."). E-FOIA—which was passed in light of the growing use of electronic records, Pub. L. No. 104-231, § 2(a)(5), 110 Stat. 3048, 3048—does not require anything more. E-FOIA was not intended to expand the coverage of FOIA to allow requesters to obtain abstract information about electronic records in addition to the records themselves. Instead, it merely "clarifie[d] existing practice by making the [FOIA] statute explicit" that "[r]ecords which are subject to the FOIA shall be available under the FOIA when the records are maintained in electronic format." H.R. Rep. No. 104-795, at 18 (1996). To affect this clarification, Congress provided that the term "record" includes "any information that would be an agency record subject to the requirements of [FOIA] when maintained by an agency in any format, including an electronic format." 5 U.S.C. § 552(f)(2)(A). The new provision did "not broaden the concept of agency record," and "matter not previously subject to FOIA . . . [was] not made subject to FOIA." H.R. Rep. No. 104-795 at 19–20.

Also, fundamentally, Sai does not accurately characterize the Policies Request. The request did not, as Sai says, request that TSA "*preserve*[] the documents as distinct files with their

individual file names." Pl.'s Opp. at 7 (emphasis added). Instead, it purported to require TSA to *separate* each distinct document into individual PDFs and to *assign* PDF file names matching the identifier and title of each policy document. *See* 99-3 at 129 (demanding that TSA release "individual PDFs per distinct document, named clearly after the document's identifier and/or title, rather than a single digital file containing multiple concatenated documents"). FOIA contains no provision that can be read to require TSA to perform those tasks.

*Second*, Sai contends that the cases relied upon by TSA do not apply because they "offer no factual parallels to the circumstances of the Policies Request." Pl.'s Opp. at 8. True, the cases may arise from different factual contexts, but those differences are neither inherently material, nor do they permit Sai to ignore the principles of law clearly articulated across those decisions that *is* applicable here. For example, in *Prison Legal News v. Lappin*, the court agreed with the government it had "no responsibility under the FOIA to organize the responsive records in any particular manner or provide explanatory material to accompany the responsive records." 780 F. Supp. 2d 29, 45–46 (D.D.C. 2011). Sai does not refute that legal principle, nor does Sai explain why it does not preclude precisely what the Policies Request asks TSA to do.

*Third*, in attempting to argue that the provisions of the E-FOIA compel TSA to comply with the Policies Request, Sai repeats the errors of the first argument: Sai assumes that "discretization" is uniquely inherent in electronic records and that the requests sought to "preserve the discretization and individual file names inherent in the manner in which these documents were stored". *See* Pl.'s Opp. at 8–9. As shown above, that is not the case on either count. And again, FOIA does not require agencies to release abstract information about records, such as how they are stored and under what file name. *See Forsham*, 445 U.S. at 185.

C. *TSA Cannot Readily Reproduce Native, Non-Rasterized, or Distinct Files in Response to Sai's Request.*

Guided by this Court's prior decision, TSA has shown in great detail why it cannot readily reproduce all the records responsive to Sai's BOS and SFO Re-Request as native files, and why it cannot readily reproduce the records responsive to the Policies Request as nonrasterized, and distinct files. *See* Def.'s Br. at 8–11. Sai's opposition fails to rebut—and even concedes—that showing. *See* Pl.'s Opp. at 9–16; Pl.'s Summ. J. Br. at 5–8.

As an initial matter, Sai has failed to comply with Local Civil Rule 7(h)(1) in responding to TSA's statement of undisputed material facts. That provision requires as follows: "An opposition to [a motion for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the records relied on to support the statement." Courts in this district "interpret[] this rule strictly, such that if the movant asserts a fact, supported by record evidence, and the non-movant does not controvert that fact with its own supporting record evidence, the Court considers that fact to be admitted for purposes of the motion." *Davis v. District of Columbia*, No. 10-1233, 2013 WL 12358526, at *1 (D.D.C. June 20, 2013); *see also Robertson v. Am. Airlines, Inc.*, 239 F. Supp. 2d 5, 7 (D.D.C. 2002) ("Because [LCvR 7(h) ] helps the district court maintain docket control and decide motions for summary judgment efficiently, the D.C. Circuit has repeatedly upheld district court rulings that hold parties to strict compliance with this rule." (citing *Burke v. Gould*, 286 F.3d 513, 517 (D.C. Cir. 2002) and other cases)). Sai's statement of material issues contains no responses whatsoever to paragraphs 1 through 22 of TSA's statements of fact, which relate to TSA's compliance with E-FOIA. *See* ECF No. 174-2 at 1–10. Accordingly, Sai is precluded from contesting those factual assertions.

