**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SAI,

      *Plaintiff*,

    v.

TRANSPORTATION SECURITY
ADMINISTRATION,

      *Defendant.*

Civil Action No. 14-403 (RDM)

## AMENDED MEMORANDUM OPINION AND ORDER

Plaintiff brings this Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, action seeking a wide assortment of records from the Transportation Security Administration ("TSA"). The matter is now before the Court on the TSA's second motion for summary judgment. Dkt. 174. On September 25, 2018, the Court issued a memorandum opinion and order granting in part and denying in part the TSA's first motion for summary judgment. *Sai v. TSA*, 315 F. Supp. 3d 218 (D.D.C. 2018) ("*Sai I*"). In doing so, the Court identified ten areas as to which the TSA had failed to carry its burden on summary judgment. *Id.* at 265–66. The TSA has now renewed its motion for summary judgment. Plaintiff opposes that motion and cross-moves for partial summary judgment. Dkt. 185-1. For the reasons explained below, the Court will **GRANT** in part and **DENY** in part the TSA's renewed motion for summary judgment, Dkt. 174, and will **DENY** Plaintiff's cross-motion for partial summary judgment, Dkt. 185.

## I.  BACKGROUND

The Court will briefly outline the background of this dispute, which is discussed in depth in the Court's prior opinion. *Sai I*, 315 F. Supp. 3d at 229–32. Sai, "who suffers from a

neurological disorder," alleges that TSA employees at several airports mistreated them based on their medical condition and the accommodations that condition requires.[1] *Sai I*, 315 F. Supp. 3d at 228.  Following these incidents, Sai submitted several records requests to the TSA pursuant to the FOIA and the Privacy Act ("PA"), 5 U.S.C. § 552a.  Sai alleges that the TSA failed adequately to respond to six FOIA requests.  *Sai I*, 315 F. Supp. 3d at 228.  As the Court explained in its previous summary judgment opinion:

> The **first** of these requests sought surveillance video and reports relating to an incident that occurred at Boston's Logan International Airport ("BOS"), as well as any other complaints against the TSA employees involved in the incident and any similar complaints against the TSA, airport police, or airport agents. Plaintiff subsequently expanded this request also to seek records relating to incidents at New York LaGuardia Airport ("LGA") and Chicago O'Hare International Airport ("ORD").  The **second** request sought "any contract/agreement with other agencies regarding surveillance, or maintenance of surveillance footage, at Logan Airport."  The **third** request followed an incident at San Francisco International Airport ("SFO") and sought records like those Plaintiff sought relating to the BOS incident.  The **fourth**—and by far the most expansive request—sought all policies and procedures that the TSA has ever issued that are not readily available in the TSA's "electronic reading room." Finally, the **fifth** and **sixth** requests sought any additional records regarding the BOS and SFO incidents created after Plaintiff's original requests.

*Id.* (internal citations omitted) (emphasis added).  After Sai filed the present action, the TSA "responded to each of the six pending FOIA requests and eventually released almost 4,000 pages of records (some with redactions) and three closed circuit television videos."  *Id.*  The TSA filed its first motion for summary judgment on June 9, 2016, Dkt. 99, and Sai filed their opposition on February 1, 2017, Dkt. 111.  The Court issued a memorandum opinion and order granting in part and denying in part the TSA's motion for summary judgment on May 24, 2018, Dkt 162, and

---

[1]  Sai is Plaintiff's full legal name.  *Sai I*, 315 F. Supp. 3d at 229.  At Sai's request, the Court will use gender-neutral pronouns to refer to them.  *Id.* at 229 n.1; *see* They, Merriam-Webster, https://www.merriam-webster.com/dictionary/they (last accessed May 29, 2020).

issued an amended memorandum opinion and order on September 25, 2018.  Dkt. 172; *see also*

*Sai I*, 315 F. Supp. 3d at 229 n.1.

In denying in part the TSA's motion for summary judgment, the Court identified ten

issues "require[ing] further development."  *Id.* at 265.  Those ten issues are as follows:

> (1) Did the TSA . . . comply with E-FOIA notwithstanding its failure to release
> the electronic records sought in Sai's BOS and SFO Re-Requests in their
> original format and its failure to release records responsive to the Policies
> Request in "discretized," "fully digital," non-"rasterized" text PDFs; (2) Did the
> TSA release any spreadsheets in response to Sai's policies request; (3) Does the
> TSA possess legible copies of [several identified pages]; (4) [Should the TSA
> have] search[ed] its FOIA Branch, Office of Legislative Affairs, Office of Chief
> Counsel, and Office of the Executive Secretariat for records responsive to Sai's
> BOS and SFO Requests and Re-Requests; (5) Did the TSA's searches for
> records responsive to the BOS and SFO Requests and Re-Requests cover the
> relevant timeframe, that is, from the date of the relevant incident to the date the
> relevant search commenced; (6) Did the TSA conduct a search reasonably
> calculated to locate responsive records with respect to the databases searched in
> response to the BOS and SFO Re-Requests and with respect to the search terms
> used to search [certain offices] in response to the BOS and SFO Requests and
> Re-Requests; (7) Did the TSA redact information pursuant to Exemption 3 that
> was previously released to the ACLU prior to responding to Sai's Policies
> Request; (8) Did the TSA properly redact factual information responsive to Sai's
> SFO Request pursuant to Exemption 5; (9) Does the redacted contact
> information for TSA contract employees, a DHS Office of Chief Counsel
> employee, and a TSA Disability Branch employee implicate a "substantial
> privacy interest" under Exemption 6; and (10) Does the redacted contact
> information of TSA employees contained in policy documents implicate a
> "substantial privacy interest" under Exemption 6.

*Id.* at 265–66.

After issuing this decision, the Court set a schedule for the TSA's second motion for

summary judgment.  Minute Entry (June 1, 2018).  The Court also granted Sai's motion to

proceed in forma pauperis and for the appointment of counsel, Minute Order (Oct. 24, 2018), and

appointed counsel appeared on April 25, 2019, Dkt. 181.[2]  On January 24, 2020, the parties

---

[2]  The Court thanks appointed counsel for their able assistance to Sai and the Court in this matter.

completed briefing on the TSA's motion, Dkt. 174; Dkt. 188, and Sai's partial cross-motion for summary judgment, Dkt. 185; Dkt. 193.  On May 5, 2020, the Court entered a minute order setting forth several questions—primarily pertaining to the scope of the E-FOIA, the universe of records responsive to Plaintiff's FOIA requests, and the extent to which Defendant had redacted responsive record prior to their release—for the parties to address at oral argument.  Minute Order (May 5, 2020).  The Court heard oral argument by teleconference on May 8, 2020.  Minute Entry (May 8, 2020).

For the reasons discussed below, the Court will **GRANT** in part and will **DENY** in part the TSA's renewed motion for summary judgment and will **GRANT** in part and will **DENY** in part Sai's cross-motion for partial summary judgment.

## II.  LEGAL STANDARD

Courts generally resolve FOIA cases on motions for summary judgment.  *Sai I*, 315 F. Supp. 3d at 233.  "To prevail on summary judgment[,] . . . the defending 'agency must show beyond material doubt . . . that it has conducted a search reasonably calculated to uncover all relevant documents.'"  *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (quoting *Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983)).  To carry this burden, the agency must offer "relatively detailed and non-conclusory" affidavits or declarations establishing that its searches were adequate.  *Safecard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991); *see also Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013).  "Agency affidavits [and declarations] enjoy a presumption of good faith," but Courts deny summary judgment if they are called into question by contradictory evidence in the record or by evidence of bad faith.  *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981).

If an agency withholds responsive records, it may satisfy it burden of demonstrating that

the records are exempt from disclosure by providing a *Vaughn* index identifying what

information was withheld, under which exemptions, and why the information is exempt.  *See*

*Vaughn v. Rosen*, 484 F.2d 820, 827–28 (D.C. Cir. 1973).  The agency "is entitled to summary

judgment if no material facts are in dispute and if it demonstrates 'that each document that falls

within the class requested either has been produced . . . or is wholly exempt from the [FOIA's]

inspection requirements.'"  *Students Against Genocide v. Dep't of State*, 257 F.3d 828, 833 (D.C.

Cir. 2001) (quoting *Goland v. CIA*, 607 F.2d 339, 352 (D.C. Cir. 1978)).  Similarly, the Court

will grant a FOIA plaintiff's cross-motion for summary judgment if the motion demonstrates

there is no material dispute of fact and that the plaintiff is entitled to judgment as a matter of law.

*See* Fed. R. Civ. P. 56.

### III.  ANALYSIS

Each of the issues discussed below was left unresolved in *Sai I* and was not resolved by

the release of additional records between the issuance of *Sai I* and the initiation of this second

round of summary judgment briefing.