Sai's counterarguments also fail. *First*, Sai accuses TSA of "ignoring the legal standard that the Court identified" simply because TSA does not quote that standard back in its brief. Pl.'s Opp. at 10–11. But TSA has not ignored the standard; rather, it has met it and the uncontroverted testimony of the Miller declaration shows that it is tailored to this Court's prior opinion. This Court said that when an agency already creates or converts a document in a particular format, it is generally not unduly burdensome to reproduce the record in that format "absent specific, compelling evidence as to significant interference or burden." *Sai v. TSA.*, 315 F. Supp. 3d 218, 239 (D.D.C. 2018). That specific, compelling evidence is precisely what the Miller declaration provides, and Sai cannot escape it simply by faulting the TSA for not "fram[ing] the inquiry" by quoting back the Court's guidance. Pl.'s Opp. at 11.

*Second*, Sai chides TSA for ignoring the Court's admonitions regarding its prior argument and for purportedly "advance[ing] precisely the same contentions." Pl.'s Opp. at 11–12. That is not what TSA has done. As an initial matter, the Court did not outright reject the premise of TSA's argument in its first motion for summary judgment. In concluded only that "at least on the current record," TSA had not met its burden, while leaving open the possibility that TSA" may be able to show that Sai's request that the agency release the records in their original format posed a burden on the agency of sufficient magnitude to justify its rejection of that request." *Sai*, 315 F. Supp. 3d at 239–40. The record is now far stronger. TSA has provided a substantially more detailed (and in relevant respects undisputed) declaration presenting specific and particularized reasons why complying with Sai's demands—particularly in the context of Sai's broad and sweeping requests—would result in significant interference and burden. *Compare* ECF No. 118-1 at 3–4 (3d Supp. McCoy Decl. ¶¶ 12–16) *with* ECF No. 174-3 at 2–12 (Miller Decl. ¶¶ 7–33). In particular, the Miller declaration newly and specifically addresses the Court's observation that TSA "may be

able to show, for example, that it could not have, at the time, 'readily' ensured that redactions were not countermanded." ECF No. 174-3 at 5–9 (Miller Decl. ¶¶ 15–25). Sai's attempt to overcome the particularized showing of the Miller declaration merely by referencing the Court's criticism of the less-detailed third supplemental McCoy declaration suffers from the fallacy of false equivalence and should be rejected.

*Third*, Sai contends that the Miller declaration fails to prove the negative that there is no known FOIA processing software that would simultaneously ensure locked-down redactions that could not be countermanded and allow for the processing of records in their native file type or as fully digital PDFs. Pl.'s Opp. at 12–13. Sai contends that TSA should have conducted a detailed investigation or attempted to develop its own software in order to meet its burden on summary judgment. But that is far more than is required of agency affidavits. *See SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (declarations are "accorded a presumption of good faith"); *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (declarations should be "reasonably detailed"). Here, a person with expertise in FOIA processing—TSA's FOIA officer— stated, in her official capacity, that TSA knows of no alternative processing software that can accomplish what Sai wants accomplished. ECF No. 174-3 at 7 (Miller Decl. ¶ 20). That is sufficient to meet TSA's burden on summary judgment. Sai of course, in attempting to rebut TSA's showing, could have conducted such an investigation or otherwise attempted to dispute TSA's statement of material facts with disputed statements supported by the record of that investigation. But Sai has not done so and instead has conceded TSA's factual assertions regarding the lack of any known alternative to FOIAXpress by failing in any way to respond to it. The agency's detailed declaration is entitled to a presumption of good faith, *SafeCard*, 926 F.2d at 1200, while Sai's speculation and lack of contradictory record evidence is entitled to no credence.

*Fourth*, Sai contends that TSA must edit documents stored as Word and Excel files to create a record with no exempt information. Pl.'s Br. at 14–15. There are a number of problems with this contention. For one, by its terms, it "put[s] aside [TSA's] alleged administrative burden." *Id.* at 14. As it must. Sai's contention that TSA must edit native file types responsive to the BOS and SFO Re-Requests to recreate records with no exempt information would place an enormous administrative burden on TSA, as explained in the Miller declaration. ECF No. 174-3 at 7 (Miller Decl. ¶ 21). Also, Sai's proposal that TSA simply delete exempt information entirely would risk TSA running afoul of another provision of FOIA; namely, that "[t]he amount of information deleted . . . shall be indicated on the released portion of the record." 5 U.S.C. § 552(b). Such indication is accomplished through an overlaid redaction, but not through outright removal of information (contrary to Sai's contention, the two methods of deleting information are not the same thing). Sai's contention also neglects that there would be no apparent way to edit many file types, such as .msg email files and .jpeg images files. Further, Sai does not attempt to contend that simply editing exempt information out of native files and then producing those native files would sufficiently ensure that the removal of exempt information could not be countermanded. Lastly, Sai presents no legal or other authority rebutting TSA's showing that outright removal of all exempt information would result in the creation of a new record, which agencies are not required to do in responding to FOIA requests. *See* Def.'s Br. at 11 n.3.