### A.    Compliance with E-FOIA

As explained in *Sai I*, "[i]n 1996, Congress enacted the Electronic Freedom of

Information Act Amendments to FOIA—or 'E-FOIA' for short—to 'improve public access to

agency records and information' and to 'maximize the usefulness of agency records and

information collected, maintained, used, retained, and disseminated by the Federal

government.'"  *Sai I*, 315 F. Supp. 3d at 235 (quoting Pub. L. No. 104-231, § 2, 100 Stat. 3048

(1996)).  To do so, "Congress amended the definition of 'record' to include electronic records,"

*Sample v. Bureau of Prisons*, 466 F.3d 1086, 1088 (D.C. Cir. 2006), and required agencies to

"provide the [requested] record[s] in any form or format requested by the [FOIA requester] if the record is readily reproducible by the agency in that form or format," 5 U.S.C. § 552(a)(3)(B). The law also requires agencies to "make reasonable efforts to maintain [their] records in forms or formats that are reproducible for purposes of" the E-FOIA. *Id.*

"[W]hether a document is 'readily reproducible' in a specified format is a fact-based determination." *Scudder v. CIA*, 25 F. Supp. 3d 19, 31 (D.D.C. 2014). In assessing agency compliance with the E-FOIA, courts must "accord substantial weight to an affidavit of an agency concerning the agency's determination as to . . . reproducibility." 5 U.S.C. § 552(a)(4)(B). This deference, however, "does not amount to a blanket exemption from judicial review of the agency's justification for declining to comply with a specific format request or failing to maintain records in readily reproducible formats." *Scudder*, 25 F. Supp. 3d at 39. The E-FOIA "recognize[s] that the burden on an agency to comply with a request to produce documents in a particular electronic format is a factor to consider in determining whether records are 'readily reproducible.'" *Public.Resource.org v. IRS*, 78 F. Supp. 3d 1262, 1265 (N.D. Cal. 2015). The agency, however, bears the burden of "demonstrate[ing] that compliance with a request would impose[] a *significant* burden or interference with the agency's operation." *Id.* at 1266; *see also Scudder*, 25 F. Supp. 3d at 32 (indicating the same). Unsurprisingly, "when an agency already creates or converts documents in a certain format[,] . . . requiring that it provide documents in that format to others does not impose an unnecessarily harsh burden, absent specific, compelling evidence as to significant interference or burden." *TPS, Inc. v. Dep't of Defense*, 330 F.3d 1191, 1195 (9th Cir. 2003); *see also Scudder*, 25 F. Supp. 3d at 32–33 (discussing *TPS* approvingly). But, at the same, the mere "technical feasibil[ity]" of producing the records in the requested format does not mean that they are necessarily "readily reproducible" under the E-FOIA. *See*

*Scudder*, 25 F. Supp. 3d at 33–34.  The word "readily" signifies "that an agency is relieved of its obligation to fulfill a format request that is onerous," but courts assess what is "onerous" keeping in mind the E-FOIA's requirement that agencies "take affirmative steps toward maintaining records in 'reproducible' formats such that they are 'readily reproducible' when sought out by FOIA requesters."  *Id.* at 34.

Three of the six FOIA requests at issue in this case potentially implicate the E-FOIA. The Policies Request sought records in an "electronic, machine-processable, accessible, open, and well-structured format to the maximum extent possible," including "individual PDFs per distinct document," "fully digital text PDFs rather than scans or rasterizations," "digital redaction rather than black marker," "lists and structured data as machine-processible spreadsheets," and "scans rather than paper copies."  Dkt. 99-3 at 129 (McCoy Decl. Ex. S).  The BOS Re-Request and SFO Re-Request sought records "in their original electronic format or as a scan of any documents that are originally paper."[3]  Dkt. 28-3 at 11–12.

The Policies Request, accordingly, raises three questions.  First, was the agency required to produce data as "machine-processible spreadsheets"?  Second, was it required to release "distinct" PDFs for each document, as opposed to conglomerated PDFs containing multiple records?  Third, was it required to release those PDFs in a "digital text" format, as opposed to a "scan[ned] or rasteriz[ed]" format?  The BOS and SFO Re-Requests, in turn, appear to raise only a single question: whether the agency was required to release electronic records in their "native formats."

---

[3]  Sai subsequently clarified that these latter requests did not seek records that the TSA had already released in response to Sai's original BOS Request and SFO Request.  Dkt. 99-3 at 180.

1.    *Native Format*

At oral argument, the parties agreed that the question of Sai's entitlement to electronic records in their "native formats" was not ripe for decision.  May 8, 2020 Hrg. Tr. (Rough at 16–18).  The Court concurs.  "Ripeness, while often spoken as a justiciability doctrine distinct from standing, in fact shares the constitutional requirement of standing that an injury in fact be certainly impending."  *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427–28 (D.C. Cir. 1996).  Here, unless Sai can show that the TSA is required to release certain records responsive to the BOS and SFO Re-Requests, the Court should not—and may not—reach the question whether those records, if any, must be released in their native formats.  As the record now stands, the Court cannot discern whether the TSA located any non-duplicative, non-exempt records responsive to Sai's Re-Requests.  *See* Dkt. 99-3 at 44–47 (McCoy Decl. ¶¶ 129–40); *see also supra* n.3 (noting that the Re-Requests do not seek re-release of records previously released).  As a result, at least on the present record, there is no basis to conclude that an "injury in fact" has occurred or is "certainly impending" in the form of Defendant's failure to release *in native format* records that might not exist or otherwise be subject to disclosure.  *Nat'l Treasury Emps. Union*, 101 F.3d at 1427–28.

2.    *Data Produced as Machine-Processible Spreadsheets*

The parties also agreed at oral argument that the TSA had released the only spreadsheet at issue in this case in an acceptable format and that no dispute remains for the Court to adjudicate concerning spreadsheets.  May 8, 2020 Hrg. Tr. (Rough at 28).

3.    *Distinct PDFs*

With respect to Sai's request that the TSA release records responsive to the Policies Request as distinct PDFs for each record, the Court held in *Sai I* that the TSA (1) had "fail[ed] to

explain whether or why [the FOIAXpress] software would have prevented the agency from generating separate PDF files for each *discrete* record," and (2) had "fail[ed] to argue that, as a matter of law, 'discretization' does not constitute a 'form or format' for purposes of 5 U.S.C. § 552(a)(3)(B)."  *Sai*, 315 F. Supp. 3d at 236 (emphasis added).  "Discretization" is a term from mathematics that Sai uses in this case to mean "distinct files for distinct documents."  Dkt. 184 at 13; *see also* Discretization, Merriam-Webster, https://www.merriam-webster.com/dictionary/discretization (last accessed May 29, 2020) ("the action of making discrete and specially mathematically discrete").  In the present context, discretization would require ten distinct PDF files for ten distinct documents, for example, as opposed to a single PDF file containing all ten documents merged.

The TSA's renewed motion for summary judgment now argues that it "was under no legal obligation to arrange" and release responsive records in separate PDF files for each distinct record because FOIA imposes no duty on an agency to organize documents in a requested fashion.  Dkt. 174-1 at 8–9.  Sai responds that their request for the discretization of records does not pertain simply to their organization; rather, in Sai's view, discretization "is frequently part and parcel of an electronic 'form or format'" because "the creation and storage of distinct electronic files is an inherent feature of a wide variety of electronic formats."[4]  Dkt. 184 at 13; Dkt. 185-1 at 5.

---

[4]  Sai's argument, at least at times, blurs the question of a requester's right to receive documents in their native formats with the right to receive them as discrete, rather than combined, documents.  The phrase "native format" refers to "[t]he file format that an application normally reads and writes."  Native Format, YourDictionary, https://www.yourdictionary.com/native-format#computer, (last accessed May 29, 2020); *see also* Native File, https://techterms.com/definition/nativefile (last accessed May 29, 2020).  In the context of the Policies Request, Sai did not request documents in their native formats but, rather, requested that they be released electronically as discrete documents.  *See* Dkt. 184 ("Plaintiff agrees that they

The question presented here is whether the statutory requirement that an agency "provide the [requested] record[s] in any form or format requested," 5 U.S.C. § 552(a)(3)(B), demands the agency, upon request, provide the requester with a separate file for each distinct record.  *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (courts "begin[]" the project of statutory interpretation "with the statutory text").  The statute does not define the phrase "form or format," so the Court must consider the ordinary meanings of these words.  *See BP America Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006).  The primary definitions of "form" are (1) "image" or "representation" and (2) "the shape and structure of something as distinguished from the material of which it is composed."  Form, Webster's Third New International Dictionary (1993).  "Format," in turn, generally means (1) "the general makeup or style of a publication" or (2) the "general plan of physical organization or arrangement," Format, Webster's Third New International Dictionary (1993), although the term has a distinct meaning in the world of computing, *see* Format, Concise Oxford English Dictionary (Oxford University Press, 12th ed. 2011) (definition as to "computing") ("a defined structure for the processing, storage, or display of data").