*Finally*, Sai throws down a gauntlet. Sai challenges the TSA to choose 10 computer security personnel to attempt to countermand redactions made to some PDFs posted on the Court's docket and delivered on an "eyes only" basis to undersigned counsel. Pl.'s Opp. at 15. TSA does not intend to take up that challenge, nor does it need to in order to obtain summary judgment. In any event, Sai's boast, even if legitimate, would prove nothing useful. It indicates only that redactions applied

to PDFs are secure; but PDFs are precisely the format that TSA uses for its redactions. Sai provides no reason to believe that redactions may be applied and not countermanded with regard to other file types, such as email .msg files, Word files, Excel files, and .jpeg image files. Further, TSA reiterates that the need to apply secure redactions is not the only reason that it would be significantly burdensome for TSA to have to process Sai's request outside the context of FOIAXpress. ECF No. 174-3 at 10–12 (Miller Decl. ¶¶ 27–32).

        D.     *TSA Is Re-Releasing a Clearer Copy of the Difficult-to-Read Record.*

Sai contends that the more-legible copy of the CCTV spreadsheet that TSA released is still not legible. In recognition that this particular document presents unique challenges, TSA has located yet another copy of the spreadsheet and is releasing it by filing it with this brief. *See* Exhibit 1. There can be no dispute that the revised spreadsheet, when zoomed in, is legible. This dispute should now be moot.

## II.    TSA's Declarations Show that It Conducted a Proper Search.

        A.     *The Miller Declaration Need Not Be Based on Personal Knowledge.*

Sai begins by attempting to avoid the substance of the Miller declaration altogether through a technicality, contending that the testimony therein is not based on personal knowledge and must be disregarded because Miller did not "conduct[] the searches herself," but merely oversees the FOIA process. Pl.'s Opp. at 18–19. Sai misunderstands the personal knowledge requirements of FOIA declarations. In the FOIA context, a declarant "satisfies the personal knowledge requirement in Rule [56(c)] if[,] in [her] declaration, [she] attests to [her] personal knowledge of the procedures used in handling [a FOIA] request and [her] familiarity with the documents in question." *Barnard v. Dep't of Homeland Sec.*, 531 F. Supp. 2d 131, 138 (D.D.C. 2008) (internal quotation marks and alterations omitted); *see also Johnson v. United States*, 239 F. Supp. 3d 38, 43 (D.D.C. 2017); *Inst. for Policy Studies v. CIA*, 885 F. Supp. 2d 120, 134 (D.D.C. 2012); *Hall v. Dep't of Justice*, 63 F.

Supp. 2d 14, 16 n.1 (D.D.C. 1999). A FOIA declarant, moreover, "may include statements in [her] declaration[ ] based on information [she] ha[s] obtained in the course of [her] official duties." *Barnard v. DHS*, 598 F. Supp. 2d 1, 19 (D.D.C. 2009); *see also Hainey v. U.S. Dep't of the Interior*, 925 F. Supp. 2d 34, 41 (D.D.C. 2013); *Thompson v. EOUSA*, 587 F. Supp. 2d 202, 207 (D.D.C. 2008).

The Miller declaration easily satisfies this standard, and, indeed, does not differ in any relevant respect from the types of declarations that are routinely filed, and relied upon, in FOIA cases. Miller testified that she is the FOIA Officer for TSA and is "responsible for overseeing the processing of all requests made to TSA under FOIA." ECF No. 174-3 at 1 (Miller Decl. ¶ 1). She is "familiar with TSA's record systems" and testified about the searches and exemptions claimed "based on [her] personal knowledge, information made available to [her] in the performance of [her] official duties, and conclusions and determinations reaches and made in accordance therewith." *Id.* (Miller Decl. ¶¶ 3–4). Because this is all that is required of a FOIA declarant, Miller's testimony may be relied upon.