Other textual clues provide some additional guidance regarding the meaning of "form or format" and whether that phrase requires discretization.  Most notably, at the same time that Congress added § 552(a)(3)(B), it added § 552(a)(3)(C), which provides: "[i]n responding under this paragraph to a request for records, an agency shall make reasonable efforts to search for the records in electronic *form or format*."  Electronic Freedom of Information Act Amendments,

---

have left the precise choice of electronic format for the policies request partially up to the agency").  For purposes of this analysis, the Court is therefore unconcerned with a situation in which, for example, the requester sought a record originally created as a ".doc" file in Word but that the agency converted to a ".pdf" file for purposes of its release.

Pub. L. No. 104–231, § 5, 110 Stat. 3048 (1996), codified at 5 U.S.C. § 552(a)(3)(C) (emphasis

added).  Congress also amended the definition of "record" to include "any information that

would be an agency record subject to the requirements of this section when maintained by an

agency in any *format*, including an electronic *format*."  Pub. L. No. 104–231, § 3, codified at 5

U.S.C. § 552(f)(2)(A) (emphasis added).  Thus, in at least these provisions, Congress

distinguished between records in "electronic form or format" and records in the standard paper or

hardcopy "form or format."  The distinction between electronic and hardcopy records might

not—and, in fact, does not—capture the universe of alternative forms or formats Congress

envisioned, but it does reflect the way in which Congress used the phrase "form or format."

Congress was, at least in part, concerned with the media used.

     The historical backdrop against which the E-FOIA was enacted further informs the

meaning of "form or format."  As the Court explained in *Sai I*, Congress required agencies to

release records "in any form or format requested . . . if the record is readily reproducible by the

agency that form or format" to overrule this Court's decision in *Dismukes v. Department of the*

*Interior*, 603 F. Supp. 760 (D.D.C. 1984).  *Sai I*, 315 F. Supp. 3d at 238; *see also* Electronic

Freedom of Information Amendments of 1996, H.R. Rep. 104–795, 21 (Sept. 17, 1996).

*Dismukes* held that a FOIA requester was not entitled to elect to receive records as computer

tapes rather than microfiche, although the agency maintained the records in both formats.  603 F.

Supp. at 763.  Like the statutory text, this history suggests that Congress used the phrase "form

or format" to refer, at least in part, to the media at issue.  *See* 142 Cong. Rec. H10450 (Sept. 17,

1996) (statement of Rep. Tate) (citing "volumes of paper," "CD-ROM's [sic]," and "computer

disks" as examples of "forms or formats").

That said, the Court does not doubt that the plain meaning of "form or format" reaches beyond the choice of media.  Indeed, had Congress intended to reach only the requested media—*e.g.*, paper, CD-ROM, microfiche, computer tape, or thumb drive—it might has simply referred to the "form" in which the records were maintained or released.  To be sure, the Committee Report on the E-FOIA often uses the terms "form" and "format" interchangeably, at times referring to an "electronic format," H.R. Rep. at 19–20 (citing "[c]omputer tapes, computer disks, CD-ROMS" and "microfiche and microforms" as examples of "formats"); *id.* at 22, and at other times speaking of an "electronic form," *id.* at 20 (discussing an "electronic form, e.g., a CD-ROM or disc").  But, where possible and consistent with other textual clues, courts endeavor "to give meaning to every word" of a statute and to avoid redundancy.  *United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1198 (D.C. Cir. 2005).  The Court can do so here by construing "form" to refer to the media—*e.g.*, paper or thumb drive—and construing "format" to refer to the electronic "structure for the processing, storage, or display" of data, Format, Concise Oxford English Dictionary (Oxford University Press, 12th ed. 2011)—*e.g.*, PDF or JPEG.  Reading the E-FOIA in this manner makes sense of the text and history of the provision.

This interpretation of the E-FOIA is also consistent with the tenet that nothing in FOIA requires the responding agency to "arrange responsive records in [a] particular order."  *Dent v. Exec. Office for U.S. Attorneys*, 926 F. Supp. 2d 257, 267 (D.D.C. 2013); *see also Prison Legal News v. Lappin*, 780 F. Supp. 2d 29, 45–46 (D.D.C. 2011) ("[T]he FOIA does not require agencies to 'organize documents to facilitate FOIA responses.'" (quoting *Goulding v. IRS*, No. 97-5628, 1998 WL 325202, at *5 (N.D. Ill. June 8, 1998))); *Shapiro v. U.S. Dep't of Justice*, 37 F. Supp. 3d 7, 20 (D.D.C. 2014).  Imposing such a duty for electronic records would dramatically expand the demands that the FOIA imposes on federal agencies with no indication

that Congress intended to make such a fundamental change to the law or that it intended to impose an organization requirement with respect to the release of electronic records that does not exist for paper records.  Congress intended to increase access to electronic records in all types of media (*e.g.*, tapes, microfiche, thumb drives) and in all types of formats (*e.g.*, PDF, JPEG).  Sai's request, however, takes the E-FOIA a step further, with no textual or other evidence that Congress intended that result.

Sai's principal argument is that discretization of files is an "inherent feature" of many electronic formats, and therefore the E-FOIA obligates agencies to honor requests that the original discrete separations of files be maintained when those records are produced.  Dkt. 184 at 13; Dkt. 185-1 at 5.  But, as the TSA argues, Dkt. 189 at 10, the discretization of a record is no more unique or inherent to an electronic record than it is to a paper document.  Paper documents also have beginnings and ends.  Three pages of notes from an interview conducted with one witness, for example, may constitute a record that is "distinct" from four pages of notes from an interview of a different witness conducted on the following day.  But, as Sai's counsel implicitly acknowledged at oral argument, May 8, 2020 Hrg. Tr. (Rough at 40–42), a FOIA requester is not entitled under the "form or format" provision of the E-FOIA to request that the responding agency staple together the three pages of notes from the first interview and then, separately, staple together the four pages of notes from the second interview.  The Court fails to see any meaningful distinction between this hypothetical request for staples and Plaintiff's request for discrete PDFs.  Both requests go to the organization of the records sought, which, as the Court has explained, is not covered by the FOIA.

The Court, accordingly, is unconvinced that Sai's Policies Request for distinct or discretized PDF files, as opposed to a single file containing multiple documents, constitutes a

request for records in a "form or format" different from that the TSA supplied.  Putting aside the separate question (which the Court does not reach today) whether the TSA was required to release the records in "fully digital text PDFs rather than scans or rasterizations," Sai received the records in the "form" they requested—electronic—and in the "format" they requested—PDF. Because the E-FOIA did not require the TSA to honor Sai's request for discrete PDFs, the Court will grant the TSA's motion for summary judgment with respect to discretization and will deny Sai's cross motion with respect to that issue.

4.     *Non-Rasterized Form or Format*

With regard to the Policies Request, the Court previously concluded that the TSA had not carried its summary judgment burden for a different reason: the TSA had failed to demonstrate that the requested documents were not "readily reproducible" as the requested "fully digital text PDFs rather than scans or rasterizations."  *Sai*, 315 F. Supp. 3d at 236–240.  The TSA's renewed motion for summary judgment argues that it was not required to comply with that request because of the administrative burden that it would impose.  Dkt. 174-1 at 10–13.

In *Sai I*, the Court analyzed this request in conjunction with Sai's request for other records in their native formats and concluded that the TSA had failed to carry its burden of showing that the responsive records were not "'readily producible' by the TSA at the relevant time in the format that Sai requested: Word, Excel, electronic PDF, or the like."  *Sai*, 315 F. Supp. 3d at 237 (quoting 5 U.S.C. § 552(a)(3)(B)).  In the prior round of briefing, the TSA merely posited "that releasing records . . . in their original format [or as non-rasterized PDFs] would be unduly burdensome" because of the TSA's use of the FOIAXpress system for processing and redacting responsive records.  *Sai I*, 315 F. Supp. 3d at 239.  The Court recognized that the TSA might be able to carry its burden of showing that releasing "records in

their original format [or as non-rasterized PDFs] posed a burden on the agency of sufficient magnitude to justify its rejection of this request" by, for example, demonstrating "that it could not have, at the time, 'readily' ensured that redactions were not countermanded." *Id.* at 240.  But the Court expressed doubt that an incompatibility "with the agency's then-existing FOIA processing software" constituted sufficient grounds—without more—for the TSA to decline to comply with its E-FOIA obligations.  *Id.*

The TSA's renewed motion for summary judgment offers little more than its first.[5]  The new Miller declaration asserts the TSA must use FOIAXpress because it is the only method of redacting records of which the agency is "aware" that allows it to ensure that the redactions cannot be countermanded.  Dkt. 174-3 at 7 (Miller Decl. ¶ 20); *see also* Dkt. 188 at 15.  The FOIAXpress process involves taking records out of their native formats and converting them into Tagged Image Format ("TIF") files for redaction, then converting them into rasterized PDFs for release to requesters.  Dkt. 174-3 at 7 (Miller Decl. ¶ 18).  The Miller declaration rejects the possibility of redacting within digital PDF formats because the TSA is unaware of a secure method of doing so.  The Miller declaration further states that, if the TSA did not use FOIAXpress, which it normally employs "as a tracking mechanism for all steps of the FOIA process," it would have had to process and release the records responsive to Sai's request from the 18 offices tasked by "manually track[ing]" "parallel compendiums" of "nearly 5,000 pages of records," throughout the redaction process, resulting in a "significant administrative burden on the agency."  Dkt. 174-3 at 10–11 (Miller Decl. ¶¶ 26–31).