  B.  *TSA Has Explained Its Searches and Their Results.*

Sai makes two never-before-raised arguments in challenging TSA's explanation of its searches for the BOS and SFO Requests and Re-Requests[4]: (1) that they are inexplicably inconsistent across different offices, and (2) that TSA did not describe what information each component's search actually yielded. Pl.'s Opp. at 19–21. As to the first, the reasons for the different search terms between offices is obvious. What Sai ignores is that the search terms are for

---

[4] Sai presents arguments in this section as though they apply to the entirety of the search for the BOS and SFO Requests and Re-requests, but that is not so. The Court specified the narrow aspects of those requests for which TSA needed to provide additional information in order to carry its burden. *See Sai*, 315 F. Supp. 3d at 247-48, 265. And TSA responded to each of these aspects specifically in its renewed MSJ briefing. *See* ECF 174-1 at 16-17.

different FOIA requests involving different incidents at different airports, and they were referred to different office's based on each office's involvement. In light of that, it is readily clear why each office used the search terms that it did. For example, it would make little sense for ORD to use the terms "Boston" or "SFO" in searching for records about the incident at ORD. And it is clear why the Disability Branch—when tasked to search for records related to an incident involving Sai at SFO, ECF No. 99-3 at 21 (McCory Decl. ¶¶ 67–69)—would use Sai's name and terms related to SFO in its search. Accounting for the obvious differences in what each office searched for (all of which is fully explained in the McCoy and Miller declarations), TSA's search terms are in no way materially inconsistent. This case is therefore distinguishable from the case law cited by Sai, wherein different offices appeared to use materially different search terms to collect the *same* information.

Next, Sai's new contention that TSA failed to describe what its searches yielded, Pl.'s Opp. at 20–21, simply does not account for the full record in this case. The McCoy declaration, which Sai apparently ignores, *see id.* at 21 (stating only that the *Miller* declaration fails to provide this information), explains the results of each search of each office. *See* ECF No. 99-3 at 5–8, 20–22, 44–47 (McCoy Decl. ¶¶ 12–24, 61–70, 123–40); *see also, e.g., id.* at 6 (McCoy Decl. ¶ 15) ("The search [by BOS for the BOS Request] yielded records of incident statements from TSA employees, responsive emails, one letter from TSA New England Filed Counsel to Plaintiff, and one CCTV video of the incident, all of which were provided to the FOIA Branch for processing."); *id. at* 6 (McCoy Decl. ¶ 17). ("The search [by ORD for the BOS Request] yielded a single entry in a database used to track checkpoint incidents regarding the encounter described in Plaintiff's request, which was provided to the FOIA Branch for processing.").

C.      *TSA Has Shown the Timeframe of Its Searches.*

Sai next argues, Pl.'s Opp. at 21–23, that TSA has not sufficiently answered the Court's question about whether "the TSA's searches for records responsive to the BOS and SFO Requests and Re-Requests cover the relevant timeframe, that is, from the date of the incident to the date the relevant search commenced," *Sai*, 315 F. Supp. 3d at 265.

*First*, Sai argues that, for those offices that issued a "second tasking," TSA cannot show that the second tasking covered the appropriate timeframe because TSA has not shown that they captured records created between the first tasking and the second tasking. Pl.'s Opp. at 22. This contention relies upon a flawed understanding of the scope of an agency's search. TSA's search did not "commence" each time one of the offices likely to have responsive records ran search terms; it "commenced" when TSA undertook to determine which offices were likely to have records and tasked them to search. *See Pub. Citizen v. Dep't of State*, 276 F.3d 634, 642 (D.C. Cir. 2002) ("[A]t minimum, the CIA could use as the cut-off date the date on which the Information and Privacy Division determined which components to 'task.'") (quoting *McGehee v. CIA*, 697 F.2d 1095, 1104 (D.C. Cir. 1983)). To use the former definition would carry the absurd result of TSA's "search" for each request having many different commencement dates. Even more compelling, Sai's approach would impose upon TSA a continuing obligation to revise its search, which courts seek to avoid by using the date of the commencement of the search as the default cut-off. *See McClanahan v. U.S. Dep't of Justice*, 204 F. Supp. 3d 30, 47 (D.D.C. 2016) ("Under the weight of this authority resting on *Public Citizen*, this Court, too, finds that a date-of-search cut-off date is reasonable, even if subsequent searches are conducted, to avoid 'an endless cycle of judicially mandated reprocessing.'" (quoting *Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1152 (D.C. Cir. 1991)). If the date cut-off did not fall when or before subcomponents are tasked, then the FOIA office would have to continuously reassess whether any additional records were being

created by any additional offices throughout the search process. Courts seek to prevents that result, not to require it. The tasking dates provided with the Miller declaration show with specificity the dates on which each office was tasked, *see* ECF 174-3 at 22-24 (Miller Dec. at ¶¶ 58-64), and the subsequent term searches would have collected all records at least through the date of those searches. Thus, TSA has shown that it searched the relevant timeframe.