---

[5]  The TSA's briefs and the Miller Declaration largely lump together their treatment of the feasibility of responding to Sai's BOS and SFO Re-Requests for documents in their native formats and Sai's Policies Requests for documents as fully digital (or non-rasterized) text PDFs. *See* Dkt. 174-3 at 4–12 (Miller Decl. ¶¶ 12–32).

Sai responds that the TSA's arguments based on the Miller declaration are "too vague and speculative to constitute 'specific, compelling evidence as to significant interference or burden.'" Dkt. 184 at 18 (quoting *Scudder*, 25 F. Supp. 3d at 32). They point out that "nowhere does the agency indicate or suggest that it has investigated or attempted to develop alternative systems or solutions to accommodate either Sai's request formats or any other possible format besides the one it prefers." *Id.* at 19. Finally, Sai argues that creating irreversible redactions within fully digital, non-rasterized PDFs, rather than through FOIAXpress, is possible and does not require the creation of new documents any more than the FOIAXpress process itself does. *Id.* at 20–21.

In *Public.Resource.org v. U.S. IRS*, 78 F. Supp. 3d 1262 (N.D. Cal. 2015), the Northern District of California confronted a similar situation. The plaintiff in that case requested that the IRS release nine Form 990 documents in the Modernized E-file ("MeF") format in which they were created and maintained. *Id.* at 1263. The IRS's normal process for responding to FOIA requests was to convert MeFs into PDFs, redact confidential information in that format, and then release the responsive documents as PDFs. *Id.* The IRS asserted that the E-FOIA did not require it to release the requested documents as MeFs because doing so would require the agency to spend $6,200 on "develop[ing] a new [redaction] protocol, train[ing] its employees, and develop[ing] the technical capacity to produce the requested Form 990s with exempt information redacted." *Id.* at 1264. In moving for summary judgment, the IRS offered declarations estimating (1) the $6,200 cost to the agency, (2) "the time required to redact exempt information," and (3) "the level of staff needed to comply with [the] request." *Id.* at 1266. The district court concluded that that $6,200 financial burden did not excuse the IRS from its obligation to produce the "small set of documents" as MeFs. *Id.* at 1264. In doing so, it noted

that if a request requiring an agency to "develop new protocols and train staff to respond" were enough to excuse the agency's E-FOIA compliance, "any time there was a request for production in a format that the agency has not accommodated before, the agency could argue undue burden." *Id.*

Here, although the TSA asserts that it would impose "significant administrative burden on the agency" to process and redact responsive documents outside of its usual FOIAXpress process, Dkt. 174-3 at 10–11 (Miller Decl. ¶¶ 26–31), the Miller declaration offers little detail concerning this burden.  It neither estimates the time or additional staffing required to take on this task nor estimates the financial burden that the project would impose.  *See Public.Resource.org*, 78 F. Supp. 3d at 1266.  Moreover, Sai correctly observes that, although the Miller declaration asserts that the TSA is unaware of a method of producing secure redactions within a non-rasterized PDF, it does not represent that it made any effort to explore whether such a method exists or to quantify the increased risk of potential countermanding of redactions realized outside of FOIAXpress.  True, the Miller declaration cites two instances in which agencies inadvertently disclosed SSI due to faulty processes.  *See* 174-3 at 6, 8 (Miller Decl. ¶¶ 17, 22).  But the mere fact that mistakes have been made does not mean that the use of FOIAXpress is the only reliable way of ensuring that they are not repeated.

The Court concludes that the TSA has failed to proffer "specific, compelling evidence as to significant interference or burden" imposed on the agency by releasing records to Sai as the requested non-rasterized PDFs.  *TPS, Inc.*, 330 F.3d at 1195; *see also Scudder*, 25 F. Supp. 3d at 32–33.  But because the legal standard at issue here is arguably undeveloped and, more importantly, because the record is incomplete, the Court will provide the agency with a final opportunity to proffer the type of evidence that will permit the Court to determine whether the

TSA can "readily reproduce[e]" the records at issue as fully digital text PDFs rather than scans or rasterizations.  If the TSA decides to accept that opportunity, it should provide the Court with an expert declaration addressing the technical feasibility of the request, the *specific* cost (in dollars) and burdens (in time) of satisfying the request, the extent of the necessary redactions, and the security risks, if any, posed by using Adobe Acrobat, as Sai suggests, May 8, 2020 Hrg. Tr. (Rough at 19), or some other software to release redacted, non-rasterized versions of the records at issue.

**B.     Legibility of Certain Documents**

The Court was unable to determine in *Sai I* whether "the TSA possesses legible copies" of certain released illegible documents.  *Sai I*, 315 F. Supp. 3d at 265.  In the most recent round of briefing, the TSA first represented that it had since "located more legible copies of those pages and released them to S[ai]."  Dkt. 174-1 at 13 (citing SOF ¶ 24).  Sai continued to object to the illegibility of one of these newly released versions, Dkt. 184 at 22, so the TSA released yet another version of that document with its reply brief, Dkt. 188 at 17; Dkt. 188-1, and Sai did not raise any further objections in their reply in support of their cross-motion.  *See* May 8, 2020 Hrg. Tr. (Rough at 28).  Accordingly, Defendant's motion for summary judgment concerning this issue is denied as moot.  *See Crooker v. U.S. State Dep't*, 628 F.2d 9, 10 (D.C. Cir. 1980) (per curiam).

**C.     Searches of FOIA Branch, Office of Legislative Affairs, Office of Chief Counsel, and Office of the Executive Secretariat**

In *Sai I*, the Court concluded that the TSA had not adequately addressed whether "the TSA [was] required to search its FOIA Branch, Office of Legislative Affairs, Office of Chief Counsel, and Office of the Executive Secretariat for records responsive to Sai's BOS and SFO Requests and Re-Requests."  *Sai I*, 315 F. Supp. 3d at 265; *see also id.* at 243, 244.  The Court

pointed to several documents that the TSA had released that at least suggested those four offices had been involved to some extent in the fallout from the BOS and SFO incidents.  *Id.* at 243–44 (citing Dkt. 145-2 at 61, 123, 143; Dkt. 144-3 at 58–62, 73).  This evidence was sufficient, in the Court's view, to raise the question whether the TSA had conducted a reasonably diligent search for all responsive records.  *Id.* at 244–45.

An agency "must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry[,] . . . [and] the court evaluates the reasonableness of an agency's search based on what the agency knew at its conclusion rather than when the agency speculated at its inception."  *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 117 F. Supp. 3d 46, 58 (D.D.C. 2015) (quoting *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 28 (D.C. Cir. 1998)).  This does not mean that "reference[s] to other files" in responsive records inevitably "establish the existence of documents that are relevant to the [plaintiff's] FOIA request."  *Morley*, 508 F.3d at 1121 (quoting *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 552 (D.C. Cir. 1994)).  But it does mean that the agency and the Court must consider the question before concluding that a search that failed to include any such "other files" was adequate.  *Elec. Privacy Info. Ctr.*, 117 F. Supp. 3d at 58.

In its renewed motion, the TSA argues that the records it produced that included references to these additional offices were not themselves responsive to Sai's FOIA requests and, therefore, could not be indicative of the presence of responsive documents in the other offices. The Court is unpersuaded.

1.      *FOIA Branch*

With respect to Sai's BOS Request, the TSA asserts that the "FOIA Branch determined that it was not likely to have generated any [records related to] Sai's request . . . prior to the

commencement date of the search (other than communications directly with Sai, which Sai would already have)" and that, as a result, it "reasonably determined that it was not a location likely to have responsive records." Dkt. 174-1 at 14. The TSA adds, moreover, that it "requested that Plaintiff provide as much information as possible to enable the FOIA Branch to locate the records being sought." Dkt. 174-3 at 15–16 (Miller Decl. ¶ 41). Sai responded with an email that focused on their screening experiences at BOS, LGA, and ORD and "did not mention anything about seeking records 'related to responding to the requests.'" Dkt. 174-3 at 15–16 (Miller Decl. ¶ 42); *see also* Dkt. 99-3 at 55 (McCoy Decl. Ex. B).

The TSA applies a similar logic to the SFO Request, a portion of which sought "any and all documents and communications related to responding to this request, whether internal or external." Dkt. 174-3 at 16 (Miller Decl. ¶ 44). As to that request, the TSA says that "it informed Sai that [the request] was too broad, but it received no response of clarification." Dkt. 174-1 at 15. It proceeded to search for "records responsive to those portions of the SFO Request that were described with sufficient specificity" but did not construe the request to seek "records created in the collateral effort to gather th[e] records about the underlying incident," and therefore did not search the FOIA Branch itself. Dkt. 174-3 at 17 (Miller Decl. ¶ 45).