Second, Sai argues that TSA has not shown that it searched the relevant timeframe for the BOS and SFO Re-requests, which Sai interprets to begin with the date of the BOS and SFO incidents, respectively. TSA has already provided a fulsome explanation of why the FOIA Branch provided specific *start* (not cut-off) dates with the taskings for the BOS and SFO Re-Requests. *See* ECF No. 99-3 at 43-46, (McCoy Decl. ¶¶ 124–133). Namely, the start date was provided in an effort to avoid searching for documents already located and released to Sai in response to their prior BOS and SFO Requests, to avoid creating an undue burden on the agency, and in the absence of any detail or specificity provided by Sai about the request (despite TSA's invitation to contact the FOIA office in its correspondence to Sai informing them of the start dates that would be used). *See id.*; *see also* Exs. BB and CC to McCoy Dec., ECF No. 99-3 at 180-185.

Finally, Sai contends that TSA's timeframe for the BOS and SFO Re-Requests is improper because it used the signed response date of the previous request as the starting point rather than the date of the commencement of the search.[5] Pl's Opp. at 23. This argument does not undermine the reasonableness of TSA's searches. As established by the Miller declaration, there was only a *de minimus* amount of time between when an office could have collected documents using search

---

[5] This argument appears to be in the alternative. That is, Sai concedes that this Court may find that it was proper for TSA to assign start dates for the Re-Request searches, but if this Court were to make such a finding, Sai contends that those start dates should have been different. For the reasons stated in this section, any such contention (in the alternative or otherwise) must fail.

terms and when that office delivered those collected documents to the FOIA Office for processing.[6]

For example, with the BOS Request, offices responded to the FOIA office within 6 to 15 days of

their being tasked; with the SFO Request, offices responded within 1 to 19 days of being tasked.

*See* ECF 174-3 at 22-23 (Miller Dec. at ¶¶ 60–61). And significantly, the amount of time between

the running of search terms and the response date would be shorter than those spans. Indeed, there

is no reason to believe that an office would have any need to delay at all the running of search

terms and the transmission of the results of those search terms to the FOIA office for processing.

Given that TSA does not have the exact date and time of day that search terms were run by each

office, it reasonably used the date of each office's transmittal of the results of those term searches

(which would have immediately followed the searches) as the starting date for the BOS and SFO

Re-Requests. That approach is adequate for purposes of FOIA, particularly considering the

circumstances of the requests as described *supra*, including the risk of undue burden being imposed

on the agency to search for duplicative documents that had already been located, processed, and

released to Sai. *See DiBacco v. U.S. Army*, 795 F.3d 178, 191 (D.C. Cir. 2015) ("[A]dequacy—not

perfection—is the standard that FOIA sets [for searches].").

> D.      *Sai Provides No Basis for TSA to Conduct Additional Searches.*

Finally, Sai insists that TSA "does not bother to explain" why the four offices identified in

the Court's prior order should not be searched and that TSA instead "reiterates the same arguments

it previously made to the Court." Pl.'s Opp. at 24–25. That is not accurate. In response to the

Court's inquiry, the Miller declaration provides a highly detailed explanation as to why TSA did

---

[6] Though Sai refers to the commencement of the search as latest date for the records released in response to their prior requests, TSA actually would have captured and released any responsive records created prior to each office running search terms, even though those documents would post-date the commencement of the search.

not need to search each of the four identified offices. ECF No. 174-3 at 14–22 (Miller Decl. ¶¶ 38–57). Sai makes no effort to rebut that actual substance of that declaration. And for good reason; Sai cannot. The Miller declaration provides a reasoned and specific basis for why the TSA did not need to search each of the four identified offices, and TSA should be granted summary judgment over Sai's cursory and inaccurate objections.

## CONCLUSION

For the foregoing reasons and the reasons set forth in TSA's opening brief, the Court should enter summary judgment in favor of the TSA and deny summary judgment to Sai.

Dated: December 13, 2019

Respectfully submitted,

JESSIE K. LIU, D.C. Bar #472845
United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

By:  /s/ Johnny Walker
JOHNNY H. WALKER, D.C. Bar # 991325
Assistant United States Attorney
555 4th Street, N.W.
Washington, District of Columbia 20530
Telephone: 202 252 2575
Email: johnny.walker@usdoj.gov

*Counsel for Defendant*