This history did not relieve the TSA of its obligation to conduct a reasonable search for the records reasonably identified in the FOIA requests. The clarification process provides requesters and agencies a means of clearing up ambiguities in a request. *See Wilson v. U.S. Dep't of Transp.*, 730 F. Supp. 2d 140, 152 (D.D.C. 2010) (allowing an agency that engaged in the clarification process to adopt a "reasonable interpretation of [the] scope" of a FOIA request after communicating with a requester who "agreed to that interpretation"). But the Court cannot conclude that a requester has forfeited a portion of their FOIA request simply by failing

explicitly to reassert it in responding to an invitation to "provide as much information as possible to enable the FOIA Branch to locate the records being sought," Dkt. 174-3 at 15–16 (Miller Decl. ¶ 41), or by failing to respond to a request for clarification, Dkt. 174-1 at 15.  To adopt such a regime would give requesters a disincentive to work with the agency to clarify their requests for fear of inadvertently forfeiting legitimate components of their initial FOIA requests by failing to reassert the initial requests in their entireties.  *See Natural Res. Def. Council, Inc. v. U.S. EPA*, 383 F. Supp. 3d 1, 13–14 (D.D.C. 2019) (noting the possibility of "unreasonable demands for clarification" that could "delay or deny [a requester] access to the records that it has sought or will seek").  And it would limit "FOIA's purpose of shedding light on the operations and activities of government," *Am. Civil Liberties Union v. U.S. Dep't of Justice*, 655 F.3d 1, 15 n.26 (D.C. Cir. 2011), by providing opportunities for agencies to engage in gamesmanship to limit the scope of FOIA requests.

With respect to Sai's BOS and SFO Re-Requests, the TSA asserts that the requests did not seek records pertaining to the treatment of the requests themselves and that it, therefore, did not search the FOIA Branch for records responsive to those Re-Requests.  Dkt. 174-3 at 18 (Miller Decl. ¶ 48).  Although Sai's first BOS and SFO Requests explicitly sought "documents and communication related to responding to th[e] request[s]," Dkt. 99-3 at 50–51 (McCory Decl. Ex. A), the Re-Requests were phrased differently, seeking "*all* documents, records, statements, surveillance video, external and internal correspondence, etc. that are currently or have ever been in the TSA's possession which relate to either of the two incidents [at BOS and SFO] [Sai] reported wherein the TSA violated [their] rights."  Dkt. 28-3 at 11–12.  The Court has previously noted the similarity between the first BOS and SFO Requests and the Re-Requests, *see* Dkt. 74 at 15 (noting that the [second] request . . . parallel[s] [Sai's] earlier requests"); *Sai I*, 315 F. Supp.

21

3d at 231 (explaining that the Re-Requests "cover the same ground covered by the BOS and SFO [R]equests" but for a different timeframe). It now concludes that the TSA should have searched the FOIA Branch for records responsive to the Re-Requests, particularly given that the Re-Requests sought, among other things, "internal correspondence" that "relate[d] to either of the two incidents" and that the TSA has previously argued that Sai's Re-Request "seeks the same information sought by Plaintiff in two of [their] prior [R]equests." Dkt. 51 at 4.

Accordingly, the Court will deny the TSA's motion for summary judgment with respect to its failure to search the FOIA Branch based upon the BOS and SFO Requests and Re-Requests.

2.      *Office of Legislative Affairs*

As the Court noted in *Sai I*, "correspondence from and to Speaker Pelosi's office relating to the incident[s] evidently came to the TSA's attention in the course of responding to Sai's FOIA request" and encountering "that correspondence should have caused the agency to inquire whether the Office of Legislative Affairs possessed other, potentially responsive records." *Sai I*, 315 F. Supp. 3d at 244 (citing Dkt. 145-2 at 123; *Campbell*, 164 F.3d at 28).

The Miller declaration attests that the correspondence between Speaker Pelosi's office and the Office of Legislative Affairs was released to Sai despite the fact that the TSA deemed that it was not responsive to their request. Dkt. 174-3 at 19–20 (Miller Decl. ¶¶ 51–52). Miller maintains that the correspondence was not responsive because it pertained to "administrative processing of [Sai's] SFO and BOS administrative complaints pursuant to the Rehabilitation Act" and not to the incident that occurred at SFO. Dkt. 174-3 at 20 (Miller Decl. ¶ 52). As a result, according the TSA, the correspondence did not trigger a duty to search the TSA Office of

Legislative Affairs for further, potentially responsive records. *Id.* at 19–20 (Miller Decl. ¶¶ 51–52).

The Court is unpersuaded by the major premise of the TSA's argument—that is, that the Pelosi correspondence was unresponsive to Sai's FOIA request for "any and all notes, correspondence, communications, etc[.] relating to the [SFO] incident by any parties."  Dkt. 99-3 at 85.  Rather, as the Court understands it, Sai's Rehabilitation Act complaint was premised, at least in part, on the SFO incident, *see Sai v. DHS*, 149 F. Supp. 3d 99, 104 (D.D.C. 2015), and thus the distinction that the TSA would have the Court draw between "communications" relating to the "incident" and "communications" relating to Sai's administrative complaint is untenable. Because the TSA offers only this one explanation for its failure to search the Office of Legislative Affairs, Dkt. 174-3 at 19–20 (Miller Decl. ¶¶ 51–52), the Court will deny the agency's renewed motion for summary judgment with respect to its failure to search the Office of Legislative Affairs for responsive documents.

> 3. *Office of the Executive Secretariat and Office of Chief Counsel*

In *Sai I*, the Court observed that "[e]mail correspondence released to Sai indicates that individuals in [the Office of the Executive Secretariat and the Office of Chief Counsel] had some involvement, even if only minimal, in addressing Sai's complaints."  315 F. Supp. 3d at 244. The Court, accordingly, concluded that it needed further evidence regarding that involvement before it could conclude that the TSA had carried its burden of demonstrating that it had searched all offices where responsive records were likely to be found.  *Id.*

The TSA now offers essentially the same explanation for its failure to search the Office of the Executive Secretariat that it offered with respect to its failure to search the Office of Legislative Affairs—that is, that the document identified by the Court in its earlier opinion was

not responsive to Sai's FOIA request and, therefore, did not trigger a duty to conduct a further search. Dkt. 174-3 at 20 (Miller Decl. ¶ 53) ("Again, since the administrative processing of Plaintiff's [Rehabilitation Act] complaints was outside the scope of the SFO Request, there was no reason to believe that the existence of these pages suggested that other responsive documents would be held in the possession of the Exec[utive] Sec[retariat]."). The Court is, once again, unpersuaded. The TSA released to Sai, for example, an email from a member of Speaker Pelosi's staff to the Office of Legislative Affairs "regarding [Sai's] experience with [TSA] officials" in incidents at BOS and SFO. Dkt. 145-2 at 123. That email shows that it was forwarded to "TSA ExecSec Mail," presumably an address belonging to the TSA Office of the Executive Secretariat. *Id.* This email belies Defendant's assertion that the document released to Sai was not responsive to their FOIA request and did not require the agency to explore whether the Office of the Executive Secretariat might have additional, responsive records. Dkt. 174-3 at 20 (Miller Decl. ¶ 53). It might be that everything that office has merely duplicates records found in the files of other offices. But, if so, the TSA should inquire of the Office of the Executive Secretariat and say so.

The Miller declaration also asserts that the documents that the TSA released to Sai showing the involvement of the Office of Chief Counsel were not responsive to their request and therefore did not alert the agency to the prospect that the Office of Chief Counsel might have other responsive records. Dkt. 174-3 at 20–21 (Miller Decl. ¶ 54). Again, this assertion does not justify the TSA's failure to search the Office of Chief Counsel for responsive documents. The documents in question include an email chain in which a paralegal from the Office of Chief Counsel seeks a copy of the BOS TSA's file concerning the incident involving Sai. Dkt. 144-3 at 73. Although the conversation occurs in the context of responding to Sai's Rehabilitation Act

24

complaint against the agency, it is responsive to Sai's request for "*all* documents, records, statements, surveillance video, external and internal correspondence, etc. that are currently or have ever been in the TSA's possession which relate to either of the two incidents [at BOS and SFO] I reported wherein the TSA violated [their] rights." Dkt. 28-3 at 11–12. The Court will therefore deny the TSA's motion for summary judgment with respect the reasonableness of the agency's decision not to search files located in the Office of Chief Counsel.

### D.      Timeframe of Searches for Records Responsive to BOS and SFO Requests and Re-Requests

In *Sai I*, the Court concluded that the TSA had failed to carry its burden of establishing that its "searches for records responsive to the BOS and SFO Requests and Re-Requests cover[ed] the relevant timeframe, that is, from the date of the relevant incident to the date the relevant search commenced." *Sai I*, 315 F. Supp. 3d at 265. In so holding, it noted that "[t]he governing DHS FOIA regulations at the time of Sai's request provided that, '[i]n determining which records are responsive to a [FOIA/[Privacy Act]] request, a component,' like the TSA, should 'ordinarily . . . include only records in its possession as of the date that it begins its search.'" *Id.* at 245 (quoting 6 C.F.R. § 5.4(a) (2003) (superseded 2016)). "If a different date is used, the component is required to 'inform the requester of that date.'" *Id.* (quoting 6 C.F.R. § 5.4(a) (2003)). The Court further observed that these "DHS regulations comport, moreover, with the D.C. Circuit's admonition that, absent a specific justification, agencies should respond to requests seeking records created or obtained up to the date of search." *Id.* (citing *Pub. Citizen v. Dep't of State*, 276 F.3d 634, 644 (D.C. Cir. 2002); *Defs. of Wildlife v. U.S. Dep't of Interior*, 314 F. Supp. 2d 1, 12 n.10 (D.D.C. 2004)). The Court concluded that the TSA's motion failed because it lacked "evidence sufficient for the Court to determine when it commenced each of the relevant searches." *Id.* at 245.

In its renewed motion, the TSA claims that it has now satisfied its summary judgment burden with respect to the timelines of the searches because the Miller declaration "show[s] with specificity the dates on which each office was tasked."[6] Dkt 188 at 21 (citing Miller Decl. ¶¶ 58–64). That declaration provides the tasking dates for each of the TSA's sub-offices for each of Sai's FOIA requests as well as the date of the signed responses from those offices. Dkt. 174-3 at 22–23 (Miller Decl. ¶¶ 60–63). Many of the signed responses were submitted within a week of the tasking, although some were submitted over a month after the sub-office was tasked. *See, e.g.*, Dkt. 174-3 at 23 (Miller Decl. ¶ 61(a)) (tasked on October 26, 2015; signed response on December 9, 2015). The TSA asserts that it "has now specified when each component office was tasked to search for responsive records, and when those offices submitted their signed response," and it states that "[t]he searches would have commenced within that timeframe." Dkt. 174-1 at 18 (citing SOF ¶¶ 47–52). In its reply, the TSA further argues that the searches commenced "when [the] TSA undertook to determine which offices were likely to have records and tasked them to search," not "each time one of the offices likely to have responsive records [ran] search terms." Dkt. 188 at 20; *but see* Dkt. 174-1 at 18 (asserting that "the searches would have commenced within [the] timeframe" between "when each component office was tasked to search for responsive records and when those sub-offices submitted their signed response"). The TSA argues that, if the Court were to consider the searches begun each time that an agency sub-office actually ran a search, there would be "many different [search] commencement dates"

---

[6] The Court understands the term "tasking" to mean the defendant agency communicating to an agency sub-component that it must perform searches for records responsive to FOIA requester's request. *See* Dkt. 188 at 20 (arguing that the agency's search began "when [the] TSA undertook to determine which offices were likely to have records and tasked them to search"); *see also Pub. Citizen*, 276 F.3d at 642 (describing the CIA's practice, upon receiving a FOIA request, of having its "Information and Privacy Division 'task[]' the divisions most likely to possess relevant documents" (quoting *McGehee v. CIA*, 697 F.2d 1095, 1098 (D.C. Cir. 1983))).

corresponding to each FOIA request.  Dkt. 188 at 20.  Sai responds that the TSA has not yet

"revealed when the search occurred and what cut-off date that the agency applied."  Dkt. 184 at

27 (quoting *Sai I*, 315 F. Supp. 3d at 245).

The Court concludes that the TSA has not filled the gap identified in the Court's previous

opinion.  First, the Court rejects the TSA's argument that the tasking date is the only appropriate

date to consider as the search commencement date because, if the Court were to instead consider

each date that an agency sub-office ran a search, there would be multiple search commencement

dates for each sub-office.  *See* Dkt. 188 at 20.  There is an obvious potential middle ground:  The

Court could consider the search commencement date to be the date on which the tasked sub-

office ran its first search pursuant to that tasking—thus commencing that sub-office's search

efforts.  This approach would result in a single search commencement date for each sub-office

and thus avoid the TSA's concern.  Defendant's present approach, which provides different

tasking dates for various sub-offices in response to each of Sai's FOIA requests, already results

in various search commencement dates, as Defendant would have the Court construe that term,

for each FOIA request.  Accordingly, it is not clear that Defendant's preferred approach is any

less administratively difficult or confusing than the middle ground.  Nor has Defendant directed

the Court to any authority establishing that the date a sub-office is informed that it must conduct

searches (the tasking date) should be construed as the date that the office commenced those

searches.  In the abstract, the logic of the Department's approach is problematic because, at least

in theory, a sub-office might wait days or weeks after receiving a tasking before starting the

search process.  Defendant might eventually convince the Court that its approach works in this

specific case, but it has yet to offer any reason to believe that the tasking date was, in fact, the date the search began.[7]  *See* Dkt. 174-1 at 18.

Turning to the BOS and SFO Re-Requests in particular, the Court concludes that the TSA has not carried its summary judgment burden with regard to the search timeframes for an additional reason.  The Miller declaration attests that, in tasking sub-offices with responding to the BOS and SFO Re-Requests, the TSA specified that the searches should cover a timeframe beginning at least as early as the *signed response date* for the earlier-conducted searches of those offices.  Dkt. 174-3 at 24 (Miller. Decl. ¶ 64).  Sai counters that the proper search timeframe for the Re-Requests spans from the date of the relevant airport incident to the date that the relevant Re-Request search commenced, even if that would overlap significantly with the time period covered by the search pursuant to the initial request.  Dkt. 184 at 29.

The Court agrees that the gap between the tasking dates for the initial Requests (or the dates on which the sub-offices actually began searching in response to those taskings) and the corresponding signed response dates present a problem.  *See* Dkt. 174-3 at 22–23 (Miller Decl. ¶¶ 60–63).  It is possible that responsive records were obtained or created after the tasking date (or the date the search actually commenced) but before the corresponding signed response dates.  If the Re-Request searches then sought documents obtained or created beginning on the signed response dates, those interstitial documents might have been missed.

_____

[7]  Defendant's opening brief discusses the search timeframe issue in a single paragraph.  *Id.*  Its reply brief quotes in parentheticals *Public Citizen v. Department of State*, 276 F.3d 634 (D.C. Cir. 2002), and *McClanahan v. U.S. Department of Justice*, 204 F. Supp. 3d 30 (D.D.C. 2016), but fails to explain why the Court should read those cases to establish that Defendant's multiple dates of tasking for its various sub-offices should (1) be considered the dates that the searches commenced in the instant case and (2) are appropriate cut-off dates.  Dkt. 189 at 20–21.

In order to meet its burden of demonstrating a search "reasonably calculated to uncover all" records responsive to the Re-Requests, *Morley*, 508 F.3d at 1114 (quoting *Weisberg*, 705 F.2d at 1351), the start date for the TSA's Re-Request searches should have aligned with the cut-off date for its initial Request searches.[8]  The Court will, accordingly, deny the TSA's motion for summary judgment based on its failure to show that its search for records responsive to Sai's Re-Requests covered a time period reasonably calculated to uncover all responsive documents not already released in response to the initial Requests.

**E.      Adequacy of Databases and Search Terms in Searches for Records Responsive to BOS and SFO Re-Requests**

In *Sai I*, the Court held that the TSA had failed to demonstrate the absence of a genuine dispute of material fact [1] concerning whether it had "conduct[ed] a search reasonably calculated to locate responsive records with respect to the [files] searched in response to the BOS and SFO Re-Requests and [2] with respect to the search terms used to search [certain offices] in response to the BOS and SFO Requests and Re-Requests."  *Sai I*, 315 F. Supp. 3d at 265–66.

The TSA now offers the Miller declaration to fill the gaps that the Court identified in *Sai I*.  Dkt. 174-1 at 19 (citing SOF ¶¶ 53–59).

---

[8]  The Court previously explained that the Re-Requests "cover the same ground covered by the BOS and SFO Requests, but seek records created or obtained after those requests were filed." *Sai I*, 231 F. Supp. 3d at 231.  Sai subsequently clarified that the Re-Requests did not seek duplicative records that had already been released pursuant to the initial Requests.  Dkt. 93-3 at 180.  Accordingly, Sai's claim based on the Re-Requests could entitle them only to documents that have not already been produced by Defendant in response to the initial request.  Sai's assertion that the Re-Requests entitle them to records spanning as far back as the BOS and SFO incidents is incorrect.

1.    *Databases and locations searched in response to BOS and SFO Re-Requests*

The Court previously determined that the TSA's "mere[] state[ment] that the FOIA

Branch tasked the SFO, BOS, [TSA Contact Center ("TCC")],[9] and Disability Branch offices to

search for responsive records" based on the Re-Requests, while failing to "explain which

databases or locations were searched within those office," failed to establish that the agency had

conducted an adequate search of those offices.  *Sai I*, 315 F. Supp. 3d at 247.  The Miller

declaration now provides the missing details and explains that, in response to the BOS Re-

Request, BOS searched "emails contained in Outlook," "records held by the Customer Service

Manager," and "an enterprise application database that is used to track operations activities at

airports."  Dkt. 174-3 at 24–25 (Miller Decl. ¶ 66).  "With respect to the SFO Re-Request[,] .

. . SFO searched for responsive records . . . in its FOIA records, TSA computer hard drives; its

internal, shared websites; emails in Outlook; and in a performance and results information

tracking system as well as a security incident report tracking system," along with "hard copy

records."  *Id.* (Miller Decl. ¶ 67).  In response to both the BOS and SFO Re-Requests, "TCC

searched its centralized database."  Dkt. 174-3 at 25 (Miller Decl. ¶¶ 66–67).  Finally, in

response to the SFO Re-Request, the Disability Branch searched "emails contained in Outlook,

in the [Disability Branch] manager's computer, and in [its] centralized complaint tracking

database," as well as "the office's centralized hard copy file system."  Dkt. 174-3 at 25 (Miller

Decl. ¶ 67).  This additional evidence fills the gap the Court identified in *Sai I*.

---

[9]  "TCC is part of the Customer Service Branch of [the] TSA's Office of Civil Rights and
Liberties . . . .  The TCC is responsible for fielding and providing timely responses to the
traveling public via telephone and email to answer questions, provide guidance, and facilitate
problem resolution."  Dkt. 99-3 at 7 (McCoy Decl. ¶ 22).

2.    *Search terms used*

The Court also concluded in *Sai I* that the TSA had failed to "identify the search terms it used" in searching for records in "the ORD field office and [the] OLE/FAMS[10] office in response to the BOS Request; the SFO field office and Disability Branch office in response to the SFO Request; and the BOS, SFO, TCC, and Disability Branch offices in response to the Re-Requests." *Sai I*, 315 F. Supp. 3d at 247–48.

The Miller declaration now explains that, in response to the BOS Request, "ORD searched for responsive records including CCTV and electronic records held by its Coordination Center as well as its Screening and Inspection department" "using the date of the ORD incident (December 25, 2010) as the search term." Dkt. 174-3 at 25 (Miller Decl. ¶ 69). It also states that the OLE/FAMS office "lacked a record of the search terms it used in 2013 when responding to the BOS Request." *Id.* at 26 (Miller Decl. ¶ 70). OLE/FAMS therefore "conducted a new search on June 14, 2018, in accordance with their general business practice for responding to FOIA requests." *Id.* The office searched "in their incident monitoring database and the archive for that database, along with electronic log databases in which incidents may be recorded" using as search terms "Plaintiff's name, Boston, [Behavior Detection Officer] referral, American Airlines, and the date range of December 1, 2012 to January 31, 2013." *Id.* The Miller declaration attests that these searches "yielded the same incident reports that were released to Plaintiff in response to the original BOS Request" and nothing more. *Id.* The Miller declaration also explains that, in

---

[10]   OLE/FAMS is the Office of Law Enforcement/Federal Air Marshal Service, which "manages [the] TSA's law enforcement programs including the deployment of Federal Air Marshals on U.S. aircraft world-wide; the protection, response, detection, and assessment activities in airports and other transportation systems; the maintenance of [the] TSA's state of preparedness and incident management coordination training and oversight of armed pilots; and coordination of [the] TSA's explosive detection canine teams." Dkt. 99-3 at 6–7 (McCoy Decl. ¶ 19).

the agency's search in response to the SFO Request, the SFO field office used "Plaintiff's name

as well as the date of the incident . . . in combination with Delta Airline passengers" as search

terms.  *Id.* (Miller Decl. ¶ 71).  Miller further attests that the Disability Branch searched using

"Plaintiff's name, SFO, and San Francisco International Airport."  *Id.* (Miller Decl. ¶ 72).

Finally, the Miller declaration asserts that, in response to the BOS Re-Request, BOS, TCC, and

OLE/FAMS used Plaintiff's name as a search term.  *Id.* at 24–25 (Miller Decl. ¶ 66).  In response

to the SFO Re-Request, SFO, TCC, and the Disability Branch also used Plaintiff's name as a

search term, and the Disability Branch also search using "SFO" as a search term.  *Id.* at 25

(Miller Decl. ¶ 67).

       3.     *Sai's criticisms of the search locations and terms*

      Among other arguments, Sai challenges the Miller declaration for lack of foundation,

asserting that Miller does not have "personal knowledge" concerning the search process.  Sai

notes that (1) Miller has held her position as FOIA Officer "since [only] May 2018—years after

the searches in response to Plaintiff's request were completed," and (2) Miller "does not indicate

that she conducted the searches herself, or that she directly supervised individuals who did."

Dkt. 184 at 24–25.  But, in FOIA cases, the agency declarant typically "satisfies the personal

knowledge requirement" if she "attests to [her] personal knowledge of the procedures used in

handling [the] request and [her] familiarity with the documents in question," *Barnard v. Dep't of

Homeland Sec.*, 531 F. Supp. 2d 131, 138 (D.D.C. 2008) (citation and internal quotations

omitted).  She need not "participate in the search for records."  *Id.*  Here, Miller attests that she is

"responsible for overseeing the processing of all requests made to [the] TSA under FOIA" and

"familiar with [the] TSA's records systems" and that she based her declaration on "personal

knowledge [and] information made available to [her] in the performance of [her] official duties."

Dkt. 174-3 at 1 (Miller Decl. ¶¶ 1–4).  The Court concludes that Miller has laid an adequate foundation for her declaration.

Sai also argues that the TSA has failed to establish that its searches were reasonably calculated to uncover responsive records because its "search methodology is wholly inconsistent across program offices and even within program offices but across different databases."  Dkt. 184 at 25 (citing Miller Decl. ¶ 69–72 (discussing the different search terms used by different offices)).  The TSA responds that the differences in search terms correspond to the different offices tasked with searches and the unique subjects of their searches.  Dkt. 188 at 19.  For example, the TSA argues, "it would make little sense for [Chicago O'Hare Airport] to use the terms 'Boston' or 'SFO' in searching for records about the incident at [O'Hare]."  *Id.*  Although that is certainly true, some of the search term inconsistencies evident here are not so easily explained.  Some sub-offices, for example, searched using only Plaintiff's name but not the date of the relevant incident, *see, e.g.*, Dkt. 174-3 at 24–25 (Miller Decl. ¶ 66) (BOS, TCC, and OLE/FAMS searches in response to the BOS Re-Request), while others searched only using the date of the relevant incident but not Plaintiff's name, *see*, *e.g.*, Dkt. 174-3 at 25 (Miller Decl. ¶ 69) (ORD search in response to BOS Request).  Some offices stuck to those barebones search terms (just Plaintiff's name or the date of the incident), while others added additional, more targeted search terms.  *See id.* (Miller Decl. ¶ 70) (OLE/FAMS used as search terms "Plaintiff's name, Boston, [Behavior Detection Officer] referral, American Airlines, and the date range of December 1, 2012 to January 31, 2013" in response to BOS Request); *id.*  (Miller Decl. ¶ 71) (SFO field office used Plaintiff's name, date of the incident and "Delta Airline passengers" as search terms in response to the SFO Request).

Absent "a good explanation for [these] inconsistent search methodologies" or some other reason to believe that each of the searches were adequate, the Court must deny Defendant's motion for summary judgment. *Roseberry-Andrews v. Dep't of Homeland Sec.*, 299 F. Supp. 3d 9, 24–25 (D.D.C. 2018) (denying summary judgment where some searches were conducted using the plaintiff's name as a search term and others were conducted using as search terms the names of employees "whose records [plaintiff] presumably believed contained relevant documents"); *see also Tushnet v. ICE*, 246 F. Supp. 3d 422, 434–35 (D.D.C. 2017) (denying summary judgment where ICE tasked twenty-six field offices with conducting searches "result[ing] [in] widely divergent searches, with several offices using one or two search terms and others conducting more comprehensive searches using 15 or more terms"). A good explanation might posit, for example, that the TSA's search terms varied across component offices because those offices organized their records differently, used different databases, or played different roles in the underlying dispute; it might posit that some offices swept more broadly than necessary to find all responsive records; or it might posit the different search terms simply represented different paths to the same end point. The problem is that Defendants fail to offer *any* explanation for the inconsistencies; the Court, as a result, cannot determine whether the different search terms were a product of some "discernable reason" or "methodology" or were a result of mere happenstance. *James Madison Project v. Dep't of State*, 235 F. Supp. 3d 161, 169 (D.D.C. 2017). Most importantly, the Court cannot assess on the present record whether a search based on the date of the incident was equally likely to locate responsive records as a search based on Sai's name—and vice versa. In short, the Court needs to know more before it can find, as a matter of undisputed fact, that the proper search terms were used by each of the component offices.

Finally, Sai argues that the TSA has failed to offer sufficient information about its searches to permit the Court to assess whether they were reasonable. *Id.* at 26–27. Sai, in particular, claims that the TSA has failed to provide any "indication of what each [component's] search specifically yielded." *Id.* at 27 (quoting *Reporters Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 403 (D.C. Cir. 2017)). The TSA disputes the premise of this contention, noting that the McCoy declaration, Dkt. 99-3, offered in support of its previous motion for summary judgment, already described the yields of the various searches. Dkt. 188 at 19; *see, e.g.*, Dkt. 99-3 at 6 (McCoy Decl. ¶ 15) ("The [BOS] search yielded records of incident statements from TSA employees, responsive emails, one letter from TSA New England Field Counsel to Plaintiff, and one CCTV video of the incident."); *id.* (McCoy Decl. ¶ 17) ("The [ORD] search yielded a single entry in a database used to trace checkpoint incidents regarding the encounter described in Plaintiff's request."). Having again reviewed the McCoy declaration, the Court agrees that the TSA has already provided this information.

The Court, accordingly, concludes that, although the TSA has now carried its burden to "describe what records were searched, by whom, and through what processes," *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 91 (D.D.C. 2009) (quoting *Steinberg*, 23 F.3d at 551), its failure to explain the inconsistencies in the search terms used by its component offices mean that it has yet to demonstrate that it "conducted a search reasonably calculated to uncover all relevant documents." *Morley*, 508 F.3d at 1114 (quoting *Weisberg*, 705 F.2d at 1351).

## F.     Withholdings Pursuant to FOIA Exemptions

The Court concluded in *Sai I* that it was unable to determine, on the record then before it, whether (1) the "TSA redact[ed] information pursuant to Exemption 3 that [the TSA] . . . released to the ACLU prior to responding to Sai's Policies Request," and (2) the "TSA properly

redact[ed] factual information responsive to Sai's SFO Request pursuant to Exemption 5." *Sai I*, 315 F. Supp. 3d at 266.  The Court also concluded that the TSA had not carried its burden of establishing that "the redacted contact information for TSA contract employees, a DHS Office of Chief Counsel employee, and a TSA Disability Branch employee" and similar information regarding "TSA employees contained in policy documents implicate a 'substantial privacy interest' under Exemption 6." *Id.*

According to the TSA, the Miller declaration remedies these shortcomings.  Despite contesting many elements of the TSA's renewed motion for summary judgment, Sai does not respond to the agency's factual assertions or arguments concerning these withholdings, *see* Dkt. 185; Dkt. 188 at 5.  It is nevertheless "incumbent on the Court to ensure itself that Defendant is entitled to summary judgment." *Kirkland v. McAleenan*, No. 13-194, 2019 WL 7067046, at *25 n.17 (D.D.C. Dec. 23, 2019) (noting the tension between the Courts' usual practice of finding unopposed elements of a motion conceded and the D.C. Circuit's mandate in *Winston & Strawn, LLP v. McLean*, 843 F.3d 503 (D.C. Cir. 2016), to adjudicate the merits of unopposed motions for summary judgment).

First, the Court concludes that the Miller declaration "establishes that the releases to Sai . . . predate[d] the releases to the ACLU." Dkt. 174-1 at 19 (citing SOF ¶¶ 60–62); Dkt. 26–27 (Miller Decl. ¶¶ 74–76).  The TSA released the records in question "between two and nine months after releasing the relevant pages to Plaintiff." Dkt. 174 (Miller Decl. ¶ 76).  Because the official disclosure doctrine focuses on whether the specific information had issue had been previously disclosed by the agency, *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990), "[i]t does not . . . apply to information that was confidential at the time the agency responded to the plaintiff's FOIA request and was only subsequently officially released," *Sai I*, 315 F. Supp. 3d at

254.  The TSA, accordingly, is entitled to summary judgment with respect the records subsequently released to the ACLU.

Second, the Court is persuaded that the TSA properly invoked the deliberative process privilege, despite Sai's previous contention that the withheld information was factual and not deliberative, *Sai I*, 315 F. Supp. 3d at 255, 257.  The Miller declaration now provides a more complete description of the information withheld, which included TSA "employees' summarized interpretations of particular segments of the CCTV video of the BOS incident and the accompanying follow-up questions from [Disability Branch] employees directed to the TSA field personnel who were involved in or witnessed the incidents . . . seek[ing] explanations and motivations for decisions that the TSA field personnel made or actions they took during the incident," along with the field personnel's responses to those questions.  Dkt. 174-3 at 28 (Miller Decl. ¶ 80).  The Miller declaration asserts that this information was "essential to the deliberative process leading up to the agency's decision with regard to the Section 504 administrative complaint" that Sai lodged against Defendant.  *Id.*

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorand[a] or letters that would not be available by law to a party other than an agency in litigation with the agency," 5 U.S.C. § 552(b)(5), and "incorporates the privileges that the [g]overnment may claim when litigating against a private party, including the . . . deliberative process privilege," *Abtew v. U.S. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015).  To qualify for withholding under this privilege, "information must be both 'predecisional' and 'deliberative.'"  *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992).  Unlike recommendations, deliberations, or preliminary analyses, facts "generally must be disclosed." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 39 (D.C. Cir. 2002) (citation omitted).

But, as the Court previously observed, "'the disclosure of even purely factual material may so expose the deliberative process within an agency" that the material is appropriately held privileged.'" *Sai I*, 315 F. Supp. 3d at 257 (quoting *Petroleum Info. Corp.*, 976 F.2d at 1434); *id.* (citing numerous cases engaging in such analysis).  Here, because the unrebutted evidence shows that the material withheld pursuant to Exemption 5 reveals the predecisional impressions, interpretations, beliefs, and opinions of agency staff, Dkt. 174-3 at 28–31 (Miller Decl. ¶¶ 79–83), the Court will grant summary judgment in the TSA's favor with respect to these withholdings.

Third, the TSA asserts that the Miller declaration "describes in detail why the redacted names and contact information of TSA employees implicates a substantial privacy interest" and "how the release of the redacted information would constitute a clearly unwarranted invasion of privacy" and "subject identified individuals to the risk of annoyance or harassment."  Dkt. 174-1 at 20; *see* 5 U.S.C. § 552(b)(6) (permitting withholding when disclosure of information "would constitute a clearly unwarranted invasion of personal privacy").  Miller attests that revealing the withheld information "would make it extremely easy to identify and contact those employees, thereby opening those employees to unnecessary harassment and abuse," particularly given Sai's "demonstrated practice of publishing information from FOIA and Privacy Act requests on the internet," and marches through each redaction explaining the particular employees' privacy interests at stake and balancing the minimal public interest in the disclosures of their corresponding names, contact information, and photos.  Dkt. 174-3 at 31–42 (Miller Decl. ¶¶ 84–102); *see also Sai I*, 315 F. Supp. 3d at 263 (listing withholdings that the Court did not consider sufficiently explained under Exemption 6).  The Court concludes that the Miller declaration, which fills the gaps identified in *Sai I* concerning the "position held by the relevant employee,

the role played by that employee, the substance of the underlying agency action, [and] the nature

of the agency record at issue," *Sai I*, 315 F. Supp. 3d 262, has established that the withholdings

pursuant to Exemption 6 were proper. *See Schoenman v. FBI*, 576 F. Supp. 2d 3, 8–9 (D.D.C.

2008) (discussing the balancing under Exemption 6).

## G.     Other Requested Information

In the final three-sentence paragraph of their cross-motion for partial summary judgment,

Sai asserts that the TSA has neither provided nor offered an explanation for its withholding of

the following records: "(1) an index of metadata withheld; (2) complete email chains; (3) emails

stemming from inter/intra-agency referrals; (4) any explanation for extra redactions noted; and

(5) withheld email attachments."  Dkt. 185-1 at 8 (citing Dkt. 166).  Sai requests "the production

of these documents."  *Id.*  Because these claims for additional records neither fall within the ten

areas that the Court's earlier opinion highlighted as inadequacies in Defendant's previous motion

for summary judgment, *see Sai I*, 218 F. Supp. 3d at 265–66,  nor are sufficiently developed in

Sai's cross-motion for partial summary judgment to allow the Court to evaluate them, the Court

will deny Sai's request for production this additional information.  *See LaShawn A. by Moore v.

Barry*, 144 F.3d 847, 852 n.6 (D.C. Cir. 1998) (arguments that are insufficiently developed may

be deemed waived); *see also Brown v. Paulson*, 597 F. Supp. 2d 67, 70 n.1 (D.D.C. 2009)

(refusing to "address the plaintiff's arguments that are inapplicable to the issues at hand" or

"beyond the scope of this litigation").

## CONCLUSION

For the foregoing reasons, the TSA's renewed motion for summary judgment, Dkt. 174,

is hereby **GRANTED** in part and **DENIED** in part, and Plaintiff's cross-motion for partial

summary judgment, Dkt. 185, is hereby **DENIED**.  It is further **ORDERED** that the parties shall

file a joint status report on or before July 1, 2020, proposing appropriate next steps in this

litigation in accordance with this memorandum opinion and order.

      **SO ORDERED**.

<u>/s/ Randolph D. Moss</u><br>
RANDOLPH D. MOSS<br>
United States District Judge

Date:  June 12, 2020